No. 25-2352

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

NATIONAL FAIR HOUSING ALLIANCE, *et al.*,

*Plaintiffs-Appellants,*

v.

BANK OF AMERICA, N.A., *et al.*,

*Defendants-Appellees.*

Appeal from the
United States District Court for the District of Maryland,
(The Honorable Stephanie A. Gallagher)

**JOINT APPENDIX**

**VOLUME IV of XVII**

Jessica P. Weber
Andrew D. Freeman
Lauren A. DiMartino
Alisha Jarwala
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel: (410) 962-1030

*Counsel for Plaintiff-Appellants*

Janell M. Byrd
Morgan Williams
Sasha Samberg-Champion
National Fair Housing Alliance
1331 Pennsylvania Avenue, NW, Suite 650
Washington, DC 20004
Tel: (202) 898-1661

William M. Jay
Keith Levenberg
GOODWIN PROCTER LLP
1900 N St., N.W.
Washington, D.C. 20001
(202) 346-4000

Brooks R. Brown
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, Mass. 02210
(617) 570-1000

Ava Lias-Booker
Melissa Martinez
MCGUIREWOODS LLP
500 E. Pratt St., Ste. 1000
Baltimore, Md. 21202
(410) 659-4400

*Additional counsel listed on next page*

*Continued from front cover*

Michael B. Posner
Posner PLLC
1661 Connecticut Avenue, NW, Suite 800
Washington, DC 20009
Tel: (202) 670-3815

*Counsel for Plaintiff-Appellant National Fair Housing Alliance*

Brian Schmalzbach
MCGUIREWOODS LLP
800 E. Canal St.
Richmond, Va. 23219
(804) 775-1000

*Counsel for Appellee Bank of America, N.A.*

Celena R. Mayo
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
150 E. 42nd St.
New York, N.Y. 10017
(212) 490-3000

*Counsel for Appellee Safeguard Properties Management, LLC*

# TABLE OF CONTENTS

Page

**VOLUME IV (Public Appendix)**

Exhibit 3 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Declaration of Deavay Tyler (ECF 183-3)……………………..…..JA1329

Exhibit 4 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Joe Iafigliola Deposition Transcript Excerpts (ECF 183-4)………..JA1396

Exhibit 7 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Declaration of Jacob Rugh (ECF 183-7)……………………...…JA1439

Exhibit 8 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Bank of America 30(b)(6) (Priesmeyer) Deposition Transcript Excerpts (ECF 183-8)……………………………………………………..JA1548

Exhibit 9 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, David Skanderson Deposition Transcript Excerpts (ECF 183-9)….JA1565

Exhibit 10 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Local Boarding Ordinances (ECF 183-10)…………..…JA1595

Exhibit 11 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Jacob Rugh Deposition Transcript Excerpts (ECF 183-11)……………………………………………….…..JA1601

Exhibit 12 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Jacob Rugh Deposition Transcript Excerpts (ECF 183-12)…………………………………….………..JA1631

Exhibit 13 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Bank of America 30(b)(6) (Silvey) Deposition Transcript Excerpts (ECF 183-13)…………………………..………..JA1646

Exhibit 14 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Safeguard 30(b)(6) (Greenbaum) Deposition Transcript Excerpts (ECF 183-14)……………………………………….……JA1666

Exhibit 35 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Declaration of Chevelle Busnell (ECF 183-35)…………..JA1685

Exhibit 52 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Declaration of Justin Chappell (ECF 183-52)…...………JA1690

Exhibit 53 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Brandon Silvey Deposition Transcript Excerpts (ECF 183-53)……………………………………………..……….JA1695

Exhibit 55 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Sergio Montelongo Deposition Transcript Excerpts (ECF 183-55)………………………………………………………..JA1706

Exhibit 56 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Deavay Tyler Deposition Transcript Excerpts (ECF 183-56)……………………………………………….…….JA1743

Exhibit 58 to Plaintiffs' Opposition to Defendants' Motion for Dismissal (ECF 183-58)……………………………………………….………JA1749

Exhibit 62 to Plaintiffs' Opposition to Defendants' Motion for Dismissal (ECF 183-62)……………………………………...……………..JA1757

Exhibit 79 to Plaintiffs' Opposition to Defendants' Motion for Dismissal, U.S. Dep't Housing & Urban Dev., Property & Preservation Requirements and Cost Procedures (ECF 183-79)……………………………………..JA1759

Exhibit 91 to Plaintiffs' Opposition to Defendants' Motion for Dismissal, Bank of America's Supplemental Response to Interrogatory No. 13 (ECF 183-91)……………………………………………………….JA1783

Exhibit 93 to Plaintiffs' Opposition to Defendants' Motion for Dismissal, Declaration of Lisa Rice (ECF 183-93)…………………………….JA1790

Bank of America's Memorandum in Support of Motion to Strike Expert Reports (ECF 206-1) (Sept. 12, 2022)…………………………...……JA1805

Exhibit 18 to Bank of America's Memorandum in Support of Motion to Strike Expert Reports (ECF 206-20)……………………….…………….JA1846

Plaintiffs' Opposition to Bank of America's Motion to Strike Expert Reports (ECF 218) (Oct. 14, 2022)……………………………………..…………JA1851

Bank of America's Reply in Support of Motion to Strike Expert Reports (ECF 223) (Nov. 10, 2022)……………………………….………..JA1892

Memorandum Opinion (ECF 226) (Jan. 23, 2023)………..………………..JA1919

Memorandum Opinion (ECF 229) (Feb. 8, 2023)……………………..…….JA1935

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | * | |
| | * | |
| Plaintiffs, | | |
| v. | * | Civil Action No. CCB-18-1919 |
| BANK OF AMERICA, N.A., *et al.*, | * | |
| Defendants. | * | |

* * * * * * * * * * * * *

**DECLARATION OF DEAVAY TYLER**

I, Deavay Tyler, am over the age of 18 years and competent to testify as to the matters set forth in this Declaration. All statements herein are based on my personal knowledge.

1. Attached hereto as Exhibit A is a true and accurate copy of my January 7, 2022 expert report in the above-referenced matter.

2. Attached hereto as Exhibit B is a true and accurate copy of my March 9, 2022 supplemental expert report in the above-referenced matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 8, 2022

Deavay Tyler

# EXHIBIT A

**Expert Report of Deavay Tyler**
*National Fair Housing Alliance, et al. v. Bank of America, N.A., et al.*, No. 18-1919 (D. Md.)

## I. Introduction and Qualifications

1. I have been retained as an expert witness by Brown, Goldstein & Levy, counsel for the plaintiffs in the above-captioned case.

2. I worked in the property preservation and maintenance field for just over nine years. From April 2008 to August 2017, I served as the Executive Vice President and Chief Financial Officer for A&D Property Services, Inc., a property preservation and maintenance company servicing over 8,000 properties in the Greater Chicagoland Area (defined as the City of Chicago (Cook County), seven collar counties in Illinois (Lake, Will, DuPage, Kane, Kankakee, Iroquois, and McHenry), and two nearby counties in northwest Indiana (Lake and Porter)).

3. A&D Property Services worked as a prime contractor for government-sponsored enterprises (GSEs), banks, and municipalities that were responsible for preserving and maintaining properties after borrowers had defaulted on their loans and after foreclosure, when they became real estate owned (REO) properties or properties awaiting conveyance back to the U.S. Department of Housing and Urban Development (HUD). A&D Property Services also occasionally worked as a subcontractor for other vendors with contracts for property preservation and maintenance services for GSEs, banks, and municipalities.

4. For about four months (from August 2011 to December 2011), A&D Property Services worked as a subcontractor to Midwest Metro, then a prime property maintenance and preservation contractor to Bank of America. We ultimately decided to stop working with Midwest Metro and Bank of America for reasons described below.

5. In my role as Executive Vice President and Chief Financial Officer for A&D Property Services, I had both administrative and operational duties. I managed the company's

finances, negotiated contracts, led and oversaw customer audits of, among other things, quality assurance of property preservation and maintenance work, oversaw office operations, and assisted with field operations. My work overseeing office operations included managing the flow of work orders, initiating and completing work orders, communicating with brokers, banks and municipalities, and overseeing internal inspections. Through my work with A&D Property Services for nearly ten years, I became very familiar with the standards and procedures governing property preservation and maintenance throughout the mortgage industry, across different investors and servicers.

6. My resume is attached as Exhibit 1.

7. Based on my industry experience, I propose to offer expert opinions on the preservation and maintenance of REOs and post-foreclosure HUD properties, including industry standards, policies, and procedures.

## II. Materials Reviewed and Considered

8. In preparation for forming my opinions in this matter, I reviewed the materials sent to me from Brown, Goldstein & Levy. These materials are listed in Exhibit 2. If I am provided with additional or different information, I reserve the right to revise my analysis and opinions based on such new information.

## III. Summary of Opinions

9. After consideration of the materials listed in Exhibit 2, and based on my years of industry experience, it is my opinion, to a reasonable degree of professional certainty within my field of expertise, that

a. Many of the criteria that Plaintiffs assessed for each property in their investigation reflect the type of routine property preservation and maintenance work that property

preservation and maintenance vendors like Defendant Safeguard Properties Management, LLC ("Safeguard") should be conducting regularly, regardless of which investor owns the property.

b. Plaintiffs correctly documented examples of substandard, inadequate, incomplete, or absent preservation and maintenance services performed on REOs and post-foreclosure HUD properties.

c. Many of the criteria Plaintiffs assessed in their investigation are items that should have been fixed or otherwise resolved by Bank of America's preservation and maintenance vendors regardless of the condition of the property when it became an REO or post-foreclosure HUD property.

d. Bank of America's and Safeguard's quality control to ensure proper maintenance of all REO properties was insufficient. This is particularly evident in areas where they apparently believe neighbors are less likely to complain.

e. The total amount of money spent on properties is not an indication that properties were better maintained than properties where less money was spent. In fact, it likely has more to do with how a long a property was an REO or post-foreclosure HUD property in the bank's inventory. It is also a strong indicator that issues with properties in the bank's inventory went unaddressed for longer periods of time, compounding problems that, if they had been addressed in a timely manner, would have prevented the properties from falling into disrepair and prevented even more costly and more damaging circumstances. Safety, security, and/or preservation issues going unreported, being ignored, or being addressed in a substandard fashion typically create or compound issues that would have been preventable if services had been performed in a timely, correct, and adequate

manner. In addition, Property Preservation and Maintenance ("P&M") vendors often complete frivolous, "low hanging fruit" work that is part of the $1,000 allowable, which they do not need to seek prior authorization to perform. Therefore, the vendors can hit the maximum limit on the allowable but fail to perform necessary preservation and maintenance work on the property.

f. Plaintiffs' decision to review each property in their investigation once, instead of multiple times, would not have affected the results showing disparities between majority white communities and majority African-American or Latino communities.

## IV. Discussion

### A. Overview of Property Preservation and Maintenance Industry

10. In its simplest terms, property preservation is about maintaining vacant properties so that they are safe, secure, and preserved. If managed properly, managed properties should not lose value while in a P&M vendor's portfolio.

11. Property preservation and maintenance vendors can be individuals or companies hired by, in most cases, a bank, municipality, or lender to maintain vacant properties on its behalf.

12. Once a property is verified as vacant, there is a standard set of initial services the P&M vendor should complete. These services include:

a. **Rekey/resecure:** Within 24 hours of the property being verified as vacant, the P&M vendor should change the locks and ensure that the property is properly secured to prevent unauthorized individuals from entering the property.

b. **Winterization:** Within 24 hours of the property being verified as vacant, and in seasons when and locations where pipes are in danger of freezing, the P&M vendor

should ensure that the property can withstand cold winter temperatures by extracting all of the water out of the plumbing system and adding environmentally friendly antifreeze to the waste lines (drainage system).

c. **Total property trashout:** Within three-to-five days of the property being verified as vacant, the P&M vendor should remove all personal property and trash from the property—both on the inside and exterior—leaving the property in "broom swept" condition.

d. **Initial lawn maintenance:** Within three-to-five days of the property being verified as vacant, the P&M vendor should ensure the grass is cut and shrubs are trimmed.

e. **Initial interior clean:** Within three-to-five days of the property being verified as vacant, the P&M vendor should ensure that the interior of the property is clean.

13. In addition, while a property remains in a P&M vendor's inventory, but after the initial services, the vendor should perform two types of routine maintenance:

a. **Routine lawn maintenance:** Weekly, every other week, or twice a month, depending on grass growth in the state or region, the P&M vendor should ensure that the grass is cut and shrubs are trimmed.

b. **Monthly interior clean:** Each month, the P&M vendor should clean the interior of the property.

14. In addition to initial services and routine services, while a property remains in a P&M vendor's inventory, ancillary services may be required to prevent or address safety, security and preservation issues that are present or arise on the property. Depending on the severity of the issue and/or the scope of services the P&M vendor provides, these ancillary



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

services may or may not require a bid approval before the P&M vendor can address the underlying issue(s).

15. Every time the P&M vendor performs work on a property, the condition of the property upon arrival and upon departure, as well as the outcome of the visit, should be properly documented, typically with date stamped photographic evidence. This includes but is not limited to:

a. Noting the condition of the property and condition of the area(s) to be serviced before services are performed, the condition of the property and the condition of the area(s) to be serviced after the services have been performed, and, in certain cases, photographic evidence of the services as they are being performed (called "during" photos) to demonstrate that the P&M vendor took proper steps to complete the services.

b. If the ordered service(s) could not be completed or performed, the P&M vendor should document the condition of the property and the condition of the area(s) to be serviced through photographic evidence demonstrating why the service(s) were not able to be completed or performed at the time of the visit. This documentation should also include an explanation and adequate photographic evidence of what is needed to schedule and complete the needed service on the next visit.

c. The P&M vendor should also identify any initial or routine services that appear to not to have been completed at the time of the visit.

d. Most importantly, the P&M vendor should identify and document any safety, security, or preservation services needed to be ordered on the property.

16. P&M vendors should maintain communication with all relevant stakeholders while working on properties. These include the listing real estate agents, inspectors (both those

internal to the P&M vendor and those external, from the bank or bank's inspection partners, broker's office, or municipality), municipalities, and the lenders.

17. In addition, stakeholders who are employees or contractors of the bank (including but not limited to P&M vendor employees and subcontractors, listing agents (and their staff), inspectors, and bank representatives (including asset managers)) should, during every visit to the property or in every review of property records, ensure that the property is safe, secure, and preserved, including the following: (A) They should check to make sure that all services for which the property is eligible have been adequately performed and that the performance was properly documented; (B) they should report any safety, security, or preservation issues present at the property, in addition to any incomplete services for which the property is eligible; and (C) they should check for any other issues that could cause the property to lose value or create a code violation.

18. There is a term in the property preservation industry called the "three-legged stool," which refers to the collaborative efforts that should exist between the bank, listing agent, and P&M vendor to ensure that every property under their management is safe, secure, and preserved. Open lines of communication between the three legs of this stool are critical to addressing any incomplete services or services not ordered that the property is eligible to receive, in addition to addressing any safety, security, or preservation issues found at a property.

19. When all the relevant stakeholders or "legs of the stool" are properly doing their jobs, someone should be reviewing the condition of the property at least every week.

20. P&M vendors, and the other "legs of the stool," must ensure that the properties under their management are not in violation of local ordinances. Even if a property comes into the P&M vendor's inventory with existing code violations, the P&M vendor must work to cure

the violation; this is not considered an improvement that might otherwise be disallowed. The main types of violations P&M vendors often must work to address are: exterior debris, exterior lawn maintenance, and compromised entry points (doors and windows).

**B. Plaintiffs' investigation criteria reflect industry standards.**

21. I have reviewed the criteria Plaintiffs used in their investigation to rate the exterior maintenance of REO and post-foreclosure HUD properties. Many of the criteria are consistent with the types of maintenance required of P&M vendors in this industry, regardless of which investor holds the loan.

22. For example, grass and shrubbery should not be overgrown. They are subject to routine maintenance. If a P&M vendor, a listing agent, or bank representative sees overgrown grass or shrubs when visiting or viewing photos of the property, that problem that should be quickly addressed.

23. Issues like broken or unsecured doors and locks are also considered critical safety and security issues that must be addressed within 24 hours. These types of issues do not require bids/work orders and should be resolved as quickly as possible by the P&M vendor. When I worked at A&D Property Services, for example, we would instruct our vendors to use boards they traveled with to quickly secure a broken door, window, or other accessible/breachable entry point until a more permanent fix could be arranged.

24. I have reviewed the Expert Report of Marcel A. Bryar (November 5, 2021), including Exhibit 5 to his report, in which he opines on whether NFHA's REO evaluation criteria are within industry standards. My responses to Mr. Bryar's opinions in Exhibit 5 to his report are attached to my report as Exhibit 3. To summarize, Mr. Bryar correctly acknowledges that several criteria NFHA evaluated are within the P&M vendor's control under industry standards. He

incorrectly asserts that certain items are either outside of or only sometimes within P&M vendors' control.

25. For example, he is incorrect that accumulated mail is not something a P&M vendor would be responsible for under industry standards. Although P&M vendors may not open, dispose of, or remove official mail from the property, they should dispose of advertisements and handbills, while placing "official" mail inside the property in a secure location and notifying the listing broker and/or bank as to the location of the mail inside the property. The accumulation of mail, advertisements, and handbills is a safety and security concern because it signals that the property is vacant and thus exposes the property to a higher likelihood of unauthorized break-ins, unauthorized entries, and other criminal activities. It is a generally accepted practice in the industry to set a process among the parts of the "three-legged stool" on how to properly handle accumulated "official" mail, while mitigating the risk of having accumulated mail, advertisements, and handbills unnecessarily expose the property to criminal activities.

26. Mr. Bryar also asserts that certain criteria would only sometimes be within the scope of the P&M vendor's duties, without recognizing that if an item creates a health or safety risk, it must be remediated as soon as possible. For example, he states that fixing damaged steps or handrails would be within the scope of a P&M vendor's duties, except for FHA properties prior to February 2016, in which case, he claims, this repair would have been outside the vendor's scope of work. Yet Mr. Bryar ignores that damaged steps and handrails typically pose a health and safety risk that the P&M vendor must resolve immediately, regardless of the investor. Similarly, he states that holes would only have to be addressed if water could leak through them to inside the home. Yet holes are often threats to health, safety, and the preservation of the home,



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

which would bring their remediation within the scope of the P&M vendor's work. For example, rodents, insects, or water can enter a home through a small hole, while a large hole can permit unauthorized access by animals or even people. Furthermore, P&M vendors should not wait until water leaks into the property to address a hole; it is typically foreseeable that a hole will lead to property damage and should therefore be addressed by the P&M vendor.

**C. Plaintiffs correctly documented examples of substandard, inadequate, incomplete, or absent preservation and maintenance services performed on REOs and post-foreclosure HUD properties.**

27. In the sampling of Plaintiffs' inspection reports and photographs that I reviewed, along with Safeguard's responses to those inspection reports, I saw substandard service levels, inadequate service levels, and frivolous/unnecessary services performed.

28. The photographs and documents I reviewed supported the findings made in the Plaintiffs' inspection reports. For example, Plaintiffs' inspection report for 4878 West Chesterwood Court Memphis, TN 38118 found overgrown grass and leaves, overgrown or dead shrubs, damaged windows, and unaddressed profane and racist graffiti. (*See* SG00487203). The associated photographs, SG00487185–202, exhibit conditions consistent with those findings. In addition, the photos from Safeguard's own contractors show some of the same issues Plaintiffs noted, such as the profane graffiti. (SG00487213). Plaintiffs' findings and Safeguard's own documentation show substandard, inadequate, and incomplete property preservation and maintenance. Industry standards and Safeguard's Work Order require that the grass and shrubs be trimmed and that leaves be removed. (SG00487207 (shrub trimming and leaf removal); SG00487206 (grass re-cut info)). Industry standards require that the damaged window be boarded or otherwise secured. The failure to secure the property increases the risk that an unauthorized occupant or animal may enter the property and/or rain or other precipitation may

damage the property, both of which would decrease the value of the property and violate a P&M vendor's mandate that a property be safe and secure. Industry standards require graffiti, especially profane and racist graffiti like that at this property, to be addressed, as it creates a safety and security risk. In addition, profane graffiti on the exterior (or interior) of the property was part of Bank of America's $1,000 allowable—a pre-authorized monetary limit for completing specific critical preservation and maintenance work—for this property.[1] (SG00487209). Yet Safeguard's P&M vendor failed to address it, or even flag it as something to be addressed at a later date.

29. Safeguard contends that the overgrown grass and shrubbery at 4778 West Chesterwood Court were trimmed and the dead leaves were removed on May 25, 2013—four days after NFHA's visit date (SG00487214)—but Safeguard's vendor did not provide photos of the rear of the property, so there is no way to confirm that these lawn services were indeed completed.[2] (*See* SG00487211–13; *see also* SG00487192–98 (NFHA's photos of the rear of the property)). Furthermore, it is not clear why the grass and shrubbery would have been overgrown

---

[1] An additional example of unaddressed profane and racist graffiti is present at 4306 Knight Arnold Road, Memphis, TN (SG00487673). Safeguard contends that it "did not receive a work order from BOA at this property from 06/16/15 until 04/28/16. Safeguard cannot complete work unless it is requested by its clients. Safeguard provided a bid to address the graffiti on 11/13/14, but work was never approved by BOA." (SG00487708). This graffiti would have been covered in the $1,000 allowable, but, instead, Safeguard's contractor submitted a bid that Bank of America never approved. It is unclear why Bank of America's failure to approve a bid from November 13, 2014, would result in the graffiti remaining on the property for close to two years, when through the Safeguard QA process, Safeguard's photo requirements, and the fact that a contractor should have been doing lawn maintenance every other week, there were several occasions for Safeguard to identify and address this issue between then and Plaintiffs' visit on April 19, 2016. This is especially the case because graffiti presents a safety and security concern.

[2] I agree with Mr. Bryar that dead grass is not an issue that a P&M vendor would typically address, as seeding new grass or sodding a property would be considered an improvement, not preservation and maintenance.

in the first place had Safeguard properly been performing lawn maintenance work at the required regular intervals. With regard to the profane and racist graffiti, Safeguard acknowledges that the May 24, 2013 work order from Bank of America requested that any profane graffiti be covered, but that "[t]he contractor did not report that graf[f]iti was covered or that it contained profanity." (SG00487214). Yet the Safeguard grass-cut vendor's photos clearly show the graffiti on the property as of May 25, 2013 (SG00487211–13), so Safeguard's Quality Assurance ("QA") either did not review the photos of the completed work on the property or overlooked the graffiti during its review. Finally, Safeguard asserts that the work order instructions directed its contractor to address any broken windows, but that the contractor did not report it to Safeguard or address it. (SG00487214). Safeguard essentially points the finger at its contractor for not doing what it was directed to do, but Safeguard fails to address the fact that its QA procedures did not catch an obvious maintenance issue that needed to be addressed to ensure that the property was secure, to avoid any safety issues with the broken glass, and to prevent any preservation issues with potential water damage and unauthorized entry to the property. That the window is double-paned and on the second floor does not matter; the glass should have been removed and the window boarded in accordance with industry standards.

30. Another example of substandard service is found in Plaintiffs' inspection report for 1367 Hyde Park Boulevard, Memphis, TN 38108, SG00486933, finding exterior trash, damaged windows, holes, wood rot, and evidence of mold or mold growing conditions. The associated photographs, (SG00486915–32, 486934, 486940), exhibit conditions consistent with those findings. Plaintiffs' findings and Safeguard's own documentation show substandard, inadequate, and incomplete property preservation and maintenance. For example, although the windows are boarded, which is an appropriate temporary solution to securing and preserving the



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

property, a review of the photographs documenting work performed by the P&M vendor to board the windows shows that they are not securely boarded, as there is light coming in through gaps around the board. (SG00486945–50, SG00487072, SG00487085, SG00487091). Such gaps are breachable openings that can allow for unauthorized access to the property—by water, insects, animals, or people. Nevertheless, the P&M vendor certified that this work was completed to the specifications in Safeguard's work order. (SG00487110).

31. Safeguard asserts that on May 25, 2013, a Safeguard inspector reported the trash NFHA photographed and opened a work order to have the trash removed, which was completed on May 29, 2013—eight days after NFHA's visit. (SG00487142). However, based on NFHA's photos, the level of decomposition of the leaves shows that exterior trash had not been addressed in the three months since the property had come into Safeguard's inventory (February–May 2013), either during recurring lawn maintenance or during the initial trash-out of the property. (SG00486931). With regard to the holes Plaintiffs noted, Safeguard only addressed the hole left in the brick of the house from an air conditioning unit that had been removed, maintaining that it is unclear from NFHA's photos that the holes go through to the interior of the home.[3] (SG00187142). Safeguard did not, however, address the two holes in the house that breach the

---

[3] In a similar example, at 831 N. Avalon Street, Memphis, TN, Safeguard contends that Plaintiffs' photos "do not support a condition that Bank of America would request Safeguard to address." (SG00495687). But the photos show holes that are breachable openings on the property (SG00495646, SG00495652) that should have been addressed as preservation issues because they would permit water, insects, and animals to enter the property. Similarly, at 11094 Silsbe Lane, Memphis, TN, Safeguard maintains that "NFHA's photos are taken from ground level and do not support that the gutters are obstructed." (SG00486843). Yet Plaintiffs' photo shows that the gutter has been obstructed for so long that a sapling is growing out of it. (SG00486835). Removing obstructions from gutters is within Safeguard's scope of work, and Safeguard's failure to address this obstruction could lead to water damage to the property.



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

interior and are a preservation issue. (SG00486921). These holes are breachable entry points to the property for insects, small animals, and water. Similarly, Safeguard contends that NFHA's photos "support[t] that there is dirt on the side of the house but no mold is present" (SG00187142) and that Bank of America "would not request that Safeguard address this damage at the property." (SG00187142). Although P&M vendors typically do not address dirt or mold on the exterior of a property, Safeguard overlooks the mold growth on the rear door of the property that could provide a breachable opening to the property, (*see* SG00486929), and therefore should have been addressed promptly as it is a preservation issue.

32. A P&M vendor (or the listing agent or bank representative) should have noticed these issues and appropriately addressed them. Given that one of the "three legs of the stool" should be visiting the property or viewing adequate photos of the property each week, the fact that these conditions existed more than 30 days after the property entered Bank of America's REO inventory[4] and the fact that Safeguard has marketability work orders going out monthly to its subcontractors, strongly indicates that this property was not being properly maintained in accordance with industry standards, Bank of America's written policies and procedures, Safeguard's policies and procedures, and/or instructions clearly articulated in the property-specific work order. Not only did the contractor assigned to the work orders discussed above perform substandard work, but it should also be noted that both the Safeguard and Bank of America QA process and employees who reviewed these orders, associated photos, and bid requests failed to identify these unaddressed issues, which allowed them to continue to go unaddressed.

[4] Rule 30(b)(6) Dep. of Lindsay Augustine (Sept. 28, 2021), 192:16–25.

33. Furthermore, the health, safety, and security deficiencies cataloged—mold, improper/inadequate boarding, a broken window, and profane and racist graffiti—at 4878 West Chesterwood Court and 1367 Hyde Park Boulevard in Memphis, TN are all of the type that should have been addressed within 24 hours or immediately by the P&M vendor and/or its subcontractors. These items should have been noticed and immediately flagged for correction by any of the "three legs of the stool": the P&M vendor, listing agent, or bank representative.[5]

**D. Plaintiffs' investigation criteria are not dependent on initial property conditions.**

34. Although REOs and post-foreclosure HUD properties enter P&M vendors' inventories in different conditions, many of the criteria Plaintiffs assessed in their investigation are items that Bank of America's P&M vendors should have addressed to properly preserve and maintain the property, within thirty days of the property entering their inventory.

35. The curb appeal criteria Plaintiffs assessed (trash, handbills and advertisements, overgrown grass and shrubbery, and excessive leaves) are all items that the P&M vendor should address, regardless of the condition of the property at the time it enters their inventory.

36. For certain safety and/or security issues (*e.g.*, breachable/accessible entry points

[5] An additional example of unaddressed safety issues is present at 1648 South 63rd Street, West Allis, WI, where there were stairs without handrails and stairs with inadequate handrails (a simple 2x4 construction). (SG004871146, SG00487155, SG00487157). Safeguard contends that Bank of America "requested that stairs and handrails be replaced if necessary. Contractor did not deem[ ] this condition necessary to be addressed." (SG00487162). Yet a review of Plaintiffs' photos shows that the back stairs have inadequate handrails, and the side stairs have no handrails. (*See* SG004871146, SG00487155, SG00487157). These safety issues should have been addressed immediately, especially because Bank of America had requested that the stairs and handrails be replaced. Even if Bank of America had not made this request, the work to add handrails and reenforce the existing handrails likely would have been covered by the $1,000 allowable. (*See* SG00487135 (listing allowable to "[r]epair/replace any missing or loose handrails")). Safeguard's failure to address these safety issues could have led to a person being injured on the property, and Safeguard's Quality Assurance procedures failed to detect this safety issue.

or broken or missing stairs or handrails), the P&M vendor must act quickly—within 24 hours—to fix these issues, because they render the property unsafe or improperly secured and thus at risk of damage from vandalism or unauthorized occupants or of injuring people. These types of repairs do not require the submission of a work order.

37. While some of the other criteria may require bids to be submitted and approved (*e.g.*, removing or repairing gutters, tarping or minor roof repairs, or door and window replacements after emergency board-up/resecuring services), which may take more time to resolve, those issues, too, should be addressed within 30 days of a property becoming part of a P&M vendor's inventory. Even if the property came into the inventory with these problems, it is the obligation of the P&M vendor to promptly identify and address them, since these kinds of problems can lead to further damage to the property.

**E. Given financial incentives to cut corners, particularly where the lender and/or prime P&M vendor compensates P&M contractors and subcontractors at comparatively low rates, Bank of America's and Safeguard's quality assurance work was inadequate.**

38. P&M vendors, and in turn their subcontractors, have financial incentives to cut corners when performing their work and not to document all safety, security, and preservation issues needed to be addressed at a property. In particular, lack of adequate financial compensation encourages contractors to perform frivolous, unnecessary, and unimpactful services to the property to make up for the lack of compensation. In the four months that I worked with Bank of America in 2011, I personally experienced its comparatively low rates of reimbursement for various services—which was one of the main reasons A&D Property Services decided to stop doing business with Bank of America after only four months. While I am not aware of what Bank of America paid its P&M vendors after I stopped working with them and I do not know what Safeguard pays its subcontractors, a low pricing structure would likely lead to



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

significant quality issues in how well jobs are performed and in QA reporting done by the subcontractors to address real safety, security, and preservation issues present on the property.

39. When there are financial incentives to cut corners because the P&M vendors are not being adequately compensated for their work, they may disproportionately do so in majority-Black or majority-Latino neighborhoods, where they may believe that their neglect is less likely to be reported.

40. Quality control in the property preservation and maintenance industry is always important but becomes critical in light of financial incentives to cut corners, particularly where P&M vendors and subcontractors are being paid comparatively low rates for their work.

41. I have reviewed Bank of America and Safeguard's quality control measures and find them to have gaps and exposures that render them insufficient to ensure that P&M vendors and subcontractors are properly and completely performing their work.

42. Based on the documents I reviewed, Safeguard relies on the methods of quality control outlined below. But as I note below, some areas of their quality control procedures are lacking:

a. Safeguard has its vendors upload information about the work performed on its properties into its system. Safeguard's corporate designee, however, testified that one of its vendors could have a subcontractor go out and perform the work and report back to the vendor, who is the one who then enters the information into Safeguard's system.[6] This means that Safeguard could be unaware that certain subcontractors—whom Safeguard may not have had the opportunity to vet—are performing work it believes its

[6] Rule 30(b)(6) Dep. of Michael Greenbaum (July 26, 2021), 111:5–112:4.



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

own vendors are performing.

b. Safeguard states that it requires a quality control review of 100% of initial service orders and 10% of recurring orders.[7] While a quality control review of 100% of all initial service orders might sound like robust quality control, in actuality, this is just a self-assessment by Safeguard's vendors, rather than real quality control. Safeguard requires its P&M vendors to evaluate their own work.[8] Safeguard does not even provide its vendors with a standard form or quality control checklist to reference when performing these checks—it leaves how the quality control is done entirely up to the vendor.[9] Because Safeguard's vendors have little incentive to report the shoddy work of their employees or subcontractors back to Safeguard, and because there is no uniform criteria for conducting these self-assessments, this approach is not real quality control. For example, at 1367 Hyde Park Blvd., Memphis, TN Safeguard's P&M vendor certified: "I have reviewed the work performed on this property by my crew/subcontractors and verified that all work has been completed per Safeguard's instructions." (SG00487110). Yet, as noted previously, photos of the poor quality boarding of the windows shows breachable openings that would allow unauthorized access to the property. (*See* SG00486945–50, SG00487072, SG00487085, SG00487091). These breachable openings could also cause (further) water damage to the property, insect or animal infestation, or even permit entry by unauthorized persons—all of which are expensive issues to address but are preventable if the property is properly secured. A robust quality control process

[7] Greenbaum Dep. 143:2–144:22.
[8] Greenbaum Dep. 143:11–144:22.
[9] Greenbaum Dep. 144:10–22.

should have caught this.

c. Upon my review of Safeguards' photos and checklists of "completed" work, work that was deemed acceptable by Safeguard QA did not have sufficient photographic evidence of work deemed completed or of the property condition mandated in Safeguard's own work order to its subcontractor. For example, the grass re-cut photos and monthly marketability work order for 4878 West Chesterwood Court, Memphis, TN, submitted as evidence for work that Mr. Bryar said was "completed" after NFHA's inspection, show that Safeguard's P&M vendor was not in compliance with Safeguard's photo requirements[10] and that Safeguard's QA failed to note or address the inadequate photos. This, in turn, meant that Safeguard failed to address the inadequate and incomplete work with its vendor. For example, NFHA's photos show a broken window on the second floor of the home. (SG00487188–89). But the photos from Safeguard's vendor omit this broken window, which is contrary to Safeguard's mandate that the vendor document the condition of the property (not to mention promptly address any issue that compromises the preservation and security of the property). (*See* SG00487206–07). Similarly, Plaintiffs' photos show that the rear yard of the property had not been maintained. (SG00487192–95). In a report from Safeguard's grass-cut vendor from work

[10] The photo requirements in the Safeguard Work Order state, in part, that the contractor must submit photos documenting: (1) [a]ll interior and exterior spaces must be documented and compliant upon departure; (2) [c]ondition photos from opposite angles should be provided to show each area is in compliance; and (3) [e]ntire exterior of property: Front, rear and side photos should be from the property lines, facing the house and from the house facing the property line. (SG00487206–07). Specifically for shrub trimming and leaf removal, the Work Order instructed Safeguard's P&M vendor to "[s]ubmit before, during, [and] after photo documentations to support the leaf removal and the total bags removed" as well as "a final photo showing all bags removed." (SG00487207).

performed four days later, the vendor did not submit any photos of the rear of the property, and Safeguard's QA never flagged or addressed the lack of required photos. (*See* SG00487241–43).

43. Similarly, there are several examples of "creative photography" by Safeguard subcontractors that omit severe safety, security, and preservation issues that are clearly present on the property. As described below, I have three theories—based on my experience—as to why this "creative photography" was done in light of the financial incentives and disincentives at play. As further noted below, effective QA should have, but failed to, spot this "creative photography" and address the underlying maintenance issues.

a. First, P&M vendors were finding ways to get paid for incomplete work. For example, the Safeguard QA process not only failed to enforce its mandated photographic documentation requirements listed on its work order sent April 23, 2013, (SG00487206–07), but also failed to pick up on this "creative photography" on the work order for the grass re-cut. Even after all of the issues were detailed and photographic evidence and documentation of the property history was provided to Safeguard, both Safeguard and Mr. Bryar failed to recognize that services had in fact not been completed. Safeguard commented on the NFHA report regarding the grass re-cut performed on or around May 25, 2013, at 4878 West Chesterwood in Memphis, TN that the grass recut services had been completed (SG00487214), when it was clear and apparent through "creative photography"—omitting photos of the backyard—that services were, in fact, incomplete.

b. Second, P&M vendors were completing frivolous "low hanging fruit" work covered in the $1,000 allowables that did nothing to preserve or maintain the property but were easy items to document and invoice for payment. For example, at 1367 Hyde Park

Blvd., Memphis, TN, Safeguard's P&M vendor capped water lines (SG00486982–83, SG00486989–93, SG00486996–487000) even though the water had been shut off at the curb and there was no water meter (SG00487107) (most likely because the property had been stripped of all its copper plumbing), so there was no risk of water leaking from the pipes and therefore no need to cap them. Similarly, Safeguard's P&M vendor installed wire caps and outlet covers (SG00486986–88, SG00486993–94, SG00487000–2) for a property where the electricity had been shut off (there was also no electric meter) (SG00487107, SG00487109) and there was no drywall on the walls (SG00487002–3). Here, Safeguard also failed to hold the P&M vendor responsible for completing and billing for egregious, frivolous, and unnecessary services performed at the property. The P&M vendor was apparently paid for the frivolous and clearly incomplete work done on this BOA property (*see* SG00487114) and left real safety, security, and preservation issues—such as a hole in the door and inadequate/improper boarding—unaddressed.

c. Third, Safeguard subcontractors employed "creative photography" to avoid addressing documented safety, security, and preservation issues. This could be from fear of being made to address the issue for a fraction of their bid or fear of losing their territory and future work to someone who was willing to replace them as a Safeguard subcontractor by accepting the bid at the price offered by Safeguard, as a loss leader into the territory (trying to pick up business in the area by initially accepting below-market rates). These incentives led Safeguard subcontractors to avoid taking photographic evidence of safety, security, and preservation issues present in communities of color and to utilize "the allowables" and incomplete work to maximize their profit.

**F. The total amount of money spent on properties does not demonstrate quality of maintenance.**

44. Bank of America's expert, Dr. David Skanderson, notes that Bank of America spent more money on maintenance and repairs for properties located in majority African-American and Latino neighborhoods than in majority white neighborhoods and seems to imply that this means homes in majority-white neighborhoods could not have been better maintained.[11] The total amount of money Bank of America spent on maintenance and repairs, however, does not indicate the quality of maintenance performed for three reasons.

45. First, the total amount of money spent on a property likely has a great deal to do with how long the property was an REO or post-foreclosure HUD property in the bank's inventory. The longer the bank had to provide preservation and maintenance services for the property, the more money it likely expended on that property.

46. Second, the total amount of money spent on repairs and maintenance likely includes additional expenses incurred because the bank and P&M vendor allowed the property's condition to deteriorate, necessitating more expensive repairs. For example, if a broken window is not repaired in a timely manner, the bank may then have to pay additional funds later to deal with water damage, animal and insect infestations, and mold issues caused by the unaddressed broken window. (*See* SG00487188–89).

47. Third, because vendors cut corners and performed unnecessary maintenance, they charged Safeguard in full for issues that remained unaddressed, were improperly addressed, or did not even need to be addressed. As discussed above, Safeguard's and Bank of America's quality control procedures failed to detect and remedy these issues, thus leading to more money

[11] Skanderson Expert Report (Nov. 5, 2021) ¶¶ 99–106.

spent on properties in communities of color. In addition, as discussed in further detail above, P&M vendors often complete frivolous, "low hanging fruit" work that is part of the $1,000 allowable, for which they do not need to seek prior authorization to perform or submit a bid. Therefore, the vendors can hit the maximum limit on the allowable but fail to perform necessary preservation and maintenance work on the property.

**G. Plaintiffs' single-point-in-time review should not have created more maintenance and marketing disparities in majority African-American or Latino communities.**

48. Defendants' experts criticize Plaintiffs' decision to evaluate each property in their investigation once. They argue that this approach may have missed pending work orders to fix deficiencies Plaintiffs identified. There are at least three reasons, though, why Plaintiffs' decision to evaluate each property only once should not have revealed the racial disparities in maintenance and marketing discovered.

49. First, there is no reason why there would be more pending work orders for problems identified in majority African-American and Latino neighborhoods than in majority white neighborhoods. There is no reason why a P&M vendor would have been on the verge of fixing a problem at a property in a majority African-American neighborhood the day Plaintiffs' testers visited more frequently than at a property in a majority white neighborhood.

50. Second, to the extent Defendants' experts mean to suggest that evaluating a property on a single day would not capture whether anyone from the bank or P&M vendor has identified the issue yet or how quickly they will fix the problem once identified, they seem to be unaware of how frequently properties are reviewed in this industry. As I noted earlier in my discussion of the "three-legged stool," a maintenance vendor, real estate agent, or bank representative frequently visits each property or reviews photos of the properties. If there is a

broken window or debris in the yard, therefore, it should be promptly noticed and reported by one of these stakeholders—weeks should not pass with an exterior maintenance issue unnoticed.

51. Third, as previously discussed, certain health and safety items should be fixed right away. As soon as a breachable opening (door or accessible window) is discovered, the P&M vendor should fix it within 24 hours, without waiting for a work order. Therefore, it is less likely that a health and safety deficiency identified by Plaintiffs in their investigation is the result of showing up before it happened to be fixed, because the window of time in which these deficiencies should be allowed to exist is very small.

## V. Testimony in Other Lawsuits Within the Last Four Years

52. I have not provided testimony in other lawsuits within the last four years.

## VI. Compensation for Work in this Litigation

53. I am being compensated in this matter at a rate of $150 per hour. My compensation is not contingent upon the outcome of this case or the opinions I express.

Dated: January 7, 2022

DocuSigned by:
A649449B9455435...
Deavay Tyler

# EXHIBIT 1

# DEAVAY TYLER

## EDUCATION

University of Minnesota, Morris
Bachelor of Arts, Business Management (1995)

Universidad de los Andes, Merida Venezuela
Masters of Arts, International Business/Spanish (1996)

## WORK EXPERIENCE

**DTJ Consulting Ltd. – Chief Executive Officer**
***President***

- Primarily responsible for driving results by creating a corporate culture that meets and exceeds customer expectations. Lead consultant to assist other consultants within the group support customers and build capacity while maintaining sustainability & scalability. Also responsible for assisting customers optimize the delivery of product or service through identifying and addressing operational inefficiencies and ensuring deliverables are met.

**Illinois State Black Chamber of Commerce – Chief Operating Officer**
***Executive Vice President***

- Primarily responsible for managing & rebuilding membership engagement platform and membership offerings. Also responsible for rebranding the organization, creating an educational platform, and rebuilding the advocacy platform.

**A&D Property Services, Inc. – Chief Financial Officer/Chief Systems Officer**
***Executive Vice President***

- Responsible for managing A&D Property Services and its affiliate entities including overseeing operations, company finances, business development, technology, legal, human resources, safety and training. Increased company average annual revenues from $1.5 million to $12 million.

**Fifth Third Bank – Business Development Officer**
***Assistant Vice President***

- Responsible for sourcing and cultivating relationships, consulting, underwriting, risk-assessing, structuring and pricing loans for businesses with annual revenue between $3 million to $20 million.
- Credit underwriting of Small Business and Emerging Middle Market accounts, including financial, collateral and guarantor analysis. Additional industry and company research also performed. Credit write-up preparation and presentation of the underwriting package portfolio managers as well as presentation of sales proposal to customer.
- Leading customer and prospect calls, and various other sales/customer oriented projects.
- Support branch network by providing training and support with business banking products and services.
- Responsible for handling branch generated complex customer needs including complex lending structures, complex treasury management needs, complex merchant services and complex payroll service's needs.
- Responsible for uncovering, referring and/or cross-selling appropriate bank products.
- Assist in the preparation of underwriting documents originated from any lending group, recommending structural changes, covenants, etc., ensuring that all of the risks associated with the credit request have been addressed and mitigated.
- Where appropriate, participate with the branch network on customer calls to obtain information on the current needs of the business.

**ABN-AMRO/LaSalle Bank- Business Relationship Manager**
***Assistant Vice President***

- Responsible for growing loan and deposit relationships for small business customers.
- Trained branch based staff (Personal Bankers and Branch Managers) on business loan and deposit products.
- Support branch based customers who have more complex lending, depository, or cash management needs.
- Ranked in the top 30 of relationship managers in loan production.

**JP Morgan Chase Bank**
***Branch Manager/Sales & Service Manager***
***Assistant Vice President***

- Responsible for driving sales and managing a $2.5 billion branch.
- Increased year over year growth in 4 of 5 core product lines.
- Achieved highest overall monthly production levels in history of branch.
- Achieved highest loan production level in history of branch.
- Recognized as a leader amongst peers driving sales, building teams, problem resolution, and developing natural product line extension strategies.

***Small Business Relationship Manager***
***Assistant Vice President***

- Ranked 3rd nationally in Small Business Banking (2004)
- Ranked 1st nationally in portfolio cross sales (2004)
- Ranked in top 5 nationally in several product line sales (2003-2004)
- Recognized nationally by my managers, peers, and banking centers as a leader within my job family.
- Trained several new small business bankers and involved in their continued training and development.
- Invited to share best practices in several other regional sales meetings.
- Called upon to be the subject matter expert in small business banking related sales, not only at the branches covered but also by many other branches in the greater Chicagoland area.

***Licensed Relationship Banker***

- Consistently ranked in the top 5% of relationship bankers nationally.
- Coached and trained multiple relationship bankers on the habits, the expectations, the characteristics and the best practices to be a consistent high performing relationship banker.
- Demonstrated ability to lead, train, build teams, work well with others and motivate people in a team environment.
- Designated to represent my branch at community outreach events and functions
- Called upon to drive sales and answer complex questions of current and prospective customers.
- Ranked 1st nationally in portfolio cross sales (2004)
- Ranked in top 5 nationally in several product line sales (2003-2004)
- Recognized nationally by my managers, peers, and banking centers as a leader within my job family.
- Trained several new small business bankers and involved in their continued training and development.
- Invited to share best practices in several other regional sales meetings.

**MEMBERS Financial Services, CUNA Mutual Group – Financial Services Representative**

- Established and managed investment and insurance programs at three credit unions.
- Created and implemented financial plans for credit union membership.
- Organized, and presented financial planning seminars and workshops for employees of credit union affiliated corporations including Lucent Technologies, SBC Corporation, CIGNA Healthcare, and the Chicago Board of Education.

**Morgan Stanley – Financial Advisor/Retirement Planning Specialist**

- NASD Licensed Broker (Series 7, Series 66, Series 31)
- State of Illinois Licensed Insurance Salesperson (Life/Accident/Health Insurance Licenses)
- Created and implemented strategies for high net worth individuals and small business owners to grow and protect estates and investment portfolios.
- Implemented and Managed Qualified Retirement Plans (QRPs) for small business clients.

## VOLUNTEERING

**State of Illinois – Fair Practice in Contracting Task Force**

**Illinois Tollway Authority – Diversity Advisory Council**

## REFERENCES

Available upon request.

# EXHIBIT 2

# Index of Documents Reviewed by Deavay Tyler

## Case Materials

- Complaint in *National Fair Housing Alliance, et al, v. Bank of America, N.A., et al.*, Case No. 18-1919, filed June 26, 2018 (ECF No. 1).

## Expert Reports

- Expert Report of Vincent Yao, PhD, November 5, 2021.
- Expert Report of Marcel A. Bryar, November 5, 2021.

## Depositions

- Deposition of Brandon Silvey (as Bank of America's 30(b)(6) Designee), including Exhibits 43, 43A, and 43B, November 17, 2021.
- Deposition of Andrew Priesmeyer (as Bank of America's 30(b)(6) Designee), December 3, 2021.

## Bates Stamped Documents

- Documents produced by Defendant Bank of America, N.A.
  - BANA-NFHA-LIT_0000796–BANA-NFHA-LIT_0000800
  - BANA-NFHA-LIT_0000808–BANA-NFHA-LIT_0000867
  - BANA-NFHA-LIT_0000874–BANA-NFHA-LIT_0000890
  - BANA-NFHA-LIT_0011370–BANA-NFHA-LIT_0011425
  - BANA-NFHA-LIT_0011427
  - BANA-NFHA-LIT_0011429
  - BANA-NFHA-LIT_0011430
  - BANA-NFHA-LIT_0022438–BANA-NFHA-LIT_0022462
  - BANA-NFHA-LIT_0022997–BANA-NFHA-LIT_0023000
  - BANA-NFHA-LIT_0023441–BANA-NFHA-LIT_0023538
  - BANA-NFHA-LIT_0023555–BANA-NFHA-LIT_0023584
  - BANA-NFHA-LIT_0023794–BANA-NFHA-LIT_0024266
  - BANA-NFHA-LIT_0024408–BANA-NFHA-LIT_0024416
  - BANA-NFHA-LIT_0312185
  - BANA-NFHA-LIT_0312233
  - BANA-NFHA-LIT_0312249
  - BANA-NFHA-LIT_0312318
- Documents produced by Defendant Safeguard Properties Management, LLC
  - SG00186219
  - SG00186385
  - SG00186444
  - SG00191093
  - SG00191385

  - SG00486812–SG00495930

- Documents produced by Plaintiff National Fair Housing Alliance
  - NFHA 003173–NFHA 003175
  - NFHA 004970–NFHA 005043
  - NFHA 005047–NFHA 005356

- REO Evaluation Form and Photos of 4714 Amberley, Baltimore, MD 21229
  - 4714 Amberley 000050
  - NFHA 000394
  - PLAINTIFFS 005012
  - PLAINTIFFS 018992–PLAINTIFFS 019004
  - PLAINTIFFS 019006–PLAINTIFFS 019010
  - SG00153012
  - SG00155360
  - SG00157383

- REO Evaluation Form and Photos of 11 Beatrice Drive, West Haven, CT 06516
  - CFHC 000003
  - PLAINTIFFS 065382–PLAINTIFFS 065386
  - PLAINTIFFS 065388–PLAINTIFFS 065401

- REO Evaluation Form and Photos of 1100 South 65th Street West Allis, WI 53214
  - MMFHC 000001
  - PLAINTIFFS 068840–PLAINTIFFS 068860

- REO Evaluation Form and Photos of 1648 South 63rd Street West Allis, WI 53214
  - MMFHC 000015
  - PLAINTIFFS 069212–PLAINTIFFS 069229

- REO Evaluation Form and Photos of 1109 W. Keefe Avenue Milwaukee, WI 53206
  - MMFHC 000263
  - PLAINTIFFS 067091–PLAINTIFFS 067101

- REO Evaluation Form and Photos of 1131 S 75th St West Allis, WI 53214
  - MMFHC 000426
  - PLAINTIFFS 004980–PLAINTIFFS 004981
  - PLAINTIFFS 004983
  - PLAINTIFFS 004985–PLAINTIFFS 004986
  - PLAINTIFFS 004989–PLAINTIFFS 004990
  - PLAINTIFFS 004992–PLAINTIFFS 004996
  - PLAINTIFFS 004998–PLAINTIFFS 005000
  - PLAINTIFFS 005002–PLAINTIFFS 005003
  - PLAINTIFFS 005006

- PLAINTIFFS 005008–005010

- REO Evaluation Form and Photos of 1729 S. 14th Street Milwaukee, WI 53204
  - MMFHC 000439
  - PLAINTIFFS 054666
  - PLAINTIFFS 054668
  - PLAINTIFFS 054670–PLAINTIFFS 054673
  - PLAINTIFFS 054675
  - PLAINTIFFS 054677–PLAINTIFFS 054680
  - PLAINTIFFS 054683
  - PLAINTIFFS 054685
  - PLAINTIFFS 054687
  - PLAINTIFFS 054689–PLAINTIFFS 054693
  - PLAINTIFFS 054732

- REO Evaluation Form and Photos of 11094 Silsbe Lane Eads, TN 38028
  - NFHA 000021
  - PLAINTIFFS 068972–PLAINTIFFS 068997

- REO Evaluation Form and Photos of 1615 Searles Road Dundalk, MD 21222
  - NFHA 000094
  - PLAINTIFFS 058187–PLAINTIFFS 058206

- REO Evaluation Form and Photos of 1757 Lanier Lane Memphis, TN 38117
  - NFHA 000115
  - PLAINTIFFS 059294–PLAINTIFFS 059301
  - PLAINTIFFS 059314–PLAINTIFFS 059321

- REO Evaluation Form and Photos of 1663 Whitewater Road Memphis, TN 38117
  - NFHA 014126
  - PLAINTIFFS 059273–PLAINTIFFS 059285
  - PLAINTIFFS 059287–PLAINTIFFS 059293

# EXHIBIT 3

USCA4 Appeal: 25-2352 Doc: 77-4 Filed: 06/02/2026 Pg: 41 of 636 Total Pages:(41 of 636)

**Exhibit 3 to Deavay Tyler Expert Report**
(Response to Exhibit 5 to Marcel A. Bryar Report)

I am in agreement with Mr. Bryar's general point regarding local ordinances requiring P&M Vendors to address issues not normally required to be addressed according to industry standards. My answers, as well, do not take into account the impact of local ordinances on industry standards.

| No. | NFHA Survey Items | Within/Outside/ Maybe Industry Standard | Bryar Notes | Tyler Notes |
|---|---|---|---|---|
| **Curb Appeal** | | | | |
| 1 | Trash | Within | | Agree with Bryar. Trash is within the scope |
| 2 | Mail Accumulated | Outside | | Disagree with Bryar. While it is outside of the scope of services of P&M Vendors to dispose of, open, or otherwise remove "official" mail from the property, it is within their scope of work to dispose of advertisements and handbills while placing "official" mail inside the property in a secure location and notifying the listing broker and/or bank as to the location of the mail inside the property. The accumulation of mail, advertisements and handbills is a safety and security concern because it signals that the property is vacant and therefore exposes the property to a higher likelihood of unauthorized break-ins, unauthorized entries, and other criminal activities. It is a generally accepted practice in the industry to set a process amongst |

USCA4 Appeal: 25-2352 Doc: 77-4 Filed: 06/02/2026 Pg: 42 of 636 Total Pages:(42 of 636)

| **No.** | **NFHA Survey Items** | **Within/Outside/ Maybe Industry Standard** | **Bryar Notes** | **Tyler Notes** |
|---|---|---|---|---|
| | | | | those who comprise the "three legged stool" on how to properly handle accumulated "official" mail while mitigating the risk of having accumulated mail, advertisements, and handbills expose the property to criminal activities unnecessarily. |
| 3 | Overgrown Grass and Leaves | Within | This item depends on the season. | Agree with Bryar (to a point). Overgrown grass and leaves are addressable during "grass off-season" and should be addressed when snow and/or ice are not present on the ground. Overgrown grass cannot be properly addressed when snow and/or ice are on the ground. It is a generally accepted practice in the industry to order initial exterior services with the other initial services and perform the initial lawn services when there is no snow and/or ice on the ground. It should be noted that routine maintenance services are not performed on the property until the official "grass season" begins, usually between March-May depending on weather and regional location. |
| 4 | Overgrown or Dead Shrubbery | Maybe | Overgrown shrubbery is Within; dead shrubbery is Outside. | Disagree with Bryar. Overgrown shrubbery is within the scope. Dead shrubbery no longer rooted |

USCA4 Appeal: 25-2352 Doc: 77-4 Filed: 06/02/2026 Pg: 43 of 636 Total Pages:(43 of 636)

| No. | NFHA Survey Items | Within/Outside/ Maybe Industry Standard | Bryar Notes | Tyler Notes |
|---|---|---|---|---|
| | | | | should be addressed with exterior trashout. Dead shrubbery rooted in the ground should be bid on to be removed. |
| 5 | Dead Grass | Outside | | Agree with Bryar. |
| 6 | Invasive Plants | Maybe | If the invasive plants affect the structural integrity of a structure on the property, then they are Within; otherwise, they are Outside. | Agree with Bryar (to a point). If it is foreseeable that invasive plants can potentially create a structural integrity problem, then a bid should be submitted to remove the invasive plants. Furthermore, weed removal is part of routine lawn maintenance. |
| 7 | Broken Mailbox | Outside | | Agree with Bryar. |
| | Miscellaneous | N/A | | N/A |

**Structure**

| No. | NFHA Survey Items | Within/Outside/ Maybe Industry Standard | Bryar Notes | Tyler Notes |
|---|---|---|---|---|
| 8 | Unsecured/ Broken Doors and Locks | Within | | Agree with Bryar. |



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

USCA4 Appeal: 25-2352 Doc: 77-4 Filed: 06/02/2026 Pg: 44 of 636 Total Pages:(44 of 636)

| **No.** | **NFHA Survey Items** | **Within/Outside/ Maybe Industry Standard** | **Bryar Notes** | **Tyler Notes** |
|---|---|---|---|---|
| 9 | Damaged Steps and Handrails | Maybe | For non-FHA properties, damaged steps and handrails are Within; for FHA properties prior to February 2016, damaged steps and handrails were Outside; for FHA properties on or after February 2016, handrails and stair treads are Within. | Agree with Bryar (to a point). Even for FHA properties prior to February 2016, individual property circumstances must be considered, and P&M Vendors must notify the bank of all potential health and safety hazards, including noting the severity of the risk and providing photographic documentation of the risk, and provide an emergency bid to cure the issue. Damaged steps and damaged or missing handrails frequently pose health and safety concerns, as evident in some of the photographs from NFHA inspections. (SG004871146, SG00487155, SG00487157). Issues like these constitute health and safety risks and should have been identified and communicated to the appropriate parties to be addressed regardless of the investor. |
| 10 | Damaged Windows (Broken, Boarded) | Maybe | A broken window is Within; a boarded window is Outside because servicers are required to either repair or board up a broken window. | Disagree with Bryar. All compromised openings must always be addressed because a compromised opening creates safety, security, or preservation issues. It is up to the P&M Vendor to determine if the compromised opening is a breachable opening, escalating the service to an |

| No. | NFHA Survey Items | Within/Outside/ Maybe Industry Standard | Bryar Notes | Tyler Notes |
|---|---|---|---|---|
| | | | | immediate emergency resecuring service (addressed in 24 hours or less) per generally accepted industry standards. |
| 11 | Damaged Roof | Maybe | If the damage causes water to leak into a structure, then it is Within; otherwise, the damage is Outside. | Disagree with Bryar. Any roof damage that could cause a preservation issue should be addressed up to the $1,000 allowable repair, and then the vendor should bid on the rest. P&M vendor should not wait for water to leak if it is clear the roof damage could lead to such a leak. |
| 12 | Damaged Fence | Maybe | For non-FHA properties, a damaged fences is Within; for FHA properties on or after February 2016, a damaged fence is Within; for FHA before then, a damaged fence is Outside. | Agree with Bryar. |
| 13 | Holes | Maybe | If a hole causes water to leak into a structure, then it is Within; otherwise, a hole is Outside. | Disagree with Bryar. A hole should be addressed if it causes a safety, security, or preservation concern on or to the property. Anything that breaches the structure and allows for unauthorized access to the property—whether by water, insects, animals, or people—should be addressed. |

USCA4 Appeal: 25-2352 Doc: 77-4 Filed: 06/02/2026 Pg: 46 of 636 Total Pages:(46 of 636)

| No. | NFHA Survey Items | Within/Outside/ Maybe Industry Standard | Bryar Notes | Tyler Notes |
|---|---|---|---|---|
| 14 | Wood Rot | Maybe | If wood rot causes water to leak into a structure, then it is Within; otherwise, wood rot is Outside. | Agree. Wood rot should be addressed if it causes a safety, security, or preservation concern on or to the property. |
| | Miscellaneous | N/A | | |

**Signage & Occupancy**

| | | | | |
|---|---|---|---|---|
| 15 | Trespassing or Warning Signs | Outside | A servicer may hire a property preservation company to place a sign on the property but a servicer will not hire a preservation company to remove them. | Agree with Bryar. |
| 16 | Marketed as Distressed Property | Outside | Property preservation companies are not in the business of marketing properties. | Agree with Bryar. |
| 17 | "For Sale" Sign Missing | Outside | Property preservation companies are not in the business of marketing properties. | Agree with Bryar. |
| 18 | Broken and Discarded Signage | Outside | Property preservation companies are not in the business of marketing properties. | Agree with Bryar. |
| 19 | Unauthorized Occupancy | Outside | Servicers are responsible for evicting squatters but they do not hire property | Agree with Bryar. |



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

USCA4 Appeal: 25-2352 Doc: 77-4 Filed: 06/02/2026 Pg: 47 of 636 Total Pages:(47 of 636)

| No. | NFHA Survey Items | Within/Outside/ Maybe Industry Standard | Bryar Notes | Tyler Notes |
|---|---|---|---|---|
| | | | preservation companies to do this work. | |
| | Miscellaneous | N/A | | |

**Paint/Siding (12 points)**

| No. | NFHA Survey Items | Within/Outside/ Maybe Industry Standard | Bryar Notes | Tyler Notes |
|---|---|---|---|---|
| 20 | Graffiti | Maybe | For non-FHA properties, graffiti is Within; for FHA properties on or after February 2016, graffiti is Within; for FHA before then, graffiti is Outside. | Disagree with Bryar. Even for FHA properties before February 2016, a P&M vendor would have to address graffiti that uses profane language, which creates a safety and security risk that must be addressed. For example, the graffiti NFHA found on at 4306 Knight Arnold Road (SG00487673) and 4878 West Chesterwood Court (SG00487187, SG00487189) in Memphis, Tennessee is the kind of profane graffiti that a P&M vendor should address regardless of the investor. |
| 21 | Peeling/Chipped Paint | Outside | | Agree with the Bryar as long as the peeling paint does not cause a safety issue on the property. |
| 22 | Damaged Siding | Maybe | If the damage causes water to leak into a structure, then it is Within; otherwise, the damage is Outside. | Disagree. Damaged siding should be addressed if it causes either a safety, security, or preservation concern —not simply if it has already caused water to |



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

USCA4 Appeal: 25-2352 Doc: 77-4 Filed: 06/02/2026 Pg: 48 of 636 Total Pages:(48 of 636)

| No. | NFHA Survey Items | Within/Outside/ Maybe Industry Standard | Bryar Notes | Tyler Notes |
|---|---|---|---|---|
| | | | | leak into a structure (P&M vendors should work to prevent this from happening). |
| 23 | Missing Shutters (not attached/secure) | Outside | | Agree with Bryar (with an exception). If a shutter is loose and hanging, it would cause a safety issue if it were to fall off and should be addressed. |
| | Miscellaneous | N/A | | |

**Gutters**

| | | | | |
|---|---|---|---|---|
| 24 | Missing/Out of Place | Outside | Assumes "out of place" means "missing" and does not include broken or hanging gutters. | Disagree. Missing/Out of Place gutters should be addressed if they cause a safety or preservation issue on or to the property. If a gutter is hanging loose and swinging or missing and causing issues with water hitting and/or breaching the property, then these issues should be addressed. |
| 25 | Broken/Hanging | Within | | Agree. Broken/Hanging gutters should be addressed if they create a safety, security, or preservation issue on or to the property. If a gutter is hanging loose and swinging or missing and causing issues with water hitting and/or breaching the property, then these issues |

USCA4 Appeal: 25-2352 Doc: 77-4 Filed: 06/02/2026 Pg: 49 of 636 Total Pages:(49 of 636)

| No. | NFHA Survey Items | Within/Outside/ Maybe Industry Standard | Bryar Notes | Tyler Notes |
|---|---|---|---|---|
| | | | | should be addressed. |
| 26 | Obstructed | Within | | Agree. Obstructed gutters should be addressed because of the potential preservation issues that could be caused, including issues with water flow to and around the property. |
| | Miscellaneous | N/A | | |

**Water Damage**

| No. | NFHA Survey Items | Within/Outside/ Maybe Industry Standard | Bryar Notes | Tyler Notes |
|---|---|---|---|---|
| 27 | Water Damage | Maybe | If the water damage relates to a leak into a structure, then it is Within; otherwise, the damage is Outside. | Agree with Bryar. Water damage should be addressed when there is evidence that it is related to an active water leak. |
| 28 | Mold (By Severity) | Outside | Mold outside a structure is Outside; mold inside a structure is Within but NFHA has not observed the internal conditions of any properties. | Disagree (to a point). Preventing mold is paramount to preserving a property. It is a generally accepted practice to address mold issues, however each individual property and its nuances must be considered. |



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

USCA4 Appeal: 25-2352 Doc: 77-4 Filed: 06/02/2026 Pg: 50 of 636 Total Pages:(50 of 636)

| **No.** | **NFHA Survey Items** | **Within/Outside/ Maybe Industry Standard** | **Bryar Notes** | **Tyler Notes** |
|---|---|---|---|---|
| | Miscellaneous | N/A | | |
| | | **Utilities** | | |
| 29 | Exposed or Tampered With | Outside | | Agree with Bryar. |
| 30 | Gas turned off | Outside | | Agree with Bryar. |
| 31 | Meter turned off | Outside | | Agree with Bryar. |



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

# EXHIBIT B

**Supplemental Expert Report of Deavay Tyler**
*National Fair Housing Alliance, et al. v. Bank of America, N.A., et al.*, No. 18-1919 (D. Md.)

Since submitting my expert report on January 7, 2022, I was provided copies of the supplemental expert reports submitted by Marcel A. Bryar, David McCrary, David Skanderson, and Vincent Yao. I now offer this supplemental report to address some of the assertions made by Defendants' experts in their February 14, 2022 supplemental reports. My resume with dates of employment is attached as Exhibit 2 to this report.

## I. Materials Reviewed and Considered

In addition to the previously noted materials I reviewed for my initial expert report (listed in Exhibit 2 to my initial expert report), in preparation for forming my opinions in this supplemental report, I reviewed the supplemental expert reports submitted by Marcel A. Bryar, Justin McCrary, David Skanderson, and Vincent Yao on February 14, 2022; transcripts from the depositions of Joe Iafigliola and Mr. Bryar; and other documents listed in Exhibit 1 to this report. If I am provided with additional or different information, I reserve the right to revise my analysis and opinions based on such new information.

## II. Opinions

After consideration of the above-referenced information, the opinions expressed in my initial expert report remain the same. It is further my opinion, to a reasonable degree of professional certainty, within my fields of expertise, that:

1. Many of the deficiencies included in Plaintiffs' REO Evaluation Form, like whether the grass is cut or accumulated mail has been removed, have no relation to the initial condition of the property at the time it became an REO. In addition, even for Plaintiffs' criteria that are related to the exterior appearance of the structure itself (such as broken windows, unsecured doors, broken

steps and handrails, and broken or obstructed gutters), most of these types of issues should be fixed or otherwise addressed within 30 days of a property entering Bank of America's REO inventory.

2. The deficiencies Plaintiffs identified have no relation to the neighboring properties or "features of neighborhoods."[1] A Property Preservation and Maintenance ("P&M") vendor's responsibility for ensuring that an REO property is safe, secure, and preserved does not depend on the condition of neighboring homes or the "features of neighborhoods."

3. Contrary to Dr. McCrary's opinion, external factors such as vandalism and weather do not explain the vast majority of the deficiencies Plaintiffs found.

4. Mr. Bryar assesses Safeguard's policies and procedures using the inferior national model of property preservation and maintenance followed by Bank of America and previously by Fannie Mae, as opposed to the local model followed by Freddie Mac and, after it settled with the National Fair Housing Alliance in 2013, Wells Fargo.

5. Mr. Bryar's reports and deposition testimony reveal his lack of experience in the property preservation and maintenance industry.

6. Exhibit 3 to my initial report, in which I noted areas of agreement and disagreement with Mr. Bryar's assessment of whether the criteria Plaintiffs evaluated are within the scope of Safeguard's responsibilities, only applies to P&M vendors, and not to banks or servicers like Bank of America. Banks and servicers may require additional preservation, maintenance, and even repair for REO properties that would normally be outside the scope of industry standards for P&M vendors.

---

[1] McCrary Suppl. Rep. ¶ 18.



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

## III. Discussion

### A. Most of the deficiencies Plaintiffs identified have no relation to the initial property condition, the appearance of neighboring properties, or external factors such as vandalism and weather.

7. In their supplemental reports, Dr. McCrary and Dr. Yao opine that one of the reasons that Plaintiffs found more deficiencies for properties in communities of color is that those properties were in worse condition when Bank of America became responsible for caring for those properties.[2] However, many of the deficiencies included in Plaintiffs' REO Evaluation Form, like whether the grass is cut, shrubs are trimmed, or accumulated mail and exterior trash and debris have been removed, have no relation to the initial property condition.

8. Even for Plaintiffs' criteria that are related to the exterior appearance of the structure itself, many of these—such as broken windows, unsecured doors, and broken steps and handrails—are emergency safety and security issues that should be fixed or otherwise addressed within 24–48 hours of being discovered. In addition, most of the other issues, such as graffiti, holes, a damaged roof, and broken, hanging, missing, out-of-place, or obstructed gutters, should be addressed within 30 days of a property entering Bank of America's REO inventory. Because Plaintiffs did not visit the properties they investigated until 30 days after the properties entered Bank of America's REO inventory,[3] the vast majority of deficiencies Plaintiffs evaluated should not be attributable to the initial condition of the property when it became an REO.

---

[2] Yao Suppl. Rep. ¶¶ 9, 14; McCrary Suppl. Rep. ¶¶ 5a, 18 ("Without knowing a property's external appearance when it became an REO, it is impossible to know what aspects of a property's external appearance predate REO status and what were improved as a result of post-REO maintenance.").

[3] Rule 30(b)(6) Dep. of Lindsay Augustine (Sept. 28, 2021), 192:16–25.



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

9. Dr. McCrary also opines that Dr. Rugh should have controlled for the appearance of neighboring properties or the "features of neighborhoods" in his regression analysis.[4] The deficiencies Plaintiffs identified have no relation to the neighboring properties or "features of neighborhoods."[5] The appearance of neighboring properties has no bearing on Safeguard's and Bank of America's obligation to ensure that REO properties are safe, secure, and preserved to industry standards. A P&M vendor's responsibility for, among other things, fixing stairs and handrails, taking the mail inside the house, removing exterior trash and debris, securing doors and windows, and removing graffiti does not depend on the condition of neighboring homes or the "features of neighborhoods." For example, if the grass at a property neighboring an REO property is six inches long and not edged, that does not alleviate Safeguard and Bank of America of their responsibility for ensuring that the REO property's grass is two inches long and properly edged. Similarly, if an REO has damaged steps or handrails, the steps or handrails must be promptly fixed regardless of whether the neighboring properties also have broken steps or handrails.

10. Dr. McCrary also asserts that Plaintiffs failed to account for external factors such as vandalism and weather, but vandalism and weather do not explain the vast majority of the deficiencies Plaintiffs found.[6] Plaintiffs evaluated 24 exterior maintenance factors.[7] Certain

---

[4] McCrary Suppl. Rep. ¶ 18.
[5] McCrary Suppl. Rep. ¶ 18.
[6] McCrary Suppl. Rep. ¶¶ 12, 28.
[7] These factors are: trash, accumulated mail, overgrown grass and leaves, overgrown or dead shrubbery, dead grass, invasive plants, broken mailbox, unsecured/broken doors and locks, damaged steps and handrails, damaged windows, damaged roof, damaged fence, holes, wood rot, peeling/chipped paint, damaged siding, missing shutters (not attached/secure), missing/out of place gutters, broken/hanging gutters, obstructed gutters, water damage, mold, and exposed or tampered with utility meter. *See* NFHA_003173–75.



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

factors on Plaintiffs' REO Evaluation Form could potentially be linked to vandalism, such as graffiti, broken windows, unsecured doors, trash in the yard, or utilities that have been tampered with. However, the majority of the factors either do not implicate vandalism at all (like trash, accumulated mail, overgrown grass and leaves, overgrown or dead shrubbery, and invasive plants) or are unlikely to be caused by vandalism (like broken steps and handrails, a damaged roof, a hanging shutter, and obstructed gutters). Furthermore, for vandalism to be a factor that explains the disparate preservation and maintenance of REO properties in Communities of Color in comparison to white communities, Plaintiffs would have just happened to have investigated very recently vandalized properties in Communities of Color, but not in majority white neighborhoods, which seems unlikely. Similarly, only the factors assessing yard maintenance—overgrown grass and leaves, overgrown or dead shrubbery, and invasive plants—implicate the weather. Not to mention that, as a matter of common sense, if the weather were to explain the disparities in yard maintenance that Plaintiffs identified between Communities of Color and white communities, it would have to rain more in Communities of Color, the grass and vegetation would have to grow faster in those communities, or both. This, quite frankly, is not plausible. And even if this theory were true, it would not alleviate Safeguard and Bank of America of their responsibility for ensuring that the REO property's grass is two inches long and its shrubs trimmed. Finally, even if vandalism and weather were factors in the exterior preservation and maintenance issues Plaintiffs observed, that does not excuse Bank of America and Safeguard from addressing these issues in a timely manner that is consistent across neighborhoods.



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

**B. In rendering his opinions, Mr. Bryar relies on the inferior national model of property preservation and maintenance instead of the local, boots-on-the-ground model.**

11. Mr. Bryar relies on the inferior national model of property preservation and maintenance followed by Bank of America and previously by Fannie Mae, as opposed to the local model followed by Freddie Mac and now Wells Fargo. In my opinion, based on my industry experience, the national model leads to insufficient quality control and monitoring of property condition. Given that all of Mr. Bryar's experience with REOs comes from his previous work at Fannie Mae, it makes sense that he is only familiar with the national model.

12. The local model approaches property preservation from a boots-on-the-ground perspective. It employs the collaborative efforts of relevant stakeholders—the bank, real estate agents, and P&M vendors, with the bank hiring the P&M vendors directly from the local community instead of contracting with large, national P&M contractors like Safeguard. Real estate agents, P&M vendors, and, when applicable, the bank and/or third-party inspectors, document the condition of each REO property and any preservation and maintenance issues that need to be addressed through in-person visits. The local model also relies on unannounced monthly quality control visits to review a P&M vendor's work and regular in-person assessments of a P&M vendor's work by both the bank and the real estate agent. As a result, safety, security and or preservation issues are promptly and properly addressed, including, when necessary, by escalating issues to the appropriate decisionmakers so they can determine what should be addressed and in what manner. While real estate agents, P&M vendors, and, when applicable, the bank and/or third-party inspectors also take photographs of the REO properties to document their condition, the local model does not rely solely on photo documentation to monitor property condition and the P&M vendor's work.

13. The national model, by contrast, relies on a centralized operation that contracts out work to vendors and subcontractors. Under the national model, banks and servicers contract with large, national P&M contractors like Safeguard that often have no ability or experience to self-perform preservation and maintenance work. As a result, the large, national P&M contractors contract with local P&M vendors to provide preservation and maintenance services. The national model emphasizes the *quantity* of work that P&M vendors complete, as opposed to the *quality*, relying on automated or remote systems to validate work completed instead of on-the-ground verification.

14. These automated and remote methods of validating the quality of work performed may sound good on paper, but, in reality, they are not a substitute for more in-person verification of work quality. This is evident when comparing Safeguard's written quality control procedures with the reality of how these procedures are executed. For example, Safeguard repeatedly reiterates to its vendors the importance of taking before, during, and after photo documentation for every work order because "[p]hotos are the only evidence [Safeguard has] to assure the Client that all work was completed in its entirety."[8] In addition, Safeguard's REO Vendor Manual requires P&M vendors to "report on the property condition on <u>**every**</u> order and take complete property condition photos" that include:

- Location photo/front of the house
- House number
- Left side of the house
- Right side of the house

[8] SG00257953; SG00257915; *see also* SG00191739 ("Photo documentation is critical to our clients. We cannot pay you for the work you performed without the photos to support.").

- Rear of the house
- Garage
- Outbuilding (if present)
- Fence line (if present)
- Roof[9]

Grass cut vendors are required to take additional photos of the REO property, including photos from each corner of the lot going towards the home and then from the home looking out.[10] Safeguard emphasizes the quality of the photos as well: "Any photos that are distorted, fuzzy, or unclear in any way will be deleted from our system and we will request better photos. We cannot expect the clients to pay for work based on substandard photo documentation."[11] Safeguard's Order Auditors then review the P&M vendor's photo documentation to make sure that the necessary photos are present and accurate.[12] Yet, as set forth in my initial report, almost all of the Safeguard photo documentation I reviewed shows that the adequacy and accuracy of its P&M vendors' photo documentation does not comply with Safeguard's own standards.

15. Further, under Safeguard's written policies for REO properties (not post-sale FHA properties), P&M vendors are supposed to be in "constant contact" with the real estate agents selling the properties and the agents are required to complete a Broker Sign Off Sheet that ensures that the agent is satisfied with the initial services that the P&M vendor performed.[13] While these are good policies, Safeguard's quality control procedures do not take any steps to

---

[9] SG00257906 (emphasis in original).
[10] Dep. of Joe Iafigliola (Jan. 28, 2022), 102:10–14.
[11] SG00191739.
[12] Iafigliola Dep. 101:4–102:18.
[13] SG00191761; SG00191781–82.

ensure that its P&M vendors are communicating regularly with real estate agents, and the agents are only tasked with assessing whether they are satisfied with the *initial* services the P&M vendor performed—they do not assess P&M vendors' *ongoing* maintenance, nor are they determining whether the work meets Safeguard or industry standards.

16. The table below shows the characteristics of the national model versus the local model.

| National Model | Local Model |
|---|---|
| Centralized authority | Shared responsibility |
| Systems and process focused | Execution and results focused |
| Bank/servicer delegates authority | Bank/servicer shares responsibility |
| Top-down direction/instruction | Collaborative |
| One-size fits all approach | Every property has its own personality |
| High vendor turnover | Low vendor turnover (retention focused) |
| Don't ask/don't tell | Accountability/responsibility |
| Decision-making based on conjecture | Decision-making based on facts |
| Quantity of work | Quality of work |
| Blind billing/payment because of volume | Proper documentation before billing |

17. Prior to the foreclosure crises in 2008, both Fannie Mae and Freddie Mac followed a local model of property preservation and maintenance, through which these government sponsored enterprises ("GSEs") engaged directly with local P&M vendors to ensure that the REO properties in their inventories were safe, secure, and preserved.

18. In 2008, banks and the GSEs experienced an influx of REO properties as a result of the foreclosure crisis. In preparation for and in response to this influx of REO properties, Freddie Mac and Fannie Mae took two very different approaches to address the impending influx of foreclosed properties. Fannie Mae switched to the national approach to property preservation and maintenance, while Freddie Mac continued to use the local approach. Bank of America also fully adopted the national approach in September 2012 when it contracted with Safeguard for REO preservation and maintenance services nationwide. Even prior to that date, Bank of America still did not directly hire local P&M vendors, as entities following the local model do.

19. Notably, while NFHA has found evidence of racial disparities in the exterior maintenance of REOs held by Bank of America and Fannie Mae, both of which contracted with Safeguard for REO preservation and maintenance services (forming the basis of lawsuits against these entities), it has not made the same allegations against Freddie Mac, which follows the local model of REO preservation and maintenance.

20. It makes sense that Mr. Bryar would be unfamiliar with the "three-legged-stool" concept I discussed in my initial report because his limited experience with REO properties comes largely from his time at Fannie Mae, which, until recently, followed the national model. This is reflected in his limited experience supervising a team of people who reviewed invoices and photos P&M vendors submitted to Fannie Mae and developing policies, as opposed to visiting REO properties in person to observe preservation and maintenance issues and evaluate the quality of P&M vendors' work.[14] In addition, the Safeguard quality control measures that Mr. Bryar cites with approval in his report, like vendors using Safeguard's mobile application to upload photos and Vendor Web to report work that has been completed and having order auditors review the photos and invoices submitted,[15] reflect the flawed national model that does not provide sufficient oversight of P&M vendors and their subcontractors. This lack of sufficient oversight results in a failure to ensure that preservation and maintenance work is timely and properly performed on all REO properties, regardless of the racial composition of the neighborhood, the income level of the neighborhood, or any other characteristics of the neighborhood. As I noted in my initial report, Safeguard relies on its vendors to perform quality control of their own work, which leads to improper and inadequate work being performed.

---

[14] Dep. of Marcel A. Bryar (Feb. 17, 2022). 31:15–18.
[15] Bryar Suppl. Rep. ¶ 64 (i)–(xii).



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

DocuSign Envelope ID: 5C1EA9AB-0DB9-4EFD-A565-EC56275F5D33


Safeguard then relies on its employees to review the photos of the work that its vendors purportedly performed. As I noted in my initial report, however, Safeguard's employees failed to detect issues with the quality of vendors' work that were obvious from the photographs submitted and failed to detect creative photography meant to obscure maintenance and preservation issues. Even Mr. Iafigliola, Safeguard's former Vice President of Operations, Vendor Management, and Quality Assurance, confirmed my assessment that one of its P&M vendors had improperly boarded a property, that the vendor should not have signed off on the work, and that Safeguard's work order auditors should have detected this issue and issued a follow-up order to correct the deficient boarding work.[16] However, Safeguard has not produced any documentation that a follow-up order was issued.[17] Thus, the Safeguard vendor performed poor quality work and Safeguard's quality control process failed to detect it. This is one of the reasons that the flawed national model fails to detect and remedy property preservation and maintenance issues.

21. Mr. Iafigliola also confirmed that creative photography (when a vendor tries to obscure necessary work or make it look like he or she performed work that was not actually completed) is an issue in the industry, and that such instances can be difficult for Safeguard's Order Auditors to detect because "the vendors are only going to show you what they want to see."[18]

22. Safeguard's Service Quality Assurance team, which assesses whether vendors are completing their work on time, and Field Quality Control team, which evaluates the quality of vendors' work, are not substitutes for the regular on-site quality assurance visits performed under

---

[16] Iafigliola Dep. 278:11–282:7.
[17] Iafigliola Dep. 282:8–12.
[18] Iafigliola Dep. 99:6–17.

the local model of property preservation. Safeguard only sends quality control inspectors to properties on a "sample basis" to determine whether vendors are trying to bill for work that they have not performed.[19] In addition, Safeguard's Field Quality Control Representatives give vendors advanced notice that they are coming to the area to review their work—typically four to six days before the Field Quality Control Representative's property visits.[20] This advanced notice gives P&M vendors time to correct their recently completed work orders (the Field Quality Control Representatives only review the most recently completed work)[21] and therefore may not accurately reflect the quality of a vendor's work or whether the property is being properly maintained.

**C. Mr. Bryar's report and deposition testimony reveal his lack of experience in the property preservation and maintenance industry.**

23. First, contrary to Mr. Bryar's opinion, real estate agents are intimately involved in the preservation and maintenance of REO properties. In his supplemental report, Mr. Bryar states that the term "three-legged stool," a term I used in my initial report, "is not a term used in the industry" and that he has "never heard the term used in connection with the industry until [he] read [my] report."[22] But these statements merely reveal Mr. Bryar's lack of experience in the property preservation and maintenance industry and, as discussed earlier, his limited experience at a bank that follows the inferior national model of property preservation.

24. Focusing only on FHA properties, Mr. Bryar further opines that "a property preservation company's work never overlaps with a real estate agent's responsibilities" and that "the primary

---

[19] Iafigliola Dep. 99:18–21.
[20] Iafigliola Dep. 120:11-17, 143:8–144:8.
[21] Iafigliola Dep. 122:9-125:14.
[22] Bryar Suppl. Rep. ¶ 24; *see also id.* ¶ 48–49.



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

responsibility of real estate agents is to sell properties, not to identify preservation issues and address them."[23] Mr. Bryar, however, fails to address how non-FHA properties are typically managed, which involves the three-legged stool of the real estate agent, the bank or servicer, and the P&M vendor, all of whom should be working together to ensure that an REO property is safe, secure, and preserved and does not lose value. I agree with Mr. Bryar that the primary responsibility of real estate agents is to sell properties, but part of this responsibility includes identifying preservation and maintenance issues and ensuring that they are addressed promptly and properly. If an REO is not properly preserved and maintained, this will interfere with the agent's ability to sell the home. The poor exterior maintenance of an REO detracts from its curb appeal. Safeguard's own training documents acknowledge that the exterior condition of an REO "[a]ffects curb appeal and marketability."[24] This extends to non-structural issues such as yard maintenance. As Safeguard's own REO Vendor Reference Guide explains, "giving the home curb appeal is a necessity as this is the first thing the potential homebuyer will see. Grass clippings and leaves must be cleared from the lawn, driveways, and all walkways. Shrubs must be trimmed if necessary. Flowerbeds must be weeded and edged and sidewalks must be edged as well."[25] Unaddressed preservation and maintenance issues may also cut into the real estate agent's commission if the condition of the property deteriorates or if the issues result in the REO being on the market for an extended period of time. Relatedly, real estate agents provide a Broker's Price Opinion ("BPO")—an agent's assessment of the value of a property—on REOs before they put the REO on the market. If the P&M vendor has not promptly and properly

---

[23] Bryar Suppl. Rep. ¶ 49.
[24] SG00257915.
[25] SG00191737.

addressed preservation and maintenance issues with the REO property, this will result in a lower valuation of the property in the BPO, which results in a lower listing price and a reduced commission for the real estate agent.

25. Mr. Bryar also overlooks the fact that even Safeguard acknowledges that communication with real estate agents is "a critical piece of the puzzle" in the relationship between Safeguard and its clients.[26] As part of its REO vendor training, Safeguard emphasizes that "[i]t is to the vendors['] benefit to form good relationships with [real estate agents]" and encourages vendors to call or email the real estate agent prior to starting work to make an introduction.[27] Safeguard further trains its vendors to "[k]eep an open dialogue with the [agent] regarding the property conditions needing [to be] addressed."[28]

26. Mr. Bryar also ignores that Safeguard's own policies require vendors to be in "constant contact" with the agents responsible for selling REO properties.[29] As Safeguard's own REO Vendor Reference Guide states: "Once a property has been secured and again when the trashout is completed, you are required to call the [agent] to advise on the progress of the order, and you must follow up with an email to the [agent] as well. The [agent] must also be immediately notified if there are damages at the property or if any condition changes."[30] Safeguard even provides its vendors with template emails to use when communicating with real estate agents.[31] Real estate agents are also required to complete a Broker Sign Off Sheet that ensures that the

[26] SG00257852.
[27] SG00257852.
[28] SG00257852.
[29] SG00191760.
[30] SG00191760.
[31] SG00191765.

agent is satisfied with the initial services that the P&M vendor performed, and Safeguard discusses the results of these Sign Off Sheets every month with the vendors.[32]

27. Second, in his deposition testimony, Mr. Bryar demonstrated his lack of expertise in and experience with property preservation and maintenance generally and Safeguard's requirements specifically. For example, Mr. Bryar could not give a concrete timeframe for when a P&M vendor must secure a property that it finds unsecured.[33] Yet both industry standards and Safeguard's own standards require a P&M vendor that finds a property unsecured to secure the property before leaving the property.[34] It makes sense, however, that Mr. Bryar would be unfamiliar with these requirements because he lacks on-the-ground experience with property preservation and management. The bulk of his experience involved managing a team of people who reviewed invoices and photos P&M vendors submitted to Fannie Mae (and this experience lasted for only about one year) as well as developing policies.[35] He has never visited an REO property for the purpose of assessing whether the property is in compliance with industry standards, let alone done so on a regular basis.[36]

28. Finally, Mr. Bryar demonstrated his lack of experience in the property preservation and maintenance industry when he stated in his deposition that the first time he heard about "creative

---

[32] SG00191761; SG00191781–82.
[33] Bryar Dep. 223:3–231:1.
[34] SG00191761 ("Prior to leaving [the] property, ensure that all windows and entry doors, including garage doors, are locked."); SG00192204 (Grass Cut Vendor Manual; "If the property is unsecure, call from the site."). Per FHA guidelines the lock on the front door of a post-foreclosure FHA property must always remain secured and that all exterior doors, regardless of location, must be secured. SG00503886–87. In addition, an FHA property should be "repair[ed] or secure[d] as necessary to protect the property and prevent damages." SG00503938. Documentation to support the secure or repair expenditure should be submitted to HUD after the fact for reimbursement. *Id.*
[35] Bryar Dep. 31:15–18.
[36] Bryar Dep. 54:8–60:3



*Deavay Tyler*
*CEO, DTJ Consulting Ltd.*

photography" was when he read my initial report.[37] But this is a term that Mr. Bryar should be familiar with in his work supervising a team of employees at Fannie Mae who were validating the work that P&M vendors claimed to have performed on REO properties. Even Mr. Iafigliola, who is not holding himself out as an expert in property preservation and maintenance, is familiar with "creative photography." He used the term unprompted during his deposition, was able to explain what it is upon further questioning on the subject, and acknowledged that it is a problem in the property preservation and maintenance industry.[38]

**D. The responses contained in Exhibit 3 to my initial report encompass only standards that apply to P&M vendors, and not to servicers.**

29. My responses to Exhibit 5 to Mr. Bryar's initial report, contained in Exhibit 3 to my initial report, only encompass what a P&M vendor would typically be responsible for preserving and maintaining; they do not extend to items that the owner or servicer is responsible for, like the marketing of a property. In addition, banks and servicers may require additional preservation, maintenance, and even repair for REO properties that may normally be outside the scope of P&M vendors' routine work requirements.

DocuSigned by:
A649449B9455435...
Deavay Tyler

Dated: March 9, 2022

[37] Bryar Dep. 280:20–281:2.
[38] Iafigliola Dep. 99:6–17.

# EXHIBIT 1

# Index of Additional Documents Reviewed by Deavay Tyler

## Expert Reports

- Supplemental Expert Report of Marcel A. Bryar, February 14, 2022
- Supplemental Expert Report of Professor Justin McCrary, PhD, February 14, 2022
- Expert Reply Report of Vincent Yao, PhD, February 14, 2022
- Supplemental Expert Report of David M. Skanderson, PhD, February 14, 2022

## Depositions

- Deposition of Marcel A. Bryar, February 17, 2022
- Deposition of Joe Iafigliola, January 28, 2022

## Bates Stamped Documents

- Documents produced by Defendant Safeguard Properties Management, LLC
  - SG00191697–SG00191729
  - SG00192112
  - SG00190116–SG00190119
  - SG00190217–SG00191784
  - SG00192193
  - SG00257845–SG00257917
- Documents produced by Plaintiffs
  - PLAINTIFFS 074577 – PLAINTIFFS 074588

# EXHIBIT 2

DocuSign Envelope ID: 5C1EA9AB-0DB9-4EFD-A565-EC56275F5D33


# DEAVAY TYLER

## EDUCATION

University of Minnesota, Morris
Bachelor of Arts, Business Management (1995)

Universidad de los Andes, Merida Venezuela
Masters of Arts, International Business/Spanish (1996)

## WORK EXPERIENCE

**DTJ Consulting Ltd. – Chief Executive Officer**
***President – August 2010 – Present***

- Primarily responsible for driving results by creating a corporate culture that meets and exceeds customer expectations. Lead consultant to assist other consultants within the group support customers and build capacity while maintaining sustainability & scalability. Also responsible for assisting customers optimize the delivery of product or service through identifying and addressing operational inefficiencies and ensuring deliverables are met.

**Illinois State Black Chamber of Commerce – Chief Operating Officer**
***Executive Vice President – September2017 – December 2019***

- Primarily responsible for managing & rebuilding membership engagement platform and membership offerings. Also responsible for rebranding the organization, creating an educational platform, and rebuilding the advocacy platform.

**A&D Property Services, Inc. – Chief Financial Officer/Chief Systems Officer**
***Executive Vice President – April 2008 – August 2017***

- Responsible for managing A&D Property Services and its affiliate entities including overseeing operations, company finances, business development, technology, legal, human resources, safety and training. Increased company average annual revenues from $1.5 million to $12 million.

**Fifth Third Bank – Business Development Officer**
***Assistant Vice President –June 2007 - March 2008***

- Responsible for sourcing and cultivating relationships, consulting, underwriting, risk-assessing, structuring and pricing loans for businesses with annual revenue between $3 million to $20 million.
- Credit underwriting of Small Business and Emerging Middle Market accounts, including financial, collateral and guarantor analysis. Additional industry and company research also performed. Credit write-up preparation and presentation of the underwriting package portfolio managers as well as presentation of sales proposal to customer.
- Leading customer and prospect calls, and various other sales/customer oriented projects.
- Support branch network by providing training and support with business banking products and services.
- Responsible for handling branch generated complex customer needs including complex lending structures, complex treasury management needs, complex merchant services and complex payroll service's needs.
- Responsible for uncovering, referring and/or cross-selling appropriate bank products.
- Assist in the preparation of underwriting documents originated from any lending group, recommending structural changes, covenants, etc., ensuring that all of the risks associated with the credit request have been addressed and mitigated.
- Where appropriate, participate with the branch network on customer calls to obtain information on the current needs of the business.

**JP Morgan Chase Bank- 2002-2006**
***Sales and Service Manager, Assistant Vice President – January 2005 – May 2006***

- Responsible for driving sales and participating in managing a $2.5 billion branch.
- Increased year over year growth in 4 of 5 core product lines.
- Achieved highest overall monthly production levels in history of branch.
- Achieved highest loan production level in history of branch.
- Recognized as a leader amongst peers driving sales, building teams, problem resolution, and developing natural product line extension strategies.

***Small Business Relationship Manager, Assistant Vice President – April 2003 – January 2005***

- Ranked 3rd nationally in Small Business Banking (2004)
- Ranked 1st nationally in portfolio cross sales (2004)
- Ranked in top 5 nationally in several product line sales (2003-2004)

- Recognized nationally by my managers, peers, and banking centers as a leader within my job family.
- Trained several new small business bankers and involved in their continued training and development.
- Invited to share best practices in several other regional sales meetings.
- Called upon to be the subject matter expert in small business banking related sales, not only at the branches covered but also by many other branches in the greater Chicagoland area.

***Licensed Relationship Banker – February 2002 – April 2003***

- Consistently ranked in the top 5% of relationship bankers nationally.
- Coached and trained multiple relationship bankers on the habits, the expectations, the characteristics and the best practices to be a consistent high performing relationship banker.
- Demonstrated ability to lead, train, build teams, work well with others and motivate people in a team environment.
- Designated to represent my branch at community outreach events and functions
- Called upon to drive sales and answer complex questions of current and prospective customers.
- Ranked 1st nationally in portfolio cross sales (2004)
- Ranked in top 5 nationally in several product line sales (2003-2004)
- Recognized nationally by my managers, peers, and banking centers as a leader within my job family.
- Trained several new small business bankers and involved in their continued training and development.
- Invited to share best practices in several other regional sales meetings.

**MEMBERS Financial Services, CUNA Mutual Group – Financial Services Representative**
***November 2000- February 2002***

- Established and managed investment and insurance programs at three credit unions.
- Created and implemented financial plans for credit union membership.
- Organized, and presented financial planning seminars and workshops for employees of credit union affiliated corporations including Lucent Technologies, SBC Corporation, CIGNA Healthcare, and the Chicago Board of Education.

**Morgan Stanley – Financial Advisor/Retirement Planning Specialist January 1999- November 2000**

- NASD Licensed Broker (Series 7, Series 66, Series 31)
- State of Illinois Licensed Insurance Salesperson (Life/Accident/Health Insurance Licenses)
- Created and implemented strategies for high net worth individuals and small business owners to grow and protect estates and investment portfolios.
- Implemented and Managed Qualified Retirement Plans (QRPs) for small business clients.

## VOLUNTEERING

**State of Illinois – Fair Practice in Contracting Task Force**
***January 2018– July 2019***
**Illinois Tollway Authority – Diversity Advisory Council**
***October2018– Present***
***Alliance of Building Contractors (ABC) – Diversity Equity & Inclusion Committee (Illinois Chapter)***
***June 2019 – Present***
***Black Contractors Owners and Executives (BCOE) – Legislative Committee***
***August 2020 – Present***
***Black Contractors Owners and Executives – Education Committee (Chairman)***
***December 2020 – Present***

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

-------------------------------X

NATIONAL FAIR :
HOUSING ALLIANCE, et al., :
Plaintiffs, :
v. : Civil Action No.
BANK OF AMERICA, N.A., et al., : 1:18-cv-01919-CCB
Defendants. :

---------------------------------X

Deposition of JOE IAFIGLIOLA
Conducted Virtually
Valleyview, Ohio
Friday, January 28, 2022
8:33 a.m. EST

Job No. 424574
Pages 1 - 317
Reported by: Jacquelyn C. Jarboe, RPR

measured -- what criteria were used to measure the vendor recruiting folks' performance?

A From what I recall, two primary metrics. One was the number of vendor requisitions that they closed. So we would open up a vendor requisition to say, hey, we need a vendor in this market for whatever reason, and then how many of those they successfully closed.

And then they'd also be evaluating -- I can't recall the time frame right now, I think it was six months, but how many of the vendors were still vendors after six months, so that they made it through the credentialing period, they had graduated to the full network, and they were still operating productively in the network. So we were trying to gauge not just how many reqs did they close but how many quality -- how many quality reqs did they close.

Q Got it. Were there a number of vendors who didn't make it past six months with Safeguard?

A Yes.

Q Any idea of kind of percentages that

might drop out at that point?
A From what I can recall, I would say 40 to 50 percent would make it past six months.
Q And why do you think that number was what it was?
A Because of the systems in place to root out vendors who weren't going to successfully perform against the requirements of the work orders that clients are directing us to perform.
Q Did some vendors ever voluntarily drop out at the six-month point or before?
A Yes. They wouldn't really do that at, like, the six-month point, they would just do it whenever they felt like they weren't either able to perform the work to the standards or financially they didn't think they could make it work based on how they were performing. So, yeah, they would opt out at any time in that period or after once they made that business decision.
Q Do you have a sense of kind of the percentage of vendors who would voluntarily drop out maybe within the first year of coming onboard?

A So from what I recall right now, I want to say probably 50 percent of the vendors that started would opt out within that one-year period.

Q Do you have a sense of why the number was 50 percent?

A I think that people took some time to assess how well they could manage their crews, how well they could manage the bid process and the time required to complete the tasks directed by customers.

So oftentimes they would assume that they could make money doing those tasks, and they would find out after they completed a number of work orders that they couldn't. And so they would do the analysis, probably mostly based on, you know, cash in, cash out, most of the vendors weren't doing accrual accounting, they were just doing cash based, and decided they weren't making enough money and they would rather do something else.

Q Now, going back to the employees who were the vendor recruiter folks, would part of what -- I know you talked about them doing background checks.

MR. HOLMES: Objection to form.

THE WITNESS: I'm sorry.

MR. HOLMES: You can answer, Joe.

A The field quality control folks would have precedence to decide that. There could be a case where -- and this happened -- where the vendor account manager didn't agree with the quality assessment of the field QC person, and then, you know, that would be brought up to either the director of the respective departments or, if they couldn't resolve it, to me, to say, well, why do you think -- the field QC person says this, based on this data why do you think that's incorrect, and then we would decide and arbitrate that.

But without that sort of intervention, the field quality control person would take precedence in terms of their decision over the on-time performance.

Q What about if a vendor was always slow, and late, never on time, or rarely on time with their work orders, but the field quality control representative said the quality of their work was

quite good, what would happen in those situations?

A So we would try to have the field quality person and the vendor account manager work with the person, understand why they weren't able to meet the client timelines. Ultimately, most client scorecards were very heavily focused on on-time performance, and so unfortunately we would have to help the vendor get to on time. We would not be able -- our clients would simply not accept, you know, high quality, not on time. We'd have to get the vendor up to delivering on time.

And generally, you could do that by lowering the number of concurrent work orders or helping them with how they dispatched work orders. So that if you had a work order that was assigned at, say, 3:00 p.m. and the vendor typically didn't look at their queue of potential work until the next morning, you'd say, well, let's do a check-in process, you know, at 6:00 p.m. so you can get that assignment going so you can get out to the property on a timely basis.

But we really did have to have the on

time, because that's just a client requirement.

Q And how many -- I know we've discussed you were VP for a number of years, and you can give a range if you'd like, but generally how many vendor account managers were you supervising during the period that you were VP?

A So it did range significantly. So in 2013 I want to say we had probably like 60 people, maybe 50, and then by 2018 it was probably down to maybe 30, 25 to 30. Now, I didn't directly supervise them, there was -- if we want to speak about REO specifically, there was a supervisor and then at some points there was a manager and a director and some points just a director.

Q Do you recall who the supervisor was for REOs?

A Laura -- gosh, it's been so long, I don't recall her last name.

Q And you mentioned there being a manager at some point. Do you recall the manager's name?

A So there was a Palmer DePetro that was a manager and a director, you know, depending on

You know, at one point in time there was a client that allowed us to pressure wash if there was dirt and debris. So if dirt and debris existed you're allowed to spend $75 per side of the home to pressure wash, and if it's dirty or has mildew you're required to do so. So that's how we would do it.

Other clients did not allow us to do that, did not provide funds to do something like pressure washing, and so the vendor would just leave the dirt, debris, or mildew there, because that's what the client instructed.

Q So if I am the person going out, I'm either an employee of the vendor or a subcontractor, to do the initial visit or the initial work order, do I have a copy of that full work order in front of me, am I expected to read all of it, or how does it get -- how does the information in the work order about what's allowable or not get communicated to the person on the ground doing the job?

A So there's really two ways. One is when

we assign the work and the vendor would receive the work order within their Vendor Web portal and they would basically, like, click on it, it would give them the full details and documents that they could print. And then this -- this didn't happen in 2013, I can't remember exact year it happened, but I want to say maybe like 2015 or 2016, then the work order was also available not just in a truncated form but the full work order text was in the mobile device that the vendor had to take photos and document the work completed and answer script questions.

So it was both provided to them in a text format and then also at some point in that period provided on their mobile phone so that they could read all the detailed work order text.

But it would be up to the specific vendor on how they provided that work order to their folks in the field.

Q Was there a best practice regarding how to communicate the instructions in a work order to the folks in the field that Safeguard would advise,

A So we did a little bit of QC for a partial bit of that time on our order auditors. So examining, you know, how accurate they were in terms of catching omission or commission errors by vendors and assessing the quality portion of the employee.

So that was probably only a year or so of that time period, but we did the internal QA. And that was done by other folks, you know, during that period of time, I just had it partially over that 2013 to March of 2019 from an internal standpoint.

Q And I think you said capturing omission or commission errors. What are commission errors?

A So commission errors would be I said I cut the grass but really I cut two strips of the lawn and took a creative photo to make it seem like I cut the whole grass.

Q When you say creative photo, what do you mean by that?

A I mean trying as a vendor to pretend like I did work and bill for it.

Q Is that something that happens quite a

bit in this industry?

A I wouldn't necessarily characterize it as quite a bit, because you root it out and eliminate the vendors that are doing that, so -- but it does happen.

Q And so the folks who were doing the order auditing at Safeguard, would they be responsible for spotting these examples of creative photography to find commission errors?

A They would be, but sometimes it's very hard for them because they're only receiving the photos that a particular -- you know, if a vendor is intending to commit fraud, they're going to only show you what they want you to see. So an order auditor will do their best to detect it, and we came up with photo standards and other things over time, and that's primarily what Mike's team did. But that's why we put in additional controls with SQA and field QC to send an inspector post completion of orders on a sample basis to go detect where we might have vendors trying to fake work.

Q And were you involved in training the

A I don't remember the exact time, but it would have been like 2017 or 2018. It's in the latter half of that period.

Q And how were you reviewing the work of the order auditors during that time?

A We would take a sample of the work they completed, and there was certain expectations that they had documented that an order auditor should do. So we would say here's the order, here's what the order auditor is supposed to do, did they do those things or did they miss catching a requirement of the client that they should have issued a follow-up order or a reopen. Or was there work that a vendor billed for that they were supposed to validate the work completed based on photos, and did they adequately review the photos when they determined that it was okay for the vendor to bill that work.

So we had a checklist which is effectively the checklist of what they're supposed to do, and the quality assurance team would just check those work activities versus the expectation.

Q And so when you were supervising or reviewing the work of the order auditors for the year, were you looking at photos from work orders and comparing them to what the order auditors had found?

A We were reviewing the same photos that the order auditors had.

Q And how did you know what to look for in the photos that the order auditors had reviewed?

A We would use the standard that they had established. So if for a grass cut you're expected to take photos from each corner of the lot going towards the home and then from the home looking out, we would make sure that those photos were present when the order auditor validated the vendor's billed work. So we would use their standard to value whether or not they followed their standard.

Q Okay. So were you looking for things like, just as an example, a photo showed a paint job that was ordered and, you know, only half the wall was painted or something and the order auditor

week, or --

A I'm not sure how many days a week they worked.

Q Okay.

A I mean, I assume they worked five days, but I bet sometimes they worked more than that.

Q Okay. If it was a normal Monday to Friday workweek, that means I guess they could divide it however they wanted, but about eight inspections a day?

A Yeah, generally what they would do is organize and travel on a Monday, do most of their inspections on a Tuesday, Wednesday, and Thursday, and then meet with vendors Thursday and Friday, and then leave Friday from that market. But it was up to them to figure out how to best manage that, but that was kind of a -- would be a typical schedule.

Q Okay. So they would be doing the 40 inspections in about three days?

A Yes.

Q And where were the field quality control representatives based?

would, you know, investigate and understand what they meant by that and determine a course of action.

So it was a productivity and quality assessment review of those market reviews that I primarily did with the management team. I rarely -- I didn't have scheduled meetings with the actual field quality control rep.

Q And just to go back a second, the schedule you mentioned, the typical schedule for a field quality rep where they travel to the place on a Monday, they do their inspections Tuesday through Thursday, they meet with vendors on a Friday, would that be -- it sounds like they would be doing that every week; is that correct?

A Yes.

Q Okay. And are they treated as normal employees or are they contractors? I'm trying to figure out if they are working a 40-hour week, or claiming overtime, kind of how that worked.

A They were salaried employees. They had a great deal of discretion in their job. So it

was -- we had a productivity standard, if you will, but they were responsible for the quality of their market. So however they -- and obviously, it would help them, but however they chose to attack that was up to them. So, no, they were salaried employees.

Q So they might be working -- I don't know, did you have a sense if they were working, like, 60-hour weeks or 40-hour weeks?

A My sense, and I'm sure this varied a lot, was they were probably working 45 to 50 hours from what I recall right now.

Q And you said that they were salaried employees, they had a lot of discretion. What kind of discretion did they have?

A So they would have to independently assess versus the standards the quality of the property and then figure out how they were going to work with the actual vendor to get them to deliver to the standard. So whether that was showing them at a given property, whether that was helping them use the online learning center, or developing

whatever other remediation plans with the vendor to get the quality delivered to standard, they were responsible for figuring out how to do that.

Q And I know you mentioned the goal was to look at each vendor's work at least once a year, if there was a problem more frequently. In assessing a vendor, what would be involved in that? Going to multiple properties, looking at one work order, what was the general course of action?

A So if there was enough volume to do it, we would assess ten properties. And they would also use that databased information that we talked about earlier to pull reopens and follow-up orders, because those are obviously indicative of quality, as well as the field assessment to do their assessment.

And then the management team had developed sort of a scorecarding system that looked at how many work orders did you look at, what types of deficiencies did you have, and, you know, what was the overall quality assessment within that. And that was just done on a spreadsheet, but they

had come up with a structured way to do that assessment.

Q And if the volume was sufficient and they were looking at ten properties, how recent would the work have been performed for those properties at the time of the inspection?

A So it would be the last ten properties that they did, that they completed. So it would be as recent as possible, given the volume in the market. So in high-volume markets like Chicago, it would be very recent work orders from a few days or maybe a week. In lower-volume markets it could be several weeks or longer when that work was completed.

Q And you mentioned the scorecarding system accounting for deficiencies. What kinds of deficiences were you looking for?

A They were looking for items that were instructed to do our bid on the work order versus what was done on our bid. So they would have the work order and be assessing the property against that work order instruction.

provide context to the reason why the assessment was not accurately reflective of performance, but fixing the discrepant issue should have already been done. So if, in fact, that Bank of America provided a fail that we hadn't already fixed, we would absolutely fix it, but it wouldn't change the scorecard result.

Q And then just jumping back a moment again to the field quality representatives, did the vendors know when the field quality representative was coming to town to review their work?

A They would, because we would want to meet with them. So we wouldn't give them a ton of advance notice, but they would know that because we were scheduling meetings to review the results of the field work.

Q How much advance notice did they generally have?

A From what I recall right now, they would generally be told like that Friday before is generally when we would do it, because after the meetings were done and the field QC person was

preparing for their next week, they would be reaching out to the vendors. Sometimes they would also do that on Sunday. So certainly they would have that much heads-up. I don't recall right now that we gave them any more than that.

Q A week before the representative was to meet with them?

A Yes.

Q Okay. Aside from the finance duties you took on in March 2018 in your VP role, are there any other responsibilities that we haven't discussed yet in terms of your role as a VP of operations over vendor management and quality assurance?

A We haven't really talked --

MR. HOLMES: Object to form. Go ahead.

A We haven't really spoken too much about the SQA group. I think -- I think we've captured all the other responsibilities, though.

Q Okay. And can you -- what were the general responsibilities of the SQA group?

A So the field quality control is in the

that question, to get that information back. And in some cases you might have a client that isn't going to do anything about that condition, and that would be the job of the SQA analyst to decide. So they wouldn't just blindly issue a follow-up order. But if the client did want a bid or did want that just remediated, the allowable, then the SQA analyst would issue the follow-up work order.

Q Got it. So there were clients who even if -- let's say peeling paint, we'll just keep going with that example. Well, let me ask this. In an initial -- what is it called, the initial work order, initial --

A Initial service for REO.

Q Right, initial service for REO, would peeling paint be something that would need to be captured and corrected?

A It would depend on the client. For most clients, no. But there would be exceptions related to local ordinances and laws. So if the local ordinance required that to be remediated and that was a code violation, then we would expect the

local vendor who has boots on the ground to have familiarity with that code and report it in. And then we tried over time to build -- there's no national database that's easy to purchase to get code requirements, but we would try to capture them over time so that we could assess the vendors and identify potential code issues so we could identify and provide a bid to the clients to remediate the issue.

Q So some clients, would some clients not have correcting -- peeling paint wouldn't be something that would need to be corrected in the initial services order, but they would want Safeguard to submit a bid, so they would want to know about it and have a bid submitted; is that accurate?

A Some clients --

MR. HOLMES: Object to form. Go ahead, Joe.

A Some clients would have what you described. So the clients, you know, were all -- they weren't -- every client wasn't different, but

A I vaguely recall it.

Q Okay. And what was the -- why was this KP City of Chicago Dangerous Building Policy created?

A I believe from what I recall right now there was a marking that the City of Chicago was putting on vacant buildings indicating that first responders may not enter the building. And we were trying to make and clarify how that City of Chicago action related to our vendor network and the vendor account manager for Illinois.

Q And under Purpose, section 2, it says, "This policy adheres to the City of Chicago's laws and procedures." Is it fair to say this policy was created also to ensure compliance, vendors' compliance with local laws and procedures?

A Yes.

Q As VP of vendor management, were you responsible for making sure vendors complied with applicable law?

A Yes, where we could determine and understand what the specific local laws were. One

of the challenges is many cities have laws, ordinances, and other things that are not easy to obtain and actually know what those ordinances and laws are. So we rely, number one, on the local vendors to have local knowledge.

But where we received either issues from maybe a city directly, or a code enforcement officer, or from a client, or other source where we needed to clarify those requirements to our vendors and/or to our internal folks, then we would attempt to do so. And this is an example of that.

Q I imagine you were also responsible for ensuring the vendors' work complied with state and federal law, too; is that right?

MR. HOLMES: Object to form. I don't know what you mean by responsible for the vendors. But you can go ahead and answer, Joe.

A So we would attempt to understand what those requirements were as it relates to REO or property preservation, work with our clients to make sure they understood it, and then use our work order system, which could identify work order

instructions down to state and zip code level, to add any specific relevant ordinances or laws that we were aware of so that the vendors would also be aware of them, with the caveat that the -- again, the vendors, as boots on the ground, were the primary control to making sure we were adhering to those laws.

So we would do best efforts to make sure that we adhered to those laws and adhered to client instructions in how the REO and property preservation business relates to those federal, state, local requirements and laws.

Q During your time as VP, did Safeguard create other policies to ensure that vendors complied with applicable law?

A I'm certain --

MR. HOLMES: Object to form.

A Yes, I'm certain we would do certain laws and ordinances where we felt like they needed to be clarified for folks.

Q Do you recall any examples of other policies like that?

Mae and Freddie Mac?
A Yes.
Q And I don't -- I'm trying to remember what that actually stands for.
A Government Sponsored Enterprises.
Q Thank you.
Did Safeguard while you've been at the company create any policy to ensure that vendors' work complied with requirements of the federal Fair Housing Act?
MR. HOLMES: Object to form.
A Other than requiring that they follow federal laws in the master service agreement, nothing specific to that, no.
Q Okay. You can put that exhibit away, Exhibit 390, and let's open up exhibit SG00293622. 293622.
A Scorecards and Expectations, Frequency of Delivery?
Q That's right, that's what's listed as the title. And we'll mark this one as Exhibit 391, please.

guess I'm used to talking about paper. You can close that out now.

I just want to revisit vendor training a bit. I know we touched on it a little bit before.

Can you give me an overview of the topics new Safeguard vendors are trained on?

A So we don't really train, because they're not our employees. So we provide best practices. But it's really effectively making somebody your employee if you train them, so there's no training done.

Q So what kind of -- is it guidance on best practices then that --

A Yes, so we did extensive guidance and best practice sharing on many different topics. So, for instance, we would go through a maid refresh order in detail, and that would be shared in that electronic learning system that the vendors would be going through during the credentialing process.

Also, topics there would be, you know, initial services expectations, and how to read a

work order, how to determine occupancy. Those are the general topics that I recall right now.

We would not be providing sort of best practices on how do you physically repair a handrail. That's really the expertise that we would expect the vendors to have, and we would not be doing much with that sort of thing.

There would be some specific learning modules, for instance, on how to do clear boarding and where to put the bolts so that the clear boarding from the street made it look like the property and the windows were still intact to minimize community blight. So we would do some of those things.

But how you actually drill a hole in the polycarbonate and that sort of thing, the vendors would either already know how to do or they would learn how to do, their crews would learn how to do it from the team, the actual vendor.

Q And all of the guidance and best practices sharing, that happened through -- I know you mentioned the name of it before, but the

electronic portal?
A That was the primary channel, but --
Q Okay.
A -- when the field QC people were in market they would share the information as well. And there would be, like, a website link. And then we would also review these topics in person at these vendor conferences that we hold and go over this with the group, with generally field QC leading the education to share those best practices.
Q Was any of the best practice sharing, did any of it pertain specifically to the Fair Housing Act?
A Other than describing and sharing the requirements to follow all laws that are applicable, and then ensuring that people understood that they needed to fully complete all the requirements on the work order, I mean, that's how we would make sure that every property is treated based on the way the clients described it to us. And the work orders would have all the

requirements so that the properties were in condition to standards as defined by the clients or the GSEs or FHA.

Q And when you say sharing the requirements to follow all laws, were laws, you know, named, or was it just at that level of generality? Maybe a little bit more information.

A If there were any specific areas that we thought people might not be aware of, we would point them out. So a specific example of that is SCRA laws, which I apologize, I can't remember what that acronym is, but it's effectively that if you're a service member serving overseas, I don't know if it has to be overseas, but serving in a war that your property cannot be foreclosed on. And I think there's other requirements as well.

So that's an example of one that we did share to make sure people were aware of it. And if there was any evidence that the property they were about to secure was owned or occupied by somebody who might be a service representative or service member, that they would reach out to the client to

is a value listed of $175,000. Do you see that?
A Yes.
Q What is that supposed to indicate? Is that the value of the property, something else?
A I believe from what I recall that that is a requirement for this FHA form that you have to fill out, the FHA requires you to declare a value.
Q And who is making this valuation?
A I believe the inspector doing the work would be putting a number in there.
Q And what is -- the inspector doing this contact attempt, what are they basing this valuation on?
A I'm not sure. We didn't really do anything with it. It was a requirement of FHA's.
Q Was any documentation actually provided supporting the valuation?
A I don't believe so, to my recollection.
Q And that number I think you mentioned gets passed along to FHA. Would it be passed along to anybody else or used in any other way?
A Not -- I don't think so. I don't

remember ever seeing it used for anything. But I'm not sure if FHA or a client would use it for some reason, but certainly if it's just an inspector, it's not an appraiser or anyone else who would have the credentials to make such a value determination.

Q And then just before that there's a line Area, and it says declining. What does that mean?

A I don't know. I didn't construct the questions here, so I'm not sure what the term set on choices are for the area.

Q Did Safeguard do anything with this information, that the area was declining?

A I don't think so. There was a different question that is in regards to whether an area was perceived by the vendor to be -- I can't remember the exact terminology, but like high vandalism. But I don't recall us ever using that piece of information. My assumption is, and this is probably a question that, you know, Mike probably would know the answer to, is if that's also a required answer that FHA forces you to give.

Q And does the choice of whether an area is

high vandalism would do is if you would see, I think it's called DAWGS, like D-A-W-G-S, but I'm not 100-percent sure, but it was, like, metal window boarding and, like, metal door boarding that would more secure the property if it was a high vandalism area. I'm sure there are other things, but those are the types of things I recall right now.

Q Okay. And who is making the determination that it's a high vandalism area?

A The vendor is making that determination.

Q And what is the vendor basing that determination on?

A I don't recall right now if we provided any guidance. Generally, they would do it based on, you know, if the property had been broken into, or if there were broken windows, or if the AC condenser had been stolen. Usually based on the property-specific activities that had happened.

Q And did any documentation have to be provided to support a determination that a property was in a high vandalism area?

A I would want to check, but I'm pretty -- I seem to recall no, it was just a yes-or-no question. I don't believe you had to append a comment or a document, but I'm not 100-percent sure in Vendor Web what it would require, if it did require that.

Q Do you recall ever seeing documentation of an area being a high vandalism area?

A In the context of like a bid to put on that metal protection and -- or an AC, AC box, yes. But that's the context I remember seeing the high vandalism mentioned.

Q And what kind of documentation would you have seen in those contexts?

A Just the prior theft of the condenser where it had been ripped off or taken from the pad outside or, you know, the doors being broken into, or the plumbing copper pipe stripped, that sort of thing.

Q So you weren't seeing documentation, for example, related to vandalism rates in the surrounding neighborhood?

A No, I don't recall seeing anything like that.
Q Or nothing related to crime rates in the area, for example?
A I remember us potentially sending out something to that effect in either a vendor memo or communication about a place to check for crime rates. But I can't remember when that was exactly right now.
Q And was that to support a statement that a property was in a high vandalism area?
A From what I remember, it was to give vendors an additional reference point other than the actual property they were at. But there wasn't -- I don't recall us doing much more than providing that reference to them.
Q And I know you mentioned the questions were required by FHA. And is that FHA required them regardless of the kind of work order; is that right?
A I don't know if they required it for every work order. If they had approved, like, a

reduce blight by lessening the appearance of a clearly vacant/abandoned property." Do you see that?

A Yes, I do.

Q Okay. What is meant by curb appeal here?

A The view of the property from the curb, from the street.

Q Does that term have meaning within the industry, the property preservation and maintenance industry?

A Not necessarily property preservation. I think just more general real estate.

Q And you said the curb appeal is the view of the property from the street. That seems to me like the curb view. I guess -- it says curb appeal. Does the word "appeal" have any meaning in that for you?

MR. HOLMES: Objection to form; asked and answered. Go ahead.

A I mean, only it means as you're looking at a house from the curb is it more appealing. I think that's -- I've heard that phrase just in

marked for identification and is attached to the transcript.)

MS. WEBER: And just so everybody knows, this is -- the document that starts SG 486940, Exhibit 402, contains an excerpt. So this is the first page of the document but then a number of other pages of the document are excluded, and you can see which by comparing the Bates numbers. But just to have a manageable file so it's not over 100 pages, we created this excerpt for this exhibit.

Q If you could look through pages 2 through 8 of the PDF and just let me know when you've reviewed those. And I'll just tell you, my question is whether the work shown in these photos, the boarding work, comports with Safeguard's standards for how boarding should be performed.

A So from my assessment of this, it looks like the bracing is appropriate, but the size of the board, at least like on page 2, is not sized appropriately. The thing I cannot tell is if that frame is sufficiently strong to hold the board. If that window frame is sufficient, then the board

should be cut to fit inside it and not overlap it.

If you go down to page 4, same thing, the board is overlapping. And it doesn't look like from the photos on the upper right that there is a window frame, so that probably is the only way to board that.

Down on page 5 there is a window frame, and the board is bigger than it. It should fit inside the window frame. That's why there's daylight showing in the lower right picture on page 5, and it shouldn't be.

Page 6, it's hard to tell if the window frame's intact. It doesn't appear to be intact. So that's really the only way to board that window. And then I don't know, I think page 8 is just showing the same thing again.

Q When you say the size of the board is not appropriate, what gives you that impression?

A So if you have a window frame that you can put the plywood to brace against, you ought to have it inset inside the window frame so that it's not on top of the brick exterior, but it's recessed

in. So the most obvious place to see that is on the Bates 486948 where there's a window frame, but the board is still outside of it. Where there's not a window frame you don't really have a choice, so you do have to do that.

Q Okay. If you could go to page 15 of the PDF, which is Bates numbered SG 487111. Just let me know when you're there.

A Okay.

Q The last paragraph says, "I have reviewed the work performed on this property by my crew/subcontractors and verified that all work has been completed per Safeguard's instructions: Yes." What does this paragraph refer to?

A It's a representation from the vendor that they're signing off on the work performed by their crew or subcontractors.

Q Is this part of the quality control that vendors are asked to do on their own crew's work, or is this something else?

A It's part of the quality control system, but it's on every work order that their vendor is

submitting at least at this time, submitting to Safeguard.

Q So based on what you saw from the boarding photos we just looked at, should this -- I mean, should the vendor have signed off in this way on this work?

A No, they should not have.

Q So would you expect that this issue would have been picked up by -- is it the work order auditors or somebody else?

A The work order auditors.

Q And if the work order auditors had kind of flagged this, would we see any documents reflecting that?

A We ought to see a follow-up order.

Q A follow-up work order?

A Yes.

Q Would that be for kind of redoing the boarding or something else?

A Yes, it would be. Or this order, I guess, could have been reopened as well.

Q And if the order were reopened, would

there be another work order update showing completion of or recompletion of the work?

A Yes. Yes, it would have been -- I'm not sure what sequence it would appear in from a photo standpoint, but yes, there would be the recompletion if it was reopened, versus a follow up would be an independent order.

MS. WEBER: And I'd just note for the record, I don't think we've received any documents indicating a follow-up order or a work order be reopened or redone. So if those do exist, we'd ask that they be produced.

Q Okay, you can close that exhibit. And I'll just tell you, we're nearing the home stretch. I know it's been a long day.

If you could open the document labeled SG 499275, please.

A Okay.

Q And we'll mark this as Exhibit 403.

(Iafigliola Deposition Exhibit 403 was marked for identification and is attached to the transcript.)

CERTIFICATE OF REPORTER - NOTARY PUBLIC

I, Jacquelyn C. Jarboe, Registered Professional Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting by me; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 31st day of January, 2022.

My commission expires:
August 21, 2022

Jacquelyn C. Jarboe
_______________________________

NOTARY PUBLIC IN AND FOR THE
STATE OF MARYLAND

# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | * | |
| | * | |
| Plaintiffs, | | |
| v. | * | Civil Action No. CCB-18-1919 |
| BANK OF AMERICA, N.A., *et al.*, | * | |
| Defendants. | * | |

* * * * * * * * * * * * *

**DECLARATION OF JACOB S. RUGH**

I, Jacob S. Rugh, am over the age of 18 years and competent to testify as to the matters set forth in this Declaration. All statements herein are based on my personal knowledge.

1. Attached hereto as Exhibit A is a true and accurate copy of my February 14, 2022 revised expert report in the above-referenced matter.

2. Attached hereto as Exhibit B is a true and accurate copy of my March 4, 2022 supplemental expert report in the above-referenced matter.

3. Attached hereto as Exhibit C is a true and accurate copy of the data I utilized when forming my analysis in the aforementioned reports. I understand from Plaintiffs' counsel that this data set was produced to Defendants as RUGH00034. Columns V-Y show the property address and column IW shows the local burglary rate per 1,000 people in the calendar year before Plaintiffs evaluated each property.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 7, 2022

[signature]
Jacob S. Rugh

# EXHIBIT A

**Revised Expert Report of Jacob S. Rugh, Ph.D.**
*National Fair Housing Alliance, et al. v. Bank of America, N.A., et al.*, No. 18-1919 (D. Md.)

## I. Qualifications

I am an Associate Professor of Sociology at Brigham Young University in Provo, Utah. I have been a professor of sociology for nearly ten years, attaining tenure and the rank of Associate Professor four years ago, in 2018. I teach advanced coursework at the graduate and undergraduate levels in urban sociology, race and ethnicity, and related subjects. I received my Ph.D. from Princeton University in interdisciplinary Urban Policy in Public Affairs with an emphasis in the sociology, economics, and public policy dimensions of the 2008 housing foreclosure crisis. My research training includes a dual M.P.A. (Public Affairs) and U.R.P. (Urban and Regional Planning) master's degree, also from Princeton University, and a B.S. in Economics, with honors, from Brigham Young University. My curriculum vitae is attached as Exhibit 1.

My research has been cited in multiple fair housing cases at the state and federal level, and in briefs filed with the Supreme Court—including in *Fisher v. University of Texas at Austin*[1] and *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*.[2] I have also served as a consulting statistical expert in ten fair housing cases. As a result of my work in one of those cases, my coauthors and I won the John Hope Franklin prize for Best Article on Race, Racism, and the Law from the Law and Society Association in 2016.

My peer-reviewed research has been cited 2,028 times according to the Google Scholar database. My articles and chapters on racial disparities in housing, racial segregation, discrimination in mortgage lending, home ownership, land use zoning, immigration, racial integration facilitated by loans from the Department of Veterans Affairs, and other related fields have been published in leading journals across multiple disciplines and byhigh quality academic presses.

I have extensive experience in matching primary and secondary data sources to U.S. Census data, Home Mortgage Disclosure Act mortgage data, local county assessor and recorder public data, and other records. I also have training and experience using geospatial methods, georeferenced data, and geographic information software and systems of maps, and have published work on these subjects. I have developed multiple databases that have been shared with other researchers. The most recent is a database of COVID-19 case rates and death rates by U.S. zip code along with housing variables for over 17,000 zip codes measured at four waves or points in time during the current pandemic with another round of data collection ongoing.

Based on my education and experience, I propose to offer expert opinions in the following fields relevant to this matter:

---

[1] *Fisher v. University of Texas at Austin*, 579 U.S. __, No. 14-981. Supreme Court of the United States. 2016. *U.S. Supreme Court Library.* [Rugh and Massey (2010)].

[2] *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.* 576 U.S.___, No. 13-1371. Supreme Court of the United States. 2015. U.S. Supreme Court Library. [Rugh and Massey (2010)].

- Analysis of racial disparities in housing
- Statistical and econometric analysis

## II. Materials Reviewed and Considered

In preparation for forming my opinions in this matter, I reviewed the materials sent to me from Brown Goldstein & Levy and the National Fair Housing Alliance ("NFHA"). A full list of these materials is included in Exhibit 2 to this report. If I am provided with additional or different information, I reserve the right to revise my analysis and opinions based on such new information.

## III. Opinions

After consideration of the above-referenced information, and following my analysis described below, it is my opinion, to a reasonable degree of professional certainty, within my fields of expertise, that:

The racial disparity in total average Bank of America, N.A. ("BANA") real estate owned ("REO") exterior property maintenance and marketing deficiencies between the 452 properties in white tracts and 953 in non-white tracts (of the Current REO Database of 1,405 total properties)[3] is highly statistically significant, practically significant, and is not fully explained by an analysis of other potential alternative explanations. In the properties investigated by NFHA, there was an average of 3.06 more deficiencies among properties in non-white tracts than in white tracts (6.14 deficiencies per white-tract property, 9.20 deficiencies per non-white tract property).[4] In non-white tracts, REO properties are 3.3 times as likely to exhibit a high number (11 or more) of deficiencies than properties in white tracts (33.6% vs. 10.2%, respectively); likewise, properties in white tracts were 2.9 times as likely to exhibit a low number (5 or fewer) deficiencies as in non-white tracts (47.1% vs. 16.3%, respectively). In my analysis—which analyzed 40 other variables like property age and poverty level—there is no variable or set of variables that eliminates or comes close to accounting for the racial disparity.

As I explain in Section IV below, the regression analysis[5] of 1,405 properties visited by NFHA demonstrates several key points:

[3] The Current REO Database consists of the 1,405 properties that Plaintiffs' counsel sent me to analyze (PLAINTIFFS 074533). I understand that these 1,405 properties include 1,145 properties that BANA agrees it was responsible for and 260 properties where the parties disagree about whether BANA was responsible.

[4] The racial disparity by tract non-white vs. white status is 3.06 deficiencies when subtracting 9.20 minus 6.14 rounded to two decimal places and is 3.053 when subtracting 9.197 minus 6.144 to three decimal places. For the regression analysis, 3.05 will be used for statistical estimation purposes.

[5] Regression analysis is a common statistical technique for estimating the association or effect of one explanatory factor on an outcome when controlling for or accounting for multiple other explanatory factors or variables. In other words, regression is way to measure the strength of an explanatory factor, such as majority non-white tract status, and its association or effect on an outcome, such as total average REO property deficiencies, after controlling for other explanatory factors or variables, such as the age of the property, local crime rates, etc.

- Controlling for 18 variables—the same included in my initial regression analysis referenced in Plaintiffs' Complaint[6] (but excluding 4 that were not statistically significant)—only reduced the racial disparity by 22%, from 3.05 to 2.38 deficiencies, leaving 78% of the disparities in deficiencies unexplained by anything other than race.
- Even with all 18 variables controlled for, the racial disparity in deficiencies remained both highly statistically significant and practically significant.
- Even when limiting the deficiencies to overgrown grass/leaves and trash/debris—two deficiencies unrelated to the condition of the property at the time BANA took ownership—the strong disparity between properties in white and non-white tracts remains unchanged, and most of the racial disparity remains unexplained by non-racial factors.

The variables controlled for in this regression analysis include the age of the property, the size of the home and the lot, the value of the home and lot, and the year and season when the property was evaluated. None of the factors in isolation resulted in an equal number of deficiencies for white and non-white tracts.

This analysis provides a strong basis for concluding that there is a racial disparity between BANA's and Safeguard's exterior property maintenance in white census tracts and their exterior property maintenance in non-white census tracts. While it is possible that additional factors could explain part of the racial disparity, these factors can only be furnished by BANA (or potentially Safeguard).[7] Given that the data on these additional factors are available to BANA, but its experts did not rely on these factors or introduce evidence that they used any or all of these factors to explain the racial disparity in BANA's REO exterior property maintenance indicates that those factors do not explain the disparity.

In Section V, I offer detailed replies and rebuttals to critiques raised in the expert reports of Vincent Yao, Justin McCrary, and David M. Skanderson, as well as a final regression analysis controlling for 20 different factors to capture the impact of the various alternative causes of the disparities hypothesized in their reports. First, I demonstrate that the observed disparities in maintenance are not explained by conditions created or left by the former delinquent mortgagor. Second, I show why the crime rates (regardless of whether burglary or vandalism rates are considered) do not explain the observed racial disparities in maintenance. Third, I rebut the argument that the distinction between urban versus suburban housing market locations explains the differences in deficiencies. Fourth, I discuss why census tract poverty rates are a poor proxy for homeowner poverty rates and, even if used, still do not explain the observed racial disparities in maintenance. Fifth, I explain why vacancy rates are not a race-neutral control variable and

---

[6] My initial regression analysis controlling for 21 variables was described in paragraph 87 of Plaintiffs' Complaint and was produced to the Defendants as PLAINTIFFS 073154.

[7] Examples of these factors include: (1) the first-time vacancy date for all 1,405 REO properties in question (currently only available for 162 properties); (2) the foreclosure initiation date for all foreclosed mortgagors; (3) the payment history or delinquency patterns by month leading up to the foreclosure start or filing; (4) the length of the foreclosure process; (5) the type of loan issued to the foreclosed borrower (conventional, subprime, alt-A, FHA, VA, etc.), the purpose of the loan, the amount of loan, and the loan-to-value ratio; (6) the back-end (or front-end) debt-to-income ratio or monthly payment-to-income ratio; and (7) any further record of property registration dates per local ordinances or code violation or nuisance complaints filed by public authorities while BANA held REO ownership.

that, even if used, still fail to account for the observed disparities to the same degree as race. Sixth, I address Dr. Skanderson's concern regarding sample size by excluding metro areas with fewer than 30 properties each and still finding the same statistically significant racial disparity. Finally, I present the results of the final revised regression analysis.

As I explain further in Section V, the final regression analysis demonstrates the following:

- By controlling for 20 variables—including 3 additional variables that Defendants' experts claim are race-neutral and could explain the disparities observed (despite the problematic nature of some of those variables, as discussed further below), as well as the 18 variables in the initial regression analysis discussed earlier[8]—the difference in deficiencies between the white and non-white tracts is still only reduced by 35%, from 3.05 to 1.97 deficiencies. This still leaves 61% of the disparity unexplained by anything other than race.
- Even when controlling for these 20 potential alternative causes of the observed differences in deficiencies, the racial disparity remains highly statistically significant and practically significant.
- Removing metro areas from the analysis with fewer than 30 properties leaves these results unchanged.
- Removing properties that BANA argues it was not responsible for maintaining from the analysis also leaves the results unchanged.

The final, revised estimates—using both the variables I suggest, as well as new ones suggested by Defendants' experts, and granting one small exclusion they suggest—continue to show that the tract racial disparity in REO property deficiencies remains both statistically and practically significant, and still mostly unexplained by any other control variable other than race (Table 16).

All regression analyses and statistical tests were run using the software package Stata/SE Versions 15 and 16.[9,10]

## IV. Analysis and Discussion

In this Section, I set forth my findings with regard to the regression analysis of the Current REO Database of 1,405 properties.

The analysis in this report investigates the difference in total REO (real estate owned or lender-owned foreclosed residential property) property maintenance deficiencies in the Current REO Database of 1,405 properties by census tract racial composition. Census tract racial composition is defined as the difference between "white tracts," where 50%-100% of the population is non-Hispanic white, and "non-white" tracts, where non-Hispanic whites are 0%-49.99% of the population in the 2010 decennial U.S. census. Census tracts are geographic units that typically

---

[8] Two of the 18 variables included in the initial regression analysis addressing the age of the home have now been consolidated into 1 variable in this final regression analysis. This is discussed further in Exhibit 3.

[9] StataCorp. 2017. *Stata Statistical Software: Release 15*. College Station, TX: StataCorp LLC.

[10] StataCorp. 2019. *Stata Statistical Software: Release 16*. College Station, TX: StataCorp LLC.

average 4,500 inhabitants and correspond to neighborhoods for the purposes of social science research. For consistency, this report will refer to them as tracts. The geocoded census tract is based on the physical address of the property and was included in the datafiles provided by NFHA. The geocoding has been validated and verified to be correct, being updated in fewer than 10 records of 1,405. The findings here only pertain to the metropolitan statistical areas, as defined by the U.S. Census Bureau in 2013, where these 1,405 properties are located (see detailed discussion of Table 12).

*The difference in distribution of low versus high number of deficiencies by white versus non-white tracts is stark.* Figure 1. shows the distribution of total REO property maintenance deficiencies for 452 white tracts (blue outline) and 953 non-white census tracts (tan with orange outline). The meaningful difference in deficiencies by tract racial composition is readily apparent from Figure 1.

**Figure 1.**
**Frequency Distribution of Total REO Property Deficiencies for White Tracts and Non-White Tracts in Current REO Database of 1,405 Properties**




Another way to measure and understand the difference is to consider the percentage distribution of total REOs from 0 to 23 in both white and non-white tracts, not just the average or the frequency distribution shown in Figure 1. Table 1 below illustrates this difference. It shows that among the 1,405 properties, about 26% (368) exhibit a low number of deficiencies (0-5 in total),

close to 48% exhibit a medium number of deficiencies—around the overall average of 8.21 deficiencies (6-10 in total), and another 26% exhibit a high number (11-23 in total).

In non-white tracts, REO properties are 3.3 times as likely to exhibit a high number (11 or more) of deficiencies than properties in white tracts (33.6% vs. 10.2%, respectively); likewise, properties in white tracts were 2.9 times as likely to exhibit a low number (five or fewer) deficiencies as in non-white tracts (47.1% vs. 16.3%, respectively). Whereas 47% of REO properties in white tracts exhibit five or fewer deficiencies, only 16% of properties in non-white tracts fall in this same low range. In addition, while only 10% of properties in white tracts have at least 11 deficiencies, 34% of properties in non-white tracts fall in this high range. These differences are also apparent in Figure 1 above.

**Table 1.**
**Comparison of Distribution of Properties in Low, Medium, and High Ranges of Total REO Property Deficiencies for White Tracts, Non-White Tracts, and All Tracts**

| | **Total REO Properties** *Percentage of Properties in Italics* | | |
|---|---|---|---|
| **Total REO Property Deficiencies** | **White Tracts** | **Non-White Tracts** | **All Tracts** |
| **0 – 5 Deficiencies (Low Range)** | 213 | 155 | 368 |
| *%* | *47.1%* | *16.3%* | *26.2%* |
| **6 – 10 Deficiencies (Medium)** | 193 | 478 | 671 |
| *%* | *42.7%* | *50.2%* | *47.8%* |
| **11 - 23 Deficiencies (High)** | 46 | 320 | 366 |
| *%* | *10.2%* | *33.6%* | *26.1%* |
| **Column Total by Tract Type** | **452** | **953** | **1,405** |
| *%* | 100.0% | 100.0% | 100.0% |

Source: Current REO Property Database (N=1,405).

*The difference is highly statistically significant, practically significant, and not due to chance.* On average, properties in white tracts have 6.14 deficiencies, or 3.06 fewer deficiencies compared to 9.20 deficiencies in non-white tracts (Figure 1, Table 2). The difference in average deficiencies between non-white and white tracts (3.06) is highly statistically significant ($p<.001$). In this instance this means that in fewer than 1 in 1,000 cases may we attribute the difference to chance.

The difference of 3.06 deficiencies *is also practically significant or substantially meaningful.*

For the Current REO Database of 1,405 properties, the practical significance of the difference in property deficiencies for white versus non-white tracts may be measured by Cohen's *d* statistic.[11] Cohen's *d* helps researchers ascertain whether a highly statistically significant difference ($p<.001$ in our case) is practically significant or substantially meaningful. Importantly, Cohen's *d*

[11] Cohen, Jacob. 2013 [1988]. *Statistical power analysis for the behavioral sciences*. Academic press.

accounts for the number of observations in each type of census tract, the standard deviation, as well as the unequal number by each type of tract.[12] In other words, *practically speaking*, is the difference or effect of non-white tract status little to none, small, medium, or large?

Table 2 below reports Cohen's *d* measure of practical significance.

**Table 2.**
**Cohen's *d* Measure of Practical Significance of Difference in Mean (Average) Total Property Deficiencies for White Tracts versus Non-White Tracts**

| | White Tracts (50%-100% White) | Non-White Tracts (0%-100% White) | Non-White minus White Difference |
|---|---|---|---|
| Mean deficiencies | 6.14 | 9.20 | **3.06*** ** |
| Standard deviation | 3.34 | 3.64 | -- |
| Number of properties | 452 | 953 | 1,405 |
| **Cohen's *d*** | | | **0.86** |
| 95% Confidence Interval | | | (0.74, 0.98) |
| *Conventional Interpretation of Effect Size Key:*<br>*0-0.2 = Little/no effect*<br>*0.2-5 = Small effect*<br>*0.5-0.8 = Medium effect*<br>*0.8-1.0 = Large effect)* | | | ***Large Effect Size*** |

*** $p < .001$, ** $p < .01$, * $p < .05$ (two-tailed test of difference)

Among the 1,405 properties, the summary statistic measure, Cohen's *d*, is computed to be 0.86, which is interpreted to mean a *large effect size*. This measure will be computed again for each model estimation result in the report's statistical regression analyses, both the reproduction of my initial pre-Complaint analysis using the Current REO Database (Table 16) as well as the revised final regression analyses incorporating the critiques and variables suggested by other experts (Table 15).

*Regression analysis is a common statistical technique for estimating the association or effect of non-white tract status on total deficiencies when controlling for or accounting for multiple other variables.* In other words, regression is way to measure the strength of an explanatory factor, such as majority non-white tract status, and its association or effect on an outcome, such as total average REO property deficiencies, after controlling for other explanatory factors or variables, such as the age of the property, local crime rates, etc.

A regression may be estimated with an increasing number of variables to illustrate what happens to the strength of the initial association or effect of the main factor of interest, in this case, majority non-white tract racial composition status. Each time a regression is estimated and the results computed using statistical software, the set of explanatory variable(s) included may be referred to as a separate regression equation or model.

[12] Rosnow, R. L., Rosenthal, R., & Rubin, D. B. (2000). Contrasts and correlations in effect-size estimation. Psychological Science, 11(6), 446-453.

As explained in Exhibit 3, I have included variables whose relationships to property deficiencies are statistically significant (and excluded those that are not). Table 3 below identifies which factors were included in the 18-factor regression analysis discussed in this Section. See Exhibit 3 for a detailed discussion of each one of these variables and their relationship to both total average REO property deficiencies and white versus non-white tract status.

In reporting the results below, each model will be numbered in a column or row of the corresponding table. For the full results, 12 models will be estimated (Table 6). For the summary of results, 5 of these 12 models will be highlighted (Table 5): (1) an uncontrolled or baseline model that does not control for any other factors beyond non-white tract status (one explanatory variable), and then adding certain sets or groups of variables that introduce factors related, (2) to the age and new construction status of the home, (3) the time and place (the year and season it was evaluated along with zip code and metropolitan area characteristics), (4) physical characteristics and sales history of property, and (5) length of time BANA held ownership of the REO per public records (see Exhibit 3) and BANA (BANA-NFHA-LIT_03222596 & 0298915).

Each regression model may be evaluated using the $R^2$ statistic, which is simply the proportion of the variation in the outcome that is explained by the explanatory variables, ranging from 0 to 1. By multiplying this statistic by 100, we can assess how much of the variation in the outcome (deficiencies), is explained by all the variables in each model.

Finally, we can compare the effect of non-white tract status from the initial, uncontrolled gap of 3.05 additional deficiencies (Figure 1) to see what percentage of the racial disparity gap (3.05) is explained by other variables. For example, if the effect of non-white tract status falls to 2.40 in a model that includes other variables, then that would mean that 2.40 / 3.05 = 79% of the racial gap is still unexplained. Put another way, the other variables only reduced or explained the gap by 21%: (3.05 – 2.40) / 3.05 = 21%. In this example, most of the racial disparity (79%) is not explained by other factors. This simple calculation is reported for each model result in Table 6.

**Table 3.**
**Summary of Variables Used in Original and Final Analyses of Total REO Property Deficiencies**

| Variable Used for Original and Final Analysis | *Number of Properties* | All Tracts | White Tracts | Non-White Tracts | Non-white minus White Difference |
|---|---|---|---|---|---|
| | | Average or Percentage by Census Tract Racial Composition | | | |
| 1 Total REO Property Deficiencies | *1,405* | 8.22 | 6.14 | 9.20 | **3.06** *** |
| 2 Year Property Built | *1,405* | 1953 | 1961 | 1949 | **-12.00** *** |
| 3 % Built before 1940 | *1,405* | 31.4% | 21.0% | 36.3% | **15.3** *** |
| 4 % Built 1940-1969 | *1,405* | 40.8% | 42.7% | 39.9% | **-2.8** *** |
| 5 % Built 1970 or later | *1,405* | 27.8% | 36.3% | 23.8% | **-12.5** *** |
| 6 % First Owner of Newly Constructed Home | *1,405* | 9.0% | 12.4% | 7.3% | **-5.1** *** |
| 7 Home Size (sq. ft.) | *1,264* | 1,561 | 1724 | 1486 | **-238** *** |
| 8 Lot Size (sq. ft.) | *1,264* | 8,614 | 11803 | 7155 | **-4648** *** |
| 9 Ratio of Home Size to Lot Size (x 100) | *1,264* | 29.99 | 26.13 | 31.76 | **5.63** *** |
| 10 Land Value per Lot Sq. Ft. ($) | *1,264* | 6.54 | 7.10 | 6.28 | **-0.82** |
| 11 % Zip Code Change in Home Prices, 2004 to 2014 | *1,405* | -13.6% | -10.9% | -14.9% | **-4.0** *** |
| 12 Date of property evaluation visit | *1,405* | 6/1/2014 | 7/15/2014 | 5/10/2014 | -66 |
| 13 % Visited January-March (1st qtr.) | *1,405* | 28.3% | 27.0% | 29.0% | 2.0 |
| 14 % Visited April-June (2nd qtr.) | *1,405* | 17.5% | 18.8% | 16.9% | -1.9 |
| 15 % Visited July-September (3rd qtr.) | *1,405* | 32.0% | 35.4% | 30.4% | -5.0 |
| 16 % Visited October-December (4th qtr.) | *1,405* | 22.1% | 18.8% | 23.7% | **4.9** * |
| 17 Property ever REO previous to BANA REO | *1,045* | 15.0% | 8.4% | 18.3% | **9.9** * |
| 18 Months between BANA REO and evaluation visit | *1,002* | 12.20 | 11.01 | 12.77 | 1.76 |
| **Variable Used in Original, Not Final, Analysis** | ***Number of Properties*** | **All Tracts** | **White Tracts** | **Non-White Tracts** | **Non-white minus White Difference** |
| 19 % Foreclosed Loan Used for Refinance Purposes | *1,034* | 34.2% | 33.5% | 34.6% | 1.1 |
| 20 % REO acquired by Deed-in-Lieu of Foreclosure | *979* | 3.6% | 3.3% | 3.7% | 0.4 |
| 21 % Flipped Property Sale to Foreclosed Mortgagor | *977* | 7.3% | 5.1% | 8.4% | 3.3 |
| 22 % Very High Burglary Rate (Top 10%) | *973* | 10.0% | 8.9% | 11.8% | 2.9 |

***$p$ <.001 **$p$ <.01 *$p$ <.05 (two-tailed tests of difference by non-white versus white tract type)

Sources: Current REO Property Database, Public County Assessor Data, Public County Deed Property Transaction Histories, Zillow.com, U.S. Census Bureau 2010 Census and 2008-12 American Community Survey, FBI, Local Police Departments.

*The results of the regression analysis show that no other variable or set of variables can account for most of the racial difference in deficiencies between white and non-white tracts.*

Table 4 summarizes the results for the 1,405 properties in the Current REO Database based on the original regression analysis models, run in June 2018 and described in Plaintiffs' complaint.,

**Table 4.**
**Summary of Results of Original Regression Estimates of Total REO Property Deficits Using Current REO Property Database:**
**Original Full Model Shows that the Effect of Non-White Tract Property Location Remains Statistically and Practically Significant and that All Other Variables Explain Only 22% of Racial Gap in Deficiencies and Only 37% of the Total Variation in Deficiencies**

| Original Statistical Regression Model: Variables Included | Number of REO Properties | Racial Gap in Deficiencies (Non-white tract coeff.) | Percent of Observed Gap Explained by Model Variables | Percent of Variation in Deficiencies Explaind by Model ($R^2$) | Practical Signifance of Racial Gap: Non-white Effect (Cohen's *d*) |
|---|---|---|---|---|---|
| ***1:*** *Observed Disparity or Racial Gap in Deficiencies: Non-white vs. White Tracts* | *1,405* | *3.05**** | *0%* | *14%* | *Large Effect (0.86)* |
| ***2:*** *1+Add Control for Era Property Was Built, New Construction* | *1,405* | *2.85**** | *7%* | *17%* | *Medium-to-Large Effect (0.79)* |
| ***3****: 2+Add Year and quarter/season of evaluation visit, Metro Area MSA Fixed Effects, Change in Zip Code Home Prices* | *1,405* | *2.68**** | *12%* | *34%* | *Medium Effect (0.67)* |
| ***4:*** *3+Add Ratio of Home-to-Lot Size, Land Value per sq. ft., Previous REO Sale* | *1,255* | *2.45**** | *16%* | *37%* | *Medium Effect (0.67)* |
| ***Full Model 5:*** *4+Add Months REO Held by Bank of America* | ***940*** | ***2.38**** | ***22%*** | ***37%*** | ***Medium Effect (0.64)*** |
| *Memo: 5. + Add Refinance Loan, Flipped Sale, Deed-in-lieu, High Burglary Rate* | *807* | *2.42**** | *21%* | *36%* | *Medium Effect (0.66)* |

For reference, Row 1 of Table 4 reproduces the observed, unadjusted racial disparity in total REO property deficiencies between non-white and white tracts, a gap of 3.05 deficiencies, which is highly statistically significant ($p$<.001) and practically significant (large effect, see also Table 2). Row 1 of Table 4 corresponds directly to Model 1 in Column (1) of Table 5, which is the extended table of full results from these original regression model estimates. Since no other

variables have been introduced in Model 1, only non-white vs. white status, by definition, 0% or none of the uncontrolled gap of 3.05 deficiencies has been explained by other variables.

Row 2 of Table 4 shows the results for Model 3 (Column (3) of Table 5) when the regression controls for the period or era the property was built and whether it was newly constructed. After including these fundamental variables, 7% of the racial disparity is now explained (93% still unexplained) and the practical significance of non-white tract racial composition or the racial disparity remains highly statistically significant and practically significant (at the threshold of medium-to-large effect size, shown in final column of Table 4).

Row 3 of Table 4 shows the results for Model 6 (Column (6) of Table 5) when the regression controls for the previous factors in Row 2 and now also the year and quarter of year (season) the property was evaluated, an indicator for the census-defined metropolitan area (which captures differences in weather, state laws, and any other factors across metro areas), and the zip code change in home prices (see discussion in Exhibit 3). After including these additional variables about the time and place (metro and zip code) where the property was evaluated, 12% of the racial disparity is now explained (88% still unexplained) and the practical significance of non-white tract racial composition or the racial disparity remains highly statistically significant and practically significant (medium effect size).

Row 4 of Table 4 shows the results for Model 9 (Column (9) of Table 5) when the regression controls for the previous factors in Row 3 and now also the ratio of the home in square feet to the property lot size in square feet (to account for home size and yard size, see Exhibit 3), the land value of the property per square foot, and whether the property was ever an REO previous to the sale to the mortgagor foreclosed upon by BANA (see discussion in Exhibit 3). After including these additional variables, 20% of the racial disparity is now explained (80% still unexplained) and the practical significance of non-white tract racial composition or the racial disparity remains highly statistically significant and practically significant (medium effect size).

Row 5 of Table 4 shows the results for the Final Full Model 10 (Column (10) of Table 5) when the regression controls for the previous factors in Row 4 and finally the number of months BANA owned the REO property (see rationale in extended discussion in Section V.1). After including this final variable, 22% of the racial disparity is now explained (78% still unexplained) and the practical significance of non-white tract racial composition or the racial disparity remains highly statistically significant and practically significant (medium effect size). The final model as a whole—the non-white tract indicator variable and all the remaining variables—explain 37% of the total variation in deficiencies. In sum, 78% of the racial disparity is not accounted for by this extensive array of non-racial control variables.

As a note of memorandum, Row 6 of Table 4 shows the results for Memo Model 12 (Column (12) of Table 5) when the regression includes added control variables in the original models that end up not being statistically significant and do not explain any of the racial disparity: whether the foreclosed loan was used for refinance versus purchase, flipped property sale, deed-in-lieu transfer, and high local crime rate (burglary rate, see definitions and discussion in Exhibit 3). The results are essentially unchanged (21% of racial disparity explained vs. 22% in Row 5). These variables, therefore, are not retained for the final, revised regression analysis (Table 16).

## Table 5.
## Original Regression Model Estimates of Total REO Property Deficits Using Current REO Property Database

| **Outcome:** **Total REO Property Deficiencies** | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | **Final Model** (10) | **Final Sample** (11) | **Memo** (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Non-white Tracts (ref=White Tracts)** | **3.05*** ** | **2.87*** ** | **2.85*** ** | **2.75*** ** | **2.82*** ** | **2.68*** ** | **2.78*** ** | **2.56*** ** | **2.45*** ** | **2.38*** ** | **2.85*** ** | **2.42*** ** |
| Home Built 1940-1969 (ref=Pre-1940) | | -0.52* | -0.51* | -0.43 | -1.14*** | -1.21*** | -1.39*** | -1.37*** | -1.22*** | -1.30*** | | -1.21*** |
| Home Built 1970-2009 | | -1.37*** | -0.77* | -0.84** | -2.19*** | -2.26*** | -2.30*** | -2.31*** | -2.29*** | -2.45*** | | -2.37*** |
| New Construction | | | -1.93*** | -2.01*** | -2.13*** | -2.15*** | -2.11*** | -2.08*** | -1.70*** | -1.53*** | | -1.17*** |
| Change in Zip Code Home Prices | | | | | | -0.03* | -0.01 | -0.01 | -0.01 | -0.02 | | -0.02 |
| Ratio of Home-to-Lot Sq. Ft. | | | | | | | -0.02*** | -0.01** | -0.01* | -0.01* | | -0.01* |
| Log of Land Value per Sq. Ft. | | | | | | | | -0.42** | -0.57** | -0.60*** | | -0.67*** |
| Previously REO Property | | | | | | | | | 0.35 | 0.41 | | 0.37 |
| Months Owned by Bank of America at Time of Evaluation Visit | | | | | | | | | | 0.01 | | 0.01 |
| Refinance Loan (ref=Purchase) | | | | | | | | | | | | 0.13 |
| Flipped Sale to Foreclosed Borrower | | | | | | | | | | | | -0.18 |
| Deed-in-lieu of Foreclosure | | | | | | | | | | | | -0.70 |
| Very High Burglary Rate (90th pctile) | | | | | | | | | | | | -0.11 |
| Intercept | 6.14*** | 6.86*** | 6.88*** | 8.55*** | 8.77*** | 8.60*** | 9.43*** | 10.03*** | 10.05*** | 9.84*** | 6.34*** | 10.04*** |
| Year of Evaulation Visit Fixed Effects | | | | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| Quarter of Evaulation Visit FE | | | | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| Metro Area/Division FE | | | | | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* | *Yes* |
| *Adjusted $R^2$* | *0.14* | *0.16* | *0.17* | *0.20* | *0.34* | *0.34* | *0.35* | *0.37* | *0.37* | *0.37* | *0.12* | *0.36* |
| *N* | *1,405* | *1,405* | *1,405* | *1,405* | *1,405* | *1,405* | *1,264* | *1,255* | *1,030* | *940* | *940* | *807* |

Note: Final Original Model Estimates appear in Column (10). Model in Column (11) reproduces baseline Column (1) estimate using final sample from Column (10) of 940 properties. Memorandum Column (12) shows that adding four additional insignificant variables (refinance loan, flipped sale, deed-in-lieu, and high burglary rate) do not reduce gap in total REO property deficits by racial composition (coefficient listed on Non-white Tracts row); these four variables are not retained for final revised analysis (Table X). See Table 3 and especially Exhibit 3 for a description of data sources.

For the sake of transparency, Table 5 reproduces the statistical model of previous estimates referenced in paragraph 87 of the plaintiffs' Complaint, using the Current REO Database of 1,405 properties.

An analysis that isolates REO property deficiencies of interest, overgrown grass and leaves and the presence of trash/debris, also demonstrates statistically significant and practically significant results, as shown in Table 6 below. Overgrown grass represents a type of deficiency that reflects natural growth in vegetation not explained by neighbors, residents, or former occupants, but instead lack of lawn care by BANA or its agent. (see Section V.1). Panel A shows that 54.0% of properties in non-white tracts have overgrown grass and leaves, compared to 39.8% in white tracts, a statistically significant difference of 14.2 percentage points, and a practically significant effect.

**Table 6.**
**Observed and Regression-Adjusted Percentages of REO Properties Exhibiting Category of Deficiency and Differences by White versus Non-White Tracts: All BANA Properties**

| | A. All BANA Properties (N=1,405) | | | | | |
|---|---|---|---|---|---|---|
| | Observed Percentages of REO Properties with Category of Deficiency | | | | | |
| **Property Deficiency Category** | **All Tracts** | **White Tracts** | **Non-White Tracts** | **Difference by Tract** | **Cohen's *d*** | **Practical Significance Based on Cohen's *d*** |
| Overgrown Grass and Leaves | 49.5 | 39.8 | 54.0 | **14.2** *** | ***0.29*** | ***Small*** |
| Trash/Debris | 53.6 | 30.8 | 64.4 | **33.6** *** | ***0.71*** | ***Medium*** |

| | B. All BANA Properties with Data (N=1,255) | | | | |
|---|---|---|---|---|---|
| | Regression-Adjusted Percentages of REO Properties with Category of Deficiency | | | | |
| **Property Deficiency Category** | **White Tracts** | **Non-White Tracts** | **Difference by Tract** | **Cohen's *d*** | **Practical Significance Based on Cohen's *d*** |
| Overgrown Grass and Leaves | 39.6 | 52.7 | **13.1** *** | ***0.26*** | ***Small*** |
| Trash/Debris | 34.8 | 61.3 | **26.5** *** | ***0.55*** | ***Medium*** |

Significant difference by race of tract in **bold**: ***p<.001 **p<.01 *p<.05

Regression-Adjusted Percentages control for the era property built, new construction, the quarter the property was visited, the lot sq. ft. and the ratio of the home sq. ft. to the lot sq. ft., and the log of the property land value per sq. ft. (Model 8 variables in Table 5).

Although not shown in Table 6, notably, the differences in overgrown grass and leaves are greater in spring months and especially among the 443 REO properties located in the Sunbelt (South and Southwest states in the Current REO Database of AL, FL, GA, LA, TN, TX). In those Sunbelt areas, 61.6% of properties in non-white tracts have overgrown grass or leaves, compared to 33.9% in white tracts, a difference of 27.7 percentage points, a highly statistically significant difference. Put differently, in the Sunbelt, REO properties in non-white tracts are 1.8

times as likely to have overgrown grass/leaves. (In the warmer months of April-October, the racial disparity ratio rises to 2.3 in the Sunbelt, 60.7% vs. 25.9%).

Similarly, as shown in Table 6, the disparity in trash/debris is wider, at 64.4% in non-white tracts versus 30.8% in white tracts, or a gap of 33.6 percentage points, highly statistically significant and practically significant (medium effect size). In other words, REO properties in non-white tracts are more than 2.1 times as likely to exhibit trash/debris as properties in white tracts.

Panel B of Table 6 shows the regression results for overgrown grass/leaves and trash/debris when the explanatory variables in Model 8 (Column (8) of Table 5) are used to estimate these two sub-categories (as opposed to total deficiencies). As shown in the footnote to Table 6, those available variables used to calculate the regression-adjusted racial disparity include the period the property was built, new construction, the year and quarter it was visited, the ratio of the home to lot size, and the property land value per square foot (N=1,255).

As shown in Table 6, for overgrown grass/leaves, after adjusting using regression for these non-racial control factors, the racial disparity shrinks only slightly from 14.2 (Panel A) to a difference of 13.1 percentage points (Panel B). In other words, these pertinent property-related variables leave 92% of the gap in overgrown grass/leaves unexplained (13.1 / 14.2 = 92%). This difference, 13.1 points, remains highly statistically significant and practically significant (small effect size). For trash/debris, the regression-adjusted racial disparity decreases from 33.6 points (Panel A) to 26.5 points (Panel B) and remains highly statistically significant and practically significant (medium effect size). For trash/debris, 79% of the racial disparity remains unexplained after controlling for these other factors listed above and at the bottom of Table 6.

The analysis in Table 7 focused on the same two deficiency sub-categories as Table 6—overgrown grass and leaves and the presence of trash and debris—but it utilized the list of properties Plaintiffs' counsel provided me that included 1,333 properties of the 1,405 total that, they explained, exclude 72 properties the parties agree Safeguard was not responsible for maintaining. Panel A of Table 8 demonstrates that overgrown grass represents a type of deficiency that reflects natural growth in vegetation not explained by neighbors, residents, or former occupants but instead represents lack of lawn care by BANA's agent, Safeguard (see Section V.1).

Panel A shows that 54.8% of Safeguard properties in non-white tracts have overgrown grass and leaves, compared to 40.1% in white tracts, a statistically significant difference of 14.7 percentage points, and a practically significant effect. Although not included in Table 7, notably, the differences in overgrown grass and leaves are also greater in spring months and especially among the 443 REO properties located in the Sunbelt (South and Southwest states in the Current REO Database of AL, FL, GA, LA, TN, TX). In those Sunbelt areas, 61.6% of properties in non-white tracts have overgrown grass or leaves, compared to 34.3% in white tracts, a difference of 27.3 percentage points, a highly statistically significant difference. Put differently, in the Sunbelt, REO properties in non-white tracts are 1.8 times as likely to have overgrown grass/leaves. (In the

warmer months of April-October, the racial disparity ratio rises to 2.3 in the Sunbelt, 60.6% vs. 26.3%).

**Table 7.**
**Observed and Regression-Adjusted Percentages of REO Properties Exhibiting Category of Deficiency and Differences by White versus Non-White Tracts: Safeguard Agent Properties**

| | A. BANA Safeguard Properties (N=1,333) | | | | | |
|---|---|---|---|---|---|---|
| | Observed Percentages of REO Properties with Category of Deficiency | | | | | |
| **Property Deficiency Category** | **All Tracts** | **White Tracts** | **Non-White Tracts** | **Difference by Tract** | **Cohen's *d*** | **Practical Significance Based on Cohen's *d*** |
| Overgrown Grass and Leaves | 49.8 | 40.1 | 54.8 | **14.7 ***** | ***0.30*** | ***Small*** |
| Trash/Debris | 53.4 | 30.5 | 65.2 | **34.7 ***** | ***0.74*** | ***Medium*** |

| | B. BANA Safeguard Properties with Data (N=1,184) | | | | |
|---|---|---|---|---|---|
| | Regression-Adjusted Percentages of REO Properties with Category of Deficiency | | | | |
| **Property Deficiency Category** | **White Tracts** | **Non-White Tracts** | **Difference by Tract** | **Cohen's *d*** | **Practical Significance Based on Cohen's *d*** |
| Overgrown Grass and Leaves | 39.8 | 53.4 | **13.6 ***** | ***0.27*** | ***Small*** |
| Trash/Debris | 34.8 | 61.3 | **26.5 ***** | ***0.55*** | ***Medium*** |

Significant difference by race of tract in **bold**: ***p<.001 **p<.01 *p<.05

Regression-Adjusted Percentages control for the era property built, new construction, the quarter the property was visited, the lot sq. ft. and the ratio of the home sq. ft. to the lot sq. ft., and the log of the property land value per sq. ft. (Model 8 variables in Table 5).

As shown in Table 7, the disparity in trash/debris is wider, at 65.2% in non-white tracts versus 30.5% in white tracts, or a gap of 34.7 percentage points, highly statistically significant and practically significant (medium effect size). In other words, REO properties in non-white tracts are 2.1 times as likely to have trash/debris as properties in white tracts among Safeguard properties (N=1,333).

Panel B of Table 7 shows the regression results for overgrown grass/leaves and trash/debris when the explanatory variables in Model 8 (Column (8) of Table 5) are used to estimate these two sub-categories (as opposed to total deficiencies) for the 1,184 properties for which data on these explanatory variables was available. As shown in the subtext of Table 7, those available variables used to calculate the regression-adjusted racial disparity include the period the property was built, new construction, the year and quarter it was visited, the ratio of the home to lot size, and the property land value per square foot.

As shown in Table 7, for overgrown grass/leaves, after adjusting using regression for these non-racial control factors, the racial disparity shrinks only slightly from 14.7 (Panel A) to a difference of 13.6 percentage points (Panel B). In other words, these pertinent property-related variables leave 93% of the gap in overgrown grass/leaves unexplained (13.6 / 14.7 = 93%). This difference, 13.6 points, remains highly statistically significant and also practically significant (small effect size). For trash/debris, the regression-adjusted racial disparity decreases from 34.7 points (Panel A) to 26.5 points (Panel B) and remains highly statistically significant and practically significant (medium effect size). For trash/debris, 76% of the racial disparity remains unexplained after controlling for these other factors listed above and at the bottom of Table 7.

In conclusion, the analyses in Table 6 and Table 7 regarding the REO property deficiency sub-categories shows that objective property characteristics such as the age, new construction, size, ratio of home-to-lot (size of yard), or value, as well as the year or season the property was evaluated, still leave 92%-93% of the racial disparity in overgrown grass/leaves unexplained and 76%-79% of trash/debris unexplained. Both of these racial disparities remain highly statistically significant.

## V. Response to Defendant's Experts' Reports

In this section, I offer detailed replies and rebuttals to five critiques raised in the expert reports of Dr. Yao, Dr. McCrary, and Dr. Skanderson. First, the data show that the observed disparities in maintenance are not explained by conditions created or left by the former delinquent mortgagor. Second, crime rates (regardless of whether burglary or vandalism rates are considered) do not explain the observed racial disparities in maintenance. Third, the fact that more properties in white tracts were located in the suburbs does not account for the racial disparity in deficiencies. Fourth, while census tract poverty rates are a poor proxy for homeowner poverty rates, they still do not explain the observed racial disparities in maintenance. Fifth, vacancy rates are not a race-neutral control variable and yet they still fail to account for the observed disparities to the same degree as race. Finally, I also address Dr. Skanderson's concern regarding sample size. My analysis in this section considers 40 different variables—those listed in Table 3, as well as those included below in Table 15.

As part of my replies and rebuttals, my further analyses controls for 20 variables—including 3 additional variables that Defendants' experts claim are race-neutral and could explain the disparities observed (poverty, vacancy rate, and distance from city center), as well as the 18 variables in the initial regression analysis discussed earlier.[13] Even controlling for these additional variables, 61% of the racial disparity in total REO property deficiencies in the Current REO Database of 1,405 properties remains unexplained by this extensive array of non-racial factors. The regression-adjusted racial disparity also remains highly statistically significant and practically significant.

[13] Two of the 18 variables included in the initial regression analysis addressing the age of the home have now been consolidated into one variable in this final regression analysis, as explained further in Exhibit 3.

1. *There Is No Relationship Between Length of BANA REO Ownership and Total Property Deficiencies or Occupancy by Former Delinquent Mortgagor and Total Deficiencies.*

Defendants' experts posit that the observed deficiencies may be a result of the condition of the property when BANA took ownership of it rather than the racial composition of the neighborhood. Yet if BANA merely inherited deficiencies from the previous delinquent homeowner and then remedied such deficiencies, we would expect the average number of REO property deficiencies to decline over time, even if it takes a few weeks or months to make repairs and cure other deficiencies. Instead, using various measures below, we observe that the average deficiencies do not statistically significantly decline over time in white tracts or non-white tracts.

But whether BANA inherited deficiencies from delinquent owners is not the central claim at issue. The issue is one of disparities in property maintenance *after* BANA has established legal REO ownership of the property. On average, NFHA's visits occur nearly a year (49 weeks) after BANA ownership. Nevertheless, if one accepts the premise that property defects were caused by the prior mortgagor and then remedied by BANA or its property preservation and maintenance agents like Safeguard, then we would expect there to be *fewer* deficiencies the longer BANA owned the property, certainly fewer than in the first weeks or months. The data are clear that this is not the case.

Dr. Yao theorizes that property defects would be elevated when delinquent mortgagors continue to occupy the property beyond the foreclosure repossession date.[14] But as Figure 2 illustrates, data provided by BANA[15] and its agent Safeguard[16] document a pattern that is in fact the opposite of Dr. Yao's theory. Instead, the data shows that they are slightly *lower* (right-hand side of Figure 2 where values for days in between vacancy and visit are greater than zero). In other words, when the delinquent mortgagor continued to occupy the property after the foreclosure date, the number of deficiencies observed decreased somewhat—just the opposite of what Dr. Yao predicted. The negative correlation contradicts his assertion that it would be positive; although weak, it is statistically significant ($r=-0.18$, $p<.03$) among the 150 properties provided. The relationship across all 1,405 properties in the REO database cannot be established unless and until further data is furnished by BANA. Based on the data provided so far though, the relationship is either slightly negative or insignificant—not positive.

Given that nearly half (47%) of the 150 properties with data provided by BANA in the graph depicted in Figure 2 were occupied by delinquent mortgagors after the foreclosure repossession date, it still raises the question of whether these borrowers also occupied the property after the NFHA evaluation visit date. But Figure 2 below shows that only 6% (10 of 162) of delinquent borrowers possibly occupied the property on or beyond the evaluation visit date. In other words, 94% of the properties evaluated for deficiencies were no longer occupied by the delinquent mortgagor in data verified by Safeguard (BANA's agent) and provided by BANA. Equally important, the share occupied does not differ by a tract's racial composition: Only 6% of

[14] Yao Report ¶ 40.

[15] BANA-NFHA-LIT_03222596 & 0298915.

[16] SG00504478.

properties in white tracts and 6% in non-white tracts were occupied upon the evaluation visit date.

The low incidence of occupancy and the equal proportion of occupied properties across white and non-white tracts both strongly point to the conclusion that such occupancy is unrelated to observed disparities by tract racial composition.

**Figure 2.**
**Weak Negative Correlation between Total REO Property Deficiencies and Time from Foreclosure to First-time Vacancy Date in Data Provided by BANA/Safeguard**




Figure 3 below shows that when the span of all timeframes in days between first-time vacancy and the property evaluation date is considered, there is no statistically significant correlation (r=.08, *p*=.30, n.s.) between this timeframe and total property deficiencies. In other words, the number of deficiencies observed did not depend on how many days the property had been vacant prior to Plaintiffs' visit. These data provided by BANA add further evidence to counter Dr. Yao's assertion that occupancy by delinquent mortgagors led to more deficiencies. The patterns here also refute the claim that widespread, long-term occupancy beyond the evaluation visit date may be blamed for elevated deficiencies or disparities by tract racial composition (only 6% of

properties were occupied on the inspection evaluation date: 6% in white tracts and 6% in non-white tracts).[17]

**Figure 3.**
**No Correlation between Total REO Property Deficiencies and Days from First-time Vacancy and Visit Date in Data Provided by BANA/Safeguard**




Three final comparisons underscore the last related empirical observation that the total number of REO property deficiencies observed is also unrelated to how long it has been since BANA foreclosed upon the property.

First, Figure 4 below depicts the lack of any statistical relationship (r= -.07, p=30, n.s.) between how long the property had been a BANA REO as of the evaluation date and the total number of REO property deficits. These are data provided by BANA on 226 properties in six states. The graph illustrates how BANA had owned these properties for 467 days (or 1 year and 3 months) on average, with a median ownership time of 358 days (or 1 week short of 1 year). It seems

[17] Research cited by Dr. Yao shows many deficiencies are caused by a delinquent mortgagor, who, understandably, does not have funds for maintenance given inability to pay a mortgage. (Yao Report ¶¶ 30-34). Given that both white borrowers and borrowers of color are delinquent, the counter-question is how does the race of the neighborhood explain a gap in these deficiencies *at the level of a single property*? Moreover, Dr. Skanderson implies that BANA's inability to access the properties due to foreclosed owners' unauthorized continued residence after visit dates may also explain the difference, but he produces no data to show this varies systematically by tract racial composition. (Skanderson Report ¶ 110).

reasonable that this would be sufficient time to remedy any defects inherited from the prior delinquent borrower.

**Figure 4.**
**No Correlation Between Total REO Property Deficiencies and Days from Foreclosure Repossession Date and Visit Date in Data Provided by BANA (N=226)**




Second, because the data in Figure 4 above only cover 226 properties, a small portion of the 1,405 properties in the Current REO Database, we can return to that full database and use the carefully collected property transaction history data to supplement the findings for an additional 776 or a total of 1,002 (776 + 226) properties.[18]

Figure 5 below shows that there is no statistical correlation (r=.03, *p*=.30, n.s.) between the total REO property deficits and the number of days BANA had owned the property at the time of

[18] The transaction history was collected for 976 properties and therefore verified for 200 of the 226 properties provided by BANA. (Public transaction data were not available for 26 of the 226 properties, so I used the BANA data for those remaining 26 of 1,002 properties.)

Plaintiffs evaluated these deficits. On average, across all 1,002 properties, BANA owned the REO property for 344 days (or 49 weeks).

**Figure 5.**
**No Correlation Between Total REO Property Deficiencies and Days from Foreclosure Repossession Date and Visit Date in Full REO Database with Available Data (N=1,002)**




In both the case of the 226 properties with data provided by BANA (Figure 4) as well as the 1,002 properties presented in Figure 5, REO ownership lasted nearly a full year, sufficient time in any reasonable estimation to remedy or ameliorate property deficiencies.

Third, Table 8 below shows the total average REO property deficiencies by four quartile ranges of days held by BANA for both white and non-white tracts. In both cases, the average total REO deficiencies in later periods after the first quartile range (120 days) are not statistically significantly different from the initial first 120 days.

**Table 8.**
**Average Total REO Property Deficiencies by Quartile Range of Days REO Property Owned by BANA at Evaluation Visit Date**

| | Average Total Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| **Days REO Owned at Evaluation Date** | **White Tracts** | **Non-White Tracts** | **All Tracts** |
| **REO owned for 0 to 120 days (Q1)** | 6.12 | 9.32 | **8.20** |
| *N* | *89* | *165* | *254* |
| **REO owned for 121 to 220 days (Q2)** | 6.04 | 9.10 | **7.88** |
| *N* | *93* | *141* | *234* |
| **REO owned for 221 to 435 days (Q3)** | 6.31 | 8.81 | **8.02** |
| *N* | *83* | *180* | *263* |
| **REO owned for 436 days or more (Q4)** | 7.09 | 9.47 | **8.92** |
| *N* | *58* | *190* | *248* |
| **Total Properties** | **6.32** | **9.18** | **8.26** |
| *N* | *323* | *679* | *1,002* |

Source: County property transaction records with available data (n=976) and BANA-NFHA-LIT_03222596 & 0298915 (n=226) for 1,002 total properties with n=200 overlapping, verified properties using both BANA-provided and public data.

In summary, among 1,002 REO properties in the database with available data, on average plaintiffs evaluated the properties for deficiencies 344 days (or 49 weeks) after BANA acquired them. As BANA's own data show, 94% of properties were vacated by the delinquent mortgagor at time the property was evaluated.

Given these timelines and findings, it is reasonable to infer that the disparity in deficiencies by tract racial composition is not a result of delinquent owners failing to maintain their properties, but an ongoing gap and pattern of deficiencies that instead persists during BANA REO property ownership.

The data discussed above is consistent with research analyzing lenders' maintenance of REOs relative to the previous delinquent owners' maintenance. One study of properties in Boston, performed by a Federal Reserve economist, Lauren Lambie-Hanson, found that "exterior property conditions appear to suffer most while homes are bank owned" and that "complaints about property conditions become somewhat more frequent in the initial months after a foreclosure auction—immediately after the bank takes control."[19] This research reports that "[p]roperties are particularly susceptible to [residential property conditions] complaints after becoming REO—for these months, properties generate complaints at a rate of over 3.2 times the

[19] Lambie-Hanson, Lauren. "When does delinquency result in neglect? Mortgage distress and property maintenance." Journal of Urban Economics 90 (2015): 1-2.

rate of properties owned by borrowers current on their mortgages (but who are later observed to default)."[20]

As one of the only studies to measure code violations and property complaints throughout the entire delinquency, foreclosure, and REO timeline, Dr. Lambie-Hanson's research also finds complaints are 1.2 times higher when owners in default are in delinquency and 1.7 times higher in foreclosure. These rates are substantially and statistically significantly lower than the more elevated likelihood of complaints (3.2 times as likely) when properties are REO or bank-owned.[21]

In terms of why property conditions may deteriorate during bank ownership versus the ownership of the foreclosed borrower, Dr. Yao, and his colleagues, have acknowledged the following:

> *After* the foreclosure completion, there are also good reasons to expect underinvestment in maintenance. Narrowly, the *lender does not obtain any consumption benefit from investment*. More broadly, the scale of residential lending could lead to an information problem. *The agent managing the property rarely has a large ownership stake in the property*. This is obviously true when the agent is acting on behalf of a securitization trust, but *it is even true when the agent works for a bank that owns the property*. The issue is that the amount of profitable investment in the property is *a matter of discretion*, and the owner of the property cannot be sure whether the manager has other incentives. As with all standard asymmetric information problems, *the result would be a failure to exploit profitable gains from trade, in this case, investment in the property.*[22]

Thus, both Dr. Lambie-Hanson and Dr. Yao's research support the findings outlined above that the deficiencies observed are not mainly explained by the prior owners' maintenance (or lack of maintenance) of the properties, but because of a bank or lender's own maintenance practices.

2. *Crime Rate—Regardless of Whether Defined as Burglary or Vandalism—Does Not Explain the Difference in Deficits.*

Defendants' experts point to property crime rates as a possible alternative explanation for the disparities in maintenance observed. In addition, Dr. Skanderson critiques the use of burglary rate in plaintiffs' regression analysis, to a minor extent, but does not introduce or include his own preferred measure of property vandalism.[23] Yet crime rates—whether examining burglary or vandalism—do not explain the disparities to the same degree as race.

[20] Ibid., pp. 1-2.

[21] Ibid, pp. 7-8.

[22] Gerardi, Kristopher, Eric Rosenblatt, Paul S. Willen, and Vincent Yao. 2015. "Foreclosure externalities: New evidence." Journal of Urban Economics 87: 42-56 (emphasis added).

[23] Skanderson Report ¶ 109.

As explained in more detail in Exhibit 3, vandalism rate is not reported on in the majority of jurisdictions. I was able to gather data on criminal property vandalism rates for 374 REO properties in seven large cities located across three national regions. Because criminal vandalism is a type of property crime that appears more directly related to property maintenance conditions than burglary rates, I further explored the relationship between the two measures to see if and how much they were statistically related.

Figure 6 shows that burglary rates and vandalism rates are strongly related, tracking each other closely across these seven cities with available data. The correlation is moderate-to-strong (r=0.67) and statistically significant (p<.001). (See the additional discussion in Exhibit 3 that details that vandalism correlates strongly with burglary rates and that burglary rates are more strongly related to deficiencies than vandalism in these cities).

**Figure 6. Plot of Local Burglary Property Crime Rate and Local Property Vandalism Crime Rate with Fitted Trend Line with 95% Confidence Intervals Shows that Burglary Rates Are Strongly Correlated with Vandalism Rates**




The main takeaway from the analysis of the relationship in Figure 6 is that burglary rates are a suitable substitute or proxy for local property crime most related to REO property maintenance. While it would be desirable to have criminal vandalism rates for the entire database of properties, among these 374 properties, burglary rates are weakly yet significantly related to REO property

deficiencies (r=0.16, $p<.002$) while vandalism rates are not significant (r=0.07, p=0.20, n.s.). Again, the data collection process was careful and sought out as much crime rate data as possible. Unfortunately, vandalism is not one of the crimes required to be reported to the FBI by all jurisdictions, so it is not universally publicly available. Therefore, I was only able to analyze a subset of properties in the REO database for which vandalism rates were available. Defendants' experts did not rely on or produce any data regarding vandalism.

When I estimate comparisons separately among this sub-sample of 374 properties using both measures—burglary and vandalism—neither measure of crime emerges as statistically significant and neither contributes to the explanatory power of a model that accounts for the racial disparity in property maintenance deficiencies. The disparity thus cannot be explained by crime rate; the racial disparity remains unchanged.

3. *Controlling for City Versus Suburban Location and Property Location in the Metropolitan Area (MSA) Did Not Account for the Disparity in Deficiencies.*

Dr. Skanderson[24]—and Dr. McCrary[25] to a lesser extent—assert that urban and suburban census tracts are distinct "housing markets" and that comparing them represents an "apples-to-oranges" comparison. Yet when we control for a property's location with respect to the city center, the same racial disparity in maintenance still persists (just as it does when controlling for lot size, home size, and home age, as detailed earlier).

Table 9 below presents the differences in average total REO property deficiencies in white tracts versus nonwhite tracts in central cities as well as white tracts versus non-white tracts in suburban areas outside those central cities. As Table 9 shows, the racial disparity in REO property deficiencies is greatest in suburban areas (3.43, $p<.001$) and least in central cities (2.58, $p<.001$).

---

[24] Skanderson Report ¶ 62.

[25] McCrary Report ¶ 43.

**Table 9.**
**Average Total REO Property Deficiencies by Central City and Suburban Location and Average Differences Between White and Non-White Tracts**

| REO Property Location | Average Total Property Deficiencies *Number of Properties in Italics* White Tracts | Non-White Tracts | Difference |
|---|---|---|---|
| **Central City of Metro Area** | 6.60 | 9.18 | **2.58*** |
| *N* | *186* | *702* | *888* |
| **Suburban Part of Metro Area** | 5.82 | 9.25 | **3.43*** |
| *N* | *266* | *251* | *517* |
| **All Properties** | **6.14** | **9.20** | **3.06*** |
| *N* | *452* | *953* | *1,405* |

Sources: Current REO Property Database; U.S. Census Bureau 2013 Central City Definitions.
Significant difference by race of tract in **bold**: ****p*<.001 ***p*<.01 **p*<.05 (two-tailed tests)

To reply more precisely to the critiques Dr. Skanderson raises about urban versus suburban location, Table 10 below employs an additional constructed variable: the shortest distance in miles between a property's location and the coordinates of the city hall of the central city in the MSA (which is a good proxy for distance from the downtown central business district where property values tend to be highest). This variable is useful because it may capture many other features such as transit access and other amenities that may affect property maintenance as well as valuation dynamics according to an urban econometric model of metropolitan areas as a set of concentric zones or rings of value and economic activity by distance from the center (central business district).[26]

The 1,405 REO property locations are subdivided into four categories by central city status and distance to city hall: (1) Central city, less than 5 miles to central city hall; (2) Central city, more than 5 miles; (3) Inner Suburb, less than 10 miles; and (4) Outer Suburb, more than 10 miles.

When we partition the continuum of central city to outer suburb, we see that racial disparities are greatest in the outer suburbs (3.62, *p*<.001), although the level of property deficiencies is highest in non-white tracts in inner central cities (9.54) and inner suburbs (9.64).

[26] See, for example: Richardson, Harry Ward. *The new urban economics: and alternatives*. Routledge, 2013.

**Table 10.**
**Average Total REO Property Deficiencies by City/Suburb Location and Distance from Central City Hall and Average Differences Between White and Non-White Tracts**

| Location & Distance to Central City Hall | Average Total Property Deficiencies *Number of Properties in Italics* White Tracts | Non-White Tracts | Difference |
|---|---|---|---|
| **Central City, less than 5 miles** | 6.84 | 9.54 | **2.70*** ** |
| *N* | *93* | *345* | *438* |
| **Central City, more than 5 miles** | 6.37 | 8.83 | **2.46*** ** |
| *N* | *93* | *357* | *450* |
| **Inner Suburb, less than 10 miles** | 6.46 | 9.64 | **2.85*** ** |
| *N* | *103* | *90* | *193* |
| **Outer Suburb, more than 10 miles** | 5.42 | 9.04 | **3.62*** ** |
| *N* | *163* | *161* | *324* |
| **All Properties** | **6.14** | **9.20** | **3.06*** ** |
| *N* | *452* | *953* | *1,405* |

Sources: Current REO Property Database; U.S. Census Bureau 2013 CBSA Definitions.
Significant difference by race of tract in **bold**: ***p<.001 **p<.01 *p<.05 (two-tailed tests)

These data in Table 10 show how using distance reveals that wider suburban disparities are driven by lower deficiencies in white tracts in the outermost suburban areas (5.42) more than 10 miles from the central city hall. The patterns here also illustrate how property deficiencies decline more on average from inner central city among white tracts (from 6.84 to 5.42) than among non-white tracts (from 9.54 to 9.04).

In other words, the inner city-outer suburb continuum explains patterns in white tracts much more than in non-white tracts, so, as expected, the racial disparity persisted even after accounting for this important new variable in the final, revised regression analysis (see Table 26, row 6).

*4. The Racial Gap Remains Regardless of the Census Tract Poverty Rates.*

Dr. Skanderson opines that the census tract poverty rate may explain the observed disparities in maintenance between white and non-white census tracts.[27] Yet the overall poverty rate of the census tract is a poor proxy for poverty rates among homeowners in the area. Nevertheless, as discussed earlier, even when we control for the census tract poverty rate in the final regression analysis, it does not explain the observed maintenance disparities as strongly as race.

Although majority-non-white census tracts have higher poverty rates than majority-white census tracts, comparisons using the total population exaggerate far smaller differences among the sub-

[27] Skanderson Report ¶¶ 72, 75, 76, 128.

population of homeowners with a mortgage. Various data sources support the conclusion that comparing such homeowners is more appropriate.

Among the 1,405 properties in the Current REO Database, Figure 7 shows that the poverty rate for the total population is 27.4% in non-white tracts and 12.2% in white tracts, a substantial gap of 15.2 percentage points. However, the poverty rate among homeowners with a mortgage is 7.2% in non-white tracts and 3.6% in white tracts, yielding a far smaller difference—only 3.6 points. Put differently, 92.8% of mortgagors in non-white tracts and 96.4% of mortgagors in white tracts do not live in poverty, around 19 out of 20 owners in each type of tract.

**Figure 7.**
**Difference in Poverty Rates in 2010 by Census Tract Racial Composition:**
**Disparity by Tract Type is Much Smaller Among Homeowners than the Total Population**




N=1,405 census tracts in Current REO Database. Source: U.S. Census Bureau 2008-12 American Community Survey.

While we do not know the exact situation of *delinquent* homeowners who were foreclosed upon by BANA in particular, we can examine several data sources that reinforce the pattern of reduced differences by race and community racial composition among the subset of homeowners with a mortgage, including those who lose their homes in foreclosure. The differences are far more muted than differences in overall poverty rates.

One key contention of Dr. Yao[28] and Dr. Skanderson[29] is that property deficiencies are primarily a result of economic differences among individual delinquent homeowners inherited by BANA upon acquiring the foreclosed REO property. What these data show is that relative differences in poverty rates among homeowners with a mortgage—even those who fall behind on payments and lose their homes in foreclosure—are too modest by race and racial composition to systematically structure persistent property deficiencies by racial composition.

Table 11 below begins by using the largest dataset available, U.S. Census Bureau microdata disseminated as Public Use Microdata Samples. To protect the privacy of the thousands of individuals the Census interviews each year, the smallest level of geography is not the census tract (or census block) but the PUMA or Public Use Microdata Area level of the community. The Census Bureau defines PUMAs as "non-overlapping, statistical geographic areas that partition each state or equivalent entity into geographic areas containing no fewer than 100,000 people each."[30]

---

[28] Yao Report ¶ 44.

[29] Skanderson Report ¶¶ 71-78.

[30] Source: U.S. Census Bureau, "Public Use Microdata Areas (PUMAs)" available at https://www.census.gov/programs-surveys/geography/guidance/geo-areas/pumas.html#reference.

**Table 11.**
**Percentage of Selected Households with Incomes Above Federal Poverty Threshold by Race of Householder and Community (PUMA) Racial Composition, 2010 Census ACS**

| | Racial Composition of Community (PUMA) | | White minus Non-White Difference (Percentage Points) |
|---|---|---|---|
| **2010 Census ACS Sub-Sample** | **White (50%-100%)** | **Non-White (50%-100%)** | |
| Householders in Metro Areas in REO Database | 90.3% | 81.6% | 8.7 |
| *(Unweighted N)* | *242,192* | *122,959* | *365,151* |
| Householders in Communities (PUMAS) in REO Database *(Unweighted N)* | 88.5% | 80.1% | 8.4 |
| | *71,878* | *59,927* | *131,805* |
| Renter Householders | 75.8% | 68.4% | 7.4 |
| *(Unweighted N)* | *18,222* | *23,315* | *41,537* |
| Owner Householders with a Mortgage | 95.9% | 92.7% | 3.2 |
| *(Unweighted N)* | *36,770* | *24,580* | *61,350* |
| White, Non-Hispanic Mortgage Holders | 96.6% | 95.6% | 1.0 |
| *(Unweighted N)* | *29,600* | *10,524* | *40,124* |
| Non-White or Hispanic Mortgage Holders | 93.4% | 90.8% | 2.6 |
| *(Unweighted N)* | *7,170* | *14,056* | *21,226* |

Note: PUMA is the abbreviation for Public Use Microdata Area. Households only (group quarters excluded). Data source: IPUMS USA (Ruggles et al. 2021) 2010 ACS tabulated using household weights merged with 2008-12 Census ACS population data. Metro Area is the 2013 census-defined CBSA MSA.

We can divide these larger communities into white and non-white majority PUMAs and then identify just the PUMAs that contain the census tracts in the Current REO Database of 1,405 properties. We can also examine all residents in the 34 Census Metro Area (MSAs) to check if the inequality or difference in poverty between communities (PUMAs) containing the REOs is greater, smaller, or not different from all residents in those 34 MSAs. Finally, we can drill down to examine renters, homeowners with a mortgage, and even mortgage holders by race, all compared by white and non-white communities (PUMAs).[31]

[31] The last comparisons by race and racial composition are cross-tabulations only available using these census micro-data. All data are weighted using the census-provided household weights to reflect all households.

First, contrary to Dr. Skanderson's argument that Plaintiffs selected communities for their investigation containing higher rates of income inequality by race,[32] the racial difference in poverty rates for residents in all 34 MSAs is quite similar.

- Among all 34 MSA white communities, 90.3% of MSA resident households were not in poverty, compared to 81.6% in MSA non-white communities, a difference of 8.7 percentage points.
- Among just the communities that contain the properties in the REO database, 88.5% of households in white communities were not in poverty, compared to 80.1% in non-white communities, a difference of 8.4 percentage points.
- These differences, 8.7 points and 8.4 points, are quite similar, and suggest that inequality in poverty rates by racial composition of communities is quite similar, not divergent.

Among renters, the difference in households living above the poverty line was 7.4 points.

Examining householders who hold a mortgage, the differences begin again to narrow. In white communities, 95.9% of householders with a mortgage lived above the poverty line, compared to 92.7% of mortgage holders in non-white communities, a difference of only 3.2 percentage points. This small gap resembles quite closely the small difference (3.6 points) in poverty rates among homeowners by tract racial composition in the census tracts of the properties in the Current REO Database (Figure 7).

Finally, even when comparing the non-poverty rates of white mortgage holders in white communities (96.6%) to non-white mortgage holders in non-white communities (90.8%), the difference remains quite small, at 5.8 points, lower than among all renters (7.4 points) and residents of all 34 MSAs (8.7 points).

However, we must consider whether racial disparities in mortgagor poverty rates widen, narrow, or remain largely unchanged when we compare: (1) those with a mortgage, to (2) those who were ever behind on a mortgage, and to (3) those who lost their homes to foreclosure. To answer this question, we may employ data from "longest running longitudinal household survey in the world," the Panel Survey of Income Dynamics (PSID), which began interviewing individuals and families in 1968.[33] Table 24 compares the percentage of selected types of households living above the poverty threshold for a family of four in 2008.

Among all those living in any metropolitan area of the U.S., 88.0% of white, non-Hispanic householders and 77.6% of non-white or Hispanic householders lived above the 2008 poverty threshold, for a difference of 10.4 percentage points. Among those who ever had a mortgage from 2007-2015, 95.3% of white householders and 91.6% of non-white householders lived above this poverty threshold, a difference of only 3.7 percentage points, consistent with the diminished difference in census tracts in the Current REO Database and in the universe of census micro-data for the communities and MSAs of those properties.

---

[32] Skanderson Report ¶ 51.

[33] Source: Panel Survey of Income Dynamics, https://psidonline.isr.umich.edu/default.aspx.

What about mortgage borrowers who fall behind or lose their homes to foreclosure? Are the racial differences magnified or diminished (or unchanged)? Starting in 2009, the PSID began to ask about mortgage foreclosure, and we can follow households over time across the 2009, 2013, and 2015 interview waves, a chief advantage of the PSID data.

**Table 12.**
**Percentage of Households with Total Family Incomes Above Poverty Threshold for a Family of Four in 2008 ($21,800), Panel Survey of Income Dynamics**

| Panel Survey of Income Dynamics Sub-sample | Race of Householder: Non-White or Hispanic | Race of Householder: White, non-Hispanic | White minus Non-White Difference (Percentage Points) |
|---|---|---|---|
| Householders in All U.S. Metro Areas, 2007 | 77.6% | 88.0% | 10.4 |
| *(N)* | *5,443* | *4,677* | *10,120* |
| Never Had a Mortgage, 2007-2015 | 64.9% | 76.4% | 11.5 |
| *(N)* | *3,056* | *1,580* | *4,636* |
| Ever Had a Mortgage, 2007-2015 | 91.6% | 95.3% | 3.7 |
| *(N)* | *2,387* | *3,097* | *5,484* |
| Ever Behind on Mortgage, 2009-2015 | 89.5% | 93.0% | 3.5 |
| *(N)* | *432* | *214* | *646* |
| Ever Lost Home to Foreclosure, 2009-2015 | 85.1% | 89.0% | 3.9 |
| *(N)* | *267* | *212* | *479* |

Source: Panel Survey of Income Dynamics, 2007-2015 interview waves tabulated using core survey weights. Data retrieved at https://simba.isr.umich.edu/data/data.aspx

As shown in Table 12 above, when we compare across the race of the householder with a mortgage, the racial difference in living above the 2008 poverty threshold is quite small among all those who ever had a mortgage (3.7 points), those who were ever behind on mortgage payments from 2009-2015 (3.5 points), and among those who ever lost their home to foreclosure over the same period (3.9 points). Even among those who lose their homes, 85.1% (or 17 of 20) non-white owners and 89.1% (or nearly 18 of 20) white owners lived above the poverty threshold in 2009.

What these data all point to is that among individual homeowners with a mortgage, even those who are in arrears on their mortgage or lose their home to mortgage foreclosure, the differences in poverty rates by community, tract, and individual racial composition are quite small, ranging, respectively from 3.2 points (community) to 3.6 points (tract) to 3.9 points (individuals from PSID). These modest differentials are vastly smaller than the difference in poverty rates among the total population of the tracts (15.2 points, Figure 7). Moreover, across all comparisons,

between 85% to 97% of homeowner and mortgagor households lived above the poverty line, regardless of race or area racial composition.[34]

Thus, it is critical to distinguish poor neighborhoods from poor individuals, as it is abundantly clear that most poor residents live in *renter* households (around 78% in the census-micro data, Table 11). For all these reasons, it is more appropriate to use the poverty rate among homeowners with a mortgage than among the total population.

Now that it is established that poverty rates of mortgaged homeowners differ very little by tract racial composition, one final question remains when we return to compare tracts by overall poverty: whether differences in average REO property deficiencies are greater in lower poverty areas or higher poverty areas. Table 13 below compares tracts with poverty rates below 20 percent to tracts with poverty rates between 20 to 30 percent and high poverty tracts (at least 30 percent in poverty).

**Table 13.**
**Average Total REO Property Deficiencies by Tract Poverty Level and Racial Composition**

| | Average Total Property Deficiencies *Number of Properties in Italics* | | | |
|---|---|---|---|---|
| | **All Tracts** | **White Tracts** | **Non-White Tracts** | **White minus Non-white Difference** |
| **Low Poverty Tract (0%-20% Poverty)** | 7.03 | 5.89 | 8.47 | **2.58*** ** |
| *N* | *646* | *360* | *286* | |
| **Poverty Tract (20%-30% Poverty)** | 8.88 | 6.92 | 9.29 | **2.37*** ** |
| *N* | *354* | *61* | *293* | |
| **High Poverty Tract (>30% Poverty)** | 9.52 | 7.52 | 9.68 | **2.16** ** |
| *N* | *405* | *31* | *374* | |
| **All Properties in All Tract Types** | 8.21 | 6.14 | 9.20 | **3.06*** ** |
| *N* | *1405* | *452* | *953* | |

Sources: Current REO Property Database; U.S. Census Bureau 2008-20012 ACS.
Significant difference by race of tract in **bold**: ****p*<.001 ***p*<.01 **p*<.05 (two-tailed tests)
Note: Poverty areas are defined by the U.S. Census Bureau as "census tracts where the poverty rate exceeds 20 percent" (See Bishaw et al. 2020)[35] and by U.S. Public Law 116-93 (2019).[36]

---

[34] Additionally, according to the 2017 American Housing Survey, 94.6% of white householders and 91.9% of non-white householders have incomes above the poverty line, a difference of 2.7 percentage points.

[35] Bishaw, Alemayehu, Craig Benson, Emily Shrider, Brian Glassman. 2020. "Changes in Poverty Rates and Poverty Areas Over Time: 2005 to 2019." Available at: https://www.census.gov/content/dam/Census/library/publications/2020/acs/acsbr20-008.pdf.

[36] Public Law 116-93 (116th Congress). Available at: https://www.congress.gov/116/plaws/publ93/PLAW-116publ93.pdf.

The racial difference in deficiencies ranges from 2.16 in high poverty tract (9.68 in non-white tracts vs. 7.52 in white tracts) to 2.58 in low poverty tracts (8.47 in non-white tracts vs. 5.89 in white tracts).

In sum, the higher number of deficiencies in non-white tracts persists across all income levels, suggesting that the racial gap continues to persist regardless of the census tract poverty rates.

*5. Census Tract Vacancy Rates Are Not a "Non-Racial" Control Variable.*

While the foregoing section shows that it may not be appropriate to use overall poverty rates—which may not explain as much of the racial disparity as anticipated—accounting for census tract property vacancy rates, as Dr. Skanderson does,[37] appears more defensible, even though it is not a race-neutral control variable. Nevertheless, although the vacancy rate explains some of the disparity in deficiencies, it still does not account for the disparity to the same extent as race.

It is well-established that higher poverty neighborhoods exhibit higher residential property vacancy rates.[38] This explanatory factor is a much more direct proxy for the density of vacant properties and potential associated lack of maintenance. Although that association is implied by Dr. Skanderson in the final portion of his analysis,[39] we can cross-tabulate the current data by range of tract vacancy for white versus non-white tracts (Table 14).

---

[37] Skanderson Report ¶ 128.

[38] One study by Immergluck (2016) identified "the extent to which neighborhood characteristics predict changes in long-term vacancy from 2011 to 2014 for the 50 largest metropolitan areas. High neighborhood vacancy rates persisted in some neighborhoods during this period, and these tended to be high-poverty neighborhoods." Source: Immergluck, Dan. 2016. Examining Changes in Long-Term Neighborhood Housing Vacancy during the 2011 to 2014 U.S. National Recovery. *Journal of Urban Affairs* 38(5): 607-622.

[39] Skanderson Report § 9.3.

**Table 14.**
**Average Total REO Property Deficiencies by Tract Vacancy Rate and Racial Composition**

| | Average Total Property Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| **Census Tract Vacancy Rate Range (Quartile)** | **White Tracts** | **Non-White Tracts** | **Difference by Tract** |
| **0% - 6.7% Vacancy Rate** | 5.83 | 8.34 | **2.51*** ** |
| *N* | *205* | *152* | *357* |
| **6.8% - 10.8% Vacancy Rate** | 6.03 | 8.72 | **2.69*** ** |
| *N* | *132* | *214* | *346* |
| **10.9% - 17.8% Vacancy Rate** | 6.31 | 9.11 | **2.80*** ** |
| *N* | *77* | *275* | *352* |
| **17.9% - 56.5% Vacancy Rate (Q4)** | 7.89 | 10.03 | **2.14*** ** |
| *N* | *38* | *312* | *350* |
| **Difference: Highest (Q4) minus Lowest (Q1)** | **2.06** ** | **1.69*** ** | |
| *N* | *452* | *953* | |
| **All Properties** | 6.14 | 9.20 | **3.06*** ** |
| *N* | *452* | *953* | *1,405* |

Sources: U.S. Census Bureau 2008-12 ACS. Current REO Property Database.
Significant difference by race of tract in **bold**: ***p<.001 **p<.01 *p<.05 (two-tailed tests)

As Table 14 above shows, average total REO property deficiencies do rise with accompanying census tract vacancy rates, and slightly more so in white tracts than in non-white tracts.

One important cautionary aspect of the impact of vacancy rates, however, is that vacancy is not wholly independent of racial processes or a completely race-neutral control variable. Two reasons vacancy rates are higher in non-white tracts relate directly to prior racial disparities. One, historical mortgage redlining from the 1930s to the 1970s has been shown to have *caused* a significant reduction in population, housing values, and rents in majority-non-white tracts.[40] Second, the much more recent accumulation of foreclosures in majority-minority census tracts and communities from the 1990s to 2010s resulted partly from a disproportionate racial disparity in subprime lending and a disproportionate impact even when accounting for other factors.[41] A

[40] For evidence on the long-lasting effect of redlining, see recent published economic research: Aaronson, Daniel, Daniel Hartley, and Bhashkar Mazumder. 2021. The Effects of the 1930s HOLC "Redlining" Maps. *American Economic Journal: Economic Policy*, 13 (4): 355-92.

Krimmel, Jacob. 2017. "Persistence of Prejudice: Estimating the Long-Term Effects of Redlining." https://faculty.wharton.upenn.edu/wp-content/uploads/2017/11/Krimmel-Redlining-DRAFT_Nov2017_v2.pdf.

[41] See: Hall Matthew, Kyle Crowder, and Amy Spring. 2015. Variations in Housing Foreclosures by Race and Place, 2005–2012. *The ANNALS of the American Academy of Political and Social Science*. 660(1):217-237.

recently published article examining the 200 largest metropolitan areas concluded the following about high census tract vacancy rates ("hypervacancy"): "We find that hypervacancy is heavily racialized; hypervacant tracts tend to have relatively large Black and Latinx populations. *Regressions show that hypervacancy is shaped by preexisting urban disparities.*" (emphasis added).[42]

Therefore, although vacancy and racial composition are correlated, the interpretation of any reduced racial gap should not be understood as a straightforward reduction in the role of race, but rather as a mechanism or pathway whereby racial factors have also shaped outcomes like vacancy rates, not just maintenance deficiencies.

In his report, Dr. Skanderson[43] maintains that including census tract vacancy rates in an analysis substantially reduces the disparity by racial composition. Yet as discussed earlier, when I controlled for vacancy rate in the final regression analysis, it only explained 10% of the disparity, leaving race as the variable that explained 65% of the disparities in maintenance.

*6. Removing the Smaller MSAs Does Not Change the Results of the Analysis.*

To address the concern of small sample size by metropolitan statistical area (MSA) raised by Dr. Skanderson,[44] the final row (8) of Table 16 below removes 118 additional properties from all 16 MSAs with fewer than 30 properties each (see list in bottom 16 rows in Table 12) and also refines the level of the metro area fixed effects from the Core-Based Statistical Area metropolitan statistical area ("CBSA MSA") level to the level of metropolitan statistical area/metro division ("MSAMD") now that there are no longer smaller MSAMDs in the sample. (See discussion and definitions of MSAs in Exhibit 3). Table 16 shows that the results remain unchanged, with the adjusted racial gap rising slightly from 1.97 to 1.99, the rounded percentage explained unchanged at 35%, and the percent of variation (100 x $R^2$).

*7. Results of Final Rebuttal Analysis and Revised Regression Analysis*

In responding to Defendants' experts' arguments above, I considered about 40 different variables, other than race, that could potentially explain the observed disparities in

---

Rugh, Jacob S., Douglas S. Massey. 2010. Racial Segregation and the American Foreclosure Crisis. *American Sociological Review*. 2010;75(5):629-651.

[42] See: Harrison, Austin, and Dan Immergluck. 2021. Housing vacancy and hypervacant neighborhoods: Uneven recovery after the US foreclosure crisis. *Journal of Urban Affairs*: 1-17. https://doi.org/10.1080/07352166.2021.1945930

Researchers classify this problem as post-estimation bias, wherein controlling for another variable structured by race earlier in a chain of events or processes that results in a racial disparity does not necessarily attenuate or eliminate the racial disparity, but instead obscures the role of race and exactly how it relates to both variables (the outcome and the control). A recent article in *Scientific American* summarized this process using several useful examples: https://www.scientificamerican.com/article/how-to-study-racial-disparities/.

[43] Skanderson Report ¶ 128.

[44] Skanderson Report ¶¶ 58-59.

maintenance—although no variable on its own or in combination with others explained more than half the disparity. These variables are listed in both Table 3 above and in Table 15 below.

**Table 15.**
**Summary of Additional Variables Used in Final (Rebuttal) Analysis of Total REO Property Deficiencies**

| Variable Used as Part of Final (Rebuttal) Analysis | *Number of Properties* | All Tracts | White Tracts | Non-White Tracts | Non-white minus White Difference |
|---|---|---|---|---|---|
| 23 Days from First-time Vacancy to Foreclosure[a] | *150* | -161 | 26 | -205 | -231 |
| 24 Days from First-time Vacancy to Evaluation Visit[a] | *162* | 621 | 431 | 669 | **238** * |
| 25 Days from Foreclosure to Evaluation Visit (BANA)[b] | *226* | 468 | 411 | 479 | 68 |
| 26 Days from Foreclosure to Evaluation Visit (public) | *1,002* | 345 | 320 | 357 | 37 |
| 27 Burglary Rate per 1,000 pop. | *973* | 12.5 | 10.8 | 13.3 | **2.5** *** |
| 28 Vandalism Rate per 1,000 pop. (where available) | *366* | 12.2 | 10.9 | 12.7 | **1.8** ** |
| 29 Distance to Central City Hall, Miles | *1,405* | 9.8 | 12.4 | 8.6 | **-3.8** *** |
| 30 Located in Central City | *1,405* | 63.2% | 41.1% | 73.7% | **32.6** *** |
| 31 Poverty Rate, Total Population | *1,405* | 22.9% | 13.3% | 27.4% | **14.1** *** |
| 32 Poverty Rate, Homeowners Only | *1,405* | 6.0% | 3.6% | 7.1% | **3.5** *** |
| 33 Median Homeowner Housing Costs as % of Income | *1,405* | 28.0% | 24.3% | 29.8% | **5.5** *** |
| 34 % Vacant Homes | *1,405* | 12.9% | 8.5% | 14.9% | **6.4** *** |
| 35 REO Property Sale Price at Foreclosure by Lender ($) | *969* | 85,817 | 96,680 | 80,436 | **-16,244** *** |
| 36 REO Property Sale Price at Foreclosure per Sq. Ft. ($) | *969* | 59.01 | 59.9 | 58.58 | -1.32 |
| 37 REO Property Re-Sale Price, Sold by Lender ($) | *912* | 70,276 | 98,354 | 56,098 | **-42,256** *** |
| 38 REO Property Re-Sale Price per Sq. Ft. ($) | *912* | 44.42 | 53.23 | 39.98 | **-13.25** *** |
| 39 % HUD FHA/VA Foreclosed Loans (Purchase Loans) | *467* | 47.3% | 47.6% | 47.1% | -0.5 |
| 40 Property Sales Price to Foreclosed Owner per Sq. Ft. ($) | *637* | 103.96 | 110.38 | 101.14 | -924 |

***$p<.001$ **$p<.01$ *$p<.05$ (two-tailed tests of difference by non-white versus white tract type)

Sources: Current REO Property Database, Public County Assessor Data, Public County Deed Property Transaction Histories, Zillow.com, U.S. Census Bureau 2010 Census and 2008-12 American Community Survey, FBI, Local Police Departments.

[a]Safeguard (SG00504478) [b]Bank of America (BANA-NFHA-LIT_03222596 & 0298915)

The final revised regression analysis of the Current REO Database includes 20 variables—18 from the original regression analysis (with 2 variables consolidated into 1) and 3 additional variables that Defendants' experts contend affect the analysis. Table 15 below contains a summary of the additional variables included in the final regression analysis.

The main conclusions drawn from the final revised regression analysis are as follows:

- The total set of variables combined explain at most 39% of the variation in total deficiencies, leaving 61% of the variation in deficiencies unexplained by anything other than the racial composition of the surrounding neighborhood.

- Although the racial disparity in deficiencies is reduced from an average of 3.05 deficiencies to 1.97 deficiencies, this disparity remains both highly statistically significant ($p<.001$) and practically significant (medium effect size).

- Even when metro areas where fewer than 30 properties were observed are excluded from the analysis, these results remain unchanged.

- Last, even when excluding the properties BANA disputes that it is responsible for, the results again remain unchanged.

The results of the final full regression analysis are summarized in Table 16 (Row 7, Full Model).

Table 16 presents the results of the final revised regression analysis after incorporating the variables discussed previously in this Section, including the appropriate census tract homeowner poverty rate, vacancy rates, and distance to the city hall (center) of the central city of the metro area. Also, per Section V.6, the final model results omit a small number of properties per the details explained below and in Table 9. The results are unaffected by these changes.

Row 5 of Table 16 shows that even using other measures of overall poverty instead of the most appropriate measure (the poverty rate among homeowners with mortgages, rather than the overall census tracts poverty rate[45]) and perhaps the most obvious proxy from census data—the vacancy rate[46]—the adjusted racial disparity only shifts from 2.30 to 1.98.

In Row 6 of Table 16, when adding the distance to the city center measure to the next model, subtracting the very few (8) properties reported to be occupied by the foreclosed mortgagor, and using homeowner poverty rate instead, the racial disparity shifts only very slightly (not significantly), from 1.98 to 1.97. This final full model explains only 35% of the racial disparity and 38% of the variance in the overall outcome of REO property deficiencies.

[45] In Section V.4, I explain why the poverty rate among homeowners and mortgagors is the most appropriate measure of overall poverty.

[46] In Section V.5, I discuss cautions and caveats regarding how the vacancy rate is not a race-neutral variable.

**Table 16.**
**Summary of Final Revised Regression Estimates of Total REO Property Deficiencies Using Current REO Property Database Incorporating Critiques and Responses: Final Full Model Still Shows that the Effect of Non-White Tract Property Location Remains Statistically and Practically Significant and that All Other Variables Explain At Most 35% of Racial Gap in Deficiencies and 39% of the Variation in Deficiencies**

| Revised Statistical Regression Model: Variables Included | Number of REO Properties | Racial Gap in Deficiencies (Non-white tract coeff.) | Percent of Observed Gap Explained by Model Variables | Percent of Variation in Deficiencies Explaind by Model ($R^2$) | Practical Signifance of Racial Gap: Non-white Effect (Cohen's *d*) |
|---|---|---|---|---|---|
| ***1:** Observed Disparity or Racial Gap in Deficiencies: Non-white vs. White Tracts* | *1,405* | *3.05**** | *0%* | *14%* | *Large Effect (0.86)* |
| **2:** Full Model: Original Regression Analysis[a] (Row 5, Table 16) | 940 | 2.38*** | 22% | 37% | Medium Effect (0.64) |
| **3**: 2. Except use year built instead of era property built | 940 | 2.30*** | 25% | 37% | Medium Effect (0.62) |
| **4**: 3 +Add Tract Vacancy Rate and Overall Poverty Rate per Skanderson Critique[b] | 940 | 1.98*** | 35% | 38% | Medium Effect (0.53) |
| **5**: 4. Except use Homeowner Poverty Rate Instead of Overall Poverty Rate[c] | 940 | 2.09*** | 31% | 38% | Medium Effect (0.56) |
| **6:** 5. +Add Distance to Downtown of MSA Central City (City Hall) | 940 | 1.99*** | 35% | 38% | Medium Effect (0.53) |
| **Full Model** **7:** 6 +Subtract 8 properties occupied by mortgagor on evaluation visit date[d] | **932** | **1.97*** ** | **35%** | **38%** | **Medium Effect (0.53)** |
| ***8:** 7. +Subtract properties from 16 Metro Areas with fewer than 30 properties and use* Metro Division fixed effects[e] | *814* | *1.99**** | *35%* | *39%* | *Medium Effect (0.53)* |
| ***9:** 8. +Also subtract properties where BANA Dispute Category = "Removal Disputed"* | *672* | *2.09**** | *31%* | *37%* | *Medium Effect (0.55)* |

As Row 8 of Table 16 demonstrates, even when subtracting from the analysis metropolitan areas with fewer than 30 REO properties (see Exhibit 3), the results remain unchanged—only 35% of the racial disparity gap and 39% of the overall variation in deficiencies are explained.

As Row 9 of Table 16 demonstrates, even if the regression subtracts the properties BANA disputes that it is responsible for, the final results remain largely unchanged, and in fact slightly stronger. That is, a lower share (31%) of the racial disparity is explained (vs. 35% in the Full Model in Row 7 or the Addendum Model Row 8). This very last result in Row 9 excluding disputed properties emphasizes how consistent the racial disparity remains across all types of sample considerations and new variables added.

Omitted variables bias (or the underestimation deriving from the possibility that another variable omitted from the final revised regression model may in fact account for most of the racial disparity), a concern raised by Dr. Skanderson,[47] is always a challenge for regression analysts. However, now, after exhausting up to 40 other variables that measure many other explanations other than racial composition, other data must be produced beyond an already very extensive list of publicly available variables to reduce, let alone substantially eliminate, the remaining, large racial disparity of 1.97 deficiencies. Based on these patterns, that is highly unlikely.[48]

Finally, the more closely the extensive, carefully collected data is examined, the more *similar* delinquent mortgagors appear by tract racial composition, casting further doubt that disparities are somehow only an artifact of disparities in delinquent mortgagor attributes (Table 15):

- Share of foreclosed homebuyers who used FHA/VA loans for purchase:
  - 48% in white tracts, 47% in non-white tracts (difference *not* significant)
- Sale price of property per sq. ft. to foreclosed homebuyers:
  - $110.38 in white tracts, $101.14 in non-white tracts (difference *not* significant)
- Sale price of REO property to BANA per sq. ft.:
  - $59.90 in white tracts, $58.58 in non-white tracts (difference *not* significant)
- Days between Foreclosure REO Acquisition and NFHA Evaluation date:
  - 320 days in white tracts, 357 days in white tracts (difference *not* significant)

These data demonstrate that responsibility for the observed deficiencies lies with the lender, BANA, and its maintenance agents because properties are evaluated on average at such a distant time point from (49 weeks) past REO foreclosure acquisition with reasonable time to remedy these racial disparities.

---

[47] Skanderson Report ¶ 132.

[48] The revised analysis already includes the two leading economic variables, poverty and vacancy, as well as the leading other explanatory variable, the age of the home. No variables come close to explaining as much of the disparity as the age of the home, which itself only accounts for a small fraction of the observed racial disparity. When the overall census tract poverty rate is included in the model in Row (4), it is not statistically significant (b=0.01, p=0.37) but the vacancy rate is statistically significant (b=.04, p<.02).

In sum, the results of all the revised regression analysis models remain the same: Less than half (no more than 35%) of the racial disparity in REO property deficiencies is ever explained by any or all 20 factors or variables, including poverty, vacancy, distance to the city center, and key existing variables like the age, size, and value of the property. Sixty-one percent of the racial disparity in total REO property deficiencies in the Current REO Database of 1,405 properties remains unexplained by this extensive array of non-racial factors. The regression-adjusted racial disparity also remains highly statistically significant and practically significant.

Put differently, the difference in number of deficiencies between white and non-white census tracts is stark, even with fewer properties and more possible explanatory variables than were included in the initial pre-Complaint regression analysis. Racial composition of the neighborhood, therefore, remains the driving factor behind the disparities in maintenance and marketing Plaintiffs observed after controlling for other variables.

## VI. Testimony in Other Lawsuits Within the Last Four Years

I have not provided testimony in other lawsuits within the last four years.

## VII. Compensation for Work in this Litigation

I am receiving $180 per hour for compensation for my work in this litigation.

Jacob S. Rugh, Ph.D.

Dated: February 14, 2022

# EXHIBIT 1

# Jacob S. Rugh

Brigham Young University • 2008 JFSB Provo, UT 84602 • (801) 422-4466 • jacob_rugh@byu.edu

## Academic Appointments

Associate Professor of Sociology, Brigham Young University, 2018 – present
Assistant Professor of Sociology, Brigham Young University, 2012 – 2018

## Education

Ph.D. Public Affairs—Urban Policy, Certificate in Demography, 2012
M.P.A. and U.R.P. (Urban & Regional Planning), 2008
Princeton University, School of Public and International Affairs

B.S. Economics, Cum Laude with University Honors, 2001
Brigham Young University

## Research Interests

Segregation, Immigration, Housing, Homeownership, Race, Ethnicity, Urban Sociology

## Peer Reviewed Publications

2021 **Rugh, Jacob S.** 2021. "From Crisis to Progress: Housing and Latino Youth." *The ANNALS of the American Academy of Political and Social Science*. 652(3). Special Issue on Latino Youth edited by Marta Tienda and Lisa A. Gennetian. doi: 10.1177/00027162211041364

**Rugh, Jacob S.** 2021. "From Segregation to Isolation: White Americans in the Age of Trump." In Benjamin Bowser and Duke Austin, Eds., *The Impacts of Racism on White Americans: In the Age of Trump*. Palgrave Macmillan. palgrave.com/gp/book/9783030752316

**Rugh, Jacob S.** 2021. "Housing Segregation and the Forgotten Latino American Story." In Kwate, Naa Oyo, Ed., with photography by Camilo J. Vergara. *The Street: A Photographic Field Guide to American Inequality*. Rutgers University Press. rutgersuniversitypress.org/the-street/9781978804500

Gabriel, Ryan, **Jacob S. Rugh**, Hannah Spencer, and Aïsha Lehmann. 2021. "The Neighborhood Attainment of Mixed-Race Couples Across the Black/White Spectrum." *Sociological Perspectives*. doi: 10.1177%2F0731121421996397

Massey, Douglas S., and **Jacob S. Rugh.** 2021. "America's Unequal Metropolitan Geography: Segregation and the Spatial Concentration of Affluence and Poverty." In F. Rosenbluth and M. Weir, Eds., *Who Gets What? The New Politics of Insecurity*. Cambridge University Press.

2020 **Rugh, Jacob S.** 2020. "Why Black and Latino Home Ownership Matter to the Color Line and Multiracial Democracy." *Race and Social Problems* 12(1):57-76. doi: 10.1007/s12552-019-09275-y

**Rugh, Jacob S.** 2020. "Vanishing Wealth, Vanishing Votes? Latino Homeownership and the 2016 Election in Florida." *Journal of Ethnic and Migration Studies* 46(18): 3829-3854. doi: 10.1080/1369183X.2019.1592877

2019 Hwang, Jackelyn, Elizabeth Roberto, and **Jacob S. Rugh**. 2019. "Residential Segregation in the Twenty-First Century and the Role of Housing Policy." In Grimm, Josh and Jaime Loke, Eds. *How Public Policy Impacts Racial Inequality*. Baton Rouge, LA: Louisiana State University Press.

**Rugh, Jacob S.** 2019. "Subprime Lending/Foreclosure Crisis." *The Wiley-Blackwell Encyclopedia of Urban and Regional Studies*. Malden, MA: Wiley-Blackwell.

2018 Fischer, Mary J. and **Jacob S. Rugh**. 2018. "Military Veterans and Neighborhood Racial Integration: VA Mortgage Lending Across Three Eras." *Population Research and Policy Review* 37(4):569-589. doi: 10.1007/s11113-018-9471-7

**Rugh, Jacob S.** 2018. "Deception, Development, & Democracy." *Contexts* 17(1):76-77.

Massey, Douglas S., and **Jacob S. Rugh**. 2018. "The Great Recession and the Destruction of Minority Wealth." *Current History* 117(802):298-303.

2017 Steil, Justin, Len Albright, **Jacob S. Rugh**, and Douglas S. Massey. 2017. "The Social Structure of Mortgage Discrimination: A Qualitative Analysis." *Housing Studies* 33(5):759-766.

Massey, Douglas S. and **Jacob S. Rugh**. 2017. "The Intersection of Race and Class: Zoning, Affordable Housing, and Segregation in U.S. Metropolitan Areas." Pp. 245-265 in Gregory D. Squires, Ed. *The Fight for Fair Housing: Causes, Consequences and Future Implications of the 1968 Federal Fair Housing Act*. New York: Routledge.

2016 **Rugh, Jacob S.** and Matthew Hall. 2016. "Deporting the American Dream: Immigration Enforcement and Latino Foreclosures." *Sociological Science* 3:1053-1076.

Massey, Douglas S., Justin Steil, Len Albright, and **Jacob S. Rugh**. 2016. "'Riding the Stagecoach to Hell:' A Qualitative Analysis of Racial Discrimination in Mortgage Lending." *City & Community* 15(2):118-136. doi: 10.1111/cico.12179

Hyra, Derek and **Jacob S. Rugh.** 2016. "The US Great Recession: Exploring Its Association with Black Neighborhood Rise, Decline and Recovery." *Urban Geography* 37(5):700-726. doi: 10.1080/02723638.2015.1103994

Sanders, Scott R., Lance Erickson, Vaughn Call, and **Jacob S. Rugh**. 2016. "Healthcare Utilization in the Heartland: How Healthcare Selection Varies Between Rural

Retirement-Age Migrants and Long-Term Residents." *Rural Sociology* 81(1): 66-98. doi: 10.1111/ruso.12088

2015 **Rugh, Jacob S.**, Len Albright, and Douglas S. Massey. 2015. "Race, Space, and Cumulative Disadvantage: A Case Study of the Subprime Mortgage Collapse." *Social Problems* 62(2):186-218.* doi: 10.1093/socpro/spv002
*Winner of the John Hope Franklin Prize, Law & Society Association, 2016.

**Rugh, Jacob S.** 2015. "Double Jeopardy: Why Latinos Were Hit Hardest by the US Foreclosure Crisis." *Social Forces* 93(3):1139-1184. doi: 10.1093/sf/sou107

**Rugh, Jacob S.** 2015. "Painting the Whole Picture: Foreclosure Rates among Asian American Ethnic Groups in Orlando, Florida, and Phoenix, Arizona." *AAPI Nexus Journal: Policy, Practice, and Community* 13(1-2):149-177.

2014 **Rugh, Jacob S.** and Douglas S. Massey. 2014. "Segregation in Post-Civil Rights America: Stalled Integration or End of the Segregated Century?" *Du Bois Review: Social Science Research on Race* 11(4):205-232. doi: S1742058X13000180

2013 Kuebler, Meghan and **Jacob S. Rugh.** 2013. "New Evidence on Racial and Ethnic Disparities in Homeownership." *Social Science Research* 42(5):1357-1374. doi: 10.1016/j.ssresearch.2013.06.004

2011 **Rugh, Jacob S.** and Jessica Trounstine. 2011. "The Provision of Local Public Goods in Diverse Communities: Analyzing Municipal Bond Elections." *Journal of Politics* 73(4): 1038-1050. doi: 10.1017/S0022381611000776

2010 **Rugh, Jacob S.** and Douglas S. Massey. 2010. "Racial Segregation and the American Foreclosure Crisis." *American Sociological Review* 75(5): 629–651. doi: 10.1177/0003122410380868

Massey, Douglas S., **Jacob S. Rugh**, and Karen A. Pren. 2010. "The Geography of Undocumented Mexican Migration." *Mexican Studies/Estudios Mexicanos* 26(1): 129-152.

**Manuscripts under Review**

Hwang, Jackelyn, Elizabeth Roberto, Francine Stephens, and **Jacob S. Rugh**. "Integrating or Segregating? Gentrification, Black Exceptionalism, and the Changing Structure of Segregation." (Revise and resubmit)

**Rugh, Jacob S.** and Mary J. Fischer. "Are Military Veterans More Racially Integrated? An Analysis of Homeowners in 98 U.S. Metro Areas."

Hall, Matthew and **Jacob S. Rugh**. "The Impact of Immigrant Deportations on Latino Segregation."

Dahlin, Eric, Samantha Ammons, and **Jacob S. Rugh.** "Toward a Comprehensive Sociology of Innovation: Considering Social Impacts."

## Working Papers and Projects

Byrd, W. Carson and **Jacob S. Rugh**. "Town-Gown Segregation: How Colleges Influence Residential Segregation." (ASA 2019 paper)

Gabriel, Ryan, **Jacob S. Rugh**, Kyle Crowder, and Matthew Hall. "Integrated Neighborhoods, Racial/Ethnic Groups, and the Foreclosure Crisis."

Massey, Douglas S., **Jacob S. Rugh**, and Jonathan Tannen. *American Apartheid 2.1: Segregation and Poverty in the 21st Century*. Book manuscript in preparation.

## Research and Teaching Awards

John Hope Franklin Prize for Best Article on Race, Racism and the Law, Law & Society Association, 2016

Kimberlé Crenshaw Outstanding Article Award Honorable Mention, Society for the Study of Social Problems, 2016

Chantal Thompson Outstanding Faculty Award in Africana Studies, Brigham Young University, 2020

BYU Undergraduate Education Alcuin Award & Honors Fellowship, 2019-2021

## Research Grants

Center for New York City Neighborhoods, with Douglas S. Massey (April 2011).

## Reports, Datasets, Essays, and Other Publications

**Rugh, Jacob S.**, and Sarah Robinson. 2021. "U.S. Zip Code Data: COVID-19 Case Rates and Death Rates [N=17,685]." OSF. (20 August 2021). doi:10.17605/OSF.IO/B4XYJ.

Gomez de Bybee, Noriadnys, and **Jacob S. Rugh.** 2021. "Perspective: For the sake of America, we must pass immigration reform now." Invited Opinion-Editorial for *The Deseret News* (November 30, 2021).

**Rugh, Jacob S.** 2020. "An Open Letter to the BYU Committee on Race, Equity, and Belonging." *Salt Lake Tribune* (August 9, 2020). [PDF version available upon request]

**Rugh, Jacob S.** 2020. "I asked 400 of my former BYU students who they plan to vote for in 2020. Their answers will surprise you." *Medium* (June 2, 2020).

**Rugh, Jacob S.** 2020. "The Promise of the Hispanic Moment or the Real Hispanic Challenge?" *Medium* (April 1, 2020).

**Rugh, Jacob S.** 2016. "Still Integrating." *BYU Magazine* (Winter 2016).

**Rugh, Jacob S.** "The Persistence of Inequality in Mortgage Default in New York City: Social Forces and the Effects of Loan Modification." (Center for NYC Neighborhoods, March 2012).

Chatters III, Ronald, Vincent Chin, Brett Hembree, Jessica Hembree, Maia Jachimowicz, Eric Mikanda, **Jacob S. Rugh**, Sarah Sable. "Reducing Depression among Mothers with Young Children in Newark: Policy Recommendations to Improve Awareness, Screening and Treatment of Depression," a supplement to "Achieving the Goals of the Newark Children's Bill of Rights: Recommendations to Mayor Cory A. Booker and Director María Vizcarrondo, Newark Department of Child & Family Wellbeing," Report Advisers: Sara S. McLanahan, Elisabeth Donahue, Michelle O. DeKlyen. (January 2008)

Drezner, Karen, **Jacob S. Rugh**. "The Bronx Charter School for Children 2006-2007 Annual Report," submitted to the New York State Education Department (August 2007).

**Rugh, Jacob S.** 2004. "What Happened to Participant Asset Allocations at TIAA-CREF from 2000 to 2004?" *Research Dialogue* No. 80 (May 2004)

**Rugh, Jacob S.** 2003. "Participant Contribution and Asset Allocations during the Recent Bull and Bear Market: Evidence from TIAA-CREF," *Benefits Quarterly* 19:55-67.

**Invited Presentations**

2021 **Rugh, Jacob S.** 2021. "Teaching about Race and Racism in the Classroom Successfully: Three Lessons I've Learned." Utah Council for the Social Studies: 2021 Annual Social Studies Conference, South Jordan, Utah (08 October 2021).

**Rugh, Jacob S.** 2021. "Building on Our Common Core Values: Why a Welcoming, Inclusive Provo Matters." Presentation to the Provo City Council (20 April 2021).

**Rugh, Jacob S.** 2021. "The Divide in the LDS 2020 Vote by Gender, Age, Race, and Place." Global Women's Studies Colloquium & BYU Kennedy Center (4 February 2021).

2020 **Rugh, Jacob S.** 2020. "Black and Latino Homeownership: Implications for Voter Turnout and the 2020 Election." BYU Kennedy Center Lecture Series (7 October 2020). https://www.youtube.com/watch?v=CmuX4eeYmao

2019 **Rugh, Jacob S.** 2019. "Black and Latino Home Ownership: Why Housing Wealth Matters to the Color Line and Multiracial Democracy." Paper presented at the Center for Study of Inequality, Cornell University, Ithaca, NY (November 20, 2019).

2017 **Rugh, Jacob S.** 2017. "Segregation Still Matters, Integration Is Still Possible." Segregation Summer Institute, Center on Race and Social Problems, University of Pittsburgh, Pittsburgh, PA (July 19, 2017).

**Rugh, Jacob S.** and Matthew Hall. 2017. "Deporting the American Dream: New Evidence and New Directions for Research." Population Research Institute, Pennsylvania State University, State College, PA (March 21, 2017).

2016 **Rugh, Jacob S.** 2016. "Race, Space, and the Subprime Crisis: Findings from a Civil Rights Settlement." Law & Society Association Speaker Series. S.J. Quinney College of Law, University of Utah, Salt Lake City, UT (October 26, 2016).

**Rugh, Jacob S.** and Matthew Hall. 2016. "Latino Deportations and Latino Foreclosures: Connecting the Dots." Paper presented to BYU Department of Sociology Brownbag, Provo, UT (February 12, 2016).

**Rugh, Jacob S.** 2016. "White Space, Black Space." Utah Valley University, Orem, UT (November 2, 2016).

2015 **Rugh, Jacob S.** 2015. "Understanding Racial Segregation and Discrimination." Discussions on Race, Provo City Police Department, Provo, UT (November 4, 2015).

**Rugh, Jacob S.** 2015. "Segregation, Subprime Lending, and Latino Double Jeopardy: Highlights and Policy Implications." Research presentation to the White House National Economic Council, Washington, DC (May 5, 2015).

2013 **Rugh, Jacob S.** 2013. "Do Veterans Affairs Mortgages Promote Neighborhood Integration?" Presentation to the Veterans Affairs Administration and BYU Department of Sociology, Provo, UT (March 13, 2013).

2012 **Rugh, Jacob S.** 2012. "Why Latinos Were Hit Hardest by the U.S. Housing Crisis," Presentation at the Mortgage Lending Data Roundtable: Using Data to Understand Emerging Trends in the Mortgage Market and Borrowers' Access to Credit, sponsored by the U.S. Department of Housing & Urban Development, held at the Urban Institute, Washington, DC (August 22, 2012).

**Rugh, Jacob S.** 2012. "The Persistence of Inequality in Mortgage Lending and Foreclosure in New York City: Post-Counseling Intake Findings," Report presented to the Center for NYC Neighborhoods. New York, NY (March 22, 2012).

2011 **Rugh, Jacob S.** 2011. "Segregation, Securitized Lending and Foreclosure Outcomes in New York City," Center for NYC Neighborhoods Research Conference at the Federal Reserve Bank of New York. New York, NY (September 22, 2011).

**Rugh, Jacob S.** 2011. "Racial Segregation and the American Foreclosure Crisis: Updated Findings and Causal Pathways," Federal Deposit Insurance Corporation, Division of Depositor and Consumer Protection. Washington, DC (July 7, 2011).

**Rugh, Jacob S.** 2011. "Racial Segregation and the American Foreclosure Crisis: Updated Findings," Brigham Young University. Provo, UT (April 5, 2011).

**Rugh, Jacob S.** 2011. "Racial Segregation and the American Foreclosure Crisis: Updated Findings", Hinckley Institute of Politics Forum, University of Utah. Salt Lake City, UT (April 4, 2011).

2010 **Rugh, Jacob S.** 2010. "Racial Segregation and the American Foreclosure Crisis," Symposium on "The Evolution of Civil Rights Litigation," Temple University Law Review and Pennsylvania Human Relations Commission. Philadelphia, PA (Nov 19, 2010).

**Rugh, Jacob S.** 2010. "Racial Segregation and the American Foreclosure Crisis," 20th Annual Fair Lending Conference, Cleveland, OH (October 29, 2010).

**Conference Presentations**

2019 Hall, Matthew and **Jacob S. Rugh.** 2019. "The Impact of Immigrant Deportations on Latino Segregation." Paper presented at the annual meeting of the American Sociological Association, New York, NY (August 10, 2019).

2018 **Rugh, Jacob S.** 2018. "Black LDS Mobility and Success: The Rising Third Generation." Paper presented at Black, White, and Mormon II: A Conference on Race in the LDS Church Since the 1978 Revelation. Salt Lake City Library, Salt Lake City, UT (June 30, 2018).

Hall, Matthew and **Jacob S. Rugh.** 2018. "The Impact of Immigrant Deportations on Latino Segregation." Paper presented at the Association for Public Policy Analysis & Management Conference, Washington, DC (November 8, 2018).

2016 **Rugh, Jacob S.** and Matthew Hall. 2016. "Deporting the American Dream: Immigration Enforcement and Latino Foreclosures." Paper presented at the annual meeting of the American Sociological Association, Seattle, WA (August 23, 2016).

**Rugh, Jacob S.** and Miles Marsala. 2016. "Racial Segregation by Age: A New Explanation for Trends in Black-White Segregation." Paper presented at the annual meeting of the Population Association of America, Washington, DC (April 2, 2016).

2015 **Rugh, Jacob S.** 2015. "Growth of the LDS Church in Urban Areas since 1980: Why It Happened and Why It Matters." Black, White, and Mormon: A Conference on the Evolving Status of Black Saints within the Mormon Fold. Tanner Humanities Center, University of Utah, Salt Lake City, UT (October 9, 2015).

**Rugh, Jacob S.** and Ryan Allen. 2015. "Understanding the Impact of the Housing Crisis on Asian and Latino Homeowners in the Sunbelt." Paper presented at the Association of Public Policy & Management Conference, Miami, FL (November 12, 2015).

**Rugh, Jacob S.** and Mary J. Fischer. 2015. "Are Military Veterans More Racially Integrated? An Analysis of Homeowners in 98 U.S. Metro Areas." Paper presented at the annual meeting of the American Sociological Association, Chicago, IL (August 21, 2015).

**Rugh, Jacob S.** and Ryan Allen. 2015. "Using Original Data to Uncover Pathways to Latino Disparities in Home Foreclosure." Paper presented at the annual meeting of the Urban Affairs Association, Miami, FL (April 9, 2015).

2014 **Rugh, Jacob S.** 2014. "Are Military Veterans More Racially Integrated? An Analysis of Black, Latino, and White Veterans with VA Mortgages?" Paper presented at the annual meeting of the American Sociological Association, San Francisco, CA (August 19, 2014).

**Rugh, Jacob S.** and Derek Hyra. 2014. "Divergent Recoveries: The Great Recession and Gentrification in Chicago, New York, and Washington, DC." Paper presented at the annual meeting of the Urban Affairs Association, San Antonio, TX (March 20, 2014).

2013 **Rugh, Jacob S.** and Len Albright. 2013. "Layered Discrimination and Cumulative Disadvantage in the Subprime Mortgage Collapse: A Case Study of Baltimore, Maryland." Paper at ASA annual meeting, New York, NY (August 11, 2013).

**Rugh, Jacob S.** 2013. "Double-Disparities: The Housing Crisis and the New Demography of the Sunbelt." Paper presented at the 2013 Annual Meeting of the Urban Affairs Association, San Francisco, CA (April 5, 2013).

2012 **Rugh, Jacob S.** 2012. "A Perfect Storm: Why Latinos Were Hit Hardest by the U.S. Housing Crisis," Paper presented at the annual meeting of the American Sociological Association. Denver, CO (August 17, 2012).

## Courses Taught

| | |
|---|---|
| SOC 111 | Introductory Sociology |
| SOC 113 | Multicultural America |
| HON 227 | Honors Unexpected Connections: Race and Music (co-instructor) |
| SOC 323 | Sociology of Race & Ethnicity |
| SOC 370 | Urban Sociology |
| SOC 490R | Capstone Seminar on Race & Immigration |
| SOC 623 | Graduate Seminar on Race & Ethnicity |

## University Service

| | |
|---|---|
| Chair | Department Undergraduate Curriculum Committee, 2016-2019 |
| | BYU Latino Civil Rights Seminar Committee Coordinator, 2018-2020 |
| | BYU FAC, Diversity & Belonging Committee Co-Chair, 2021- |
| Member | BYU Africana Studies Affiliated Faculty, 2015- |
| | BYU Africana Studies Executive Committee, 2017- |
| | BYU Faculty Advisory Council, 2020- |
| | College of FHSS Curriculum Council, 2016-2019 |
| | College of FHSS Research Committee, 2014-2016 |
| | Department Undergraduate Curriculum Committee, 2012-2019 |
| | Department Rank and Status Committee, 2021- |
| Adviser | BYU Antiracism Club, 2020- |
| Presenter | College of FHSS Panel on Immigrants and Refugees, 2017-2018 |
| | College of FHSS Master Teaching Luncheon, 2017, 2019, 2021 |
| | BYU Black History Month Discussion Panel, 2015 & 2020 |
| | BYU Museum of Art, Take 5 Series, 2015 |
| | BYU General Education (GE) Academy, 2016 & 2019 |

| | |
|---|---|
| | BYU Global Women's Studies & Kennedy Center Lecture, 2020 & 2021 |
| | Trainings on Race for BYU Services, Advisers, and Faculty, 2016- |
| Reviewer | BYU David O. McKay Grant Proposals, 2016 |
| | BYU Honors Theses & Great Questions Essays, 2015- |
| Co-Instructor | BYU Civil Rights Seminar and Trip to Alabama & Georgia, 2017 |
| | BYU Latino Civil Rights Seminar and Trip to Texas, 2019 |
| | BYU Latino Civil Rights Seminar and Trip to Southern California, 2021 |
| Guest Lecturer | COMMS 489 Strategic Ad Campaigns (Memorial to Peace and Justice) |
| | COMMS 300 Media Ethics, Law and Responsibility |
| | EL ED 203 Foundations of Multicultural Education |
| | HIST 385 Latinos in the United States |
| | HONRS 120 Introduction to Great Questions |
| | HONRS 226 Jazz on the Road: Race & Tourism in 20th Century America |
| | IAS 221 Introduction to Africana Studies |
| | PHIL 449R Philosophical Lecture Series |
| | SOC W 630 Social Welfare Policy |
| | LAW 621 The 14th Amendment |

## Professional Affiliations and Service

| | |
|---|---|
| Member | American Sociological Association (ASA) |
| | Population Association of America (PAA) |
| Secretary | ASA Community & Urban Sociology Section (2014-2017) |
| Chair | SSSP DREM Graduate Student Paper Award Committee (2017) |
| Organizer | PAA 2015 Annual Meeting-Sessions on Urbanization & Urban Change |
| | PAA 2022-Session on Neighborhoods, Communities, Spatial Demography |
| Discussant | PAA 2014 Annual Meeting-Session on Segregation |
| | American Civil Liberties Union Housing Foreclosure Forum, April 2016 |
| | ASA 2018 Annual Meeting-Session on Housing Discrimination |
| | APPAM 2022-Racial/Ethnic Residential Segregation: The Roles of Mobility, Neighborhood, and Housing Choice Processes |
| Reviewer | *American Journal of Sociology, American Sociological Review, City & Community, Criminology, Demography, Housing Policy Debate, International Journal of Urban & Regional Research, International Migration Review, Journal of Ethnic & Migration Studies, Journal of Urban Affairs, Population Research and Policy Review, Social Currents, Social Forces, Social Problems, Social Science Research, Social Service Review, Societies, Sociological Perspectives* |

## Selected Media Coverage

*KUER NPR Utah*. "The Role Black Homeownership Plays in Wealth and Voter Turnout." Caroline Ballard (2020).

*Mother Jones*. "An Eviction Wave Could Wreak Havoc on Voting by Mail." Hannah Levintova (2020).

*Journalist's Resource, Shorenstein Center on Media, Politics, and Public Policy at Harvard University*. "Drop in Voter Turnout among Hispanic Democrats Linked to Home Foreclosures." Denise-Marie Ordway (2019)

*Marketplace on National Public Radio*. "What Happens to Your House When You Get Deported?" Reema Khrais (2017)

*New York Times*. "Why More Mass Deportations Would Be Bad News for the Housing Market." Emily Badger (2016)

*FiveThirtyEight*. "Can Miami Convince the Supreme Court that Subprime Loans Hurt Cities, Too?" Amelia Thomson-DeVeaux (2016)

*WYPR (Baltimore NPR affiliate)*. "John Hope Franklin Prize Winner Jacob Rugh on Racial Discrimination in Baltimore Mortgage Lending." (2016)

*New York Times*. "Racial Penalties in Baltimore Mortgages." Editorial Board (2015)

*Top of Mind with Julie Rose*, BYU Radio. "Segregation in Post-Civil Rights Era" (2015)

*The Atlantic*. "The Case for Reparations." Ta-Nehisi Coates (2014)

*Washington Post*. "Does Immigration Hurt Support for the Welfare State?" Dan Hopkins (2013)

**Supreme Court and Federal Cases [Published Research Cited in Court Filings]**

Bank of America Corp. v. Miami. 581 U.S. No. 15-1111. Supreme Court of the United States. 2017. *U.S. Supreme Court Library*. [Rugh and Massey (2010), Rugh et al. (2015), Rugh (2015), Steil et al. (2018)]

Fisher v. University of Texas at Austin. 579 U.S. No. 14-981. Supreme Court of the United States. 2016. *U.S. Supreme Court Library*. [Rugh and Massey (2010)]

Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc. 576 U.S. No. 13-1371. Supreme Court of the United States. 2015. *U.S. Supreme Court Library*. [Rugh and Massey (2010)]

Centro Presente et al. v. US Department of Homeland Security et al. CIVIL ACTION NO. 1:18-cv-10340-DJC. *United States District Court for the District of Massachusetts*. 2018 (Filed June 22, 2018). [Rugh and Hall (2016)]

Crista Ramos et al. v. Kirstjen Nielsen, US Department of Homeland Security et al. Case 18-16981. *United States Court of Appeals for the Ninth Circuit*. 2019 (Filed February 7, 2019). [Rugh and Hall (2016)]

**Graduate and Undergraduate Academic Honors**

Woodrow Wilson Society of Fellows, 2011-2012.
Princeton University Fellowship, 2006-2012.

University Honors, Brigham Young University. Honors Thesis: "Segregation and Student Performance: Central City High Schools in California," 2001.
Phi Kappa Phi National Honor Society, 2000-2001.

**Graduate and Undergraduate Academic Teaching**

Princeton University, Princeton, NJ
Assistant Instructor, *Intro to Urban Studies*, Prof. Douglas S. Massey, 2010-2011
Brigham Young University, Provo, UT
Teaching Assistant, Program in Latin American Studies, 1999-2001

**Graduate and Undergraduate Research Assistantships**

Princeton University, Princeton, NJ
Research Assistant, WWS, Professor Douglas S. Massey, 2009-2010
Research Assistant, Dept. of Politics and WWS, Professor David E. Lewis, 2009:
Research Assistant, Dept. of Politics and WWS, Professor Jessica Trounstine, 2008
Brigham Young University, Provo, UT
Research Assistant, Dept. of Political Science, Professor Dan Nielson, 2000-2001

**Prior Professional Experience**

Mathematica Policy Research — Princeton, NJ
Senior Programmer Analyst — 2005- 2006
Research Assistant/Programmer — 2004-2005

TIAA-CREF Institute — New York, NY
Research Assistant — 2001-2004

# EXHIBIT 2

# Index of Documents Reviewed by Jacob S. Rugh, PhD

## Case Materials

- Complaint in *National Fair Housing Alliance, et al, v. Bank of America, N.A., et al.*, Case No. 18-1919, filed June 26, 2018 (ECF No. 1).

## Discovery Materials

- Defendant Bank of America, N.A.'s Second Set of Requests for Production of Documents, December 3, 2020.

- Defendant Bank of America, N.A.'s Second Set of Interrogatories to Plaintiffs, December 9, 2020.

## Correspondence

- Letter from Keith Levenberg to Jean M. Zachariasiewicz, May 5, 2021.

## Bates Stamped Documents

- Documents produced by Defendant Bank of America, N.A.
  - BANA-NFHA-LIT_0298915
  - BANA-NFHA-LIT_0312184
  - BANA-NFHA-LIT_0312203
  - BANA-NFHA-LIT_0312212
  - BANA-NFHA-LIT_0312240
  - BANA-NFHA-LIT_0312263
  - BANA-NFHA-LIT_0312312

- Documents produced by Defendant Safeguard Properties Management, LLC
  - SG00185690
  - SG00185694
  - SG00185706
  - SG00185722
  - SG00185746
  - SG00185752
  - SG00185764
  - SG00185765
  - SG00185821
  - SG00185835
  - SG00185836
  - SG00185872
  - SG00185879
  - SG00185894
  - SG00185905
  - SG00185932
  - SG00185933

- SG00185950
- SG00185966
- SG00185972
- SG00185994
- SG00186009
- SG00186034
- SG00186049
- SG00186052
- SG00186073
- SG00186082
- SG00186099
- SG00186106
- SG00186117
- SG00186139
- SG00186140
- SG00186174
- SG00186192
- SG00186193
- SG00186203
- SG00186223
- SG00186227
- SG00186238
- SG00186250
- SG00186264
- SG00186265
- SG00186297
- SG00186301
- SG00186316
- SG00186325
- SG00186348–SG00186349
- SG00186361
- SG00186375
- SG00186381
- SG00186395
- SG00186413
- SG00186434
- SG00186448
- SG00186451
- SG00186473
- SG00186479
- SG00186492
- SG00186499
- SG00186510
- SG00186530–SG00186531
- SG00186565–SG00186566

  - SG00186577
  - SG00186591
  - SG00186613
  - SG00186619
  - SG00186631–SG00186632
  - SG00186642
  - SG00186662
  - SG00191081–SG00191082
  - SG00191084–SG00191087
  - SG00191089–SG00191090
  - SG00191093
  - SG00191095–SG00191100
  - SG00191102
  - SG00191104–SG00191106
  - SG00191109–SG00191111
  - SG00191113–SG00191116
  - SG00191118
  - SG00191121
  - SG00191125–SG00191131
  - SG00191135–SG00191139
  - SG00191141–SG00191142
  - SG00191144

- Documents produced by Plaintiffs
  - PLAINTIFFS 073125–PLAINTIFFS 073168
  - PLAINTIFFS 074533–PLAINTIFFS 074536
  - PLAINTIFFS 074539
  - PLAINTIFFS 074562–PLAINTIFFS 074564

# EXHIBIT 3

# Exhibit 3
# Collection of Data Used in the Regression Analysis and Explanation of Variables Considered

## A. Collection of data

I collected or constructed 39 variables based on various data sources. These sources can be divided into three broad categories: (1) physical characteristics of the property lot and dwelling or home (*e.g.*, size, age, etc.) from county public assessor records; (2) detailed transaction history for 4,713 past sales and transfers of the property, including REO foreclosure sales, in county public recorder or register of deed records; and (3) variables that describe and control for attributes at the level of the census tract, zip code, county, census metropolitan statistical area (MSAs, detail on census MSAs), state, and region.

In terms of property physical characteristics, the year built was collected for all 1,405 properties in the Current REO Property Database, and the home square footage, lot size square footage, total value, structure value, and land value were collected for 1,264 properties.

As a result of the careful, detailed search of public real estate transaction records where available, sale dates, sale prices, sale types, buyer, and seller were recorded for 4,713 total transactions across 1,031 properties in the Current REO Database.[1]

Descriptions of these variables, the sources, constructed variables, and definitions follow below.

Two types of property data were collected from three main data sources:

First, the following administrative and physical characteristics were collected for all properties from the corresponding local county property assessor public website:

- Assessor Parcel ID number
- Physical street address
- Lot size in square feet
- Dwelling floor area in square feet
- Year property built
- Land value of property
- Structure value of property
- Total property value of land and structure

Second, data were collected from the corresponding local county recorder or registrar of deeds on the most recent 3 real estate deed transactions for all properties, the most recent 5 transactions for most properties, and up to 10 transactions for some properties as available. The following fields were collected:

[1] Detailed sales history and prices were not available for properties located in Texas (n=155) and were not collected for 10 metropolitan areas with fewer than 30 properties each (n=142). More information is provided in Table E-10.

- Current owner name (most recent buyer)
- Buyer and seller name for each transaction
- Dollar ($) amount of each transaction
- Sale type or transaction type:[2]
    - Warranty deeds (standard arms-length sale transaction)
    - Limited, special, or exempt warranty deeds, including REO/foreclosure re-sales to exempt entities
    - Foreclosure deeds (Sheriff's deeds, trustee deeds, and other REO deeds)
    - Deed-in-lieu of foreclosure
    - Quit-claim deeds (*e.g.*, transfer of ownership)
    - Executor's, probate, and estate deeds for deceased owners
- Sale date: Where available, this date is the contract signed date in the original document; otherwise, it is the date the deed transaction was recorded

In rare instances, some of these data were collected from web sites such as Zillow.com, Redfin.com, and Trulia.com, depending on the geographic region. At least two sources were always used when public sources were unavailable and details available publicly were cross-referenced before retrieving further details from commercial web sites.

Based on the public county assessor and county recorder transaction history data, I constructed the following variables:

- The era the property was built:
    - Before 1940, 1940-1969, or 1970-2009;
- The decade the property was built: 1880-89, 1890-99, …. 1990-99, 2000-09;
- The ratio of the square footage of the dwelling floor area to the lot square footage: *ratio_sqft_lot = (sqft / lotsqft) * 100*;
- An indicator for newly constructed homes where the foreclosed borrower was the first owner of the property;
- A dichotomous indicator for whether the foreclosed loan was for refinance (vs. purchase; 1=refinance loan, 0=purchase loan);
- Whether the property was ever previously an REO property before the sale to the borrower later foreclosed upon by BANA;
- The total land value per square foot (natural logarithm of this variable was used for analysis due to the skewed distribution);
- Whether BANA acquired the property via deed-in-lieu of foreclosure;
- The contract date (or recorded date if contract date not available) when BANA acquired the foreclosed property and when it became an REO property;

[2] For a complete list of deed types in one county, see this helpful listing by the Shelby County (Memphis area), Tennessee Register of Deeds: https://www.assessormelvinburgess.com/content?key=Inst_Type.

- The contract date (or recorded date if contract date not available) when BANA re-sold the REO property;
- The total number of days BANA legally held title to the property;
- The number of days between the BANA REO acquisition or repossession date and the NFHA property deficiency evaluation date;
- The three-month quarter of the calendar month of the year the property was evaluated; corresponds to seasonal weather, precipitation, and vegetation growth:
    - 1 (Jan, Feb, Mar: Winter)
    - 2 (Apr, May, Jun: Spring)
    - 3 (Jul, Aug, Sep: Summer)
    - 4 (Oct, Nov, Dec: Fall).

## B. Variables considered in regression analysis

### 1. *Age of the Property*

A fundamental variable to account for in analyzing differences in total REO property deficiencies is the year the property was built—the age of the home. As the analysis shows, few to no other control variables will explain differences in deficiencies as much as the age of the home. Nevertheless, as detailed in my report, racial disparities by white versus non-white tract status persist and are statistically significant at every age range of properties (see Table E-1 and Figure E-1).

Among all 1,405 properties, on average, homes built in white tracts were built in 1961, or were 12 years younger than homes in non-white tracts, which on average were built in 1949. Table E-1 below shows the number of properties, average total deficiencies, and differences in deficiencies for white and non-white tracts by the decade in which the property was built, ranging from pre-1920 to every decade from 1920 to 2009 (the 1920s to 2000s). One widely cited article finds that, "housing depreciates at roughly 2.5 percent per year, while net of maintenance, housing depreciates at approximately 2 percent per year."[3] As Table E-1 shows, average deficiencies decline substantially and significantly in white tracts for homes built after 1990. In non-white tracts, deficiencies decline significantly only for homes built after 2000, and even for those newer homes, they remain almost as high as homes in white tracts that are 20 years older—yet another racial disparity despite the strong role of housing age in explaining overall total REO deficiencies.

[3] Source: Harding, John P., Stuart S. Rosenthal, and C. F. Sirmans." "Depreciation of housing capital, maintenance, and house price inflation: Estimates from a repeat sales model." Journal of urban Economics 61, no. 2 (2007): 193-217.

**Table E-1. Average Total REO Property Deficiencies by Decade Built for White and Non-White Tracts and Test of Statistically Significant Difference by Decade**

| | Number of Properties | | | Average Total Deficiencies | | |
|---|---|---|---|---|---|---|
| Decade Property Built | White Tracts | Non-White Tracts | Total | White Tracts | Non-White Tracts | Difference |
| **Pre-1920** | 33 | 145 | 178 | 7.33 | 10.29 | 2.96*** |
| **1920s** | 40 | 151 | 191 | 6.03 | 9.23 | 3.20*** |
| **1930s** | 22 | 50 | 72 | 7.77 | 9.56 | 1.79* |
| **1940s** | 45 | 89 | 134 | 7.22 | 9.03 | 1.81** |
| **1950s** | 94 | 202 | 296 | 5.60 | 9.27 | 3.67*** |
| **1960s** | 54 | 89 | 143 | 6.61 | 9.46 | 2.85*** |
| **1970s** | 39 | 85 | 124 | 6.82 | 9.36 | 2.54*** |
| **1980s** | 37 | 48 | 85 | 6.46 | 9.17 | 2.71** |
| **1990s** | 31 | 29 | 60 | 4.94 | 8.24 | 3.30*** |
| **2000s** | 57 | 65 | 122 | 4.51 | 6.28 | 1.77** |
| **Total** | **452** | **953** | **1,405** | **6.14** | **9.20** | **3.06*** ** |

*** $p < .001$, ** $p < .01$, * $p < .05$ (two-tailed test of difference)

Initially, a three-period or era variable was used to measure the difference in average deficiencies for three eras that correspond to pre-war (pre-1940), the rise of suburban subdivisions (1950-1969), to the modern advent of air conditioning (1970-2009). This three-era measure is used in the first regression analysis (see Table 3 in my report), but then a continuous single-year measure of the year built (simply the year built) is used in the final rebuttal regression analysis, which helps explain more of the racial disparity (see Table 16 in my report).

Figure E-1 confirms the pattern in the Table E-1: At every age of the home (year built), average property deficiencies are always statistically significantly higher in non-white tracts compared to white tracts. This further suggests that the strong influence of housing age may decrease, but not eliminate, this extremely consistent pattern of disparities by tract racial composition.

**Figure E-1. Plot of Total REO Property Deficiencies by Year Property Built for White Tracts and Non-White Tracts with Fitted Trend Line with 95% Confidence Intervals**




2. *New Construction*

Beyond accounting for the age of the home, in my close examination of property transaction records I noted when the foreclosed mortgagor was the first-time owner of a newly constructed home, never before occupied or sold. Most of these properties were less than 30 years old, mainly built in the previous two decades from 1990 to 2009. While this variable may at first appear redundant, there are at least three reasons to hypothesize that newly constructed, never-before-occupied homes will have fewer deficiencies. First, certain exterior features like a roof are designed to last 20 years or more, and a first-time owner will not have any issues from previous owners, by definition. Second, newer homes will often be larger, but on smaller lots with reduced yard space or potential for those types of deficiencies (and may have fewer or newer, smaller trees with fewer leaves, etc.). Finally, owners of newly constructed properties may be less likely to let the property deteriorate or, alternatively, those types of properties may also be easier to maintain.

Table E-2 shows the anticipated pattern that merits inclusion in further analysis: When compared to other new properties built since 1985, homes where the foreclosed borrower was the first homeowner have 1.70 fewer deficiencies in white tracts (4.05 vs. 5.75), 1.05 fewer deficiencies in non-white tracts (6.73 vs. 7.78), and 1.30 fewer in all tracts (5.48 vs. 6.78). One recurring

pattern that again emerges is that there is still a substantial disparity by tract racial composition, one that is even wider among former first-occupied newly constructed properties (6.73 – 4.05 = 2.68) than among properties that were not newly constructed (7.78 – 5.75 = 2.03).

Therefore, because when a property is newly constructed with a first-time owner it has fewer deficiencies, new construction is a factor that merits inclusion in the regression analysis.

**Table E-2.**
**Average Total REO Property Deficiencies Are Lower When Foreclosed Occupant Was First Owner of Newly Constructed Property (All Homes Built Since 1985)**

| | Average Total Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| **Homes Built Since 1985** | **White Tracts** | **Non-White Tracts** | **All Tracts** |
| **Not New Construction** | 5.75 | 7.78 | **6.78** |
| **(*N*)** | *(52)* | *(65)* | *(117)* |
| **First Owner of Newly Constructed Home** | 4.05 | 6.73 | **5.48** |
| **(*N*)** | *(55)* | *(63)* | *(118)* |
| **Difference by New Construction** | **-1.70** | **-1.05** | **-1.30** |
| **(*N*)** | *(107)* | *(128)* | *(235)* |

*N*=224 homes built since 1985 based on property transaction history. (Source: Current REO Database of 1,405 properties).

3. *Home Size, Lot Size, and Ratio of Home Size to Lot Size*

Tables E-3 and E-4 below summarize the pattern of total average REO deficiencies by the size of the home and the size of the lot. The relationship is not always consistent (white tracts in Table E-3) or even apparent (non-white tracts in Table E-4 do not exhibit any decline in deficiencies as homes grow in size). Racial disparities are largest among the smallest and largest lot sizes. (Table E-4).

These uneven findings lend importance to examining the combination of the two variables: the ratio or percentage of the home size compared to the lot size (Table E-5).

**Table E-3.**
**Average Total REO Property Deficiencies by Size of Home and Tract Racial Composition**

| | Average Total Property Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| **Home Size (Dwelling Floor Area)** | **White Tracts** | **Non-White Tracts** | **Difference** |
| **Smallest Homes (Less than 1,000 sq. ft.)** | 6.36 | 9.31 | **2.95*****|
| *N* | *76* | *226* | *302* |
| **Smaller Homes (1,000 -1,399 sq. ft.)** | 6.44 | 9.03 | **2.59***** |
| *N* | *98* | *254* | *352* |
| **Medium Homes (1,400 - 1,799 sq. ft.)** | 6.72 | 9.27 | **2.55***** |
| *N* | *99* | *198* | *297* |
| **Largest Homes (1,800 - 7,350 sq. ft.)** | 5.60 | 9.34 | **3.74***** |
| *N* | *124* | *189* | *313* |
| **All Properties** | **6.23** | **9.23** | **3.00***** |
| *N* | *397* | *867* | *1,264* |
| *Average Home Size (Sq. Ft.)* | *1,724* | *1,486* | ***238****** |

Sources: Current REO Property Database. County Assessors, Appraisers, and Public Data Sources.
Significant difference by race of tract in **bold**: ***p<.001 **p<.01 *p<.05 (two-tailed tests).

**Table E-4.**
**Average Total REO Property Deficiencies by Size of Home and Tract Racial Composition**

| | Average Total Property Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| **Total Lot Size of Property** | **White Tracts** | **Non-White Tracts** | **Difference** |
| **Smallest Lots (Less than 4,500 sq. ft.)** | 5.01 | 8.61 | **3.60***** |
| *N* | *67* | *249* | *316* |
| **Smaller Lots (4,500 -6,999 sq. ft.)** | 6.54 | 9.00 | **2.46***** |
| *N* | *108* | *294* | *402* |
| **Medium Lots (7,000 - 9,999 sq. ft.)** | 7.00 | 9.74 | **2.74***** |
| *N* | *105* | *192* | *297* |
| **Largest Lots (10,000 - 182,952 sq. ft.)** | 5.96 | 10.14 | **4.18***** |
| *N* | *117* | *132* | *249* |
| **All Properties** | **6.23** | **9.23** | **3.00***** |
| *N* | *397* | *867* | *1,264* |
| Average Lot Size (Sq. Ft.) | 11,803 | 7,155 | **4,648***** |

Sources: Current REO Property Database. County Assessors, Appraisers, and Public Data Sources.
Significant difference by race of tract in **bold**: ***p<.001 **p<.01 *p<.05 (two-tailed tests).

**Table E-5.**
**Average Total REO Property Deficiencies by Ratio of Home Size to Lot Size and Difference by Tract Racial Composition**

| | Average Total Property Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| Ratio of Home Size as a Percentage of Lot Size | White Tracts | Non-White Tracts | Difference |
| **Home is Less than 15% of Lot Size** | 6.31 | 10.14 | **2.95*** ** |
| *N* | *127* | *201* | *328* |
| **Home is 15% to 24% of Lot Size** | 6.69 | 9.26 | **2.59*** ** |
| *N* | *137* | *269* | *406* |
| **Home is 25% to 59% of Lot Size** | 6.00 | 9.05 | **2.55*** ** |
| *N* | *107* | *298* | *405* |
| **Home is 60% to 309% of Lot Size** | 4.38 | 7.80 | **3.74*** ** |
| *N* | *26* | *99* | *125* |
| **All Properties** | **6.23** | **9.23** | **3.00*** ** |
| *N* | *397* | *867* | *1,264* |
| Average Ratio Percentage | 26.1% | 31.8% | **5.6%*** ** |

Sources: Current REO Property Database. County Assessors, Appraisers, and Public Data Sources.
Significant difference by race of tract in **bold**: ***p<.001 **p<.01 *p<.05 (two-tailed tests)

Table E-5 above shows that the last category of home size ratio as a percentage of the lot size (where the home's total square footage is 60 to 309% of the lot size) reveals an important reason to control for this ratio variable. This category makes up the top 10% of properties measured by home size as a percentage of lot size. The average property deficiencies are much lower for properties within this category, at only 4.38 in white tracts and 7.80 in non-white tracts. When homes approach the size of the lot and exceed it, the size of any front or back yard shrinks and can even be zero. The percentage can exceed 100% and rise as high as 309%, as observed in the public property records when a three-story home sits on a lot with no space between other homes and no extra space out front (*i.e.*, attached rowhomes).

This pattern suggests that homes on properties with very small or no yards exhibit fewer deficiencies on average, more than two fewer than homes that are less than 25% of the total lot size (where the yard space, any driveways, etc. may reach 75% of the lot size if the home is one story with no basement).

Another important point to note is that 11% of properties in non-white tracts (99 of 867) fall into this category of smallest lot space around the home and fewest yards, compared to 7% of properties in white tracts (26 of 397). In other words, there are relatively more properties containing homes that occupy more of the lot in non-white areas than in white areas, including attached row homes and townhomes with small or no yards. This is one of the few variables that suggests that deficiencies, where all else is equal, might be lower in non-white areas. In Table E-5 above, the level of deficiencies, while lower than other categories as expected, is higher in non-

white tracts (7.80) than white tracts (4.38), and the difference is greater than any other category and highly statistically significant (3.74, $p$<.001).

Thus, because when the lot size is smaller, fewer deficiencies are found and because a greater percentage of homes in non-white tracts have the smallest lot space when compared to white tracts, home size, lot size, and home-to-lot-size ratio are variables that merit inclusion in the regression analysis.

4. *Previous REO sale (REO by lender prior to borrower foreclosed upon by BANA)*

Table E-6 below shows that homes that were REOs before the most recent borrower was foreclosed upon by BANA, and thus became REOs again, tend to have more deficiencies. Some of these deficiencies may be attributable to property damage incurred when the property was previously occupied by a prior delinquent owner or was foreclosed upon, abandoned, and/or an REO property. Among all 919 properties with prior property transaction history, there are an average of 9.26 deficiencies when a property was previously an REO, and only 8.22 deficiencies when it was not previously an REO.

**Table E-6.**
**Average Deficiencies Are Elevated Among Properties that Were Previously REO (Other Lenders) and Re-Sold to Borrower that Would Later Be Foreclosed Upon by BANA**

| | **Average Total Property Deficiencies** *Number of Properties in Italics* | | |
|---|---|---|---|
| | **White Tracts** | **Non-White Tracts** | **All Tracts** |
| **Never an REO Previously** | 6.48 | 9.12 | 8.22 |
| *N* | *261* | *503* | *764* |
| **Previously REO Property** | 7.21 | 9.73 | 9.26 |
| *N* | *29* | *126* | *155* |
| **Difference by Previous REO** | **0.73** | **0.61** | **1.04** |
| *N* | *290* | *629* | *919* |

Source: County property transaction records with available data.
Note: Excludes 126 properties of first-time occupants of newly constructed homes foreclosed upon by BANA; by definition, such properties have no prior sales transactions.

This additional increase in average property deficiencies is observed in both white and non-white tracts alike. However, the observed share of previous REO properties in non-white tracts (20.5%) is twice the share in white tracts (10.2%).

The higher incidence of previous REO ownership in non-white areas and the difference in total current property deficiencies each support the decision to include a property's previous REO status as a variable for further regression analysis in combination with other variables.

5. *Refinance versus purchase loan*

This variable examines whether the loan that was foreclosed upon by BANA was used to purchase the property or for refinance purposes. This question matters if the type of loan is related to property maintenance.

Foreclosed-upon homeowners who used their loan to purchase a property may have had less time to accrue home equity and therefore had less money to maintain the property. On the other hand, foreclosed-upon owners who used their loan to refinance an existing loan were likely to have used the loan for cash-out refinance purposes and therefore may have accrued higher balances under constrained budgets, possibly leading to more deficiencies. During the housing boom from 2000 to 2007, approximately 7 in 10 subprime loans were used for cash-out refinance purposes.[4] A smaller portion of refinance loans were used to obtain home improvement loans or rate/term refinances, particularly after 2008.[5] Rate/term refinances represented a savings to the homeowner, possibly leading to more funds for home maintenance and fewer deficiencies.

Table E-7 shows that there is only a slight increase in total deficiencies (0.16 to 0.28) among properties where the loan foreclosed upon was for refinance. This variable is not expected to play a major role in explaining disparities by tract racial composition; 34% of properties in white tracts (115/343) and 35% of properties in non-white tracts (239/691) used later foreclosed loans for refinance purposes.

This strongly suggests that borrowers were more similar than different in their use of loans for purchase across *both* types of tracts. Thus, it is not clear whether using a loan for purchase or refinance would lead to greater disparities in maintenance. Because there is only a slight increase in total deficiencies among properties where the foreclosed loan was a refinance loan, this did not merit inclusion in the regression analysis of the Current REO Database.

---

[4] Bhardwaj, Geetesh, and Rajdeep Sengupta. 2012. Subprime mortgage design. *Journal of Banking & Finance* 36(5): 1503-1519. See also Mayer, Christopher, Karen Pence, and Shane M. Sherlund. 2009. "The rise in mortgage defaults." Journal of Economic perspectives 23(1): 27-50.

[5] Lauren Lambie-Hanson & Carolina Reid. 2018. Stuck in Subprime? Examining the Barriers to Refinancing Mortgage Debt, *Housing Policy Debate* 28(5): 770-796.

**Table E-7.**
**Average Total REO Property Deficiencies by Refinance versus Purchase Loan Status of Foreclosed Borrower in White and Non-White Tracts**

| | Average Total Property Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| | **White Tracts** | **Non-White Tracts** | **All Tracts** |
| **Loan Used to Purchase Property** | 6.04 | 8.98 | 7.99 |
| *N* | *228* | *452* | *680* |
| **Loan Used for Refinance Purposes** | 6.32 | 9.14 | 8.22 |
| *N* | *115* | *239* | *354* |
| **Difference by Purchase/Refinance Purpose** | **0.28** | **0.16** | **0.23** |
| *N* | *343* | *691* | *1,034* |

Source: County property transaction records with available data.

6. *Previous flipped property sale to foreclosed mortgagor*

A "Flipped Property Sale" is defined in this analysis as a home sale to the foreclosed mortgagor within two years of a previous sale[6] where the price appreciation exceeds 100% per year (*e.g.*, price more than doubled within 12 months). For example, if a home sold for $100,000 in January 2002 and was then sold to the later-foreclosed-upon owner in January 2003 for $210,000, then this would be a flipped sale because the annual appreciation was +110% (+110,000 / 100,000 = +110). As Table E-8 shows, properties of owners who pay such inflated prices have on average higher deficiencies post-foreclosure sale.

While some flipped property sales may represent legitimate improvements in property conditions or market value, they may also result from illegal activity, collusion in appraisals, or predatory practices.[7] Table E-8 below shows that, consistent with prior research that finds a higher share of flipped sales in minority neighborhoods,[8] a higher share of sales to the eventual foreclosed mortgagor were flipped sales in non-white tracts (8.4%) compared to white tracts (5.1%). The 71 properties previously occupied by foreclosed-upon owners who paid inflated prices in flipped sales exhibited on average 1.08 more deficiencies than the 906 properties that were not flipped (out of 977 properties BANA REO properties for which the relevant data was available), a statistically significant difference ($p$<.02).

---

[6] Depken, Craig A., Harris Hollans, and Steve Swidler. 2009. An empirical analysis of residential property flipping. *The Journal of Real Estate Finance and Economics* 39(3): 248-263.
[7] Ibid.
[8] Immergluck, Daniel. 1999. Two steps back: The dual mortgage market, predatory lending, and the undoing of community development. *Woodstock Institute*. See also Anacker, Katrin B. 2009. "Big flipping schemes in small cities? The case of Mansfield, Ohio." Housing and Society 36(1): 5-28.

**Table E-8.**
**Average Total REO Property Deficiencies by Previously Flipped Property Sale to Foreclosed Owner Status for White and Non-White Tracts**

| | Average Total Property Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| | **White Tracts** | **Non-White Tracts** | **All Tracts** |
| **Property Not Flipped** | 6.08 | 8.89 | 7.91 |
| **N** | *318* | *588* | *906* |
| **Flipped Property Sale to Foreclosed Mortgagor** | 7.41 | 9.48 | 8.99 |
| **N** | *17* | *54* | *71* |
| **Difference by Property Flipped Sale** | **1.33** | **0.59** | **1.08** |
| **N** | *335* | *642* | *977* |

Source: County property transaction records with available data.
Note: A "Flipped Property Sale" is defined as home sale where the price appreciation exceeds 100% per year (price more than doubled within 12 months) on an annualized basis.

The difference ranged from 0.59 more deficiencies in non-white tracts to 1.33 more in white tracts. Moreover, even among the relatively smaller group of flipped properties, the average number of total property deficits is significantly higher in non-white tracts, 9.48 versus 7.41 ($p$<.02).

Overall, flipped sales are still quite rare and unlikely to explain the difference by tract racial composition, therefore I did not include it in the final regression analysis along with other variables.

7. *REO acquisition by way of a deed-in-lieu of foreclosure (instead of foreclosure)*

One exception to a foreclosure sale where a lender normally purchases the property at auction is a transfer of ownership through a deed-in-lieu of foreclosure. After examining property records carefully, of the 979 properties for which the relevant information was available, 3.3% of properties in white tracts and 3.7% in non-white tracts ever owned by BANA were acquired by deed-in-lieu of foreclosure (Table E-9).

**Table E-9.**
**Average Total REO Property Deficiencies by Deed-in-Lieu of Foreclosure Status for White and Non-White Tracts**

| | Average Total Property Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| | **White Tracts** | **Non-White Tracts** | **All Tracts** |
| **REO acquired in Foreclosure** | 6.29 | 9.24 | 8.24 |
| **N** | *319* | *625* | *944* |
| **REO acquired by Deed-in-Lieu of Foreclosure** | 5.82 | 8.00 | 7.31 |
| **N** | *11* | *24* | *35* |
| **Difference by Deed-in-Lieu of Foreclosure** | **-0.47** | **-1.24** | **-0.93** |
| **N** | *330* | *649* | *979* |

Source: County property transaction records with available data.

Research has shown that deed-in-lieu transfers of delinquent property ownership increased from 1% in 2009 to 10% in 2016, meriting collection of this variable.[9] Because the deed-in-lieu process is voluntary and takes more time as the product of negotiation between borrower and lender, one may expect there to be a difference in the type of borrower that manages to achieve this outcome, which is also more beneficial to their credit score.[10] While other research has found few differences among borrowers using deed-in-lieu of foreclosure, it has found that those with more home equity when obtaining their loan (lower loan-to-value (LTV) ratio at origination) were more likely to sell a distressed property using a deed-in-lieu rather than foreclosure.[11]

Consistent with the research cited in the preceding paragraph, Table E-9 above shows that property deficiencies do appear to be lower among properties acquired by BANA via deed-in-lieu of foreclosure (-0.47 fewer in white tracts and -1.24 fewer in non-white tracts). However, the small number of such exceptional instances of deed-in-lieu acquisition means that the difference is not statistically significant. Further, a nearly identical share of borrowers in white and non-white tracts, 3.3% and 3.7%, respectively, transferred ownership using deed-in-lieu of foreclosure; like the case of refinance, this further suggests a more similar owner profile by census tract racial composition.

Therefore, because there is such a small number of deed-in-lieu of foreclosure transactions such that they are not statistically significant, I excluded this factor from the regression analysis of the Current REO Database.

---

[9] Biswas, A., Fout, H. & Pennington-Cross, A. 2020. Mortgage Losses under Alternative Property Disposition Approaches: Deed-in-Lieu, Short Sales, and Foreclosure Sales. *The Journal of Real Estate Finance and Economics*.
[10] Ibid.
[11] Andra C. Ghent, Marianna Kudlyak. 2011. Recourse and Residential Mortgage Default: Evidence from US States, The Review of Financial Studies, Volume 24, Issue 9: 3139–3186.

8. *Census Metropolitan Area Codes and Definitions*

Based on property location, data from the U.S. Census Bureau were collected for the Census Region of the state (Northeast, Midwest, South, West); the County FIPS (Federal Information Processing) code as of 2010; census tract codes as of 2010; and the Core-Based Statistical Area metropolitan statistical area (CBSA MSA) name and code and the metropolitan statistical area/metro division name and code (MSAMD) based on the 2010 census as released in 2013. A metropolitan division is a subset of a larger metropolitan area. For example, the Newark, NJ-PA metro division is a part of the larger New York-Newark-Jersey City, NY-NJ-PA metropolitan statistical area. Most metropolitan areas are not large enough to have divisions and, in those cases, the CBSA MSA code is equal to the MSAMD code.

As stated, the U.S. Census Bureau releases both types of definitions and codes (CBSA MSA and MSAMD).[12] Other government data sources such as the Home Mortgage Disclosure Act publish the MSAMD code.[13] Both the CBSA MSA and MSAMD definitions are regularly used by researchers when comparing U.S. metro areas.[14] Both CBSA MSA and MSAMD census-defined metro areas are comprised of counties. In other words, they are collections of counties containing a central city with at least 50,000 inhabitants and their surrounding county or counties. Because counties are the building blocks, census metro areas and divisions never cross county boundaries.

Each year the U.S. Census Bureau reviews the population settlement and commuting patterns of counties in the United States and makes changes to its definitions. The boundaries are always revised after each decade's census and may change substantially, especially as exurban areas envelop rural counties. In other words, metropolitan areas can and do change their boundaries over time, especially over decades. According to the most recent study, from 1970 to 2017, 753 counties have been reclassified and become part of new metropolitan areas, or nearly 25% of previously nonmetropolitan counties.[15]

*The analysis in this report uses official census CBSA MSA and MSAMD definitions as of 2013 for metropolitan areas. Neither the analysis in this report nor my previous analysis described in the complaint in this case has ever used, developed, or defined a variable based on the geographic areas served by the local housing agencies affiliated with NFHA.*

---

[12] See https://www.census.gov/programs-surveys/metro-micro.html (U.S. Census Bureau Metro/Micro Areas)
[13] See https://ffiec.cfpb.gov/data-publication/ (FFIEC CFPB Home Mortgage Disclosure Act)
[14] See https://s4.ad.brown.edu/projects/diversity/segregation2020/Default.aspx (Spatial Structures in the Social Sciences, Brown University)
[15] Kenneth M. Johnson, Daniel T. Lichter; Metropolitan Reclassification and the Urbanization of Rural America. *Demography* 1 October 2020; 57 (5): 1929–1950. doi: https://doi.org/10.1007/s13524-020-00912-5. In short, if any organization established a service area in prior time periods, it is probable that their areas may not align with constantly updating census metro area/division names and boundaries. For example, if a metropolitan fair housing organization began in a prior decade and serves primarily urban and suburban communities, then it is likely that they may not serve more rural, new counties in their census-defined metro area. Again, counties are the building blocks of metro areas and often contain significant rural, low-density populations, not just urban or suburban populations.

The census metropolitan statistical area (CBSA MSA) and metropolitan statistical area/metro division (MSAMD) codes were each merged or matched to the Current REO Database of 1,405 records using the County FIPS code based on the geocoded 2010 census tract number.

According to official 2013 definitions based on the 2010 census, the 1,405 properties in the Current REO Database are located in 34 metropolitan statistical areas (CBSAs). As mentioned earlier, most CBSA MSAs are not sub-divided into metro divisions with distinct MSAMD codes. So, the CBSA MSA and MSAMD code are the same. In the Current REO Property Database the CBSA code is equal to the MSAMD code in 27 of 35 CBSA MSAs.[16]

- According to official 2013 definitions based on the 2010 census, the 1,405 properties in the Current REO Database are located in 45 metropolitan areas/divisions (MSAMDs).

    - Among those 45 metropolitan areas/divisions defined in 2013, 4 were newly created divisions of larger metropolitan statistical areas (CBSAs) in 2009.
    - Among an additional 5 metropolitan areas/divisions defined in 2013, total housing units gained or lost at least 10 percent of their original total as new counties were subtracted or added as areas grew or were subdivided into new metro divisions.
    - The remaining 36 metropolitan divisions exist as the same continuously defined set of counties since 2009, arriving again close to the total of 37 "metro areas" (not necessarily census-defined) referenced in Plaintiffs' Complaint.[17]

*In this report, the analysis uses the Census CBSA MSA (henceforth MSA) definition in 2013 for the 34 MSAs where the 1,405 Current REO Property Database records are located.*

Table E-10 on the following page shows the number of REO properties and average total deficiencies in white and non-white tracts for each of the 34 metropolitan statistical areas (MSAs). The difference in average REO property deficiencies by tract racial composition is statistically significant across 23 of 34 MSAs containing 1,174 or 84% of all 1,405 REO properties. In each of the 11 MSAs in which the difference in deficiencies is not statistically significant (as well as in all 23 MSAs in which it is statistically significant), the average of number of deficiencies in non-white tracts is greater than those in white tracts.

The MSA code provides an important control for the statistical regression models as a fixed effect. This variable controls for differences across MSAs, such as variation in state and local laws, weather patterns (which affect vegetation growth, mold, water damage, and other pertinent

[16] Plaintiffs' Complaint refers to 37 "metro areas." This small discrepancy of three areas (37 versus 34) is explained by a few metro areas commonly understood and sometimes colloquially known by either their divisions or greater CBSA MSA definitions, such as nicknames like "Metro Detroit," "Dallas Metroplex," "Chicagoland," etc.
[17] In summary, any distinctions and discrepancies between census and other defined areas above are moot in terms of the analyses that follow because the 2013 definitions and codes come directly from the U.S. Census Bureau based on the 2010 census, not any other source. All findings thus pertain to these 36 CBSA MSA metro areas only.

indicators), and any other unobservable differences. Using this variable, therefore, isolates the differences between white and non-white tracts *within* each MSA and controls for the differences *across or between* MSAs. As the results will show, the effect of controlling for MSA location helps explain a nontrivial portion of the variation in property deficiencies as well as the gap by tract racial composition.

## Table E-10.
## Number of REO Properties and Average Total Deficiencies for White and Non-White Tracts by Census MSA Metropolitan Statistical Area Code and Name in 2013, Sorted by Total Properties

| (MSAs Sorted by Total Properties) | | *Number of REO Properties* | | | Average Property Deficiencies | | |
|---|---|---|---|---|---|---|---|
| CBSA MSA Code | CBSA Metropolitan Statistical Area Name in 2013 | Total | White Tracts | Non-white Tracts | White Tracts | Non-white Tracts | Difference |
| 33340 | Milwaukee-Waukesha-West Allis, WI | ***122*** | *25* | *97* | 3.68 | 6.15 | 2.47 *** |
| 16980 | Chicago-Naperville-Elgin, IL-IN-WI | ***96*** | *28* | *68* | 4.50 | 9.74 | 5.24 *** |
| 19100 | Dallas-Fort Worth-Arlington, TX | ***93*** | *16* | *77* | 6.06 | 8.92 | 2.86 ** |
| 24340 | Grand Rapids-Wyoming, MI | ***91*** | *44* | *47* | 8.23 | 11.85 | 3.62 *** |
| 12060 | Atlanta-Sandy Springs-Roswell, GA | ***74*** | *8* | *66* | 5.13 | 9.74 | 4.61 *** |
| 19740 | Denver-Aurora-Lakewood, CO | ***59*** | *20* | *39* | 5.55 | 9.15 | 3.60 *** |
| 41860 | San Francisco-Oakland-Hayward, CA | ***58*** | *14* | *44* | 4.79 | 9.09 | 4.30 *** |
| 47900 | Washington-Arlington-Alexandria, DC-VA-MD-WV | ***57*** | *3* | *54* | 3.33 | 10.76 | 7.43 ** |
| 12580 | Baltimore-Columbia-Towson, MD | ***56*** | *15* | *41* | 5.67 | 7.66 | 1.99 * |
| 37980 | Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | ***55*** | *12* | *43* | 4.83 | 7.79 | 2.96 ** |
| 33100 | Miami-Fort Lauderdale-West Palm Beach, FL | ***54*** | *23* | *31* | 5.96 | 9.32 | 3.36 *** |
| 32820 | Memphis, TN-MS-AR | ***45*** | *5* | *40* | 4.60 | 9.65 | 5.05 ** |
| 19820 | Detroit-Warren-Dearborn, MI | ***43*** | *24* | *19* | 5.25 | 9.37 | 4.12 *** |
| 18140 | Columbus, OH | ***39*** | *21* | *18* | 6.24 | 11.56 | 5.32 *** |
| 45300 | Tampa-St. Petersburg-Clearwater, FL | ***38*** | *6* | *32* | 6.50 | 9.81 | 3.31 * |
| 45780 | Toledo, OH | ***35*** | *24* | *11* | 6.33 | 9.73 | 3.40 ** |
| 19380 | Dayton, OH | ***33*** | *16* | *17* | 8.00 | 10.76 | 2.76 * |
| 36740 | Orlando-Kissimmee-Sanford, FL | ***33*** | *15* | *18* | 9.53 | 12.11 | 2.58 |
| 12940 | Baton Rouge, LA | ***29*** | *14* | *15* | 7.21 | 10.07 | 2.86 * |
| 13820 | Birmingham-Hoover, AL | ***28*** | *10* | *18* | 4.60 | 10.17 | 5.57 ** |
| 35380 | New Orleans-Metairie, LA | ***28*** | *9* | *19* | 6.22 | 10.21 | 3.99 |
| 35620 | New York-Newark-Jersey City, NY-NJ-PA | ***27*** | *3* | *24* | 7.00 | 8.50 | 1.50 |
| 35300 | New Haven-Milford, CT | ***24*** | *12* | *12* | 7.25 | 9.33 | 2.08 ** |
| 17460 | Cleveland-Elyria, OH | ***23*** | *9* | *14* | 8.44 | 10.00 | 1.56 |
| 31140 | Louisville/Jefferson County, KY-IN | ***23*** | *17* | *6* | 6.24 | 8.83 | 2.59 * |
| 34740 | Muskegon, MI | ***23*** | *14* | *9* | 5.64 | 7.56 | 1.92 |
| 28140 | Kansas City, MO-KS | ***22*** | *9* | *13* | 4.22 | 8.54 | 4.32 *** |
| 26900 | Indianapolis-Carmel-Anderson, IN | ***21*** | *10* | *11* | 6.20 | 9.36 | 3.16 |
| 41700 | San Antonio-New Braunfels, TX | ***21*** | *3* | *18* | 4.67 | 8.89 | 4.22 |
| 33460 | Minneapolis-St. Paul-Bloomington, MN-WI | ***16*** | *10* | *6* | 6.60 | 7.33 | 0.73 |
| 46700 | Vallejo-Fairfield, CA | ***15*** | *3* | *12* | 6.00 | 6.25 | 0.25 |
| 25540 | Hartford-West Hartford-East Hartford, CT | ***12*** | *4* | *8* | 7.25 | 10.75 | 3.50 |
| 39300 | Providence-Warwick, RI-MA | ***11*** | *5* | *6* | 8.80 | 10.83 | 2.03 |
| 10900 | Allentown-Bethlehem-Easton, PA-NJ | ***1*** | *1* | *0* | 6.00 | | |
| | **All Metropolitan Areas in Final REO Database** | **1,405** | **452** | **953** | **6.14** | **9.20** | **3.06 ***** |

Sources: U.S. Census Bureau Metro/Micro Areas Definitions in 2013 based on 2010 census. Current REO Property Database.
***p<.001 **p<.01 *p<.05 (two-tailed tests of difference by non-white versus white tract type)

9. *Local Zip Code Home Price Changes*

It is well known and well established that the foreclosure crisis in the United States was precipitated by a large decline in housing prices that began around 2007 and lasted several years.[18] Prices did not begin to recover until at least 2012 in most housing markets. Steep declines in home prices led to foreclosures, partly because delinquent homeowners lost home equity, with some even experiencing negative equity (when the home is worth less than the balance of the mortgage, *i.e.*, is "under water"), which may be a disincentive for keeping up the home. Delinquent homeowners also had fewer options to avoid foreclosure, like refinancing or selling their home. In other words, where home prices declined more, we would expect to see more deficiencies because owners had fewer financial resources in the form of home equity, fewer options for selling or refinancing, and fewer incentives or lower capacity to keep up the dwelling.[19]

**Table E-11.**
**Average Total REO Property Deficiencies by Change in Zip Code Home Prices, 2004-2008 Peak to 2009-2014 Trough (Four Quartile Ranges) for White and Non-White Tracts**

| | Average Total Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| **Home Price Change, 2004-08 to 2009-14 (Quartile)** | **White Tracts** | **Non-White Tracts** | **All Tracts** |
| **-52% to -21% Decline (Q1)** | 6.89 | 9.60 | 8.91 |
| *N* | *91* | *267* | *358* |
| **-21% to -15% Decline (Q2)** | 7.09 | 9.39 | 8.80 |
| *N* | *91* | *261* | *352* |
| **-14% to -6% Decline (Q2)** | 5.73 | 8.51 | 7.47 |
| *N* | *129* | *215* | *344* |
| **Less than 6% Decline (Q4)** | 5.43 | 9.15 | 7.66 |
| *N* | *141* | *210* | *351* |
| **Total** | **6.14** | **9.2** | **8.21** |
| *N* | *452* | *953* | *1,405* |

Data source: Zillow Home Value Index by U.S. Zip Code., Current REO Database.

Table E-11 above lists the total average REO property deficiencies for four roughly equal ranges or quartiles of zip code home price change from the 2004-2008 peak in home prices to the 2009-2014 trough or lowest point of price depreciation for properties in white tracts, non-white tracts,

[18] Mayer, Christopher, Karen Pence, and Shane M. Sherlund. 2009. The rise in mortgage defaults. *Journal of Economic perspectives* 23(1): 27-50.
[19] Gerardi, Kristopher, Eric Rosenblatt, Paul S. Willen, and Vincent Yao. 2015. "Foreclosure externalities: New evidence." *Journal of Urban Economics* 87: 42-56. Large declines in home prices led to foreclosures, partly because delinquent homeowners lost home equity, even experiencing negative equity (home is worth less than the mortgage balance), and thus had fewer options like home sale to avoid foreclosure.

and all tracts. Zip codes are larger than census tracts, so multiple census tracts will make up a zip code; on average there are 3 tracts in each zip code in the database. Overall, the deficiencies are higher in zip codes where prices declined more and lower where prices declined less, thus validating the anticipated pattern.[20]

The anticipated pattern prevails of average total deficiencies being higher in zip codes where prices declined more and lower where declines were less severe. For example, in the last column of the top two rows of Table E-11, average deficiencies were 8.91 and 8.80 in zip codes where prices declined by at least 21% and 15 to 21%, respectively. By contrast, the next two rows show that average deficiencies were 7.47 and 7.66 in zip codes where prices fell by 6 to 14% or less than 6%.

The pattern documented here and the key role of house price depreciation in homeowner distress and foreclosure merit inclusion of zip code home price changes in the regression analysis.

10. *Property Crime*

To assess what, if any, effect crime rates might have on the differences in REO maintenance, I collected crime data from the U.S. FBI Uniform Crime Report (UCR) standards on the annual number of the following property crimes: burglary, arson, motor vehicle theft, and, where available, property vandalism (more on vandalism below and in Section V of my report). Wherever possible, I collected data from local jurisdictions (police departments, municipal open data portals, counties, or states) at the lowest level of geography available. From smallest to largest, these units are the police district or beat zone, the census tract, neighborhood community area, and zip code level. For less populous suburban jurisdictions and cities in Ohio, data were only available, and collected, at the municipal (city or town) level.

Crime in this analysis is measured by taking the numerator of number of property crimes in the calendar year prior to the year when plaintiffs evaluated the property and dividing it by the population of the local area in the same year if available, or according to the 2010 census, multiplied by 1,000 to generate a rate per 1,000 persons. For example, if a property were visited in July 2014 and in 2013 there were 12 burglaries and population of 10,000 in the local area, then the burglary rate is (12 / 10,000) * 1,000 = 1.2 burglaries per 1,000 persons.

An indicator for a very high burglary rate is set equal to 1 when the burglary rate is in the top 10 percent, at least 22.2 per 1,000. Figure E-2 below illustrates why this high burglary rate indicator variable was defined and used in this analysis. As shown in Figure E-2, there is no relationship between the number of REO property deficiencies until the burglary rate reaches a very high level of around 22 per 1,000.

[20] Publicly available data on the zip code-level monthly Zillow Home Value Index ("ZHVI") for all single-family homes were collected from https://www.zillow.com/research/data/ in October 2015. For each zip code, the following ZHVI statistics were calculated: (1) the maximum (peak) ZHVI figure for 2004-2008 and (2) the minimum (trough) ZHVI figure for 2009-2014. This variable is calculated by taking the ratio of the trough to peak and subtracting 1 and multiplying by 100 to represent a percentage change from the peak. For example, if the peak ZHVI were $420,000 in July 2007 and the trough were $252,000 in January 2011 then value of this ZHVI home price change variable would be as follows: ( (252000 / 420000) - 1) * 100 = –40% change in ZHVI.

**Figure E-2. Plot of Total REO Property Deficiencies by Local Burglary Property Crime Rate per 1,000 (FBI UCR standard) with Fitted Trend Line with 95% Confidence Intervals Shows That Burglary Rates Have Weak Correlation with Property Deficiencies Until It Reaches Very High Levels**




Beyond that point, total deficiencies are somewhat higher, although the relationship becomes slightly less precise. While, by definition, 10% of all tracts exhibit very high local burglary rates, the share is 8.9% in white tracts and 11.8% in non-white tracts, a difference that is not statistically significant. Therefore, I excluded the very high burglary rate from the regression analysis of the Current REO Database, but, as discussed below, I included the burglary rate and the vandalism rate for a subset of properties for which this data was available.

While the relationship between REO property deficiencies and burglary rates is somewhat weak, it is still significant ($r=0.13$, $p<.001$). The same cannot be said for auto theft rates or arson rates (arson is increasingly rare and usually zero in most places), which have near-zero correlation with property deficiencies and are not as closely related as a property crime like burglary.

During the process of carefully collecting crime data, the rate of property vandalism was available and gathered for 374 properties, mainly in seven cities: Milwaukee WI (n=112 properties), Grand Rapids MI (n=88), Philadelphia PA (n=47), Memphis TN (n=42), Columbus

OH (n=33), Louisville KY (n=23), and Chicago (n=22). Because criminal vandalism is a type of property crime that appears more directly related to property maintenance conditions than burglary rates, the relationship between the two measures was further explored to see if and how much they were statistically related.

Figure E-3 below shows that burglary rates and vandalism rates are strongly related, tracking each other closely across these seven cities with available data. The correlation is moderate-to-strong (r=0.67) and statistically significant (*p*<.001).

**Figure E-3. Plot of Local Burglary Property Crime Rate and Local Property Vandalism Crime Rate with Fitted Trend Line with 95% Confidence Intervals Shows That Burglary Rates Are Strongly Correlated with Vandalism Rates**




The main takeaway from the analysis of the relationship in Figure E-3 is that burglary rates are a suitable substitute or proxy for local property crime most related to REO property maintenance. While it would be desirable to have criminal vandalism rates for the entire database of properties, among these 374 properties burglary rates are weakly yet significantly related to REO property deficiencies (r=0.16, *p*<.002) while vandalism rates are not significant (r=0.07, p=0.20, n.s.). Again, the data collection process was careful and sought out as much crime rate data as possible. Unfortunately, vandalism is not one of the crimes required to be reported to the FBI by

all jurisdictions, so it is not universally publicly available. Therefore, I was only able to analyze a subset of properties in the REO database for which vandalism rates were available.

# EXHIBIT B

**Supplemental Expert Report of Jacob S. Rugh, Ph.D.**
*National Fair Housing Alliance, et al. v. Bank of America, N.A., et al.*, No. 18-1919 (D. Md.)

Since submitting my expert report on January 14, 2022, and my revised expert report on February 14, 2022, I was provided copies of the supplemental expert reports submitted on behalf of the Defendants in this matter. I now offer this supplemental report to address some of the assertions made by Defendants' experts in their February 14, 2022, supplemental reports.

## I. Materials Reviewed and Considered

In addition to the previously noted materials I reviewed for my initial expert report (listed in Exhibit 2 to my initial expert report), in preparation for forming my opinions in this supplemental report, I reviewed the supplemental expert reports submitted by David M. Skanderson, Vincent Yao, Justin McCrary, and Marcel A. Bryar on February 14, 2022; BANA-NFHA-LIT_0322596, BANA-NFHA-LIT_0081308-0081314, SG00487211-00487213, and an Excel spreadsheet entitled "BoA Property List with Deficiencies _excluded properties for new RA 2-17-22" (RUGH 000038). If I am provided with additional or different information, I reserve the right to revise my analysis and opinions based on such new information.

## II. Opinions

After consideration of the above-referenced information, and following my further analyses described below, the opinions expressed in my initial expert report remain the same. It is further my opinion, to a reasonable degree of professional certainty within my fields of expertise, that:

1. Plaintiffs' edits of certain property data in their database more than a day after the data was initially entered into Plaintiffs' database did not affect the resulting racial disparity discovered in the exterior maintenance and marketing of the properties Plaintiffs investigated in this case. When I excluded from my regression analysis properties for which data was edited more than a day after first being entered into Plaintiffs' database, or where data was changed on the same day as initially entered, but by a different person, I found the same strong pattern of racially disparate results, with a gap in average observed deficiencies of 3.1 between majority white and non-white census tracts before controlling for other factors. Like my analysis of the 1,405 properties in the Current REO Database, this disparity is also statistically significant. Furthermore, when I controlled for the factors included in the regression analysis in my initial report, I found that 53% of the disparity was still not explained by any factor other than race.

2. The length of time between when the former homeowner stopped making mortgage payments and the date of the foreclosure sale, as well as the length of time between when the former homeowner stopped making mortgage payments and the date of Plaintiffs' inspection, do not explain the disparities in exterior maintenance and marketing Plaintiffs observed between properties in majority white and non-white tracts. Thus, Dr. Yao's theory that the disparities observed could be attributable to the length of time the former homeowner was delinquent on their mortgage does not hold true when analyzing the data.

3. Defendants' experts incorrectly assert that Table 8 in my initial report demonstrates that Defendants inherited properties in worse condition in majority non-white neighborhoods and then improved those properties the longer they held them. If this were the case, we would not see the average number of deficiencies increase in majority non-white neighborhoods the longer Bank of America, N.A. ("BANA") was responsible for them. Furthermore, the changes in average property maintenance among properties held by BANA for longer are *not* in fact statistically-significantly different than the average among those held for a shorter time period.

4. Defendants' experts' criticisms of my regression analysis and use of Cohen's *d* statistic are unfounded. The Defendants' experts offer no objective criterion to replace Cohen's *d* statistic, only a disagreement about its interpretation, which is based on conventional thresholds.

5. Defendants' experts' criticism of my use of certain crime and poverty data in my analyses is misplaced. For crime data, I used data from the lowest geographic level available in my analyses—not simply city level data. I controlled for poverty rates in response to Dr. Skanderson's opinion that poverty rates should be included as a variable in the regression analysis. My results show that poverty rates are *not* in fact a primary factor that explains a substantial portion of the disparity in REO property maintenance deficiencies by racial composition.

6. Comparing the properties at issue in this case as one combined sample was the best way to analyze the data given the small sample sizes for many of the metropolitan areas investigated. My regression analysis controlled for many of the location-specific variables that could have affected the combined analysis and Defendants' experts have not suggested a better approach.

7. Contrary to Defendants' experts' belief otherwise, I did not exclude the same properties from my final regression analysis described in my initial report as I did in the analyses I performed before Plaintiffs filed their Complaint. I excluded properties from my pre-Complaint analysis based only on publicly-available information—an overly broad exclusion. Because more information, including non-public information, regarding the properties at issue in this case is now available to Plaintiffs' counsel, they directed me to use the list of 1,405 properties included in my final analysis.

8. Although some of Defendants' experts have pointed to different requirements or practices governing the maintenance of REOs secured by Federal Housing Administration ("FHA") loans versus other types of mortgages, I have found that there is no statistically significant difference in the percentages of each type of loan between the properties in majority white and majority non-white census tracts within the group of 1,405 properties included in my final analysis, based both on publicly available data and the limited data Defendants provided for 280 properties. This indicates that difference in loan type does not explain the racial disparity in observed deficiencies.

9. The conclusions Dr. McCrary draws from his purported placebo analyses miss the purpose of my analyses. I did not set out to determine the reason the racial composition of a neighborhood correlates so highly with the number of observed deficiencies. Instead, my analyses seek to determine: (a) whether other factors explain the variation in observed

deficiencies more than the racial composition of the neighborhood; and (b) whether the inclusion of other factors in a regression analysis eliminate or decrease the racial gap in observed deficiencies to the point of not being a statistically significant difference.

## III. Analysis and Discussion

### 1. Edits to property data did not create the racial disparity in observed deficiencies.

Because Defendants' experts have raised concerns about edits made to properties in Plaintiffs' database, I analyzed whether the racial gap in deficiencies I found with respect to the final property list of 1,405 properties was still present when considering only the smaller group of 635 properties that had either not been edited at all or had only been edited by the same person as had initially entered the property information into the database on the same date as the initial entry ("Unedited Properties"). Even with this limited group of Unedited Properties, the gap in average number of deficiencies between majority white and non-white tracts was 3.10 (compared to 3.05 in the full current REO database). Furthermore, after conducting a regression analysis on this smaller subset of Unedited Properties, I found the same strong pattern of racially disparate results, with 53% of the disparity not explained by any factor other than race (Table S1).

This new analysis excludes 770 properties that, as I understand from Plaintiffs' counsel, had edits of any kind to the investigation data originally entered into Plaintiffs' database, either more than a day after the data was originally entered or on the same day as the initial entry, but by a different person who initially entered the data. The sample size of Unedited Properties in the full model is 430 properties, versus 932 properties in the final sample in my initial expert report. I was only able to include 430 of the Unedited Properties in my model because I lacked sufficient data for all 635 properties in the group.

Notwithstanding the reduced sample size, the results remain substantially unchanged: Most (53%) of the gap in REO property maintenance deficiencies by tract racial composition remains unexplained by factors other than race, just over one-third (34%) of the variance is explained, and the adjusted racial gap for this sub-sample of Unedited Properties is 1.65. The racial gap remains highly statistically significant ($p<.001$). In deference to Defendants' experts, rather than interpret the Cohen's *d* statistic here, I leave potential range of labels in Table S1 and note that in the sub-sample of 430 properties, the Cohen's *d* value is 0.46 versus a value of 0.53 in the prior expert report final analysis full model of 932 properties. The change from 0.53 to 0.46 in the Cohen's *d* statistic is not meaningfully different.

Before controlling for any other variables, the Cohen's *d* statistic in row 1 of Table S1 is 0.91 ($N$=635) versus 0.86 in the prior expert report ($N$=1,405). Again, using statistically objective measures, I do not detect that there is any reduction in statistical significance or practical significance in the disparity in REO property deficiencies by tract racial composition.

I therefore conclude that the pattern of results reported among the sample of 1,405 properties remains the same among this smaller subset of 635 Unedited Properties. Accordingly, edits to the database do not appear to have affected the overall findings from my initial expert report with respect to the current REO database of 1,405 properties.

**Table S1. Reproduction of Final Revised Regression Model Results Using Restricted Sample of Unedited Properties (*N*=635 REO Properties)**

| REVISION: N=635 Sample 2/17/2022<br>Revised Statistical Regression Model: Variables Included | Number of REO Properties | Racial Gap in Deficiencies (Non-white tract coeff.) | Percent of Observed Gap Explained by Model Variables | Percent of Variation in Deficiencies Explaind by Model ($R^2$) | Practical Signifance of Racial Gap: Non-white Effect (Cohen's *d*) |
|---|---|---|---|---|---|
| **1:** *Observed Disparity or Racial Gap in Deficiencies: Non-white vs. White Tracts* | *635* | *3.10**** | *0%* | *15%* | *Large Effect (0.91)* |
| **2:** Full Model: Original Regression Analysis[a] (Row 5, Table 5) | *438* | *1.85**** | *40%* | *33%* | Medium Effect (0.52) |
| **3**: 2. Except use year built instead of era property built | *438* | *1.84**** | *41%* | *33%* | Medium Effect (0.52) |
| **4**: 3 +Add Tract Vacancy Rate and Overall Poverty Rate per Skanderson Critique[b] | *438* | *1.72**** | *45%* | *34%* | Medium/ Small Effect (0.48) |
| **5**: 4. Except use Homeowner Poverty Rate Instead of Overall Poverty Rate[c] | *438* | *1.63**** | *47%* | *33%* | Medium/ Small Effect (0.46) |
| **6:** 5. +Add Distance to Downtown of MSA Central City (City Hall) | 438 | 1.73*** | 44% | 33% | Medium/ Small Effect (0.49) |
| **Full Model**<br>**7:** 6 +Subtract 8 properties occupied by mortgagor on evaluation visit date[d] | **430** | **1.65***** | **47%** | **34%** | **Medium/ Small Effect (0.46)** |

*** $p < .001$, ** $p < .01$, * $p < .05$

**2. Length of time between delinquency and foreclosure sale or Plaintiffs' visit does not explain the disparities in exterior maintenance and marketing that Plaintiffs observed.**

The length of time between when the former homeowner stopped making mortgage payments and the date of the foreclosure sale, as well as the length of time between when the former homeowner stopped making mortgage payments and the date of Plaintiffs' inspection, do not explain the disparities in exterior maintenance and marketing Plaintiffs observed between properties in majority white and non-white tracts. Thus, Dr. Yao's theory that the disparities Plaintiffs observed could be attributable to the length of time the former homeowner was delinquent on their mortgage does not hold true upon analyzing the data.

Dr. Yao asserts that one should consider the length of time of delinquency prior to bank ownership and that doing so may uncover that properties with a higher number of deficiencies

had longer periods of time between delinquency and bank ownership.[1] Yet when I used the limited data provided by Defendants,[2] I found no statistically significant correlation between the period of days from the mortgagor's last payment to the foreclosure sale date and total REO property deficiencies in white tracts ($r$=0.13, $p$=0.36, not significant) or non-white tracts ($r$=0.01, $p$=0.93) as depicted in Figure S1 below.

When I use the limited data provided by Defendants ($N$=272), I also find that there is not a systematic or statistically-significant difference in the length of time from last payment to foreclosure in white versus non-white tracts (difference = 45 days, $p$=0.71, not significant, Table S2). Importantly, this additional finding strongly suggests that there is no difference in delinquency timelines by racial composition that would lead to a statistically- and practically-significant gap of 3.1 total REO property deficiencies. Defendants would need to provide more data beyond the 272 properties for me to conduct further analysis that may show otherwise, but the current, limited data does not support Dr. Yao's theory.

**Figure S1. No Statistically Significant Correlation between Days from Paid-thru Date to Foreclosure Sale Date (Length of Delinquency) and Total REO Property Deficiencies in White Tracts (*n*=48, *r*=0.13, *p*=0.36) or Non-white Tracts (*n*=224, *r*=0.01, *p*=0.93)**




[1] Yao Supp. Rep. at ¶¶ 26-27.

[2] Of the 1,405 total properties analyzed in my original analysis, Defendants only provided paid-thru and foreclosure dates for 272 ($N$=280 matched loans from BANA- NFHA-LIT_0322596 with $N$=272 non-missing "paid-thru" and foreclosure dates).

**Table S2. Average Days from Last Payment or Start of Delinquency (Paid-thru Date) to Foreclosure Sale Date by Tract Racial Composition**

| Tract Type | *N* | Paid-through Date | Foreclosure Date | Days |
|---|---|---|---|---|
| White Tracts | 48 | 9/22/2010 | 10/17/2013 | 1,121 |
| Non-white Tracts | 225 | 3/22/2010 | 5/31/2013 | 1,166 |
| All Tracts | 273 | 4/23/2010 | 6/24/2013 | 1,157 |
| | | | ***Difference:*** | ***45 days (p=0.71)*** |

Similarly, because the REO property maintenance condition was evaluated later in time after the foreclosure date, it is important also to examine the patterns in deficiencies between the time of delinquency or last payment and Plaintiffs' visit date by tract racial composition (Figure S2).

**Figure S2. No Statistically Significant Correlation between Days from Paid-thru Date to Plaintiffs' Evaluation Date and Total REO Property Deficiencies in White Tracts (*n*=50, *r*=0.13, *p*=0.36) or Non-white Tracts (*n*=229, *r*=-0.06, *p*=0.36)**




When I use the limited data provided by Defendants (*N*=280 matched loans from BANA-NFHA-LIT_0322596 with *N*=279 non-missing "paid-thru" and evaluation visit dates), I found

no statistically significant correlation between the period of days from last payment to Plaintiffs' visit date and total REO property deficiencies in majority white tracts or non-white tracts (Figure S2).

When I use the limited data provided by Defendants (*N*=279), I also find that there is not a systematic or statistically significant difference in the length of time from last payment to Plaintiffs' visit date in white versus non-white tracts (difference = 131 days, $p$=0.24, not significant, Table S3). This additional finding strongly suggests that there is no difference in delinquency timelines combined with REO ownership timelines by racial composition that would lead to a statistically and practically significant gap of 3.1 total REO property deficiencies. Defendants would need to provide more data beyond the 279 properties to show otherwise.

**Table S3. Average Days from Last Payment or Start of Delinquency (Paid-thru Date) to Plaintiffs' Evaluation Date by Tract Racial Composition**

| Tract Type | *N* | Paid-thru Date | Plaintiffs' Evaluation Date | Days |
|---|---|---|---|---|
| White Tracts | 50 | 1/13/2011 | 12/4/2014 | 1,421 |
| Non-white Tracts | 229 | 5/1/2010 | 8/1/2014 | 1,552 |
| All Tracts | 279 | 6/17/2010 | 8/23/2014 | 1,529 |
| | | | ***Difference:*** | ***131 days (p=0.24)*** |

### 3. Defendants' experts draw incorrect conclusions from Table 8 of my initial report.

Defendants' experts incorrectly assert that Table 8 in my initial report demonstrates that Defendants inherited properties in worse condition in majority non-white neighborhoods and then improved those properties the longer they held them. If this were the case, we would not see the average number of deficiencies increase in majority non-white neighborhoods the longer BANA held the properties.

**Table S4. (Table 8)**
**Average Total REO Property Deficiencies by Quartile Range of Days REO Property Owned by BANA at Evaluation Visit Date**

| | Average Total Deficiencies *Number of Properties in Italics* | | |
|---|---|---|---|
| **Days REO Owned at Evaluation Date** | **White Tracts** | **Non-White Tracts** | **All Tracts** |
| **REO owned for 0 to 120 days (Q1)** | 6.12 | 9.32 | **8.20** |
| *N* | *89* | *165* | *254* |
| **REO owned for 121 to 220 days (Q2)** | 6.04 | 9.10 | **7.88** |
| *N* | *93* | *141* | *234* |
| **REO owned for 221 to 435 days (Q3)** | 6.31 | 8.81 | **8.02** |
| *N* | *83* | *180* | *263* |
| **REO owned for 436 days or more (Q4)** | 7.09 | 9.47 | **8.92** |
| *N* | *58* | *190* | *248* |
| **Total Properties** | **6.32** | **9.18** | **8.26** |
| *N* | *323* | *679* | *1,002* |

Source: County property transaction records with available data (n=976) and BANA-NFHA-LIT_03222596 & 0298915 (n=226) for 1,002 total properties with n=200 overlapping, verified properties using both BANA-provided and public data.

First, the average number of deficiencies in non-white tracts increases from 9.32 in the 0-120-day group to 9.47 in the 436 days or more group, which suggests that the slight narrowing of the gap in disparities between these groups is not explained by BANA improving property conditions over time.

Second, accounting for the sample size of properties in each of the four quartiles or time periods shows that the pattern of change over time is not statistically significant (Figure S3). That is, the changes in average property maintenance in later periods are *not* in fact statistically-significantly different that the average in the first period (0-120 days). As is visually apparent from Figure S3, the observed estimates of deficiencies are not different across time periods (≤120 days, 121-220 days, 221-435 days, or >435 days) because the 95% confidence intervals extending from each point overlap across (horizontally) each time period, for both non-white tracts (red) and white tracts (blue). Therefore, the trend by time period is not statistically significant, which also means that the difference is not statistically distinguishable by period.

**Figure S3: There is No Statistically Significant Difference in Total REO Property Deficiencies Across All Four Periods of BANA Ownership Length Used in Table 8 Based on the 95% Confidence Intervals or Margins of Error of Observed Estimates Based on Sample Sizes**




Figure S4 shows the absence of any statistically significant relationship between time of BANA ownership upon date of Plaintiffs' visit and total property deficiencies by depicting a scatterplot of values. It is again readily apparent that there is no meaningful or significant relationship. The trend using all data points, including outliers beyond 1,337 days (not just those 99% of data shown excluding outliers) shows an insignificant relationship in white tracts (*n*=323, *r*=0.02, *p*=0.69), non-white tracts (*n*=679, *r*=-0.02, *p*=0.58), and all tracts (*n*=1002, *r*=0.004, *p*=0.90). A correlation statistic (Pearson's *r*) may range from -1.0 (perfect negative correlation) to 0.0 (absolutely zero correlation) to +1.0 (perfect positive correlation). In this case, when *r*=0.02 in white tracts, *r*=-0.02 in non-white tracts, and *r*=0.004 in all tracts, that is extremely close to absolutely zero or no correlation between these variables (time held by BANA and total deficiencies).

**Figure S4: There is No Statistically Significant Relationship between the Time of BANA Ownership at Plaintiffs' Evaluation Visit and Total REO Property Deficiencies in White Tracts (*n*=323, *r*=0.02, *p*=0.69) or Non-White Tracts (*n*=679, *r*=-0.02, *p*=0.58) or All Tracts (*n*=1002, *r*=0.004, *p*=0.90)**




Note: Although 8 outliers ranging from 1,337 to 7,137 days are not shown, these outliers are included in computing the sample sizes and correlation statistics reported in Figure S4's title.

Finally, according to Dr. McCrary's theory that "properties in better condition sell before properties in worse condition,"[3] the racial disparity in deficiencies between white versus non-white tracts may simply be a product of there being more properties held for a longer amount of time by BANA at the time of the evaluation visit (*e.g.*, more than 435 days) in majority non-white tracts than in majority white tracts. Given the pattern above in Table 8, where properties held for this long of a period (the top 25% of all properties ranked by time) were found to have higher total average deficiencies in both types of tracts, this is a possibility worth examining more closely. One way to examine this is to simulate a hypothetical distribution where an identical percentage or share of properties is held for each period across both white and non-white tracts. In other words, what would the total disparity by racial composition be if there were no differences in how long properties were held?

[3] McCrary Supp. Rep. ¶ 39.

Table S5 below shows a reproduction of Table 8 in the columns labeled "Actual Observed Column Distribution" of REO properties by quartile range or period category of days held by BANA at time of evaluation for deficiencies (≤120 days, 121-220 days, 221-435 days, >436 days). To facilitate easier reading, the values for white tracts appear in blue font and the values for non-white tracts in red font. As shown in the row for the last category, "REO owned for 436 to 7137 days," 18.0% of properties were owned or held that long by BANA in white tracts, compared to 28.0% in non-white tracts. Overall, the bottom row shows there are 6.32 deficiencies in majority white tracts versus 9.18 total deficiencies in majority non-white tracts among the 1,002 records with public data or cross-validated data from Defendants.

**Table S5. Actual versus Hypothetical Distribution of Properties by Time Held by BANA and Comparison of Total Deficiencies Under Hypothetical Scenario**

| | Actual Observed Column Distribution | | | Hypothetical White Distribution | | |
|---|---|---|---|---|---|---|
| Days REO Held at Evaluation Date | White Tracts | Non-White Tracts | Difference | White Tracts | Non-White Tracts | Difference |
| REO owned for 0 to 120 days (Q1) | 6.12 | 9.32 | **3.20** | 6.12 | 9.32 | **3.20** |
| *Column Percentage* | *27.6%* | *24.7%* | | *27.6%* | *27.6%* | |
| REO owned for 121 to 220 days (Q2) | 6.04 | 9.10 | **3.06** | 6.04 | 9.10 | **3.06** |
| *Column Percentage* | *28.8%* | *20.8%* | | *28.8%* | *28.8%* | |
| REO owned for 221 to 435 days (Q3) | 6.31 | 8.81 | **2.50** | 6.31 | 8.81 | **2.50** |
| *Column Percentage* | *25.7%* | *26.5%* | | *25.7%* | *25.7%* | |
| REO owned for 436 to 7137 days (Q4) | 7.09 | 9.47 | **2.38** | 7.09 | 9.47 | **2.38** |
| *Column Percentage* | *18.0%* | *28.0%* | | *18.0%* | *18.0%* | |
| **Total Properties** | **6.32** | **9.18** | **2.86** | **6.32** | **9.15** | **2.83** |
| *Column Percentage* | *100.0%* | *100.0%* | | *100.0%* | *100.0%* | |
| ***N*** | ***323*** | ***679*** | ***1,002*** | ***323*** | ***679*** | ***1,002*** |

Source: County property transaction records with available data (n=976) and BANA-NFHA-UT_03222596 & 0298915 (n=226) for 1,002 total properties with n=200 overlapping, verified properties using both BANA-provided and public data.

In the columns to the right, labeled "Hypothetical White Distribution," all values are identical except for the column percentage for majority non-white tracts, now identical to the white tracts distribution and labeled in blue. Remarkably, when one applies the simulated hypothetical distribution of white properties by time period (27.6%, 28.8%, 25.7%, 18.0%, respectively) to the observed non-white average property deficiencies by period, the resulting weighted average or sum product is 9.15 (purple), not substantially different from the actual value of 9.18. In sum, I conclude that the observed racial disparity is not an artifact of there being more properties held by BANA for a longer period of time in majority non-white tracts than in majority white tracts.

Last, an additional way to test whether the mix of time periods during which properties were held explains the racial gap in disparities is to estimate the effect of each period as a categorical 4-way variable in the final regression model (in lieu of the linear continuous measure of months held by BANA). This allows us to examine the effect of time period when accounting for all other rival explanations. When I estimate the final full model in my initial report without a measure of time held by BANA at all (*i.e.*, I remove just this one variable), the effect of non-

white tract status is 1.97 ($p$<.001). When I add the 4-category variable, none of the coefficients for any of the categories attain statistical significance, the $R^2$ remains unchanged at 0.38, and the effect of non-white tract status or the final regression-adjusted racial gap is 1.96 ($p$<.001)—little changed from the prior estimate of 1.97 ($p$<.001). Even if I interact the 4-category variable with non-white tract status, none of the period category or interactions between tract status or period category coefficients attain statistical significance. I conclude that even accounting for a non-linear categorical measure of the four quartile-category time periods of length of BANA ownership at the time of Plaintiffs' evaluation fails to produce a substantial or statistically significant explanation for the racial gap in property deficiencies.

**4. Defendants' experts' criticisms of my regression analysis and use of Cohen's *d* statistic are unfounded.**

Dr. Skanderson criticizes my interpretation of Cohen's *d* statistic,[4] yet offers no objective criterion to replace Cohen's *d* statistic. His critique is only a disagreement about its interpretation. The interpretation in my original report, however, is based on conventional thresholds.

In Table S6 below, I offer the standardized coefficient, which is another objective measure of potential effect size of non-white tract status on an unadjusted or observed basis versus a final, full model regression-adjusted basis. Researchers use a standardized coefficient to compare the associations of variables measured in different units. When using the standardized coefficient, for a given 1-standard deviation increase in an explanatory variable (in this case, non-white tract status), the standardized coefficient tells us the associated fraction of standard deviation change in the outcome (in this case, property deficiencies). In the example below, I use it as a comparison from the initial model (no controls) to the full model (controlling for all listed variables).

[4] Skanderson Supp. Rep. at ¶¶ 9, 47-51.

**Table S6. Comparison of Coefficient or Gap, Standardized Coefficient, and Cohen's *d*: Ratio of Initial, Uncontrolled Statistic Values to Final Full Model Statistic Values**

| | | Coefficient of Non-white Tract status (racial gap, measured in total deficiencies) | Standardized Coefficient of Non-white Tract status (standard deviations) | Cohen's *d* Effect Size Statistic (measure of practical significance) |
|---|---|---|---|---|
| Initial Model (No control variables) | | 3.05*** | 0.38*** | 0.86 |
| Full Model (Row 7, Table 16 (my initial report), all final control variables included) | | 1.97*** | 0.24*** | 0.53 |
| **Ratio of Full Model Value to Initial Model Value** | | **0.65** | **0.65** | **0.62** |

*** $p < .001$, ** $p < .01$, * $p < .05$ Source: Current REO Database (N=1,405)

As shown in Table S6 above, whether one relies upon the regression coefficient measured in deficiencies (*i.e.*, the racial gap or disparity by tract majority non-white racial status), the standardized coefficient, or Cohen's *d*, the relationship between the full final model and the initial observed or unadjusted gap is the same: the ratio of each of these statistics is, in corresponding order, 0.65, 0.65, and 0.62. The ratio of 0.65 or 65% of the gap unexplained measure used throughout my reporting, fits squarely with the ratio of Cohen's *d* statistic (0.62) and the standardized coefficients (0.65). By using a ratio or comparison of initial-to-final results statistical approach, I am not attaching any labels or interpretations, simply showing that the ratio is above 0.60, ranging from 0.62 to 0.65. In sum, this means that the ratio of these two other measures of effect size or substantial strength of the effect of non-white status is entirely consistent with the interpretation that no other extensive set of variables has thus far explained more than half of the racial disparity in REO property deficiencies. That is, 65% of the gap remains unexplained even after accounting for all other factors other than race in the full model.

Further, Dr. McCrary's criticism of my use of the stepwise approach[5] matters little to not at all to the size or significance of the final results (full model in initial expert report). Whether one adds variables in one order or another, the final variables in the full model are the same. The different models are shown in stepwise fashion for full transparency and to introduce categories of variables that are theoretically and practically related at the same time (*e.g.*, the physical attributes of the property or the year and quarter visited).

In response to Dr. McCrary's criticism that the linear regression I performed can increase bias,[6] I have used probit and logit estimations as well as different categorical and exponential and logged variables in exploratory analyses using prior samples and have not found a different

---

[5] McCrary Supp. Rep. at p.15 n.38.
[6] McCrary Supp. Rep. at p.15 n.39.

pattern of results. The Defendants' experts have all the same variables and may likewise test for non-linearities and use non-linear methods. I have not found substantially different results.

I have used a categorical measure of days held by BANA (a 4-category measure) and come to the same conclusions as in my initial report. As shown in Section III.3 above, I did not find that the coefficients on any of the 4-category time periods of BANA ownership attained statistical significance nor did I find that using this categorical measure made any meaningful difference in the racial gap, which shifted only very slightly, from 1.97 ($p<0.001$) to 1.96, $p<0.001$).

In response to Dr. McCrary's concern that omitting crime rates (as measured by burglary rates) in the final model influences the regression results, I re-ran the final full model in my initial report ($N$=932, Table 16, row 7), except I limited it to the sub-sample of properties with available burglary rate data—but did not yet add burglary rates to the model. In this identical specification using a slightly smaller sub-sample ($N$=866) and potentially different distribution of relationships between the variables, I find that the effect of non-white tract status or the unexplained racial gap is 1.91 ($p<0.001$) or only very slightly lower than the final reported estimate in the sample of 932 properties, which is listed as 1.97 ($p<0.001$). Whether I add the linear burglary rate (B=-0.023, p=0.57), the non-linear burglary rate-squared (B=-0.0009, p=0.39) or the non-linear burglary rate-cubed (B<-0.00001, p=0.22), none of these measures, whether linear or non-linear, are statistically significant and the $R^2$ remains 0.38 ($N$=866). Most important, the coefficient for non-white tract status or the unexplained racial gap remains unchanged, at 1.91 ($p<0.001$), and therefore 1.91/3.05 = 63% of the racial disparity or gap remains unexplained, only slightly different from the 65% in the model specification using 932 properties without the burglary rate. I conclude that retaining the burglary rate, whether a linear measure or a non-linear exponential measure, does not influence the estimates of the effect of non-white tract status or in any substantial or statistically significant way explain the racial gap, which remains unchanged.

**5. Defendants' experts' criticisms of the use of certain crime and poverty data in my analyses are unfounded.**

Dr. McCrary incorrectly asserts that the burglary rates I used in my analyses are entirely reported at the city level based on the annual FBI Uniform Crime Reports.[7] I have already supplied data and explained that most of the data used in my analysis features the burglary rate at a lower level of geography than the city or municipal level. Specifically, in the June 2018 data dictionary detailing my data collection, it states: "Data were collected as made available per the US FBI Uniform Crime Report (UCR) standards on the annual number of the following property crimes: burglary, arson, and motor vehicle theft. **In every instance possible, data were collected from local jurisdictions (police departments, municipal open data portals, counties, or states) at the lowest level of geography available via public statistics, including, in ascending order, police district or beat zone, the census tract, neighborhood community**

[7] McCrary Supp. Rep. at ¶ 21.

**area, and zip code level.** For less populous suburban jurisdictions and [most] cities in Ohio, data were only available, and collected, at the municipal level." [8] (emphasis in bold added).

I can only surmise that Dr. McCrary skipped over the word "standards" in the preceding description and assumed all data came from the FBI when in fact most of the data did *not* come from the FBI.[9]

As Table S7 below shows, for 86% of properties located in larger cities with at least 10 properties evaluated for REO property deficiencies, the annual burglary rate in the prior year was collected and analyzed *below* the city level, including at the police district, police sub-district, zip code, police beat, community area (77 in Chicago), and neighborhood/census tract level. The average population of these cities is 664,223.

For properties located in municipalities with fewer than 10 Plaintiff-visited properties, the average municipal population is much smaller, at less than 50,000, and these often suburban and small towns are not divided into neighborhoods nor is neighborhood data available. These represent less than 25% of all property records with crime data. I note that because these are annual statistics, there still exists variation by city whenever there is variation by year.

Moreover, many large cities also provide detailed crime incident and uniform FBI Uniform Crime Reports codes at the incident-level that are then geocoded and tagged with the corresponding neighborhood, police zone, and/or zip code. As a result, I relied upon over 12.4 million geocoded incidents as part of analyzing burglary rates and vandalism rates (where available) at the lowest level of geography possible. Many cities, such as Atlanta, Baltimore, Denver, and Minneapolis, furnish data that I used to measure and analyze crime at the census-tract level.

I have already produced the data and a scatterplot in my initial expert report (reproduced below) that shows the variation in burglary rates and vandalism rates (where available) *within* cities, which demonstrates that these rates are in fact below the city level.

---

[8] PLAINTIFFS 053023.

[9] Moreover, Dr. Skanderson reports that 86% of Milwaukee records have the same value of the lagged burglary rate when that in fact is not true; I can only assume that he confused the result with the fact that 86% of Milwaukee records have a burglary rate below the very high (90th percentile or top 10%) threshold. It is not surprising at all that 14% of records in Milwaukee have high crime rates compared to 10% of all records by definition. It appears that he simply confused the variable *lag_burglary_rate* with the indicator variable *hiburg* (very high burglary rate).

**Figure S5 (Reproduced from Expert Report). Plot of Local Burglary Property Crime Rate and Local Property Vandalism Crime Rate with Fitted Trend Line with 95% Confidence Intervals Shows that Burglary Rates Are Strongly Correlated with Vandalism Rates**




Contrary to Dr. McCrary's assertions otherwise, I used this more localized crime data in my regression analysis. To assert that the burglary rate data are at the city level in all or even most cases is simply not correct and has never been correct in any datasets or descriptions I have provided.

**Table S7: Summary Geographic Level, Statistics, Sources of Annual Burglary Rates for 1,052 REO properties with crime data**

| | | | | | Burglary Rate in Prior Year | | | |
|---|---|---|---|---|---|---|---|---|
| City | City Pop. 2010 census | Level of UCR Crime Data | UCR Crime Data Geography | *Percent of Properties with Crime Data* | *N* | Mean | SD | UCR Crime Data Source, 2010-2017 |
| Milwaukee, WI | 594,833 | Below City-level | **Police Districts** | *10.65%* | *112* | 12.40 | 4.22 | Police Department |
| Grand Rapids, MI | 188,040 | Below City-level | **Police Districts** | *6.94%* | *73* | 11.01 | 2.77 | Police Department |
| Dallas, TX* | 1,197,816 | Below City-level | **Zip Codes** | *5.80%* | *61* | 13.38 | 3.18 | Dallas: 1,478,855 incidents geocoded |
| Atlanta, GA | 420,003 | Below City-level | **Neighborhood/Tract** | *4.75%* | *50* | 24.98 | 13.97 | Atlanta: 324,914 incidents geocoded |
| Philadelphia, PA | 1,526,006 | Below City-level | **Police Sub-districts** | *4.47%* | *47* | 8.49 | 4.63 | Phila.: 2,365,114 incidents geocoded |
| Baltimore, MD | 620,961 | Below City-level | **Neighborhood/Tract** | *3.90%* | *41* | 12.66 | 6.60 | Baltimore: 450,059 incidents geocoded |
| Memphis, TN | 646,889 | Below City-level | **Zip Codes** | *3.90%* | *41* | 17.08 | 4.49 | Memphis: 1,634,236 incidents geocoded |
| Denver, CO | 600,158 | Below City-level | **Neighborhood/Tract** | *3.14%* | *33* | 7.14 | 2.32 | Denver: 497,190 incidents geocoded |
| Oakland, CA | 390,724 | Below City-level | **Police Beats** | *2.85%* | *30* | 20.49 | 7.66 | Oakland: 1,026,929 incidents geocoded |
| Columbus, OH | 787,033 | Below City-level | **Police Districts** | *2.38%* | *25* | 20.44 | 4.32 | Police Department |
| Toledo, OH | 287,208 | Below City-level | **Zip Codes** | *2.28%* | *24* | 21.46 | 4.03 | Police Department |
| Louisville, KY | 597,337 | Below City-level | **Zip Codes** | *2.19%* | *23* | 12.28 | 5.73 | Oakland: 809,735 incidents geocoded |
| Chicago, IL | 2,695,598 | Below City-level | **Community Areas** | *2.09%* | *22* | 15.51 | 7.20 | Chicago: 3,224,611 incidents geocoded |
| Indianapolis, IN* | 820,445 | Below City-level | **Police Beats** | *1.71%* | *18* | 12.38 | 11.94 | Indianapolis: 630,730 incidents geocoded |
| Baton Rouge, LA | 229,493 | Below City-level | **Police Districts** | *1.33%* | *14* | 25.63 | 26.61 | Police Department |
| Wyoming, MI | 72,125 | Below City-level | **Police Districts** | *1.33%* | *14* | 7.04 | 0.23 | Police Department |
| Aurora, CO | 325,078 | Below City-level | **Police Districts** | *1.24%* | *13* | 3.93 | 1.81 | Police Department |
| Orlando, FL | 238,300 | Below City-level | **Zip Codes** | *1.05%* | *11* | 4.11 | 3.72 | Police Department |
| Minneapolis, MN | 382,578 | Below City-level | **Neighborhood/Tract** | *1.05%* | *11* | 20.08 | 6.01 | Police Department |
| **Sub-total: Cities with *Below* City-level data, >10 properties** | **664,223 (Avg.)** | **Below City-level** | | ***63.02%*** | ***663*** | **14.78** | **10.72** | **City Open Data Portals datafiles covering 12,443,103 incidents geocoded; Police Departments.** |
| Tampa, FL | 335,709 | City-level | | *2.57%* | *27* | 5.07 | 0.03 | FBI UCR |
| Dayton, OH | 141,527 | City-level | | *2.47%* | *26* | 21.74 | 0.99 | FBI UCR (Ohio data limitation) |
| Waterbury, CT | 110,366 | City-level | | *1.43%* | *15* | 4.91 | 0.65 | Connecticut UCR data by township |
| Aurora, IL | 197,899 | City-level | | *1.33%* | *14* | 4.75 | 0.02 | FBI UCR (suburban city) |
| Richmond, CA | 103,701 | City-level | | *1.33%* | *14* | 14.67 | 0.09 | FBI UCR (suburban city) |
| Cleveland, OH | 396,815 | City-level | | *1.24%* | *13* | 21.05 | 1.11 | FBI UCR (Ohio data limitation) |
| **Sub-total: Cities with City-level data, >10 properties** | **214,336 (Avg.)** | **City-level** | | ***10.36%*** | ***109*** | **10.87** | **9.08** | **FBI & State UCR.** |
| **Cities/towns/villages with 1-10 properties** | **Avg. < 50,000** | **Mostly City-level** | | ***26.62%*** | ***280*** | **8.26** | **5.97** | **Below city-level for New Orleans, LA; Fort Lauderdale, FL; DC. FBI UCR.** |

With respect to my use of poverty rates, Defendants ignore my basis for including poverty rates in the first place. I incorporated poverty rates into the regression analysis in my initial report in response to Dr. Skanderson's opinion that poverty rates should be included as a variable in a regression analysis. My results show that census tract poverty rates do *not* in fact explain a substantial portion of the disparity in REO property maintenance deficiencies by racial composition. As shown in row 5 of Table 16 in my initial report (p. 40), when census tract homeowner poverty rates are added to the final regression model, this variable does not explain any additional percentage of the variation in deficiencies (the $R^2$ remains at 0.38 between rows 4 and 5). Even when overall poverty rates are added to the model, only an additional 1 percentage point of variation is explained (the $R^2$ rises from 0.37 in row 3 to 0.38 in row 4).

In response to Dr. Yao's critique that the poverty rate is too "blunt" an indicator to use,[10] the poverty rates used in the final regression analysis are a continuous measure ranging from 0 to 100 percent and are measured at the census-tract level among both the general population and — more specifically and more pertinent to the alternative explanation that property deficiencies are mainly an artifact of homeowner attributes—among the population of homeowners. Thus, I am not examining individuals who may lie just above or below an absolute threshold but instead a continuous range of census-tract poverty *rates* that is not a blunt measure. Although poverty is not an adequate indicator and was only used in response to Dr. Skanderson's original critiques, I still found that poverty is not a significant driver of deficiencies (at most 1 percent of variation, see paragraph above) or a significant explanation for deficiencies or disparities (the effect of census tract homeowner poverty is not statistically significant or substantial).

**6. With many location-specific variables controlled for, comparing the properties in a combined sample offered the best method for analyzing the data.**

Comparing the properties at issue in this case as one combined sample was the best way to analyze the data given the small sample sizes for many of the metropolitan areas investigated. My regression analysis controlled for many of the location-specific variables that could have affected the combined analysis. Notably, Defendants' experts have not suggested a better approach.

Dr. Skanderson opines that by conducting a combined analysis for all properties, one inappropriately compares properties in Florida with those in Chicago.[11] This critique, however, ignores that my regression analysis accounted for differences across or between different metropolitan areas and housing markets.

As I reported in Exhibit 3 to my initial report (pp. 15-16): "The [U.S. Census Bureau metropolitan statistical area] MSA code provides an important control for the statistical regression models as a fixed effect. This variable controls for differences across MSAs, such as variation in state and local laws, weather patterns (which affect vegetation growth, mold, water damage, and other pertinent indicators), and any other unobservable differences. Using this variable, therefore, isolates the differences between white and non-white tracts *within* each MSA

[10] Yao Supp. Rep. at ¶ 34.

[11] Skanderson Supp. Rep. at ¶ 21.

and controls for the differences *across or between* MSAs. As the results will show, the effect of controlling for MSA location helps explain a nontrivial portion of the variation in property deficiencies as well as the gap by tract racial composition."

I then considered differences within metro areas by accounting for many location-specific factors, including the age of the home, new construction status, previous REO status, local burglary rates, proximity to downtown/city hall, property land values, zip code home price fluctuations, and census tract vacancy rates and census tract homeowner poverty rates.

**7. Defendants' experts incorrectly assert that certain properties were excluded from my final regression analysis.**

Contrary to Defendants' experts' apparent belief otherwise, I did not exclude the same properties from the final regression analysis described in my initial report as I did in the analyses I ran before Plaintiffs filed their Complaint. Before this case was filed, I excluded certain properties based on publicly available information—an exclusion that was overbroad given that no information regarding these properties had been produced by Defendants at that point. Now that more than publicly available information regarding the properties at issue in this case is available to Plaintiffs' counsel, they directed me to use the list of 1,405 properties included in my final analysis. I included all of the 1,405 properties for which I had relevant data in the analyses described throughout my initial report.

Dr. Yao opines that the properties excluded from my final analysis (those with final =0) likely were in better condition, which could have skewed the results.[12] Dr. Skanderson also questions the exclusion of those properties.[13] However, I did not actually exclude these properties from my final analysis and relied on a different, overlapping Current REO Database provided by Plaintiffs' counsel. Any previous exclusions were based on incomplete information that has been updated and expanded according to, Plaintiffs' counsel inform me, information and documents furnished by the Defendants that establish BANA's responsibility for maintenance of the properties not previously clear in public records.

Furthermore, as previously noted in this report and in Exhibit 3 to my initial report, the number of properties included in each analysis I performed was based on the total number of properties for which I had the data necessary to perform the analysis. In other words, for each analysis I performed, I used as many properties as possible, which was dependent on the data available to me. As reported in Exhibit 3 to my initial report (p. 1): "In terms of property physical characteristics, the year built was collected for all 1,405 properties in the Current REO Property Database, and the home square footage, lot size square footage, total value, structure value, and land value were collected for 1,264 properties. As a result of the careful, detailed search of public real estate transaction records where available, sale dates, sale prices, sale types, buyer, and seller were recorded for 4,713 total transactions across 1,031 properties in the Current REO Database." I further noted in footnote 1 to Exhibit 3: "Detailed sales history and prices

[12] Yao Supp. Rep. at ¶ 26.

[13] Skanderson Supp. Rep. at ¶ 18.

were not available for properties located in Texas (n=155) and were not collected for 10 metropolitan areas with fewer than 30 properties each (n=142)."

**8. There is no statistically significant difference in the percentages of FHA-backed mortgages versus other mortgage types in majority white and majority non-white census tracts.**

As I explained in my initial report, there is no statistically significant difference by white versus non-white tract status in FHA/VA loan usage among purchase loans with available public data. As shown in Figure S8, 45.5% of loans in white tracts and 46.3% of loans in non-white tracts were FHA/VA loans; the difference of 0.8 percentage points is not statistically significant (*n*=415, *p*=0.87).

**Figure S8. No Statistically Significant Difference in FHA/VA Loan Type by Tract Racial Composition Status According to Available Public Data on Purchase Loans (N=415)**




As shown in Figure S9 below, even when considering 700 loans for all purposes, 46.4% of loans in white tracts and 42.9% of loans in non-white tracts were established as FHA/VA loans according to available public data. The difference of 3.5 percentage points is not significant (*n*=700, *p*=0.38).

**Figure S9. No Statistically Significant Difference in FHA/VA Loan Type by Tract Racial Composition Status According to Available Public Property Transaction Data (N=700)**




Moreover, based on the limited data for 280 of the properties at issue in this case provided by BANA (BANA-NFHA-LIT_0322596), I also established that there was no statistically significant difference in FHA/VA loan usage among foreclosed REO properties in white versus non-white tracts.[14] As shown in Figure S10 below, 56.0% of loans underlying foreclosed REO properties in white tracts were FHA/VA loans, compared to 57.4% among non-white tracts. The difference of 1.4 percentage points is not statistically significant ($n$=280, $p$=0.86).

In summary, the careful collection of public data on 4,713 total transactions—including data on 700 properties with or without known FHA/VA status as well as the smaller set of data provided by Defendants for 280 of the properties investigated in this case—reaches the same conclusion: There is no substantial or statistically-significant difference in FHA/VA loan usage by tract racial composition.

These findings documenting no difference across tract racial composition type are important because FHA/VA loans are based on a much smaller minimum down payment (around 3.5% of the property purchase value); thus, it is reasonable to expect that foreclosed borrowers with FHA/VA loans in both types of tracts were similarly constrained in terms of income and wealth/assets. While this is not a perfect proxy for these unobserved differences, it is one of the best ones available per public data or data provided by the Defendants. Again, further data that could corroborate (or challenge) this pattern have not been provided by the Defendants.

[14] Exactly 157 of 160 of these FHA/VA loans are FHA loans and only 3 are VA loans.

**Figure S10. No Statistically Significant Difference in FHA/VA Loan Type by Tract Racial Composition Status According to Loans Matched from BANA-NFHA-LIT_0322596 (*N*=280)**




**9. Dr. McCrary's purported placebo analyses misconstrue the purpose of my analyses.**

The conclusions Dr. McCrary draws from his purported placebo analyses[15] miss the purpose of my analyses. I did not set out to determine the reason the racial composition of a neighborhood correlates so highly with the number of observed deficiencies. Instead, my analyses seek to determine: (a) whether other factors explain the variation in observed deficiencies more than the racial composition of the neighborhood; and (b) whether the inclusion of other factors in a regression analysis eliminate or decrease the racial gap in observed deficiencies to the point of not being a statistically significant difference.

Never in my report did I assert that racial composition caused, was causal, or inferred causation as it pertains to the outcome of REO property deficiencies. Instead, I demonstrated that no other variable besides racial composition explained more of the variation in deficiencies. Indeed, no other collection of variables ever explained even half of the gap in average deficiencies by tract racial composition. Other aspects of this investigation or litigation may further confirm that the racial disparity in maintenance is perpetuated by Defendants' procedures, policies, and practices, or lack of adherence to such policies.

Jacob S. Rugh, Ph.D.

Dated: March 4, 2022

[15] McCrary Supp. Rep. at ¶ 23 and Ex. 2.

# EXHIBIT C

**Placeholder**

**File Name:** Jacob Rugh - revised_current_reo_database

**Original File Size:** 4,810,165 Bytes

# Exhibit 8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

(Northern Division)

- - - - - - - - - - - - - - - - - - -x

NATIONAL FAIR HOUSING ALLIANCE, : Civil Action No.
et al., : CCB-18-01919
Plaintiffs, :
v. :
BANK OF AMERICA, N.A., et al., :
Defendants. :

- - - - - - - - - - - - - - - - - - -x

DEPOSITION OF BANK OF AMERICA BY AND THROUGH

CORPORATE REPRESENTATIVE ANDREW PRIESMEYER

CONDUCTED VIRTUALLY

Friday, December 3, 2021

7:31 a.m. PT

Job No.: 416204

Pages: 1 - 265

Reported By: Charlotte Lacey, RPR, CSR No. 14224

occupied based on the task completion that Safeguard did. But as far as inspection reports, if we wanted to see them, inspection reports, we'd be able to log into CARDS just like the asset managers.

Q. Is there any requirement that the asset managers -- and I mean vendor asset managers or internal asset managers at Bank of America -- look at the photos of the REO property?

A. No. If -- if there was -- if it's vacant, no. If it's -- if there was, you know, personal property left behind, then the eviction specialist would review the photos to determine if an eviction is needed or a post-restore or any other action.

Q. So just the eviction specialist would look at the photos?

A. If there was -- if, when Safeguard went out to the property, they identified that the property has personal property, yes.

Q. And then you were talking about the real estate agents. So what is the relationship

between the vendor asset managers and the real estate agents?

A. They -- the asset manager from the asset management company and the agent communicate regularly to understand, you know, the -- what's going on with the property. And, you know, if there -- if at any time the asset manager needs the agent to go out to the property for any reason, then they would submit the request for them to do so.

Q. So then how would they submit that request?

A. Through the system of record, they would -- they would send a message through the system of record for the agent.

Q. And by "system of record" you mean Equator?

A. Equator, correct.

Q. And what types of things would the vendor asset manager send the real estate agent out to the property for?

A. I mean, to make contact, if there's an

occupant there. Follow up on certain things, like if we offered cash for keys. Just to check on the property. If -- if there was any concerns with, like, boundary lines or something like that, they would have the agent go out there and check that.

Q. And do the asset managers at Bank of America communicate with the real estate agents?

A. Generally, no. There may be an opportunity where -- where that senior asset manager may get pulled in, but the majority of the time it's the asset management company speaking directly to the agent themselves. Again, that senior asset manager is really in an oversight role, so not really managing the day-to-day tasks. It's the asset management company's responsibility.

Q. And does the real estate agent have access to CARDS?

A. No.

Q. And do they have any way to submit bids?

A. The agent submit bids?

Q. Yeah.

waterfall?
A. So, of course, if an appraisal was completed, then that would trump that agent's BPO, right? And then if an exterior appraisal was completed by LandSafe in this instance and then down -- and it was occupied, of course it would be exterior, right? And then, down the road, the property becomes vacant and we get an interior appraisal, that established value would change to that -- that interior value.
Q. And what about an interior BPO versus an exterior appraisal?
A. The interior BPO would be utilized.
Q. And then, I guess, is it sort of a spectrum, an interior appraisal, does that have sort of the highest value?
A. Yes.
Q. Okay. And then an exterior BPO would have the lowest -- I shouldn't say value -- the lowest weight?
A. Correct.
Q. Okay. And then how would you put it in

A. That's correct.
Q. And does Bank of America give the vendor asset managers any criteria for establishing the list price?
A. So they -- whenever that -- as we're talking about the different valuation types, whatever is the one that trumps the other is the one that they would go off of for determining what the list price would be. But they would utilize both to determine if there's any factors that may cause a need for adjustment of that list price.
Q. And I -- what -- I mean, what factors are there?
A. It would be property specific.
Q. And does Bank of America give the asset managers those factors to consider?
A. No. It would be -- there are so many different types of factors that could come into play. We would never be able to -- to document all of those factors.
Q. Okay. And is it the same factors for every property?

A. Yeah.

MR. LEVENBERG: Objection to form.

Q. And how do you know what the factors are?

MR. LEVENBERG: Objection to the form.

A. It would just -- anything that -- that's documented within the appraisal or the BPO would be reviewed by the asset manager.

Q. And how is Bank of America aware of what the asset managers are considering, the factors the asset managers are considering if Bank of America isn't telling them those factors?

MR. LEVENBERG: Objection to the form.

A. So, again, it could be -- it's really up to the agent that's documenting -- that's putting information within the BPO and -- and the appraiser that's putting the information in the BPO. We can't tell the agent what to put or we can't tell the appraiser what to put in their BPO. So it could be anything that either of the two write within their valuation.

And so, again, if the vendor goes

outside of their authority limits, then at that time, the bank would know because they would receive the task to complete, and we would go review the exact same information that -- that the asset manager did, as well as any write-up that was provided by the asset manager decision and why they feel that -- that they should adjust the list price.

Q. And how do the asset managers know how much weight to give each factor?

MR. LEVENBERG: Objection to the form.

A. The -- I mean, it's -- there's no weighting. They just -- they review it based on -- based on those values, they determine what value that it should be listed at and why and submit the request, and then we would -- internally, Bank of America senior asset manager would review and see if what -- what the asset manager had stated makes sense and if we agree with that -- with that list price that's being requested or suggested.

Q. But that's only if it's outside of the

asset manager's approval authority --
A. Correct.
Q. -- correct?
And so an asset manager can stray from the value that's on a BPO or an appraisal, correct?
A. Within their authority limits, correct. And again, it would be based on whatever the value was the strongest value, whatever value trumps. So they can't pick and choose -- the asset manager can't pick and choose, oh, I like this value and the BPO better, I'm going to use this one. They have to use the one that trumps the other. So, for example, the interior appraisal, they would have to use that versus the BPO or an exterior appraisal.
Q. And so real estate agents perform BPOs, correct?
A. Correct.
Q. Is there anybody else that performs BPOs?
A. We do have the ability to request a BPO.

A. Yes, ma'am.
Q. Okay. And so if I remember correctly, when we left off we were talking about Safeguard valuations. And this is -- it looks like a work order update from Safeguard, correct?
A. That's what it says on the document, yes.
Q. And on the document, I would say about in the third block of text, it has a value of 17 -- $175,000, correct?
A. Yes.
Q. Okay. And then this work order is dated June 12th of 2013, correct?
A. Correct.
Q. Okay. And how would a valuation like this be used?
A. We don't get this in REO. If it's something that Safeguard provides, we don't -- we don't obtain a copy of this, or we don't use this or look at this document.
Q. And I just wanted to make sure that this is marked as Exhibit 241.

efforts to bring this deposition to a conclusion, especially now that it's exceeded the time for a single deposition combined with the other witness who testified.

You can ask your question now.

MS. BASCHE: We're going back on the record.

BY MS. BASCHE:

Q. And are the inspectors trained?

A. Yes. The inspectors -- the internal inspectors, when we had them, were trained on how to complete the inspections.

Q. And are the third-party inspectors trained?

MR. LEVENBERG: Objection to the form.

A. So whenever -- whenever we transitioned from the internal inspectors and rolled it out to Matt Martin and ServiceLink, yes, the vendors were trained on what the inspections were to consist of.

As far as the current posture, I would have to ask CPP on what the training looked like.

Q. Okay. And can you describe what the inspections would consist of?
A. I could not.
Q. And who created the training materials for the third-party inspectors?
A. The current ones or the ones in the middle, between the current ones and -- and our internal inspectors?
Q. The ones that were in the middle.
A. In the middle? You know, Douglas Graves and other parties would have had some involvement in that.
Q. And -- and so then did Bank of America review those materials?
MR. LEVENBERG: Objection to the form.
A. So Douglas Graves is a Bank of America employee and was a manager in property preservation at the time, so, yes, he would have reviewed those -- those files prior to.
And when I -- I did -- like I said, I did chat with him, and I know he had listed off some of the areas of the inspections. He had been

to Miami, Chicago, and Los Angeles, just to name a few.

Q. And do you know how he selected those areas?

A. You know, again, it was tied to the -- the areas that had the most REOs. But as far as that quarter, which one -- which area they chose to go visit, I do not know.

Q. And I've marked -- I'm going to have you open up -- it would be BANA-NFHA-LIT_9504. And this should be marked as Exhibit, I believe, 248.

(Deposition Exhibit 248 was marked for identification.)

Q. And then are you familiar with this document?

A. Are you asking me, Andy?

Q. Yes.

A. I was trying to find that. I didn't think you were asking me. You said 9504?

Q. Uh-huh.

A. One minute, please. I did find it.

MR. LEVENBERG: 3259504 was the full

property preservation decisions that are based on the age of the home?

MR. LEVENBERG: Objection to the form.

A. No.

Q. And are there any Bank of America property preservations decisions based on the value of the home?

MR. LEVENBERG: Objection to the form.

A. Did you say -- apologize. Did you say maintenance decisions?

Q. Preservation decisions based on the value of the home.

A. No.

Q. Did Bank of America change any of its policies or procedures as a result of plaintiff's 2011, 2012, 2014, or 2015 reports on discrimination in the maintenance and marketing of REO properties?

MR. LEVENBERG: Objection to the form and outside the scope of the noticed topics.

A. So we make changes all the time for -- to -- you know, our processes based on many

different factors, but I can't say that it would have been based on any type of litigation. Generally, if we're making changes to our policies or procedures, it would be tied to a regulatory change.

Q. And did Bank of America change any of its policies and procedures as a result of plaintiff's allegations?

MR. LEVENBERG: Objection to the form, outside the scope, and objection into the inquiry into the potentially privileged communications.

A. Yeah. I don't -- I wasn't in any communications within any sort of litigation, and so I wouldn't be able to speak to that, and I think that that would be privileged information between the bank and the attorneys.

Q. Has Bank of America ever mapped its quality control results?

MR. LEVENBERG: Objection to the form.

A. Can you -- can you restate that in another form.

Q. I guess, has Bank of America ever

CERTIFICATE OF SHORTHAND REPORTER

I, Charlotte Lacey, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto subscribed my hand this 19th of December, 2021.



Charlotte Lacey, RPR, CSR #14224

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - x

NATIONAL FAIR :
HOUSING ALLIANCE, et al., : Case No.
Plaintiffs, : 1:18-cv-01919-CCB
v. :
BANK OF AMERICA, N.A., et :
al., :
Defendants. :

- - - - - - - - - - - - - - - x

D E P O S I T I O N

o f

DAVID SKANDERSON, Ph.D.,

taken on behalf of Plaintiffs

DATE: February 25, 2022
TIME: 12:29 p.m. to 7:35 p.m. EST
PLACE: - REMOTE -
BEFORE: Dawn A. Hillier, RMR, CRR
Stenographic Reporter
Notary Public - State of
Maryland, at Large

JOB NO: 430648

analysis is listed in the report.
Q All right. So let's go back to the body of your report.
A Okay.
Q Let's see. If you could turn to page 26 of the PDF, which corresponds to page 22 of the document. And I'll direct you to paragraph 48 once you get there.
A Okay. Let me just read that paragraph.
Q Yep. Sure.
A Okay. Go ahead.
Q Okay. So, in this paragraph, and I'm looking at the third sentence, you discuss plaintiffs' -- "The exclusion from consideration of the great majority of metro areas in which BANA-serviced REO properties, without taking any steps in the statistical analysis to adjust for that exclusion, means that Plaintiffs' inspection sample cannot be taken as representative of BANA's national REO maintenance activities." And it continues.
If plaintiffs are not using their findings from their investigations to draw conclusions for

locations beyond those investigated, then this particular critique here no longer applies; correct?

MR. LEVENBERG: Objection to the form.

THE WITNESS: I think that's a fair statement. At the time that I wrote this, the only information that I had to go on, really, about plaintiffs' claims was in the complaint.

Since then, I understand that plaintiffs have essentially disclaimed and their experts have reinforced the point that they're not attempting to extrapolate their results to the national level.

And so the question of the national representativeness of plaintiffs' dataset is not really relevant any longer.

BY MS. WEBER:

Q Okay. And if you look a little further down to paragraphs 49 and 50, here you critique plaintiffs' selection of metro areas with higher rates of residential segregation and foreclosure, and also -- let me get to the right sentence.

Yeah. So in paragraph 49, the second

sentence, you say, you know, it's also not representative of BANA's national REO portfolio.

Again, if plaintiffs are not using their findings to draw conclusions for locations beyond those investigated, then this critique no longer applies either; correct?

A Correct.

MR. LEVENBERG: Would this be a good break point for a couple of minutes?

MS. WEBER: I just have one follow-up and then I'm happy to take a break, if Dr. Skanderson's okay.

THE WITNESS: That's perfectly fine.

BY MS. WEBER:

Q Okay. In terms of selecting metro areas with high rates of residential segregation, in order for plaintiffs to investigate neighborhoods that are sufficiently majority white and sufficiently majority African American and Latino, there needed to be some degree of residential racial segregation in the neighborhoods studied; correct?

MR. LEVENBERG: Objection to the form.

Q Are you also asserting that plaintiffs selected metro areas for inclusion in their investigation based on those areas having high degrees of economic inequality between the majority-white and the majority-minority neighborhoods?

A I don't know that they've specifically said that, but I would say that is the result of their selection when you examine the economic data for those areas.

Q I understand you saying that it's the result of the selection, but do you have any basis for believing it was one of the criteria plaintiffs looked at in selecting metro areas?

MR. LEVENBERG: Objection to the form.

THE WITNESS: No, I don't believe so. They've stated that the selection was based on the degree of segregation and foreclosure rates, as far as I can recall.

BY MS. WEBER:

Q So it appears that what you deemed to be a high degree of economic inequality between the

inequality between majority-white and majority-minority neighborhoods, do you?

A No.

MR. LEVENBERG: Objection to the form, calls for speculation.

BY MS. WEBER:

Q So, further in paragraph 51, you note that the high degree of economic inequality between the two types of neighborhoods could reasonably be expected to be associated with differences in neighborhood property quality and condition.

What do you mean by "neighborhood property quality and condition"?

A Well, you could think about, just intuitively, the general quality of housing in the neighborhood, the extent to which there is -- there are distressed properties based on differences in rates of foreclosure. Differences in general income levels tend to correlate with differences in upkeep of properties, just sort of general neighborhood property quality.

You know, some low-income neighborhoods

are what people refer to as blighted. They have a lot of unoccupied or boarded-up properties or poorly maintained properties.

Upper-income neighborhoods tend to have a lower incidence of that kind of issue, generally speaking.

Q And would the neighborhood property quality -- I think that's the term you used to kind of describe a number of those factors; is that fair?

A I did use that expression, yes.

Q Okay. So would the neighborhood property quality and condition -- I'll just go to the terms that you use in your report -- would that affect whether Bank of America could regularly and properly cut the grass in a particular REO?

MR. LEVENBERG: Objection to the form, calls for speculation.

THE WITNESS: I don't have a reason to believe that that would affect something like cutting grass.

BY MS. WEBER:

Q Do you have any reason to believe that the

evaluate the implications of it. And it was a relatively small number of records affected, as I recall.

But I think that is the date value or the date difference value that he would have used in evaluating whether there was a relationship between the number of deficiencies observed and the time since -- the time between Bank of America's taking control of the REO property and plaintiffs' inspection visit.

Q Did you analyze whether there was a relationship between the number of deficiencies plaintiffs found and the time between Bank of America's acquisition date and the time of plaintiffs' visit to the property?

A No. Apart from -- no, I haven't independently analyzed that.

Q And do you have any opinion on how what you claim are errors in his calculations, with respect to these dates, impact his findings, Professor Rugh's findings?

A I haven't specifically looked at that.

As I mentioned, it's not a large number of records, so it might be a very minor impact.

Q But you don't know if it's minor or no impact, do you?

A I haven't evaluated it.

Q Are there any other errors you found in the computations in Professor Rugh's report or the data he used?

A I didn't really focus too much on that, aside from comparison of the original data produced by plaintiffs for the complaint, regression analysis, and the data underlying Rugh's original report.

I don't recall any major issues, anything that I would consider material. But again, it's not something I particularly focused on.

Q Now, you talked a bit about the condition of the property at the time Bank of America acquired it or it became vacant.

And I assume you're aware that Bank of America has photographs and inspection reports of its properties at various points in time; correct?

the status of the excluded properties is, in fact, correlated with the presence of alleged deficiencies?

A Well, we don't have observations of deficiencies for those properties; right? So that's not something that could be done.

We're talking about properties that were excluded because they were actively being serviced, or excluded because they were occupied. There were no inspection results from those properties to do such an evaluation.

Q You don't know, one way or another, whether exclusion of these properties would have impacted the results regarding deficiencies found; is that right?

A Well, I think it's a logical surmise. I don't have specific evidence of it. But in the case of properties that are being actively serviced, presumably, if plaintiffs had -- instead of disregarding those properties -- gone back and viewed them after they had been serviced, after the servicing was completed, they would have seen

different conditions than they might have seen from a property that hadn't yet been serviced.

And for occupied properties as well, you know, if they had gone and observed those properties after they had been vacated and serviced, they would have possibly observed favorable conditions for those properties.

So it's -- I think it's, just on an intuitive level, reasonable to expect that those statuses might be correlated with the presence or absence of the issues plaintiffs were looking for.

Q Let's start with a property that was excluded because it was being worked on at the time of plaintiffs' visit.

If that resulted in properties with better conditions being removed, wouldn't that have applied equally in majority-minority and majority-white neighborhoods?

A Well, it depends on whether the incidence of that issue was proportionately distributed between majority-white and majority-minority neighborhoods. I don't recall what the exact

distribution of those 12 properties was.
Q If they were distributed fairly equally between majority-minority and majority-white communities, how would that affect your answer here?
A If it turns out that they were proportionally distributed between majority-minority and majority-white areas, then it probably would not make a material difference.
As I note in the report, there are only 12 properties in that category, so it's probably immaterial, in any case.
Q And in terms of properties that weren't scored because they were occupied at the time of plaintiffs' visit, if this resulted in properties with more deficiencies being excluded from this sample, that would also affect properties in both majority-white and majority-minority neighborhoods equally; right?
A Well, I'm not sure if the premise is correct; excluding occupied properties necessarily would result in more deficiencies. I guess, in some cases, it would because the bank isn't able to

service the property.

But simply on a mathematical basis, if that -- if that incidence of that particular omission is proportionately distributed between majority-minority-area properties and majority-white-area properties, then it probably doesn't have a material impact on the estimation of disparities in plaintiffs' data.

Q So you talked about your report and we talked today about the property and economic characteristics of the majority-white neighborhoods investigated being quite different from the majority-minority communities. And that's kind of throughout section 6.4 of your report, starting on page 32 of the PDF and going down.

Do you know if, as a practical matter, there were better-matched neighborhoods that the plaintiffs could have selected for comparison within each metro area, between majority-minority and majority-white communities?

A I haven't looked at that question.

Q You haven't assessed whether there were

majority-white and majority-minority neighborhoods in any of the metro areas investigated that would have been more comparable matches?

A That's correct.

Q So let's move on to paragraph 62 of your report. That's on page 33 of the PDF and page 29 of the document.

A Is it 62?

Q Correct. Yeah. Just let me know when you've gotten a chance to look it over.

A I am there.

Q So you note here that plaintiffs often compared majority-minority neighborhoods that were in densely populated urban areas with majority-white neighbors that were in more suburban areas; right?

A Yes.

Q And Professor Rugh controlled for the difference between suburban and urban location as well as distance from city center in the regression analysis he performed in his report; correct?

MR. LEVENBERG: Objection to the form.

THE WITNESS: So, I mean, the word

don't understand, but I would have to go back and look at each one.

Q Let's move to paragraph 128 of your report, which is on page 68 of the PDF, or 64 of the document.

So the third sentence, you note that you found that majority-minority neighborhoods in plaintiffs' sample have lower owner-occupancy rates, higher property vacancy rates, higher foreclosure rates, lower average income levels, a higher share of households with income below the poverty level, and higher population density.

You note that these variables are correlated with each other. You say you tested each of them as additions to plaintiffs' model and found that the poverty rate and property vacancy rate are both statistically significant explanatory factors for the variation in alleged deficiencies among REOs in plaintiffs' sample.

So, first off, when you say "plaintiffs' model," are you referring to the regression analysis Professor Rugh performed?

A Yes.

Q And you write that you found that the poverty rate and property vacancy rates are both statistically significant explanatory factors for variation in alleged deficiencies.

So my question is did the other variables you examined - the lower owner-occupancy rates, the higher foreclosure rates, lower average income levels, and higher population density - did those all turn out not to be statistically significant explanatory factors for variations in the alleged deficiencies?

A So here, I would refer back to our previous discussion about the poverty rate and the vacancy rate. I looked at those variables in the context of the model.

I think the way that I would phrase it is that I found that the poverty rate and the property vacancy rate were the factors that had the strongest explanatory power among those, and that after including those two variables, the others did not increase the explanatory power of the model. So

they didn't have a significant effect beyond what was captured in those two variables; the poverty rate and the vacancy rate.

Q Did you run the regression analysis testing any of the other variables I just mentioned, other than the poverty and vacancy rates, first, before doing the poverty and vacancy rates, to see kind of what impacts, if any, they had on the analysis?

MR. LEVENBERG: Objection to the form.

THE WITNESS: I don't recall the order in which I did it. We looked at various permutations of those variables, and we looked at the correlations among those variables. And the result was that the model that provided the best boost in explanatory power was the one that simply included the poverty rate and the vacancy rate.

BY MS. WEBER:

Q And when you added the other four factors, after controlling for poverty and vacancy rates, you said it did not significantly change the results,

then?

A That's a fair statement, yes.

Q Are there any other variables you tested for in your regression analysis that you didn't list in the report?

A I don't believe so, no.

Q So let's move to paragraph 131 of your report on page 70 of the PDF, page 66 of the document.

Just let me know when you're there.

A Yeah. I'm there.

Q Okay. So the second sentence, you write, "In light of BANA's consistent national standards for property preservation and absent any evidence that BANA or Safeguard applied those standards differently to properties based on area minority concentration, it seems more reasonable to conclude that the small difference not explained by Plaintiffs' regression model is due to non-discriminatory factors Plaintiffs did not measure or consider." And it goes on.

So you note that it's more reasonable to

conclude what you have -- what you've listed here in this paragraph.

Is it also reasonable to conclude that the remaining difference between deficiencies in majority-minority and majority-white communities, after controlling for the various factors in regression analysis, are based on the race of the neighborhood or the racial composition of the neighborhood?

MR. LEVENBERG: Objection to the form.

THE WITNESS: I'd say at this point, we can't definitively say which hypothesis is correct or if either of them are correct. We don't have the data or analysis to support either statement. But both are theoretically possible.

I think what I would say, in addition, is that, as I think I explained in the report, and it looks like it's maybe in the next paragraph, even once you include the variables in plaintiffs' regression model plus the two additional variables that I proposed plus the

indicator of race, there's a substantial proportion of the overall variation in this deficiency measure that is not explained by the model, not explained by race, not explained by the measured economic characteristics or property characteristics in the model.

That tells me that there is still a lot we don't know, from a statistical perspective, about why the observed number of deficiencies varies in general, regardless of whether it's based on minority status.

BY MS. WEBER:

Q Okay. And we'll -- I will get to paragraph 132 in a moment.

Staying with 131 for a little bit longer, you also note here that controlling for differences in property condition based on BPOs -- which are Broker Price Opinions; right?

A Yes.

Q And repair expenditures could reduce -- might reduce or eliminate the estimated disparity but that there's too few records. The relevant data

available is only for a subset of the Phase 1 metro areas, and there's kind of too few records for estimation of plaintiffs' regression model.

The BPO data you're referring to here, is that what you cite in Table 9 on -- let's see what page it is -- page 48 of your report. Let me tell you the PDF number. It's page 52 of the PDF.

A I don't think I need to look at the page.

Q Okay.

A It is the BPO data I cite there, yes.

Q Okay. And the data contained in that table, is that all of the data you had access to regarding BPOs?

A You mean the data for the Phase 1 properties?

Q Right.

A Yes.

Q Did you have BPO data for properties outside of the Phase 1 properties?

A When you say "Phase 1" -- let me go -- actually, could you give me the page reference again, just so I can --

Q Sure. It's page 52 of the PDF, Table 9.
A Okay. Okay. Yeah. So this is specifically based on the BPOs available for the properties that are in plaintiffs' data sample in the Phase 1 metro areas.
Q Okay. And so looking at the -- oh, go ahead.
A Nope.
Q Okay. Looking at the --
A Just --
Q -- first row of Table 9, under Property Count.
A Yeah.
Q So this is for all the metro areas.
For the first drive-by BPO, if we add the majority-white, majority-minority numbers, I came up with 109 total properties; is that correct?
A That is correct, yes.
Q Okay. And for the initial BPO online, I came up with 90 properties when I added 12 plus 78.
A Who said lawyers can't do math.
Q Right?

A You're correct.
Q Great.
So was there any overlap between the properties you had first drive-by BPO for and maybe you had the initial BPO online information for?
A Yes. I don't know what the exact overlap was. I think that -- well, I'd be guessing here, but I believe that, for the most part, the properties that had an initial online BPO were contained within the set of properties with the first drive-by BPO; it's simply that some of those with the first drive-by didn't have an initial online BPO.
I couldn't say specifically without going back to the database, but that's my best recollection.
Q Okay. So it's not the case that you had access to records for 190 properties, total? There's at least some overlap, maybe one category consumed by the other?
A Correct. Yes.
Q Okay.

A Once I merge the Phase 1 data to plaintiffs' dataset, there are some properties in Phase 1 metro areas that don't merge, and then among those, there are some that don't have a BPO data in Bank of America's dataset.

So this is all the properties that are contained within plaintiffs' regression data file for the Phase 1 properties for which there is the relevant BPO data in Bank of America's data.

Q So just to make sure I'm understanding, looking at Table 9, you concluded that the mean and median differences in as-is value and as-repaired value were greater in majority-minority neighborhoods; right?

A Correct.

Q But you did not measure what effect, if any, that difference had on the number of deficiencies plaintiffs found; right?

A No, because the sample size is too small for a reasonable regression analysis.

Q Did you ask Bank of America for more data to attempt to control for the differences in

valuation on the number of deficiencies found?

A No. My understanding is that I was to work within the data that had been produced in this matter. I didn't ask for additional data beyond that, with one exception.

In the earlier evaluation of the representativeness of the sample within the Phase 1 metro areas, I asked the bank if it could produce a list of all the REO properties that are in the Phase 1 metro areas, regardless of whether they were inspected by plaintiffs, so that I could look at that representativeness issue.

But aside from that, the data that was produced to plaintiffs regarding expenditures, BPOs, and so forth, is what I had to work with.

Q Okay. And let me just go back to a previous question because I'm realizing, because of the negatives, the answer might not have been clear.

A Okay.

Q I had asked for confirmation that you did not measure what effect, if any, the difference in the as-is and as-repaired values had on the number

of deficiencies found. And I believe you answered no, because the sample was too small.

So just to be clear, no, you did not measure that; correct?

A Correct.

Q Okay. So let's go now to paragraph 132, which is on page 70 of the PDF.

A Okay.

Q And page 66 of the document.

So, in this paragraph, you note that the R-squared -- you note the R-squared value of .389, in the last row of your table. And you point to Table 12.

Let me just find Table 12. So Table 12 is on page 69 of the PDF.

A Correct.

Q And if you go --

A I see where you're going.

Q If you look at the last row of Table 12, it has adjusted R-squared of .392; is that correct?

A Yeah. The number referenced in the text was not updated based on my final results, so it

regulation, investor or insurer requirements.

If plaintiffs' investigators inappropriately counted as deficiencies something required under the law, that would affect the scoring of properties in both majority-minority and majority-white neighborhoods; right?

A Correct, to the extent that those issues were cited in both sets of properties.

Q And the same is true with investor or insurer requirements; right? They would affect the scoring in both majority-minority and majority-white neighborhoods?

A To the extent that those issues were cited for properties in both neighborhoods. But, of course, given that more issues were cited for properties in minority neighborhoods, it may very well be the case that those were disproportionally affected by those kinds of issues.

Q So I just want to try to understand what you've just said.

A Sure.

Q So let's say, for example -- I'm going to

this data in this case, in your view, to run an analysis; correct?

A For the phase -- the six Phase 1 metro areas, that's correct.

Q And then you talked about getting property valuations for a sufficient number of properties in the sample.

Do you know if there is property valuation information available for a sufficient number of properties in the sample at issue in this case?

A Well, I've looked at it only in the context of the Phase 1 properties, and I've cited all that data in my report.

And I discussed how, within that data sample for the six Phase 1 metro areas, there isn't enough BPO data to use in a regression model.

Q Okay. So you're referring to the BPO data here for the property --

A Correct.

Q -- valuation?

A Yes.

Q Okay. And you said you mentioned

State of Maryland

Baltimore City

I, Dawn A. Hillier, a Notary Public of the State of Maryland, Baltimore City, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been first duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings. I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties, nor in any way interested in the outcome of the action.

As witness my hand and seal this 2nd day of March 2022.

Dawn A. Hillier

My Commission Expires August 14, 2022

# Exhibit 10

**Local Boarding Ordinances**

| Boarding Required/Mandated | | |
|---|---|---|
| **City** | **Ordinance** | **Notes** |
| Atlanta, GA | Atlanta, Ga. Code of Ordinances § 29(b) | |
| Baltimore, MD | Building, Fire, and Related Codes of Baltimore City, Md. § 116.4.3(2) | If windows, doors, and other openings are "readily accessible" |
| Baton Rouge, LA | Code of Ordinances of the City of Baton Rouge, La. and East Baton Rouge Parrish, La. § 12:405.1. | |
| Capitol Heights, MD | Incorporated Town of Capitol Heights, Md, Code of Ordinances § 5-1104. | |
| Chicago, IL | Municipal Code of Chicago, Ill. §§ 14X-12-1202.6.1 & 2 | For openings smaller than 1 sq. ft.; permitted, but not mandated, after 6 months of vacancy for openings greater than 1 sq. ft. |
| Columbus, Ohio | Columbus, Ohio – City Codes § 4707.03.A–B | |
| East Point, GA | Code of Ordinances City of East Point, Ga. § 6-2052 (b)(6)a.i | All windows and doors except front door |
| Garfield Heights, OH | Codified Ordinances of the City of Garfield Heights, Ohio § 1371.03 | City does boarding and, in general, it should be clear boarding |
| Memphis, TN | Memphis, Tenn. Housing Code § 14-4-32.D | Applies only to openings within 20 feet of the ground |
| Newark, NJ | City of Newark, N.J. Housing Code § 18:13-1.9 b. | |

| Boarding Permitted, Not Required | | |
|---|---|---|
| **City** | **Ordinance** | **Notes** |
| Aurora, Ill. | City of Aurora, Ill. Code of Ordinances § 12-504(e) | No longer than 6 months |
| Calumet City, Ill. | Municipal Code of Calumet City, Ill. § 14-28 | |
| Cleveland, Ohio | City of Cleveland, Ohio Code of Ordinances § 3101.10(c), (f) | |

| | | |
|---|---|---|
| Dayton, Ohio | Code of Ordinances – City of Dayton, Ohio § 93.104(A)(4)–(5) | Allowed for ten business days if visible from right-of-way; if not visible from right-of-way, no time limit |
| Denver, Colo. | Denver, Colo. Code of Ordinances § 10-138(c)(2) | Property becomes a "neglected or derelict" property after being boarded for 3 months without substantial and ongoing construction activity |
| Eastpoint, Mich. | Code of Ordinances City of Eastpointe, Mich. § 10-115(a) | |
| Evanston, Ill. | Evanston, Ill. Code of Ordinances § 4-16-13 | No longer than 6 months |
| Fishers, Ind. | Fishers, Ind. Code of Ordinances § 157.09(T) | |
| Fort Lauderdale, Flo. | Ft. Lauderdale, Fla. Code of Ordinances §§ 9-306, 9-307 | |
| Gary, Ind. | Gary, Ind. Code of Ordinances § 105-728 | Must be painted to compliment exiting style of building |
| Grand Rapids, Mich. | Grand Rapids, Mich. Code of Ordinances chap. 135 § 8.209 | Must be painted to match siding |
| Hartford, Conn. | Municipal Code City of Hartford, Conn. §§ 9-93B(2)(j), 9-98 | |
| Indianapolis, Ind. | Marion, Cnty. Code of Ordinances §§ 537-31(14), 537-41, 537-42 | May be ordered by the City |
| Irvington, N.J. | Township of Irvington, N.J. Code of Ordinances § § 460-70(A) | |
| Kansas City, MO | Kansas City, Mo. Code of Ordinances § 56-572 | |
| Lake Worth, Fla. | Code of Ordinances City of Lake Worth, Fla. §§ 2-75.2.3(a)–(f), 2-75.2.4 | Prohibited without a certificate, which is valid for one year |
| Lauderdale Lakes, Fla. | Lauderdale Lakes, Fla. – Code of Ordinances § 42-116(a)–(b) | |
| Margate, Fla. | Margate, Fla. – Code of Ordinances §§ 40.12(1)–(4), 40.16(11)(b) | Allowed with permit |
| Miami, Fla. | Miami, Fla. – Code of Ordinances § 17A-16(3), (12) | No longer than 180 days |

| | | |
|---|---|---|
| Milwaukee, Wis. | Milwaukee, Wis. Code of Ordinances §§ 200-51.7-7, 275-32-7 | Boards must be painted to match the trim or siding color of the structure, or be painted forest green |
| Minneapolis, Minn. | Minneapolis, Minn. – Code of Ordinances § 249.25(a) | If building is vacant and is deemed hazardous due to the fact that the building is open to trespass and has not been secured and the building could be made safe by securing the building the building must be boarded or otherwise secured |
| Oakland, Cal. | Oakland, Cal. – Code of Ordinances §§ 8.54.100, 8.54.330(A)–(B) | |
| Pontiac, Mich. | Pontiac, Mich. – Code of Ordinances §§ 22-916(c)(6), 22-922 | Only if window of a vacant building is broken, then must follow City of Pontiac Board Up Specifications in securing the building |
| Providence, RI | Rhode Island Property Maintenance Code § 23-27.3-124.6(a)–(b) | Boarding must be ordered by local official |
| Richmond, Cal. | Richmond, Cal. – Code of Ordinances §§ 6.38.030, 6.38.100(a)(1) | Allowed with permit |
| River Rouge, Mich. | River Rouge, Mich. – Code of Ordinances § 10(g) | |
| Riviera Beach, Fla. | Riviera Beach, Fla. – Code of Ordinances § 11-209(a)–(b) | |
| Roselle, N.J. | Roselle, N.J. – Code of Ordinances § Sec. 632-9(A)–(B) | |
| Tampa, Fla. | Tampa, Fla. – Code of Ordinances § 19-137(a)–(b) | |
| Toledo, Ohio | Toledo, Ohio Municipal Code § 1767.05(b) | |
| Vallejo, Cal. | Vallejo, Cal. Municipal Code § 7.62.040.A | No longer than 90 days after window is broken |
| Waukegan, Ill. | Code of Ordinances – City of Waukegan, Ill. § 6-402 subsect. R115.1 & § 6-412(b) | No longer than 6 months |
| West Palm Beach, Fla. | Code of Laws and Ordinances Related to Palm | Owner must first provide proof of two instances of vandalism or unauthorized |

| | | |
|---|---|---|
| | Beach County Govt. § 14-31(c)(1)–(2) | entry within a three-month period |

| **Boarding Prohibited** | | |
|---|---|---|
| **City** | **Ordinance** | **Notes** |
| Harper Woods, Mich. | Code of Ordinances City of Harper Woods, Mich. § 11-99(5) | Boarding prohibited, except as a temporary measure for no longer than 14 days |
| San Antonio, Tex. | San Antonio, Tex. Property Maintenance Code § 304.18.2 | |
| Southfield, Mich. | City Code of Southfield, Mich. § 8.608(e) | Boarding prohibited, except as a temporary measure for no longer than 14 days |
| West Orange, N.J. | Township of West Orange, N.J. Municipal Code § 14-8.2a.5 | |

**Boarding Mandated or Prohibited Depending on Circumstances**

- Philadelphia, PA (prohibited if the building has a "blighting influence," then the windows must be glazed; if "securely fastened windows and doors fail or are inadequate to prevent trespassers from entering the building" steel boarding is required)

**No mention of boarding/no boarding ordinance/no express prohibition on boarding**

- Birmingham, AL
- Bloomfield, NJ
- Centennial, CO
- Center Point, AL
- Croydon, PA
- Dallas, TX
- Decatur, GA
- Denham Springs, GA
- Desoto, TX
- District Heights, MD
- Dolton, IL
- Dundalk, MD
- East Hartford, CT
- Forestville, MD
- Fort Worth, TX
- Galloway, OH
- Hyattsville, MD
- Johnston, RI
- Louisville, KY
- Manchester, CT
- Muskegon, MI

- New Haven, CT
- New Orleans, LA
- Oregon, OH
- Orlando, FL
- Schererville, IN
- Slidell, LA
- Stone Mountain, GA
- Vandalia, OH
- Waterbury, CT
- Wayne, MI (Broken windows must be repaired or replaced within 14 days)
- Wyoming, MI

# Exhibit 11

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

(NORTHERN DIVISION)

NATIONAL FAIR HOUSING
ALLIANCE, et al.
Plaintiffs
vs. CIVIL ACTION NO:
BANK of AMERICA, N.A., CCB-18-01919
et al.
Defendants
_______________________________/

The Virtual Deposition of JACOB RUGH was held on Wednesday, March 30, 2022, commencing at 10:59 a.m., at the offices of the deponent, before Oneeka S. Hill, Notary Public.

REPORTED BY: Oneeka S. Hill

terms of the number of properties.

In terms of the I.D. numbers, I don't know if these are the same ones. They could be. It's likely they could be. I just don't know based on the information here. So that would be a lot of this similar information just included with the other information with the same properties.

This is something in a -- in a smaller exploratory analysis could be included, but were it to be included, I could only make a very initial kind of hypothesis based on a limited sub sample. But, it certainly would be something of interest.

Would it be useful in the end? It's not clear if it would be, but it would certainly be of interest to at least examine.

And again, as I stated, a lot of missing values here. So looks about 150 or so records, which appears consistent with some of the other limited data that are perhaps only available for a certain limited number of properties. It appears consistent with that number right around 150 or so.

Q What's the reason why you didn't use this data in your January, February reports?

A So I don't recall exactly. I can tell you looking at the spreadsheet now, the main reason why it wouldn't be in a final model or even a final version of the model, which we haven't discussed the final version yet, is simply because there are too few values.

There's only 150. And so I wouldn't be examining the full dataset.

But certainly, you know, other than a race analysis, you could look at this differences and it just remains to be seen that's an empirical question, whether there are systematic differences.

What they mean I couldn't tell you right now if there are -- just based on looking at the spreadsheet.

Q You did use other variables where you had to use it for a sub sample of the set, is that right?

A There are some variables that are not

available for all 1,405 properties, but, in the case of those variables, they are available for either the majority or the vast majority of properties.

Q Table 15 is where you list the additional variables you added to your final analysis?

A Uh-huh.

Q So the data on days for personal vacancy or foreclosure was available for 150 properties and you incorporated that in the analysis, right?

A That depends how you define the term "analysis." And so when I'm using the term "analysis" here and as I explain later on in the report, that is part of the response to the other experts.

And so that's not limited only to the -- to the regression analysis. There's also other analysis that's a different type of analysis, such as plotting data or cross tabulating data. So it refers to those types of analysis in that section of the report.

Q So let me try to ask that as specifically as my limited statistical literacy allows --

A Sure.

Q Is the variable days from first time vacancy to foreclosure one of the independent explanatory variables tested in the regression analysis?

A It is not in the regression analysis because of the results of the initial analysis where it was found to not be statistically significantly related to the outcome of interest.

Q So in Table 15 which -- which items in Table 15 were found to not be related to the item of interest and removed from the regression analysis?

MS. WEBER: Objection to form.

A Just to clarify, those variables were never removed from the regression analysis because they were -- they were never in the analysis in the first place. Cause there are too few values for those -- for those data, the variables on row 23,

So a type of isolation index would say that on average, just for example, right, people who are affluent are likely to live in more affluent neighborhoods, right. So that's another way of thinking of a type of index.

So that overlaps with but it is distinct from the level of affluence and the concentration of affluence. Because you could have -- for example, according to the spatial segregation you could have an area that's 20% affluent. If every neighborhood is 20% affluent, all the affluent people are spread out, but if most affluent people are living in certain collection of neighborhoods, you're going to see affluence more concentrated in that type of index.

Q So, in order to measure the concentration of affluence, you need more data than just the rate of affluence because it -- terms in not just how much there it is, but where it is and how it's distributed, am I understanding that right?

A Yes.

Q You did a regression analyses in connection with this article, right?
What were these regression analyses trying to study? What was the outcome variable that you were interested in there?
A Yes. Looking at Table 7.2 here we've got predicting concentration of affluence, for example.
So what it's doing there is invested in kind of the determinants what's correlated or have an association as we discussed earlier regression with this kind of outcome variable of the spatial concentration of affluence, for example, in that Table.
Q Spatial concentration of affluence was the outcome variable?
A Here I'm making sure -- yeah, concentration affluence for those of different races. It's just kind of a subdivision by race in that -- in that table.
Q Is that Table 7.1?

A 7.2, yeah. Degree of spatially concentrated affluence, uh-huh, and then degree of different races.

Q What's in Table 7.1? What's the analysis in that one?

A Yeah, let me go back to that. So 7.1 is a listing of the variables used in the analysis. It's showing the summary statistics such as the mean, the standard deviation, the minimum and the maximum values. It includes a list of variables used both in prior research by us as researchers, as well as very common demographic research by population researchers, tomographers, economists, sociologists, lots of different metropolitan area levels -- excuse me, metropolitan area level variables that we would anticipate based on the prior research would be related to the concentration of affluence and the concentration of poverty.

Q So starting from the top you've used explanatory variables both percentage of affluent and percentage in poverty, right?

A These are -- these are the outcome variables, those first two. Let me make sure -- I want to get -- so what -- let me make sure I get this right here. It's been a few years since I looked at this.

So these first two variables -- I appreciate the clarification. Just to be specific, those are those level variables that you referenced earlier, right, so the percentage that are affluent and the percentage that are in poverty just to clarify. They're not outcome variables. Excuse me.

Q In this regression you used both the affluent rate and the poverty rates. Is there a reason why you didn't use affluence rates in your regression analysis for this case?

A That's a good question. The main reason is when I looked before at income, when I looked at other economic variables and exploratory analysis, I didn't find that, you know, looking at the range of incomes, say the number of people making more than a hundred thousand, I didn't find that to be a

significant -- significant driver in those exploratory analysis.

And again, that's an empirical question. When I include say poverty, including both overall poverty and then of course more precisely and appropriately the property rates of homeowners, I don't find that either one is a big driver.

And so, it is certainly possible that affluence could be significantly related. It's highly unlikely that it would be a significant driver, but it's one of those other variables that you could add and then you could run. You could run the estimates and not knowing beforehand the estimates could show no effect.

They could show a very small positive, but insignificant effect. They could even show a slightly negative effect.

My hypothesis is like poverty they're most likely, right -- because there are so many other economically-related variables and it's at the census tract level and not at the individual level.

That most likely the more reasonable expectation in terms of hypothesis is it's probably going to be a small effect and it's potentially insignificant. And so that explains some of the reasoning recollection behind why say, for example, it's not included in the regressions in this -- in this investigation in property maintenance deficiencies.

Q What specifically did you do in your exploratory work to assess that?

A I remember looking years ago at kind of income brackets and looking at the correlation of say -- that correspond directly with affluence to say, you know, how many more -- not how many -- excuse me, what proportion of residents in the census tract earn more than a hundred thousand dollars which corresponds very closely to this level of affluence variable, and my recollection when I looked at it was it wasn't -- it wasn't strongly related and it -- it didn't -- it wasn't related.

Another thing that kind of affirms or

strengthens my confidence in that assessment is that I did look at income based in terms of -- I want to make sure I get the definition correct in terms of the label.

I think it would be around Table 15 in the report. That variable -- this came up once earlier. I just wanted to -- that's the median homeowner cost as a percentage of income. So that's a continuous variable.

And that one when it's included in the model -- and that's in the code that I provided as a way of transparency to the other researchers. When that's included it has this kind of small impact. The racial disparity it's largely unchanged. I don't recall the exact decimal points, but it's very, very similar. It's not statistically significant different that's for sure.

So based on that income measurement as it relates to housing cost -- and we talked so much about this earlier and how important that is when you think about the relationship of housing in terms

of the mortgage and other owner costs that didn't shake out in the regression results. It didn't come out to be statistically significant.

So that was another thing that -- that is supportive or another piece of evidence one might say that would be the researcher like myself to conclude that it's unlikely that including say the share of the homeowners at this higher distribution that that explains this difference.

It's an empirical question. It's something that can be reestimated and added using census data and then we can find out. But, my expectation just based on the work that I've done is that the effect would be small and unlikely and insignificant.

Q Make sure I understand this practice of doing some work, you know, reaching the conclusion that it's not going to be significant and then leaving it out of the analysis.

Wouldn't you want to keep it in the analysis in order to demonstrate its lack of

significance?

A It depends on the situation of the variable. It depends how many variable values are missing. I think as a matter of completeness like I just discussed with that medium homeowner cost as a percentage of income, I got the code that includes it and it's there and you can run it and see anybody that can run it and can see -- anybody can run it and see that.

We could add affluence. I think it's reasonable to include it for completeness and being thorough. It's just that the body of evidence so far either probably won't matter as much but it's an empirical question. And so, it could be added and that would be warranted.

Q I'm looking at some of the other variables on the list here and I'm wondering if you considered them for use in the NFHA case as well.

How about that percentage aged 65 variable under the demographic structure?

A That was something I remember looking at

the percentage that were older because I remember looking at the transaction data looking at, you know, how many people got a reverse mortgage. A home equity conversion mortgage is the technical term for a first mortgage. Those are marketed to seniors and people that are older take out a mortgage.

I remember seeing in the records how many people had a probate deed or estate deed where the property was transferred to say their heirs or their children.

I recall looking very carefully at the difference by tract. I didn't find any differences, no statistically significant difference.

I recall earlier on much like Dr. Skanderson mentioned running other census data, including age, including exploratory regressions. That was of course many years ago. I don't recall exact results, but I do recall that age 65 and older wasn't -- wasn't -- wasn't related and it should be noted that you know here is a study of metropolitan

level of kind of concentrated affluence which is a different outcome variable.

So it can be true in one setting variable is significantly related and another setting it's not related. It's pretty well known that people are more affluent when they're older. So I can see clearly why it's included you know in our study that we have here with Professor Massey.

It's not immediately clear why the percentage are older would always explain -- and I didn't find that relationship when I looked at the census data and I know that Dr. Skanderson reported only finding vacancy and poverty.

I didn't find age 65 and older to be significant. I couldn't say for sure if I included in regression -- I recall including regression just to be thorough, and I don't recall any significant results for that in the initial exploratory analysis.

Q How about this density restrictiveness variable?

A That's something that is not available for every locality in the United States. It's something that's based on an index or a survey or a representative sample for metropolitan areas. There are different researchers such as those at the Wharton Business School and I have used that variable in other research.

So that's based on a survey index and then used a representative survey to represent the different metropolitan areas.

And so, one reason why we use that is I've already got an indicator for metropolitan areas, and so that would capture differences in metropolitan areas already the variable that I used.

So it would be -- it would be interesting, but it would be redundant. It wouldn't add new information.

Q Well, density restrictiveness you wouldn't expect to be uniform across an entire metropolitan area, would you?

A No, you wouldn't. Unfortunately, like I

between say industry standard or practices related to one firm versus another, versus the policies in one area or another. I don't know of any discrepancy that potentially could be there.

The other thing -- the one other thing is that one of the first things I did when I examined the data very early on is I looked at two things, the subcategories, collection of categories that are related such as these things that have to do with foliage and grass and shrubbery and leaves and so forth.

I looked at those categories and individual categories, you know, such as saying -- you know -- this is an example of dead grass, but you could think of another one having a boarded window, right, or something like that.

When I looked at the data and I excluded something like a boarded window or something else early on, more recently, whether one thing is excluded or not, I haven't found -- according to my work, I haven't found a difference in pattern of the

results that I reported here in my reports. I haven't found that having one thing included or one thing excluded drives the different changes the pattern overall in terms of the index total tally. So I haven't found that according to my work drives the difference.

The last thing I'll say is this is out of my area of expertise. So I don't have the same expertise as say Mr. Bryar or Mr. Tyler.

I also referenced in our earlier conversation, I'm not aware of the training that was given on objective indicators. I'm not aware of the reasonable standard in terms of say a mailbox being broken, you know, as viewed as a deficiency and I'm not -- as I said at the beginning of my answer, I don't know how industry standard, right, relates to specific policy or a specific firm or other firms. I'm not aware of that consistency.

So I couldn't, right, weigh-in and say on the substance of that category. I can just tell you as a data analyst when I look overall, if I

exclude one category, I don't -- I don't find a different category result. I don't find somehow it's being driven by one category or a collection of categories more than another.

Q Which categories did you run tests on to -- excluding those categories and seeing if the results were any different.

A I don't recall all the categories that -- that -- that I excluded before. I do recall a few that -- I can tell you the ones that I recall. Cause I don't recall them. Some of them were in the distant past.

Some of them I do recall excluding boarded windows, boarded doors, trash. What's another one?

Oh, there's another one. It wasn't shutters. It was something else exterior on the windows.

Oh, the gas meter, running it without the gas utilities turned off or not. I believe -- I don't remember the label for the column. I'd have

to look up the dataset. There might be something about a warning sign or a "No trespassing" sign. I'd run it excluding that, and I found the same pattern of results.

In some instances when I excluded the variable, the results were extremely significant, almost identical down to the decimal point.

So, most of the time, it -- in all instances I've looked at I didn't -- I didn't find it to drive a difference. That was something at the beginning earlier on I was very interested in looking at is this being driven just by one category more than another. I haven't found that according to what I looked at.

Q You may have just answered it, but my next question was going to be what was your reason for doing those tests?

A I think the main thing is to understand data better at a very basic level. A good data analyst will plot the data, will look at the data, examine the data visually, cross tabulate the data,

understand the distribution of the data.

I presented a histogram, for example, in Figure 1 of the report; showed a clear difference in distribution of data.

And so, in the interest of examining the data carefully, I looked at collection of subcategories and then some of the actual category deficiencies themselves single count and looked at those as well.

To be thorough, I want to make sure I answer your question completely. Another one had to do with something that we've discussed a couple times today. The idea of weather, climate, those types of things.

So I wanted to understand really well in the data, is this driven really by grass or something else or -- or something else.

And so I found that it's -- that it's pretty well distributed across deficiencies. It's not being driven by some outlay of collection of categories. I was interested from kind of that

subjective category to understand the data.

Q Has anyone asked you to rerun the regression analysis at any point since you performed the final one based on any changes to what was scored as a deficiency?

A The only thing I can think of is just only one time where I ran it and I did it without the boarded windows, boarded doors, trespassing signs. That's the only one that I could think of that I've done since my final regression back in January, February.

Q When did you do that one?

A I did that one just -- just recently in March.

Q What was the reason for that?

A Looking at --

MS. WEBER: I'm just going to object to the extent that -- just caution you not to discuss anything counsel may have told you. Other than anything we told you that would be considered or relied on in forming your opinion, you can go ahead

and answer.

A Yes. It's the same reason I've given so far to examine what would be the difference if you exclude certain categories and you know that could be based on any number of reasons. It could be based on whether those things are required or not.

There's a lot of reasons why, but when I ran it recently with -- excluding boarded doors, boarded windows, the results were remarkably similar. In some cases, very close to identical in terms of the percentage of variation explained and so forth.

Q And I realize this is a difficult standard to pars as Weber just described, but nonetheless it's the one we deal with all the time.

What assumptions or facts did plaintiffs supply you with about the -- the data they were asking you to analyze in connection with that -- with -- with that exercise you did?

A Uh-huh. Yeah, they were straightforward, mainly just definition. This

column means it's adjusted with subtracting out boarded windows, boarded doors, and then this is the other column and then I could examine the difference in the two columns, which, of course, they were extremely similar, and then I could use that new column of the total adjusted deficits or deficiencies and then rerun the exact same model and -- and find that it's -- that it's very, very close to being the same.

Q Are you planning to update or revise your report in any way to account for that analysis?

A Based on my results I'm not planning on that just because the results are sometimes identical. Sometimes only just a decimal point or so away. And I couldn't find any case where they were statistically significantly different at all. And the proportion of the racial disparity explained remained unchanged. So that would be why I wouldn't plan on doing any more supplemental analysis.

Q And tell me again which categories were removed from the deficiency list for purposes of

MR. HOLMES: Okay, great. I think -- let's mark this -- this would be, if I'm following correctly, 489, is that right?

MS. WEBER: Exhibit number --

MR. HOLMES: Yeah.

MR. WEBER: I think we weren't numbering during many of these.

MR. HOLMES: We stopped numbering and the last one I had was 488 --

MS. WEBER: Yeah, the last one I have is 486, but whatever you want.

MR. HOLMES: All right. Let's go with 489 I think.

THE REPORTER: Mr. Holmes, the other reporter is on. Is this an okay time to switch, or did you want to finish with this exhibit?

MR. HOLMES: Sure. No, this is fine.

(The virtual deposition suspended at 5:58 p.m.)

State of Maryland
City of Baltimore, to wit:

I, ONEEKA S. HILL, a Notary Public of the State of Maryland, City of Baltimore, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand this 4th day of April, 2022.

ONEEKA S. HILL
Notary Public

My Commission Expires:
June 20, 2025

Jessica Weber, Esquire

jweber@browngold.com

April 7, 2022

RE: National Fair Housing Alliance Et Al v. Bank Of America NA Et Al

3/30/2022, Jacob Rugh, A.M. Session (#5147420)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com.

Return completed errata within 30 days from receipt of transcript.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

National Fair Housing Alliance Et Al v. Bank Of America NA Et Al

Jacob Rugh (#5147420)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________ _______________

Jacob Rugh Date

A.M. Session

# Exhibit 12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

NORTHERN DISTRICT

- - - - - - - - - - - - - - - - +

NATIONAL FAIR HOUSING ALLIANCE, et al.

Plaintiffs

V. Case No.

BANK OF AMERICA N.A., et al. CCB-18-01919

Defendants

- - - - - - - - - - - - - - - - +

VIDEOCONFERENCE DEPOSITION OF PROFESSOR JACOB RUGH

Provo, Utah

Wednesday, March 30, 2022

6:00 p.m.

Job No. PA 5147420

Pages 1 - 61

Reported by: Danielle E. Lawrence

be other physical attributes that relate to age, that correspond to age. So, I would say the age of the home is a necessary variable, especially because in how we search for the age of the home is so essential. Is it sufficient all by itself. My analysis found that there were other variables, like, new construction that were helpful so that it wasn't sufficient all my itself, for example.

Q. Yes, I guess my question is whether there's sufficient weight given to it however that variable operates in the regression analysis? How do we know there's sufficient weight given to that?

MS. WEBER: Objection to form.

THE WITNESS: Yes, I can't think of, like, an absolute standard that would see, hey, this is sufficient. What I can think of is looking at age of the home in terms of the decade it was built, or the year it was built, or the era it was built -- that was the initial way -- looking at other nonlinear transformations. Any way I looked at it, it came out pretty similar. It was the most important controlling

factor, explained a good share of the variation, and it explained anywhere from .2 to maybe .3 or .4 deficiencies. So, it did stand out from all other variables no matter how I measured it, as a category or as a continuous year measurement.

BY MR. HOLMES:

Q. Okay.

A. Didn't matter as much.

Q. Okay. All right, you were asked some questions about the opinions of Plaintiffs' expert Mr. Tyler, and you told us that you did run a regression analysis where you eliminated boarded windows, you eliminated boarded doors, and I believe you said you eliminated trespassing signs; is that right?

A. Yes, that's my understanding. That's right.

Q. And when you did that, did you do their regression analysis and eliminate one at a time?

A. When I did that analysis it accounted for eliminating boarded windows, boarded doors, and assigned all together. And, of course, it obviously varies on every record that you're looking at of the hundreds of

records. In some instances, that didn't affect the index. In some it reduced it by 1, in some it reduced it by 2, but that was in combination. Not in separate sequence but taken together, those three.

Q. Okay. Got it, I think. So, you did all three of them together and your testimony was that you really found very little difference, correct?

A. Yes, that's correct. I found very little difference, very similar results. Sometimes almost exactly the same.

Q. All right, you have not read Mr. Tyler's deposition transcript?

A. I have not read his whole transcript, no.

Q. Okay. So, if he testified, and he did, that at least 14 of the criteria used out of the 37 are not recognized in the industry as something that is done by a property preservation company like Safeguard, you haven't done any regression analysis where you eliminated 14 criteria; have you?

MS. WEBER: Objection, mischaracterizes record. Go ahead.

THE WITNESS: I have not performed any analysis that would subtract all 14 of those specific ones that you referenced together at the same time. That's something I haven't done yet, no.

BY MR. HOLMES:

Q. And you don't know how that would turn out; do you?

A. As we were discussing earlier, I wouldn't know beforehand exactly how it would turn out. The only thing -- the information that I do possess right now is after excluding things that we just mentioned, boarded windows, boarded doors, things like the gas electric meter, some select things I've done before, no, the result are the same. Now, would they be the same when I excluded 14, that I don't know beforehand.

Q. Right. What if you excluded 10?

A. It would be the same.

Q. You wouldn't know, right?

A. Similar answer.

Q. You wouldn't know ahead of time. You would have clues and information that would lead you to form a

Q. Congratulations.
A. Thank you.
Q. You're now a professional expert. I'm sure you were before but now you've gotten through a deposition and you did just fine. I have no further questions?
MR. LEVENBERG: Thank you, Dr. Rugh. We appreciate your time very much.

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MS. WEBER:
Q. I have a brief question for redirect, so we won't say good bye just yet. All right, Professor Rugh, you were asked about -- or you mentioned previously more recently excluding boarded windows and doors and the no trespassing warning signs, the deficiencies from the analysis. I just want to show you a document to make sure we're talking about the same thing so I'm going to introduce an exhibit, hopefully this will work. I'm going to make it 490, I think is what we're up to. Hopefully this shows up now, let's see. Yeah, actually, Exhibit 490, Plaintiffs 074589, just let me know when you've got that.

A. Yes, I see that. I have that up on my other screen now.

(Exhibit 490 marked for identification and attached to the transcript.)

Q. Great. Is this the spreadsheet you relied on in doing the more recent analysis removing some of the boarded windows and doors and no trespassing signs deficiencies?

A. Yes, I can confirm this is the same spreadsheet that I used recently this past week and that we discussed earlier.

MR. HOLMES: I'm sorry, I'm trying to find this. Did you upload it?

MS. WEBER: I can tell you it's Plaintiffs 74589, it's the spreadsheet that we actually produced --

MR. HOLMES: Got it. Thank you.

BY MS. WEBER:

Q. No problem. So, Professor Rugh, I think you testified previously about removing the boarded windows and doors deficiencies. Looking at this spreadsheet, I

don't know if it refreshes your memory, did you remove those deficiencies for all of the properties or a subset of the properties?

A. This one is among a subset, to the best of my understanding.

Q. Okay. And the signage and occupancy, the trespassing or warning sign deficiencies, was that removed for all the properties or just some?

A. To the best of my knowledge, this is among some.

Q. If you want to take a look at the adjusted sheet, and it's column Z, you can compare with the full data set.

A. I'm on column Z here.

Q. Under the adjusted for column Z, it looks to me like all of the properties that have a zero for signage and -- I mean, trespassing or warning signs?

A. Yes, I see those zeros now.

Q. And in the full data set, some of them were marked as having that deficiency, right, some of the properties?

A. That's right, so you can see the differences

there with zero versus one.

Q. And the analysis you ran relied on the adjusted data presented in this Exhibit 490; is that right?

A. Yes, down this third spreadsheet, that column A is definitely adjusted.

MS. WEBER: Okay. I don't have any other questions, thank you. If nobody has anything else, the witness will review and sign.

(Videoconference deposition of PROFESSOR JACOB RUGH, adjourned at 7:12 p.m.)

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Danielle Lawrence, court reporter, the officer before whom the foregoing proceedings were heard, do hereby certify that the foregoing transcript and said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of April, 2022.

________________________________

NOTARY PUBLIC IN AND FOR THE

STATE OF MARYLAND

Jessica Weber, Esquire
jweber@browngold.com

April 8, 2022

RE: National Fair Housing Alliance Et Al v. Bank Of America NA Et Al

3/30/2022, Jacob Rugh (#5147420)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com.

Return completed errata within 30 days from receipt of transcript.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

National Fair Housing Alliance Et Al v. Bank Of America NA Et Al

Jacob Rugh (#5147420)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________   _______________

Jacob Rugh                                        Date

National Fair Housing Alliance Et Al v. Bank Of America NA Et Al

Jacob Rugh (#5147420)

ACKNOWLEDGEMENT OF DEPONENT

I, Jacob Rugh, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

________________________________ _________________

Jacob Rugh Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

___________________________

NOTARY PUBLIC

National Fair Housing Alliance Et Al v. Bank Of America NA Et Al

Jacob Rugh (#5147420)

E R R A T A S H E E T

PAGE 20 LINE 1 CHANGE "records." to "factor."

REASON

PAGE 38 LINE 19 CHANGE "sufficient" to "significant"

REASON

PAGE 39 LINE 15 CHANGE "try" to "explain"

REASON

PAGE 41 LINE 5-6 CHANGE "Jacqueline Wong" to "Jackelyn Hwang"

REASON

PAGE 42 LINE 13 CHANGE "(inaudible)" to "Cohen's d"

REASON

PAGE 44 LINE 7 CHANGE "sold" to "solid"

Page 51 Line 9 CHANGE: "director" to "directory"

REASON Page 52 Lines 18 & 19 (both times) CHANGE: "highly predicted" to "highly predictive"

Jacob S. Rugh 03 May 2022

Jacob Rugh Date

# Exhibit 13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

NATIONAL FAIR HOUSING ALLIANCES, et al.,

Plaintiffs,

vs. No. 1:18-cv-01919-CCB

BANK OF AMERICA, N.A., et al.,

Defendants.

DEPOSITION OF BRANDON SILVEY

Conducted Virtually

Wednesday, November 17, 2021

9:00 a.m.

(Proceedings ended at 2:59 p.m.)

Reporter: Angela C. Loisi, CSR, RPR, FCRR

License No.: 084-004571

APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

quality control spreadsheets, that means 09:18:18
pre-foreclosure sale? 09:18:21
A. Correct. 09:18:22
Q. Great. And then "post-sale FHA," can 09:18:23
you just define that briefly for the record so 09:18:27
we're all on the same page? 09:18:29
A. Yeah. It means the foreclosure sale 09:18:30
has occurred. It's an FHA-backed loan, they 09:18:32
are the insurer, and we have yet to convey 09:18:36
that property to them. 09:18:39
Q. Okay. Great. And just so we're 09:18:40
clear, "FHA" is Federal Housing 09:18:42
Administration; is that right? 09:18:44
A. Correct. 09:18:46
Q. Okay. And is that sometimes referred 09:18:46
to as a "HUD loan"? 09:18:48
A. Yep. 09:18:51
Q. Okay. And HUD is the Department of 09:18:51
Housing and Urban Development; right? 09:18:53
A. Correct. 09:18:57
Q. Okay. Great. Thank you. 09:18:58
So can you describe for me in your own 09:19:00

words the progress of a home from being in default to no longer being on Bank of America's books? 09:19:02 09:19:05 09:19:08

A. Yes. So it would go into default, which we would call the -- the pre-foreclosure sale, the pre-sale space. During that time it would be inspected and -- until the foreclosure sale occurred. There are minor repairs that can be done in pre-sale space because we don't own the property. Bank of America is not on the deed, right, the property still belongs to the homeowner. And then once the foreclosure sale occurs, depending on the investor or the insurer, Fannie Mae, Freddie Mac, those properties go directly to the investors, and they market them in REO on their own. 09:19:09 09:19:12 09:19:15 09:19:18 09:19:21 09:19:24 09:19:27 09:19:29 09:19:30 09:19:33 09:19:34 09:19:37 09:19:40 09:19:42

If it were Bank of America-backed loans, so there's no investor, no insurer, it would go to REO. And then if it's FHA, then it goes into the post-sale space. FHA -- and then they have a process called "in conveyance 09:19:44 09:19:48 09:19:50 09:19:54 09:19:58

condition." There's a list of items that need to be done on that property before HUD would take that property into their inventory so they could then sell it in REO. 09:20:01 09:20:03 09:20:05 09:20:08

Q. Okay. And I'll have a lot of questions about different aspects of that along the way. 09:20:11 09:20:12 09:20:15

So starting first with pre-sale, pre-foreclosure sale, you mentioned "inspections." How often do those take place? 09:20:15 09:20:19 09:20:20

A. It's based on investor guidelines, but generally, at least once every calendar month -- 09:20:23 09:20:25 09:20:28

Q. Okay. 09:20:28

A. -- it needs to occur. 09:20:29

Q. And is that an exterior inspection? 09:20:30

A. Yeah. Unless the property is vacant, yeah. That would be exterior only. 09:20:33 09:20:36

Q. And if it's vacant, what kind of inspection is it? 09:20:38 09:20:40

A. Interior inspection. 09:20:41

Q. Okay. And you mentioned that there 09:20:42

are minor repairs that can be done on a pre-foreclosure sale property. What are those? 09:20:48 09:20:51 09:20:52

A. Generally there's going to be anything exterior that we would do to the property, unless there's some health or safety concern that's at the property, such as, you know, gas leak or spilled oil, things of that nature. That's something that we can see clearly that's going to possibly affect the health or anyone who were to go on that property -- the safety of anyone to go on that property. 09:20:52 09:20:54 09:20:57 09:20:59 09:21:03 09:21:05 09:21:07 09:21:11 09:21:13

But it -- we have -- we would have to work with the city in order to get permission, especially if it requires a permit, because like I said, we're not on the deed, you know -- 09:21:14 09:21:16 09:21:19 09:21:21 09:21:25

Q. Okay. And in -- in line with exterior inspections and that minor work, is there any recurrent maintenance that occurs on pre-foreclosure sale properties? 09:21:25 09:21:27 09:21:29 09:21:33

A. Only if it's vacant. So if it's 09:21:35

vacant, then we would cut the grass and winterize the property. So make sure the pipes don't -- you know, don't burst during the winter months. But if it's occupied then we don't do any of that -- that exterior maintenance, recurring maintenance. 09:21:37 09:21:39 09:21:41 09:21:44 09:21:47 09:21:50

Q. And am I right that part of those monthly checks is to determine occupancy as well; correct? 09:21:52 09:21:54 09:21:57

A. That's correct, yeah. 09:21:58

Q. Okay. So if a property had been occupied, and then it's determined not to be occupied anymore at one of those inspections, at that point would Bank of America start to order recurrent maintenance, like grass cuts? 09:21:59 09:22:01 09:22:03 09:22:06 09:22:08

A. Correct. 09:22:12

Q. Okay. So we talked about that sort of progression from default to either post-sale FHA or REO. 09:22:12 09:22:17 09:22:21

Can you tell me to the best of your knowledge, I know it might be a lot, but the various Bank of America departments or 09:22:23 09:22:25 09:22:28

A. Right. 10:27:17
Q. Do you know how "high vandalism" is defined? 10:27:17 10:27:20
A. I do not. 10:27:25
Q. Have you ever seen any evidence submitted to prove an assessment of high vandalism? 10:27:26 10:27:31 10:27:36
A. Personally, I have not. 10:27:36
Q. Does Bank of America require that that evidence be submitted? 10:27:38 10:27:40
A. I -- honestly, I'd have to look at the policy related to -- to this, to -- 10:27:49 10:27:56
Q. And -- okay. What policy would that be that you need to look at? 10:27:59 10:28:02
A. It would most likely be in the inspection and preservation standard. 10:28:03 10:28:08
Q. Okay. I think we'll -- we'll be looking at that policy later, so you can tell me if it's the right one. 10:28:12 10:28:17 10:28:19
And if those crime statistics were submitted, where would they be located or stored? 10:28:25 10:28:28 10:28:30

A. It is the FHA guidelines, yeah. I think Safeguard has an actual checklist of what that can -- contains. 10:30:10 10:30:15 10:30:17

Q. So does Safeguard make the initial determination that something's in conveyance condition, that a home is in conveyance condition? 10:30:20 10:30:25 10:30:28 10:30:30

A. They do. 10:30:30

Q. Okay. And then who -- strike that. 10:30:31

Does somebody at Bank of America review that to make sure they agree? 10:30:35 10:30:37

A. They do. 10:30:39

Q. Who would do that? 10:30:39

A. The mortgage servicing specialist. 10:30:41

Q. What would they review in order to make that determination? 10:30:43 10:30:46

A. The photo evidence that Safeguard provided. 10:30:47 10:30:50

Q. Okay. And then what happens next once everyone agrees it's in conveyance condition, what happens? 10:30:51 10:30:55 10:30:58

A. It's actually in the system. It's 10:30:59

MS. ZACHARIASIEWICZ: Me or the deponent? 10:42:26 10:42:26

THE COURT REPORTER: You, what you just said, please. 10:42:26 10:42:31

BY MS. ZACHARIASIEWICZ: 10:42:31

Q. Sure. Has Bank of America ever checked for patterns of which areas are marked as high vandalism? 10:42:32 10:42:33 10:42:36

MR. LEVENBERG: Objection to the form. 10:42:38

THE WITNESS: Not to my knowledge. 10:42:41

BY MS. ZACHARIASIEWICZ: 10:42:43

Q. Has Bank of America checked on whether high vandalism, that designation, actually correlates with areas with higher crimes? 10:42:43 10:42:45 10:42:49

MR. LEVENBERG: Object to the form. 10:42:53

THE WITNESS: No, not to my knowledge. 10:42:56

BY MS. ZACHARIASIEWICZ: 10:43:03

Q. Has anyone at Safeguard checked that form -- 10:43:04 10:43:06

MR. LEVENBERG: Objection to the form, and objection to being outside of the scope. 10:43:06 10:43:07

THE WITNESS: I can't speak for what 10:43:09

So this is saying, you know, this is CPP high-risk division, and then default liquidation services, which encompasses more than just preservation. 11:17:22 11:17:24 11:17:27 11:17:30

BY MS. ZACHARIASIEWICZ: 11:17:33

Q. Okay. 11:17:33

A. So if maybe at the executive level is, I think the best way to describe that. 11:17:34 11:17:36

Q. Okay. And then there's some top of -- if you want to scan through these emails at all, vacant property registration and a code violation related to that. 11:17:38 11:17:49 11:17:51 11:17:54

Whose responsibility is vacant property registration? 11:17:57 11:18:00

A. Mortgage servicing specialist. 11:18:02

Q. And do they handle it or do they direct Safeguard to do it? 11:18:05 11:18:07

A. Safeguard is delegated to do it. 11:18:11

Q. And is it done everywhere, or does it depend on the localities requirements? 11:18:14 11:18:17

A. Depends on the localities requirement. 11:18:20

Q. Okay. I think I'm done with this one, 11:18:23

management. 11:52:46

Q. And who created the training materials? 11:52:46 11:52:49

MR. LEVENBERG: Objection; outside the scope. 11:52:50 11:52:51

THE WITNESS: Another question for vendor management. 11:52:51 11:52:52

BY MS. ZACHARIASIEWICZ: 11:52:54

Q. Have you ever reviewed them? 11:52:54

MR. LEVENBERG: Same objection. 11:53:02

THE WITNESS: Training materials? 11:53:04

BY MS. ZACHARIASIEWICZ: 11:53:06

Q. Yes. 11:53:07

THE COURT REPORTER: I'm sorry. Was there --

MR. LEVENBERG: Same objection.

THE COURT REPORTER: Thank you.

BY MS. ZACHARIASIEWICZ:

Q. And your answer was "no"; correct? 11:53:08

A. Correct. 11:53:10

Q. Okay. Has Bank of America ever sent anyone out to inspect properties itself? 11:53:10 11:53:14

A. Beyond our vendor network? 11:53:23
Q. Yes. 11:53:26
A. Safeguard and Altisource or -- 11:53:26
Q. Yes. 11:53:29
A. -- services, not to my knowledge. 11:53:31
Q. How frequently are the third-party quality reviews completed? 11:53:34 11:53:39
A. The orders are placed monthly. Well, they're actually -- now they're placed weekly, but they're batched monthly for the purposes of calculating the score on the scorecard, right. 11:53:44 11:53:50 11:53:52 11:53:55 11:53:58
Q. Okay. How many properties are reviewed per week? 11:53:59 11:54:02
A. About 100 and -- 100 to 125. 11:54:03
Q. So then monthly it's somewhere between 400 and 500? 11:54:14 11:54:17
A. Correct. 11:54:19
Q. And what kinds of properties are reviewed in terms of where they are between default and REO? 11:54:19 11:54:23 11:54:27
A. Pre-sale. It's split up between the 11:54:30

A. It would be -- customer service would open up a complaint case, and then it gets assigned to us. 02:26:46 02:26:49 02:26:55

Q. What is "curb appeal" as that term is used in your industry? 02:27:01 02:27:04

A. Property preservation doesn't use the term "curb appeal." 02:27:09 02:27:11

Q. Are you familiar with the term? 02:27:13

A. I have heard of it before, yeah. 02:27:15

Q. What does it mean? 02:27:19

MR. LEVENBERG: Objection. 02:27:22

THE WITNESS: I don't know the relevancy to that, but, I mean, it's the aesthetic pleasing to the eye of what a house looks like from -- from outside. 02:27:24 02:27:25 02:27:28 02:27:31

BY MS. ZACHARIASIEWICZ: 02:27:35

Q. Okay. So you're aware that the allegation in this case, that plaintiffs found patterns of differential maintenance in mostly post-FHA and REO properties maintained by Bank of America. Are you aware of that? 02:27:41 02:27:45 02:27:48 02:27:56 02:27:59

MR. LEVENBERG: Objection to the form. 02:28:01

him? 02:34:24
A. No, I have not. 02:34:24
Q. Scott Bertram? 02:34:25
A. No. 02:34:28
Q. Mary Wegner? 02:34:28
A. Not familiar. 02:34:31
Q. Kimberly St. Jean? 02:34:33
A. Not familiar with her. 02:34:36
Q. Sarah Goldfrank? 02:34:37
A. Not familiar with her either. 02:34:40
Q. Okay. And it looks like they're all in different sort of divisions; is that right? 02:34:42 02:34:45
MR. LEVENBERG: Objection; lack of foundation. 02:34:49 02:34:50
THE WITNESS: I think besides Mary and Kimberly, yeah, most likely those are different divisions. 02:34:53 02:34:55 02:34:58
BY MS. ZACHARIASIEWICZ: 02:34:59
Q. Okay. What, if anything, did Bank of America do in response to what plain- -- the National Fair Housing Alliance informed them they were finding? 02:35:06 02:35:08 02:35:11 02:35:13

MR. LEVENBERG: Objection. 02:35:15
BY MS. ZACHARIASIEWICZ: 02:35:15
Q. And please don't tell me about any communications with counsel. 02:35:16 02:35:17
MR. LEVENBERG: Objection; outside the scope. And as just indicated, we'll also object to the extent it inquires to any communications involving counsel. 02:35:19 02:35:21 02:35:24 02:35:26
THE WITNESS: Yeah. I wasn't involved in any of those communications, so... 02:35:30 02:35:31
BY MS. ZACHARIASIEWICZ: 02:35:33
Q. And you're a Bank of America designee. Can you speak to anything Bank of America did as a result? 02:35:34 02:35:38 02:35:39
MR. LEVENBERG: Objection to the form and to the characterizations on the topics on which he's been designated. 02:35:40 02:35:41 02:35:45
THE WITNESS: Besides the extensive document compilation and loan-level research that we've provided, I'm not aware of anything else that's been done differently, besides those meetings that were in these emails and 02:35:47 02:35:51 02:35:54 02:35:57 02:35:59

then what -- what we've done to prepare. 02:36:01
BY MS. ZACHARIASIEWICZ: 02:36:04
Q. And when you say "loan-level" documentation, do you mean the documents produced in this lawsuit? 02:36:04 02:36:08 02:36:09
A. Correct. 02:36:11
MR. LEVENBERG: Same objections. 02:36:12
BY MS. ZACHARIASIEWICZ: 02:36:13
Q. Okay. So outside of gathering and producing documents in this lawsuit, you're not aware of the bank doing anything in response? 02:36:14 02:36:16 02:36:19 02:36:21
MR. LEVENBERG: Objection; outside the scope, and to the extent it inquires into privileged communications. 02:36:21 02:36:23 02:36:26
THE WITNESS: Yes. I'm not aware of anything else. 02:36:28 02:36:29
BY MS. ZACHARIASIEWICZ: 02:36:30
Q. Did Bank of America ever analyze its own data regarding maintenance or marketing to see if they found any patterns matching what plaintiffs alleged they found? 02:36:30 02:36:32 02:36:35 02:36:43

MR. LEVENBERG: Objection; outside the scope, and to the inquiry into privileged work product. 02:37:28 02:37:29 02:37:32

THE WITNESS: No, nothing else was done besides what was previously mentioned. 02:37:34 02:37:36

BY MS. ZACHARIASIEWICZ: 02:37:41

Q. And has Bank of America implemented any new trainings or developed any new policies around maintenance and marketing of post-sale FHA and REO properties as a result of Plaintiffs' allegations in this case? 02:37:42 02:37:45 02:37:49 02:37:51 02:37:54

MR. LEVENBERG: Objection; outside the scope, and to the inquiries of privileged communications. 02:37:57 02:37:58 02:38:00

THE WITNESS: You said the marketing and what for REO properties? 02:38:01 02:38:03

BY MS. ZACHARIASIEWICZ: 02:38:06

Q. Maintenance and marketing. 02:38:07

A. Oh, for marketing that's going to be a question for the REO designee. 02:38:08 02:38:11

Q. Right. 02:38:12

A. For maintenance, no. As a result of 02:38:12

this litigation, changes weren't made. 02:38:14

Q. Okay. I think -- I'd like to take five minutes and just review. So if we could -- let's just come back at 3:45, if that's okay. 02:38:18 02:38:24 02:38:28 02:38:30

(Whereupon, a recess was had.) 02:38:31 02:44:55

BY MS. ZACHARIASIEWICZ: 02:44:55

Q. I just have one final question, Mr. Silvey. Am I right that the third-party quality review that Altisource, and previously ServiceLink did, that what they reviewed for is not dependent on investor guidelines; is that right? 02:44:56 02:45:00 02:45:04 02:45:09 02:45:11 02:45:14

A. Not dependent on investor guidelines? 02:45:18

Q. For instance, on a pre-sale FH- -- on pre-sale FHA properties, they don't review them differently based on whether Fannie is the investor, versus Freddie versus HUD; is that right? 02:45:21 02:45:22 02:45:24 02:45:27 02:45:30

A. That's correct. 02:45:31

Q. So -- 02:45:32

the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was waived for the respective parties.

I further certify that the taking of this deposition was pursuant to notice, and that virtually present at the deposition were the attorneys hereinbefore mentioned.

I further certify that I am not counsel for, nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my verified digital signature on November 28, 2021.



_______________________________

Angela C. Loisi, CSR, RPR, FCRR

# Exhibit 14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL FAIR HOUSING )
ALLIANCE, et al., )
Plaintiffs, )
)
v. ) Civil Action No.
) CCB-18-01919
BANK OF AMERICA, N.A., et )
al., )
Defendants. )

- - -

THE VIDEO DEPOSITION OF MICHAEL GREENBAUM

JULY 26TH, 2021

- - -

Video deposition of MICHAEL GREENBAUM, as if upon Cross-Examination before Christine A. Schirripa, a Registered Professional Reporter, Certified Reporting Instructor, and Notary Public in and for the State of Ohio, on Monday, the 26th day of July, 2021, at Gallagher Sharp, LLP, 1501 Euclid Avenue, Cleveland, Ohio, commencing at 9:00 a.m.

means by reports, but go ahead.

A. Well, yeah, I do want to just be really -- do you mean am I aware that NAFA specifically had followed lawsuits or made allegations about specific servicers or --

Q. (BY MS. ZACHARIASIEWICZ) So these reports were general public reports released in 2011, 2012, 2014, and 2015.

A. Yes.

Q. About discrimination in the maintenance and marketing of REOs.

A. Okay.

Q. They were not specific to a lender or servicer.

A. Okay.

Q. But they were public records. So I was just asking whether Safeguard was aware of any of those public reports?

A. Certainly -- I'm aware of allegations that NAFA had made.

Q. Okay.

A. And I was aware that there was an inspection

and survey process that was followed.

Q. Okay.

A. And I was aware that Safeguard had managed some of those assets as well. So definitely aware of that.

Q. That's helpful.

A. Okay.

Q. Do you remember approximately what year you became aware of that?

A. I do not.

Q. Would you say it was more than five years ago?

A. Yes.

MR. HOLMES: Object to form.

Q. (BY MS. ZACHARIASIEWICZ) Okay. To your knowledge, did Safeguard change any of its policies or procedures as a result of what you learned, that awareness?

A. No.

Q. To your knowledge, did Bank of America change any of its policies or procedures as a result?

A. Not that I'm aware of.

Q. And did Bank of America direct Safeguard to change anything as a result?

A. Not that I'm aware of.

Q. Okay. Are you aware that there was a HUD complaint filed by NAFA against Safeguard in 2013?

A. Yes.

Q. And that was not about Bank of America properties; correct?

A. I do not know.

Q. Okay. Did Safeguard change any of its policies or procedures as result of that HUD compliant?

A. No.

Q. All right. I'm going to move on to some other exhibits. Do you need a break?

A. I'm good.

Q. Okay. Just let me know when you do. This isn't like War of Attrition.

So I would like to mark as Exhibit -- I think we're at 4. Yes. Mark as Exhibit 4, it's SG00295085. This Charged Off Loans CV Pricing is the name of the document, but will probably make more sense.

MS. ZACHARIASIEWICZ: I'm just putting

how that's determined?
A. I don't, to be honest with you. I think that was a term that got introduced just within the industry itself, and it honestly predates me.
Q. Uh-huh.
A. It showed up in the scripts when I arrived at Safeguard. If you go back into old investor guidelines, you also see reference to high vandalism areas, specifically as it relates to boarding, those types of things. So that is what it is and it was just that was the terminology that was used.
Q. Do you know who makes the decision that a property is in a high vandalism area?
A. No. I don't know specifically what you mean when you ask that.
Q. Does the vendor decide this is a high vandalism area?
A. A vendor can make a comment that says, you know, I recommend that we continue to leave this property because it could potentially get revandalized.
Q. Uh-huh.
A. They could definitely make that comment. So

I don't know. When they do that in the end, it's going to be the investor that decides. So if you want to talk FHA -- if you ever want to convey a property that has boards on the windows, you have to submit what's called a surcharge request, go back to them formally and say, I'm going to convey this property, it's got boards on it. Well, why are you going to do that? Well, the recommendation that came from our contractor was that it's a high vandalism area. Do you agree in principal? Either say yes or no. If you say no, then we'll return, we'll deboard the property and we'll reglaze the windows. It's 100 percent up to you, the United States Government, to let us know whether or not you want to leave that property boarded.

Q. And so then for a private investor property, it's Bank of America's decision?

A. Yes. That would be their decision.

Q. And then for REOs, it's also their decision; is that right?

A. Or the asset manager or whoever that delegated authority would go to.

Q. Okay. And if I'm understanding you

correctly, you're not aware of what data anybody uses to determine it's a high vandalism area?

A. I'm not.

Q. When somebody goes to do a PCR for an -- and I understand now it's not a PCR, it's just in Vendor Web, but for the initial secure, is that done through a work order? So there's a work order for an initial secure?

A. That's correct. We -- so when we go out to -- if the property is vacant, if the property qualifies to be secured, then a work order would get generated. That work order then would go to a contractor. And what shows up on that work order is the instructions they are to follow. They're not to go outside of that document. That is what they are to follow in total. So then they would visit the property, they would have that work order in hand, they would go through, identify the conditions we had talked about. If there was a set allowable, then they could potentially address.

Q. Okay.

A. Okay. So then otherwise then that's going to guide their behavior while they're at the property. Then they're going to come back, provide that documentation,

and it's dated March 13, 2013. So right around the same time as the other, Exhibit 27, which is March 15, 2013. So this is about the grass cut quality control processees, and it notes that grass cut vendors have to complete the grass cut checklist for 20 percent of their work orders. Is that checklist submitted to Safeguard?

A. I don't believe it was submitted to us.

Q. And so what was done with it?

A. That would be the company themselves just documenting the fact that they visited at least 20 percent of their assets and went through the QC process.

Q. Okay. And so is someone at the property who didn't do the grass cut themselves supposed to then visit it?

A. That is what the expectation is.

Q. And how does Safeguard ensure that happens?

A. When our field quality management would conduct the audit process or review process with a vendor, they would ask them to bring those documents forward.

Q. Okay. And can you tell from the documents if someone who didn't complete the work did it?

A. They should be documenting who the inspector was and who the crew that completed the work was on the form.

Q. Is there any way to verify that's correct?

A. No.

Q. Okay. And then it says under Quality Control Inspections, "As part of ongoing inspections, Safeguard will review a statistically significant sample of the work completed in addition to quality checks done by the field control team."

What's that statistically significant sample?

A. Yeah. We would just go back with our vendors and we would look at their body of work and then we would open up a percentage of inspection work orders where we're evaluating the exterior of the property and then we would just send that third party inspector out. They would come back and do an evaluation.

Q. Okay. And then that's submitted to SQA?

A. That's right, yep.

Q. Okay. And is that rolled up into the scorecards created for vendors?

A. That's correct.

A. We complete an audit every time debris is removed as part of the order audit process, definitively. From an overall holistic process standpoint, it's not something that -- we would do it if we felt like there was something incomplete about the process because we saw inconsistent results on individual work orders.

Q. (BY MS. ZACHARIASIEWICZ) Do you remember if that's what happened that caused you to do this audit?

A. I don't remember.

Q. Okay. Can you think of any other similar kinds of audits Safeguard has done?

A. I think our SQA analysis and script questions that we developed, I think is just in line with making sure that our practices are being followed. Can I think of any other independent audits that we completed? I will ask SQA to do audits on like individual client complaints.

Q. Uh-huh.

A. If we have an example of, you know, a fence that gets knocked down or we have -- a better example would be we just don't see the actual fence perimeter being secured when there's a pool present. Then we'll go

back and we'll do analysis, like, let's go back and identify all properties with a pool, equals yes, and so we'll isolate that. And then we have to go find whether or not there's a fence that surrounds, and we'll do an audit to make sure that we are comprehensively, you know, addressing that. And then if what we found is, is that we see inconsistency around either that being done or that being bid, then what we would do is come back and just remind the vendor base that, you know, just in general, this is what we want you to think when you, you know, see a perimeter that's surrounding a pool. That's probably a good example.

Q. Did you, to your knowledge, do any such audits when you learned of the plaintiff's allegations in this case?

A. I don't believe so, no.

Q. Did you do any such audits as a result of the 2013 HUD complaint filed?

A. What I remember us doing at Safeguard Properties was -- and I don't -- honestly, I don't remember which allegation it was.

Q. That's okay.

A. But, you know, again, like we started the day that I was aware of an allegation made by NAFA. And then at some point in time, we did get a subset of properties that had been inspected. So what we did as an operational group is we tried to identify the addresses of those properties and then carefully went back into the loan history, reviewed when was the inspection, what did the condition of the property look like in our system, what work orders did we have open. And we were just trying to see if there was any form of process break, anything of, you know, non-responded to bid, anything that we could figure out that would be systemic in nature. So we definitively took that allegation ultra seriously and then we carefully -- I went through to the extent we could off the sampling basis provided and did a pretty comprehensive review.

Q. And to your knowledge, was that in conjunction with the HUD complaint? Is that how you knew addresses?

A. I don't know, to be honest with you.

Q. Okay.

A. I don't know which complaint it was aligned

with.

Q. And just to be clear, you said property that had been inspected. Did you mean the plaintiff's inspections?

A. Correct.

Q. Okay. We've used the word inspect a lot, so I didn't want to confuse it. And as a result of that review you did, did you discover anything?

A. I did not.

Q. Okay. Do you remember -- I mean, beyond sending this vendor memo, did anything change as a result of this audit on debris that we're looking at in Exhibit 40?

A. I don't remember, no.

Q. When you do something like this and then send out a vendor memo, do you then do another audit later to see if anything has changed?

A. Yeah. Absolutely. That's typically what we would do. We would find an issue. We'd cleanly communicate it. This would be one step in the communication. The second part would be the vendor account managers in that monthly cadences we talked with

MR. HOLMES: Object to form. That's really broad.

A. This kind of audit, meaning very specifically a reopen audit or the debris audit that we had talked about?

Q. (BY MS. ZACHARIASIEWICZ) Yes. Yes.

A. That -- I mean, we're always trying to improve the process. So if we go out, we will definitely challenge ourselves if we see inconsistency in the field, taking a look at the actual work order text, how we communicate, you know, with our individual contractors, what should we decide is going to be the area of focus for the field quality reps when they visit the vendors, just to reassure fundamentals. So when we see problems, yeah, I mean, we attempt to communicate, address broadly. And every component that we can change to clarify we will definitely take.

Q. Okay. Has Safeguard ever done an audit that assessed P&P maintenance by zip code?

A. Not that I recall.

Q. By census block group?

A. Not that I recall.

Q. Or in conjunction with census data?

A. No.

Q. And similar questions for REO. Has Safeguard ever done an audit that assessed REO maintenance by zip code?

A. No.

Q. By census block group?

A. No.

Q. Or in conjunction with census data?

A. No.

Q. Has Safeguard ever mapped the results of a quality control process to see where deficiencies might be located?

A. We --

MR. HOLMES: Object to the form. Go ahead.

A. Yeah. I mean, when we do analysis, sometimes it is easier for our field reps to understand when we export that analysis back into a map software package, so we do have the ability to like go back and identify some of the orders that get opened up off the SQA process, and sometimes what we'll do is we'll go ahead and import that

and make sure that it meets the standard. We do have a separate invoicing group that will create the invoice event to be submitted to Bank of America's system.

Q. Okay. To your knowledge, has Bank of America ever done an audit that assessed P&P maintenance by zip code?

A. Not that I'm aware of.

Q. By census block group?

A. Not that I'm aware of.

Q. Or in conjunction with any census data?

A. No, not that I'm aware of.

Q. Okay. And has Bank of America, to your knowledge, ever done an audit that assessed REO maintenance by zip code?

A. No, not that I'm aware of.

Q. And the same question by census block group?

A. No.

Q. And the same question by in conjunction with census data?

A. No.

Q. Okay. To your knowledge, has Bank of America ever mapped its quality control results to see where

there are the most deficiencies?

A. No, I'm not aware of that.

Q. And to your knowledge, has Bank of America ever done anything to compare rates of deficiencies between or among different areas?

A. I'm not aware of it.

Q. Okay. I have one last question for you. I need one more sticker.

This will be Exhibit 51, and it's SG00295043.

\- - -

(Whereupon, Exhibit 51 was marked for identification.)

\- - -

Q. (BY MS. ZACHARIASIEWICZ) And I just want to know what this is.

A. I don't know definitively, but my best guess at what this is, is a translation of how to read the servicing system, so just defining the specific code, what does a number one mean. When I look into the servicing system, that means first lien, as an example. That is what I would guess. This is Bank of America trying to let us know how to read their system of record.

Q. And when you say their system of record, in

THE STATE OF OHIO, )
) SS: NOTARY CERTIFICATE
COUNTY OF MEDINA. )

I, Christine A. Schirripa, a Registered Professional Reporter, Certified Reporting Instructor, and Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within-named witness MICHAEL GREENBAUM, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by him was by me reduced to Stenotype in the presence of said witness, afterwards prepared and produced by means of Computer-Aided Transcription and that the foregoing is a true and correct transcript of the testimony so given by him as aforesaid.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

I do further certify that I am not a relative, employee of or attorney for any party or counsel, or otherwise financially interested in this action.

I do further certify that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Brunswick, Ohio, on this 6th day of August, 2021.



________________________________________

Christine A. Schirripa, RPR, CRI, Notary Public

My Commission Expires 11-26-21

# Exhibit 35

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | * | |
| | * | |
| Plaintiffs, | | |
| v. | * | Civil Action No. CCB-18-1919 |
| BANK OF AMERICA, N.A., *et al.*, | * | |
| Defendants. | * | |

* * * * * * * * * * * * *

**DECLARATION OF CHEVELLE BUSHNELL**

I, Chevelle Bushnell, am over the age of 18 years and competent to testify as to the matters set forth in this Declaration. All statements herein are based on my personal knowledge.

1. I am a Maryland resident and an African-American woman. I am the homeowner of 6086 S. Hil Mar Circle, District Heights, Maryland, 20747, which is located in a majority-African-American neighborhood. I have owned this home since 1990 and have lived there the entire time. My son, Jalen Bushnell, is 28 years old and has also lived in this house since his birth until February 21, 2021, except for a period in 2010-2013. Jalen has since moved into his own home.

2. My home is located next to 6088 S. Hil Mar Circle, District Heights, Maryland, 20747. During the time that Bank of America had responsibility for 6088 S. Hil Mar, the Bank failed to adequately care for, secure, and maintain the property, which caused damage to me, my home, and my neighborhood.

3. In approximately 2010, the former owners of 6088 S. Hil Mar moved out of their home. I believe this occurred in response to Bank of America, the mortgage holder,

threatening foreclosure on the home. The property remained vacant through at least 2017.

4. Prior to 2010, 6088 S. Hill Mar did not create any problems for me or my home.

5. The first winter 6088 S. Hill Mar was vacant, the pipes burst. I know this because I heard water running in the walls.

6. In January 2013, my home was broken into. The perpetrators kicked in my front door and stole personal property, causing damages and losses of over $1,500. The police officers who responded to my 911 call said the break-in likely occurred due to 6088 S. Hil Mar sitting vacant next door. Break-ins were not common in my neighborhood.

7. In August 2013, 6088 S. Hil Mar remained vacant and unsecured. My home was again broken into, but this time, the perpetrators broke through my bedroom wall from a room in the unsecured and vacant 6088 S. Hil Mar. They ransacked my bedroom and stole more personal property. The damages and losses from this second break-in exceeded $3,000.

8. In March 2014, 6088 S. Hil Mar still remained vacant and unsecured. Thieves again attempted to break through my bedroom wall from 6088 S. Hil Mar. My son was home at the time and witnessed approximately four people enter 6088 S. Hil Mar through an unsecured door, after which he heard banging on the wall of our bedroom and called the police. The perpetrators left prior to the police's arrival.

9. It is my understanding that Bank of America did not file a foreclosure action against the owner of 6088 S. Hil Mar until August 2014 – four years after it had first been abandoned by the previous owners. The Bank closed on the property in January or February 2015.

10. Even after Bank of America officially owned 6088 S. Hil Mar, the property was frequently left unsecured, and doors and windows were left open. We continued to hear

people inside 6088 S. Hill Mar periodically, as well. This was very anxiety-provoking considering the break-ins we had experienced.

11. In November 2015, an acquaintance inquired with Bank of America about the poor maintenance of 6088 S. Hil Mar and expressed interest in purchasing the property. Bank of America's REO Vendor Management responded that 6088 S. Hil Mar "is not a property being marketed by Bank of America."

12. In early 2015, I contacted Bank of America about 6088 S. Hil Mar being unsecured, with windows and doors left open. Nevertheless, the house remained frequently unsecured through 2017. Whenever the front door was broken, it would usually take several months until it was fixed.

13. In addition to the property remaining unsecured, Bank of America also failed to maintain the exterior of the property. Weeds grew up the walls, the yard was not maintained, and there were holes in the structure.

14. The holes in the side of the structure and the roof of 6088 S. Hil Mar caused problems with squirrels entering my attic. In February 2017, I was forced to hire a trapping service to trap the squirrels and prevent them from entering my attic again. The trapping service confirmed that the squirrels were entering from 6088 S. Hil Mar and that I would continue to have problems with squirrels unless Bank of America repaired the holes in 6088 S. Hil Mar.

15. As a result, on February 23, 2017, I contacted Safeguard to request that they repair the holes. I did not receive a response, so I contacted them again on March 6, 2017. Safeguard responded that my "email was sent to the client and bids are being obtained." I followed up on Monday, March 13, and was told the holes would be fixed by the end of the

week. A vendor came, but the two holes that were causing the problems were left unrepaired. The vendor repaired the wrong holes. I sent another email on the morning of March 27 and attached photographs of the holes. I received a response the afternoon of March 28 that said a work order was opened for a vendor to return to repair the holes. The holes were not repaired until April—more than a month after I first notified Safeguard of this issue. Even then, it was clear that the vendor had only plugged the holes that were causing the issues in my attic. I continued to hear squirrels in the neighboring property and know from the new owners that the holes were still there when they moved in.

16. In June 2017, Bank of America conveyed title to 6088 S. Hil Mar to the U.S. Department of Housing and Urban Development.

17. As a result of Bank of America and Safeguard's failure to maintain 6088 S. Hil Mar, we were forced to spend money to remediate the problems it caused our home and to replace stolen property. Living next door to an unsecured vacant property also caused us significant stress, anxiety, and fear.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 8, 2022

C. Bushnell
______________________________
Chevelle Bushnell

# Exhibit 52

DocuSign Envelope ID: D2E49245-531E-466C-B6F4-539BFB75E53B



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | * | |
| | * | |
| Plaintiffs, | | |
| v. | * | Civil Action No. CCB-18-01919 |
| BANK OF AMERICA, N.A., *et al.*, | * | |
| Defendants. | * | |

* * * * * * * * * * * * *

**DECLARATION OF USTIN CHA ELL**

I, Justin Chappell, am over the age of 18 years and competent to testify as to the matters set forth in this Declaration. All statements herein are based on my personal knowledge.

1. I am a Black man and the owner of Bama's Landscaping LLC, located south of Dallas in Texas.

2. Bama's Landscaping has landscaping contracts with several major local businesses, including a hospital, restaurants, and a convenience store.

3. Bama's Landscaping contracted to do work for Safeguard Properties Management, LLC from approximately 2013 to 2020.

4. Bama's Landscaping did lawn maintenance for properties maintained by Safeguard throughout Texas.

5. The properties Bama's Landscaping worked on included REO properties. Bank of America was one of the banks whose properties Bama's Landscaping maintained for Safeguard.

6. Safeguard provided some online training but did not include any training on non-discrimination or fair-housing or fair-lending laws.

7. I would receive assignments from Safeguard via e-mail or through my vendor account manager. Safeguard pre-authori ed some work to be done on a schedule, like biweekly grass cuts. All work required a work order.

8. Safeguard did quality control on our work. Usually this was done more frequently at the beginning of the year than the end of the year.

9. Safeguard divided Texas up into different geographic ones with different prices for work done in different ones. I negotiated with my Safeguard vendor account manager to determine how much Safeguard would pay for a specific type of job in a particular one.

10. Bama's Landscaping had to submit photos to Safeguard as proof that it had completed the requested lawn maintenance to get paid. The photos were sent to Safeguard via Safeguard's online app.

11. The amount Safeguard paid for lawn maintenance was unreasonable. Only approximately 10 of the work I did was paid at a fair rate, and the rest of it was underpaid. For example, Safeguard would want Bama's Landscaping to cut one acre of grass for a price that would not cover the costs of the job.

12. By contrast, other national property preservation companies that I have worked for pay more for the same type of job, and sometimes even twice as much.

13. Because Safeguard did not pay enough, it motivated contractors to cut corners.

14. When I first started working for Safeguard, another Safeguard vendor I knew took me out in the field to show me how to complete work for Safeguard. He showed me how to mow a sufficient perimeter around a home and to take photos demonstrating a grass cut that would be enough to get paid, while not cutting the full lawn. He explained that this was one way to deal with the problem of Safeguard not paying enough for vendors to do a complete job. He also made

clear to me that in certain neighborhoods Safeguard would be watching my work more, but in other neighborhoods I could get away with cutting corners.

15. As I began to do lawn maintenance on Safeguard properties, I noticed that lawns in African-American and Latino neighborhoods were often cut as the other vendor had shown me, with a perimeter close to the house properly maintained but the grass along the property line much longer.

16. I observed that contractors cut corners more often in predominantly African-American or Latino neighborhoods than in predominantly white neighborhoods. This is most likely because, in my experience, white neighbors were more likely to complain to Safeguard.

17. Safeguard would send a contractor back to redo work in whiter neighborhoods if the work was not done satisfactorily. If this happened, Safeguard would send an email and put the work order back into a contractor's queue in the online app. It would also ask for more pictures of the completed work. Over my seven years of working with Safeguard, I noticed that this only occurred in predominantly white neighborhoods. I cannot recall being asked to redo work in predominantly African-American or Latino neighborhoods.

18. Jobs in predominantly African-American or Latino areas were not held to the same standard by Safeguard as in whiter areas. In predominantly African-American or Latino areas, a contractor could do jobs more quickly and less thoroughly. In whiter areas, contractors had to do all the work that was required for the same amount of money.

19. When I first started working for Safeguard, a vendor account manager told me to never do more work than I was paid for—meaning if Safeguard is only paying me $35, I should only do $35 worth of work. Like the vendor who first showed me how to do work for Safeguard, the vendor account manager also explained to me how to cut a perimeter of the grass around a

house and take pictures closer in to get paid for a full job.

20. Based on this and other conversations I have had with other vendors and Safeguard employees, I believe that Safeguard was aware that contractors tended to cut corners in African-American and Latino neighborhoods in ways that they did not in white neighborhoods.

21. Safeguard has a bad reputation among vendors, with many vendors reporting negative experiences and complaints to each other and online.

22. Safeguard is notorious for not paying enough for the work it orders and for refusing to pay contractors for work that was done.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 4/6/2022

DocuSigned by:

2301CC0389E0410...

Justin Chappell

# Exhibit 53

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

---

NATIONAL FAIR HOUSING ALLIANCE, et al.,

Plaintiffs,

-v-

BANK OF AMERICA, N.A., et al.,

Defendants.

Civil Action No. 1:18-cv-01919-CCB

---

DEPOSITION OF BRANDON SILVEY

Conducted Virtually

Wednesday, August 11, 2021

9:35 a.m. Eastern Time

Job No.: 390110

Pages: 1 - 95

Reported by: Paula Flint

A. Currently one of my peers, Mario Frias handles REO.

Q. Do you have any experience with REO?

A. Just the -- where my role interacts with REO is I oversee the vendor, Safeguard, and their performance. So if they were not performing according to the statement of work the service level agreement sets forth in it --

THE REPORTER: I'm sorry. Can you repeat the very last part of that? I lost part of the connection.

A. If there was a performance issue with the vendor, Safeguard, as it relates to completing work on REO properties, then REO would engage me to then drive performance improvement with the vendor.

Q. And I just want to clarify for the record, you mentioned FHA earlier. Is that Federal Housing Administration?

A. Yes.

Q. So do you have any role as it relates to asset managers?

A. I do not.
Q. Do you have any knowledge of what they do?
A. Very limited.
Q. And in terms of the contract with Safeguard, were you involved in negotiating that contract?
A. I was not.
Q. What's your understanding of why Bank of America entered into the exclusive contract with Safeguard?
A. I wasn't involved in those discussions. I came on two months after the contract had been executed. But I know that they are the industry leader in that area. So they had a lot of expertise. And at the time I know we had multiple vendors who did -- I think three main vendors who did the work. Centralizing it, having one was much more manageable.
Q. Do you know who the other two were?
A. I do not.
Q. Just because I've seen this acronym a

specialists. And then there's two team leaders. And then there's operational project --

Q. I didn't hear that last bit.

A. Operations project consultants who perform support roles.

Q. And even though you're not involved with REO, you said you are involved with overseeing Safeguard's work, correct?

A. That is correct.

Q. Does that mean that you're involved with reviewing their maintenance of REOs?

A. No. I would be involved in reviewing their scorecard column.

Q. And what does that mean?

A. So there is a scorecard that's set forth in the statement of work that there's different categories we measure Safeguard on and their adherence to the service level agreements in that statement of work. And so we'll measure the timeliness of the work being completed. And if they were to underperform in those areas, then that's where my involvement comes in.

Q. Can you give me an example of a high-risk process?
A. In my space, inspecting and securing is a high-risk process.
Q. Why is that?
A. It's a determination that's made by the independent compliance team, your risk and your compliance partners.
Q. And you mentioned that the compliance independent testing team I think you said does monthly tests. Is that right?
A. The frequency depends on -- can vary. Some are monthly, some are quarterly, some are semiannually.
Q. What are the ones that are monthly?
A. Currently I think -- I can't -- I know there's at least three that are monthly.
Q. And what are they testing on a monthly basis?
A. Initial inspection was ordered within investor guidelines and completed within the timeframe allotted in the investor guidelines.

And then the subsequent inspection was ordered and completed within investor guidelines. And then the property was secured within investor guidelines.

Q. Are most of the -- these compliance independent testing, tests about timing?

A. The ones that I'm involved in, yes, they're related to timing, completing it within the days allotted set forth in the investor guideline.

Q. Are any of them concerned with the quality of the work performed?

A. I believe there are some, yeah. Like the one that's on the screen. (Indecipherable.)

Q. And by that do you mean the CPP INS TS score?

A. Correct.

Q. But that says it's monthly, correct?

A. Yes, this one says it's monthly.

Q. Okay.

A. Or in 2015.

Q. Is it no longer monthly?

Q. Is anything done to ensure that that fail is corrected after the scorecard is completed?

MR. LEVENBERG: Objection to the form.

A. We would follow up and monitor to make sure it got remediated.

Q. And whose responsibility would that be?

A. My team, my operations team.

Q. And how is it communicated to them that they need to do that?

A. Via email.

Q. Whose responsibility is it to notify them of outstanding fails?

A. It's my team. Dawn.

Q. Does she have a process at the end of every month whereby she looks at the remaining fails and notifies your team?

A. She does not.

Q. So how do you ensure that it gets done?

A. That it gets remediated?

Q. Yes.
A. My operations team oversees that.
Q. Right. And sorry, I wasn't clear.
A. I trust that my team is going to handle the work that needs to be done.
Q. So you trust that Dawn will notify them?
MR. LEVENBERG: Objection to the form and to the characterization of testimony.
A. What was your question again?
Q. You trust that Dawn will notify them. Is that right?
MR. LEVENBERG: Same objection.
A. Yes, I trust that Dawn will do her job.
Q. Okay. And am I understanding you correctly that it would take a loan-level review to see if the other items identified in these columns that don't always show up in column X get addressed?
A. I'm sorry. Can you repeat that again?
Q. Sure. We talked about the example

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Paula Flint, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 24th day of August 2021.

My commission expires June 30, 2023.

Paula M. Flint

No. 390110

Re: Deposition of **Brandon Silvey**
Date: 8/11/2021
Case: National Fair Housing Alliance, et al. -v- Bank of America, N.A., et al.
Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 23 | 7 | Change "loan" to "lieu" [Transcription Error] |
| 23 | 8 | Change "loan" to "lieu" [Transcription Error] |
| 24 | 13 | Change "column" to "performance" [Clarification] |
| 37 | 12 | Change "assist them" to "the system" [Transcription Error] |
| 40 | 5 | Change "night" to "Knight" [Transcription Error] |
| 40 | 21 | Change "MSB" to "MSP" [Transcription Error] |
| 49 | 19-20 | Change "more rigid" to "Mortgage" [Transcription Error] |
| 54 | 12 | Change "filled" to "billed" [Transcription Error] |
| 62 | 11 | Change "business" to "vendor" [Clarification] |
| 63 | 10-11 | Change "responds to the admin and says" to "responses to the findings" [TE] |
| 90 | 3 | Change "met" to "mapped" [Transcription Error] |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

9/10/21
(Date)

[signature]
(Signature)

# Exhibit 55

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

-----------------------------------X

NATIONAL FAIR HOUSING ALLIANCE, :
et al., :
Plaintiffs :
V : Civil Action No.
BANK OF AMERICA, N.A., et al., : 1:18-cv-01919-CCB
Defendants, :

-----------------------------------X

Deposition of SERGIO MONTELONGO, JR.

Conducted virtually

Thursday, November 4, 2021

9:02 a.m.

Job No.: 410938

Pages 1 - 143

Reported by: Dianna C. Kilgalen

yearly?
A. Correct.
Q. Okay. And then did you, after those few weeks that you shadowed someone, did you receive any ongoing training outside of the compliance/fair housing training you just described?
A. No.
Q. Okay. So I would like to talk just more generally about what an asset manager does. And again, this will be in the context of when you managed Bank of America properties.
So can you tell me generally in your own words what an asset -- what it means to manage an REO as an asset manager? What are your responsibilities?
A. Working with realtors, title companies, closing companies, reviewing appraisals, broker price opinions, establishing list prices, executing contracts, executing extensions, releases, negotiating offers.
Q. Okay. That's a great list because those

are a lot of things I'm going to ask you about later in more detail.

When you managed properties, was it within any specific geographic area?

A. No. It was nationwide.

Q. How were properties assigned to you?

MR. LEVENBERG: Objection to form.

MS. ZACHARIASIEWICZ: You can answer.

A. Sure. We would load balance so that the asset managers would all have relatively like portfolios in terms of size.

BY MS. ZACHARIASIEWICZ:

Q. And what do you mean by like? About how many assets is that?

A. Going back to 2012, I don't know what my portfolio size was.

Q. Can you remember in 2018?

A. No.

Q. Did your portfolio size fluctuate over the years?

A. Yes.

Q. And in what way?

A. So I would just say the portfolios were larger in the earlier 2010s, '12s, as we were moving away from 2008, versus what I have now with my current -- you know, my current client. It's different because there's moratoriums in place going back to March 2020. So it's a completely different portfolio in terms of size.

Q. Okay. And you said they would load balance. Was it Skyhill that was trying to load balance?

A. Correct.

Q. Okay. So would someone at Skyhill -- when a new asset came in, was it someone at Skyhill who would decide what asset manager to assign it to?

A. Correct.

Q. How many other asset managers at Skyhill were working for Bank of America at the time?

A. I don't remember.

Q. Okay. And then you mentioned the Equator system earlier. What is Equator?

A. The system of record for Bank of

America. It's where we communicate with the agents, the asset managers. We can communicate with the bank direct. And any of the other roles that were assigned to the title companies were also in there.

But ultimately, it is the system of record. It's where we wanted all documentation, you know, all communications -- we wanted them through Equator so that way, again, it was a record.

Q. Did you also have e-mail?

A. Yes, Outlook.

Q. Okay. Would your Outlook e-mails be in Equator?

MR. LEVENBERG: Objection to the form.

MS. ZACHARIASIEWICZ: You can answer that one.

A. Yeah. No.

BY MS. ZACHARIASIEWICZ:

Q. Okay. So if you communicated about a property via Outlook, that would not be saved in Equator. Is that right?

Q. Okay. So am I correct then in understanding that Bank of America would tell Skyhill here's some new REOs that need asset managers and then Skyhill would assign them to various asset managers?

A. The properties were boarded into Equator.

Q. What do you mean by boarded into?

A. They would show up in Equator in Skyhill's portfolio, and that is how we knew new assignments had come in.

Q. Do you know if they were manually boarded into Equator or if that was an automatic process?

A. I don't -- I don't know.

Q. Okay. What happens when you are assigned a property? How do you find out?

A. You would have an assigned list in agent task.

Q. And does that -- I'm sorry to cut you off. Go ahead.

A. I'm saying, you would see the assigned

list in agent task show up in -- you know, as a task for you to complete.
Q. And is that in Equator?
A. Correct.
Q. Okay. This is really hard to talk about a system like Equator when we are not all looking at it on our screens together.
But is this a screen you would have open all day?
And I guess the question I'm trying to ask is: How do you find out? Are you logged into Equator all day? Do you get an e-mail in your Outlook?
A. Yes, you are logged into Equator all day.
Q. Okay. And so when -- when you get an assignment, how does Equator sort of notify you?
A. It would show up in your task queue.
Q. Okay. And so you find out you are assigned to a property. And then what happens next?
A. We assign a listing agent.

Q. How do you assign a listing agent?

A. They are in Equator. You know, it shows their information, like their real estate license, when it expires, their E and O insurance. Some of them have photos of themselves, some of them don't.

They have statistics that show how they -- how they complete their tasks, how they complete their work in Equator in terms of on time or if they are constantly late in completing their tasking.

It shows proximity to the property itself.

Q. Okay. So I'm assuming -- let's take Baltimore, for an example.

I'm assuming a city like Baltimore has a lot of real estate agents listed in Equator. Is that right?

A. I don't remember.

Q. But for any place -- well, strike that.

For a metropolitan area like Baltimore, am I correct in assuming there is more than one

Q. Okay. Do you remember on average how close they tended to be?
A. I do not.
Q. And when you are assigned a property, what information do you get about the property?
You said you sort of -- it comes up in your task queue. But are you given any information about the property at that time?
A. Just the address.
Q. Do you get access to any of the information about the property previous, like the maintenance that was done, work orders, anything like that?
A. I do not.
Q. Okay. So it sounds like, if I'm getting this right, you get assigned, you assign an agent. Then what happens next?
A. The agent will inspect the property to determine occupancy.
Q. Okay. And then what?
A. If a property is occupied, we would offer some form of relocation assistance, if they

are wanting to accept that.

If the occupants decline, then the property would go -- be referred to eviction.

On a vacant asset -- so that you know, Equator is a task-driven system. Every task creates another task.

If a property is vacant, then Safeguard would go out to the property, secure it and complete initial services, trash it out, cut the grass, sales clean. We would also obtain values at that time.

So once initial services and the values are in, we would be able to list the asset.

Q. Okay. You just mentioned Safeguard.

As an asset manager, what was your interaction with Safeguard?

MR. LEVENBERG: Objection to the form.

A. I would say not much. Safeguard had their own tasking in the system for their own work to complete.

BY MS. ZACHARIASIEWICZ:

Q. When Safeguard completed initial

services, would you see the pictures of that?
MR. LEVENBERG: Objection as to form.
A. I would see the photos in the BPO and appraisal.
BY MS. ZACHARIASIEWICZ:
Q. So you -- go ahead.
A. No. So, you know, we would see that the house had been trashed out, that the lawn had been cut and that sales clean had been completed.
Q. But am I correct that you mean you see the real estate agent's photo?
A. Correct.
Q. In the BPO?
A. Uh-huh.
Q. Did you ever see Safeguard's work orders that they -- that are created after a -- for instance, a trash-out is complete?
A. No.
Q. Okay. Did you have any role in regards to the maintenance of REO properties?
A. No.
Q. If repairs needed to be done, were you

involved with authorizing that?
A. What sort of repairs are you talking about? Cosmetic or health and safety?
Q. Well, both. Let's start with cosmetic.
A. So Bank of America has policies and procedures set out where asset managers have a certain dollar amount in which they can approve bids.
Anything over that dollar amount was escalated up to Bank of America for review with their management team. And depending on what the dollar amount was would determine how far up the approval needed to go.
Q. What was the dollar amount you had authority to approve?
A. I do not remember. I don't know.
Q. Okay. Was that dollar -- does that dollar amount cover both cosmetic and health and safety repairs?
A. Safeguard was authorized to do health and safety repairs at the time of the initial services.

Q. What if the cost of those health and safety repairs would exceed the amount that you could approve?

A. I don't know.

MR. LEVENBERG: Objection to the form.

BY MS. ZACHARIASIEWICZ:

Q. What is considered -- strike that.

Can you tell me what the difference is or describe for me -- oh --

THE WITNESS: One moment.

MS. ZACHARIASIEWICZ: You are going to make me feel guilty for making you sit up too long all day because that is going to keep happening.

BY MS. ZACHARIASIEWICZ:

Q. Can you describe for me what a cosmetic repair is versus a health and safety repair?

A. The lack of a handrail on stairs leading up to the front door would be considered safety.

Cosmetic, new carpet.

Q. Okay. What if it was determined that an asset needed a health and safety repair after the

time of initial services?
A. Safeguard would be responsible for it.
Q. And would you be the one to notify Safeguard that that needed to be done?
A. No.
Q. Who would notify them?
A. The agent direct. Safeguard has a broker direct line.
Q. Okay. And did you have any role in having to authorize the repairs that were needed for health and safety at that point? This is post initial services.
MR. LEVENBERG: Objection as to form.
A. No.
BY MS. ZACHARIASIEWICZ:
Q. And your answer was no?
A. No.
Q. Okay. So at that point, it's just between the broker and Safeguard. Is that right?
A. Correct.
Q. Do you know if Bank of America had any role at that point in authorizing the repairs or

not?
A. No, I do not know.
Q. Okay. As an asset manager, did you have any role in regards to bids to do work?
MR. LEVENBERG: Objection to the form.
A. Yes. Some -- you know, we receive unsolicited bids from Safeguard for cosmetic items. And you would be able to review them, approve or reject.
BY MS. ZACHARIASIEWICZ:
Q. When you received those, how -- how did you receive them in order to review and approve? And by that I mean in what format?
A. Through cast -- I'm sorry -- through -- gosh -- Equator. Equator messages.
Q. Would you see the photos through Equator as well?
MR. LEVENBERG: Objection to the form.
A. Yes.
BY MS. ZACHARIASIEWICZ:
Q. Okay. And then how would you decide whether or not to approve that cosmetic work?

A. You would look at market conditions. You would look at anticipated buyer type.
Q. Where would you get that information?
A. From the valuations, BPO, the appraisal.
Q. And so am I right -- oh, did I just cut you off?
A. No.
Q. Am I right that you were receiving that information from the real estate agent?
A. Real estate agent and, again, looking at the appraisal.
They also would notate market conditions.
Q. Okay. And can you describe for me what you mean by market conditions?
A. Are values -- you know, are values stable in that market, is it a cash-driven market in terms of who is purchasing and what type of financing, or if they are using cash or financing, average days on market for that market. That's it.
Q. Okay. If a market is stable, does that

10:06 a.m.)

(Thereupon, the proceedings were resumed at 10:11 a.m.)

MS. ZACHARIASIEWICZ: We are back on the record.

BY MS. ZACHARIASIEWICZ:

Q. So, Mr. Montelongo, can you pull up what we will mark as Exhibit 216, which for Justin, this is the document with the Bates number BANA NFHA LIT 0011432.

(Whereupon, Montelongo Deposition Exhibit 216 was marked for identification and attached to the transcript.)

Q. So, Mr. Montelongo, this is a big spreadsheet, and I'm going to represent to you that we hid the rows that we are not going to need today just because it was so big. They are in there. So this is the same as the document produced with some rotated and also some fancy color coding by me. But otherwise, it is unchanged. Because the most important thing to prepare for a deposition is to color code a

spreadsheet. So that is how I spent my time.
So this is a large spreadsheet generated, my understanding is, from Equator. So I am going to give you a moment to open it. And then I will direct you to where we are going to start. So just tell me when you are ready.
A. I'm ready.
Q. Okay. Great. So if you could scroll down to the orange -- am I right? Wait a minute. Yes, the orange section. And row 9390. So just tell me when you are there and ready.
A. Okay.
Q. It will be the first orange row.
A. Oh, okay.
MS. ZACHARIASIEWICZ: Sorry. I should have said that earlier.
A. No, that's okay. 3517 Juneway?
MS. ZACHARIASIEWICZ: Yes, that is right.
A. Okay.
Q. So you will see in that row that on August 21st, 2017, it looks like you were

assigned as the auction asset manager. Is that right?

A. Yes. I see that.

Q. Okay. Is there a difference between an auction asset manager and a regular asset manager?

A. I don't remember.

Q. Okay. Do you know if that means that the property -- it had already been determined that the property would be sold at auction?

A. I don't. I don't remember.

Q. Okay. And I see there under column H, which has the header e-mail, it says: Smontelongo.CTR@auction.com.

Do you see that?

A. I do.

Q. Why is it showing your name with an Auction.com e-mail address?

A. Well, at the time -- but I don't remember when we -- there was an Auction.com at -- Skyhill was working for Auction.com and Auction.com was the vendor for Bank of America.

I don't know when that happened, but that's the only reason why there would be this change from Skyhill to @Auction.com.

Q. Okay. And I just want to make sure I understand that.

When you say Skyhill was working for Auction.com, did they have a financial relationship to your understanding?

A. I don't know. I don't know the particulars of any of that.

Q. Okay. Did you earn any money from Auction.com?

A. My compensation is from Skyhill.

Q. Okay. So we talked earlier, when you are assigned a property like this, you don't see any of the property history. Is that right?

A. Correct.

Q. Would you know how long it has been since the foreclosure sale?

A. I don't remember.

Q. Okay. And if previous to your assignment on a property broker's price opinions

had been submitted on that property, would you see them when you got assigned?

A. I don't remember.

Q. We talked earlier about your commissions.

Were they based -- were they based on your Auction.com work even if they might have been paid by Skyhill?

MR. LEVENBERG: Objection to the form.

A. Yeah. I don't know.

BY MS. ZACHARIASIEWICZ:

Q. And were those commissions based on the number of properties you managed to get sold?

A. I don't -- I don't remember.

Q. Okay. So if you scroll down a little -- well, not very much. You don't have to scroll. Go down two rows to row 9391.

It also says you are assigned to the role of senior closing officer for this property. What does that mean?

A. I don't know.

Q. Was it normal for you to have multiple

roles for one property?

MR. LEVENBERG: Objection to the form.

A. I don't remember.

BY MS. ZACHARIASIEWICZ:

Q. Okay. And then the next row down, 9392, it looks like you are assigning this property to a real estate agent. Is that right?

A. That's what I see.

Q. Okay. In the to column, that's F, it's DowntownREOBPO@Gmail.com. So that appears to be an e-mail address for the agent. And the message and note says: Accept/reject listing.

Could an agent decline to take an REO when you assigned it?

MR. LEVENBERG: Objection to the form.

A. I believe they had the option to accept or reject an assignment, yes.

BY MS. ZACHARIASIEWICZ:

Q. Did you ever have agent rejections?

A. I don't remember.

Q. And how many properties could an agent have at a time?

A. I don't -- I don't remember.
Q. You mentioned how Skyhill tried to make sure that asset managers had fairly equal loads. Did you do the same for real estate agents?
A. I don't remember.
Q. What were an agent's responsibilities with regard to an REO property that they were assigned to?
A. I want to go back to what we said -- are we talking just this initial assignment or are we -- when the property first comes in, they are assigned to the property, they are going to do the initial occupancy inspection. Okay?
Q. Okay. And then what's next? Is the BPO next?
A. If the property is vacant, then, yes, the next set of tasking should be a BPO. Then a third-party value, an appraisal.
Q. If we go down to row 9394 of the -- the new task assigned, provide drive-by BPO. Do you see that in the notes?
A. Yeah. I'm sorry. I don't -- I don't

have the row numbers on mine, but --

MS. ZACHARIASIEWICZ: Well, that is going to make things more complicated. Sorry.

It's the same date, and it says: You have been assigned a new task, provide drive-by BPO. This is on August 21st, 2017.

MR. LEVENBERG: Sergio, if you arrow down to the left, do you see the row numbers? I'm seeing them, but I'm on a big screen.

THE WITNESS: I'm sorry. My first row, it just says Auction.com.

MS. ZACHARIASIEWICZ: I wonder if something is hidden, but I don't -- I'm not very good with Excel. So I'm not going to be able to help you.

MR. HOLMES: I'm seeing it the same way. It is my first row. I can't move it over.

THE WITNESS: Okay. I found -- if we just go by the dates, we can make it work.

BY MS. ZACHARIASIEWICZ:

Q. Okay. I remember in a previous deposition, the deponent told me how to unhide

everything. So that is generally the level I'm working with. Okay.
So what is a drive-by BPO?
A. That would be an exterior value.
Q. And an agent does that. Is that correct?
A. Correct.
Q. Mr. Montelongo, are you viewing this in Dropbox or did you download it?
A. Dropbox.
Q. That is probably why you can't see the row numbers. You may want to download it just because later on it is going to get a little more complicated.
A. Okay. Maybe at the next break I will go ahead and download it.
Q. Okay. Yeah, or we can take a break -- if we get to a point where it's getting hard to follow along, let me know and we will just stop for a minute so you can download it.
Okay. So a drive-by BPO is -- you said it's an exterior BPO.

Now, you said BPOs are only done once a property is vacant. Is that right?
A. I don't remember. I mean, a drive-by BPO is exterior value. I don't remember what -- I don't remember the Equator flow system in regards to this drive-by BPO.
Q. Okay. Is there any other kind of BPO?
A. Well, you have interior and exterior BPOs.
Q. Okay. And if you go down -- let's see.
Well, this is -- it's much farther down. So let me find you the date. And maybe you can find it. Well, it's actually just the next date.
So if you go down to 8/22/17, the second entry for that date.
A. Okay.
Q. And it says: Agent must complete the three Equator tasks below in the following order, determine units-OPT.
Do you know what OPT is?
A. I do not.
Q. Property inspection -- number 2,

property inspection OPT; three, provide occupancy status OPT; and then it says: Please be aware that two BPOs may be generated concurrently, drive-by and initial.

Do you know what an initial BPO is?

A. I believe that would be if it was -- if it's determined that it's vacant, that might be an initial --

Q. Would the --

A. -- BPO.

MS. ZACHARIASIEWICZ: Go ahead. Sorry. I didn't mean to interrupt.

A. Yeah. I mean, I don't remember or -- you know, this particular process right here, I don't -- it's not familiar to me.

Q. Okay. Do you -- strike that.

Did the initial BPO include an interior inspection to your knowledge?

A. I don't remember.

Q. Okay. I think we talked a little bit earlier about BPOs, and you said there are BPOs and appraisals, right?

A. Correct.
Q. Okay. What is the difference between a BPO and an appraisal?
A. Well, a BPO is a broker price opinion. So that would come from a listing agent. And then an appraisal is completed by an appraiser.
Q. Okay. Is one considered more authoritative than the other?
A. I don't -- I don't know.
Q. And am I recalling correct that you said once you get those, the listing price would be the higher one?
A. That is correct.
Q. What if the BPO and the appraisal are vastly different?
A. I don't know. What is the question, if they are vastly different what?
Q. What do you do? Do you still go with the higher price?
MR. LEVENBERG: Objection to form.
A. Yeah. We follow policy/procedure outlined by Bank of America.

BY MS. ZACHARIASIEWICZ:
Q. And do you remember what that policy and procedure was?
A. Previously stated, yes, listing at the higher of the two values.
Q. In your memory, do you remember any Bank of America REOs you worked on being sold through more traditional sales as opposed to an auction?
MR. LEVENBERG: Objection to the form.
A. I don't remember.
BY MS. ZACHARIASIEWICZ:
Q. Did all the auctioned properties go through Auction.com?
MR. LEVENBERG: Objection to form. Lack of foundation.
A. I don't remember.
BY MS. ZACHARIASIEWICZ:
Q. Do you remember Bank of America using any other auction vendor?
A. I don't remember.
Q. You mentioned earlier Skyhill's relationship with Auction.com. Do you remember

when that started?
A. I don't.
Q. Are you familiar at all with Bank of America's REO website?
A. I'm not.
Q. Did you have any role in getting REO properties listed there for sale?
A. I don't remember.
Q. Going back to this spreadsheet and back up to August 21st, there is an entry -- for me, it's row 9404 -- that says: Attention property has been selected for dual-path marketing.
That is what it says in column D. Do you see that one?
A. This is on the 22nd?
MS. ZACHARIASIEWICZ: The 21st. It's the last entry on the 21st.
A. Okay. Yeah. I see it.
Q. What is dual-path marketing?
A. That is where a property was listed in the MLS and the auction website.
Q. Okay. Do you remember any REO

properties you worked on not being dual-pathed?
A. I don't remember.
Q. This says: Bank of America has identified this property as a candidate for dual path.
I'm sorry. It says that in the note.
Does that mean that you didn't make a decision as to whether it should be dual-pathed?
A. That is correct.
Q. So someone at Bank of America decided that?
A. I don't know if it's Bank of America, but I did not make the decision if it was going to go to auction or not.
Q. Okay. So as an asset manager, you didn't make the decision whether something should go to auction or traditional sale?
A. That is correct.
Q. Someone at Bank of America made that decision?
A. I don't know if it was Bank of America. All I know is that I did not make the decision on

dual-path or traditional marketing.
Q. Okay. If it wasn't you and it wasn't Bank of America, who else could it have been?
A. I don't know.
Q. For something to be dual path, did that affect how the property was marketed?
A. I don't remember.
Q. So going down one row, the first entry for August 22nd, 2017, it says, the note: I have been assigned as the premarketing specialist.
What is a premarketing specialist?
A. I don't remember.
Q. Was that someone who worked at Skyhill?
A. AWeis? Yes, they did.
Q. Okay. Did you ever serve as a premarketing specialist?
A. No.
Q. Do you know what a premarketing specialist's responsibilities are as opposed to an asset manager?
A. No.
Q. Do you remember what your interactions

with the premarketing specialist were?
A. No.
Q. So I'm going to go down -- it's about five rows, to 9409. And it says, in the note: Reserve due date has been changed by vendor.
Do you see that?
A. I do.
Q. What is the reserve due date?
A. I don't know.
Q. And do you know who the vendor is?
A. I do not.
Q. And going down one more, if you look in the note, it appears to be a message talking about dual path from someone named Raeleen Alvarado at Auction.com.
Do you remember Raeleen Alvarado?
A. I do not.
Q. Do you remember what the role of the person at Auction.com was?
A. I do not.
Q. And then down one more, it's a message to the realtor to do a property inspection. Do

you see that on August 23rd?
A. I do.
Q. What's the property inspection a realtor had to do?
A. I don't remember.
Q. And then going down about eight rows, so it's row 9419 for me, also August 23rd, and it's -- there's two notes here describing the house. So let me know when you see those.
It starts with: Subject is attached rowhouse.
A. I see it.
Q. Okay. So it looks like this is a description from a drive-by BPO. Is that right?
A. It looks like that's what the column says.
Q. Okay. And I see in there, in the first entry, it says: To get home sold in the shortest amount of time, this property will need to be marketed as is.
When an agent gives you that information, did you generally follow it?

A. I don't remember.
Q. Was there any other information you would use to decide whether to market a property as is or not?
MR. LEVENBERG: Objection to the form.
A. I don't remember.
BY MS. ZACHARIASIEWICZ:
Q. Generally, would you take an agent's advice in regards to how to market a property?
A. I don't remember.
Q. Okay. So that was a drive-by BPO with a date of August 23rd, 2017. But in those two -- in those two boxes of notes, I don't see a price. So I'm going to ask you to open what we will mark as -- I think we are at Exhibit 217.
(Whereupon, Montelongo Deposition Exhibit 217 was marked for identification and attached to the transcript.)
MS. ZACHARIASIEWICZ: This is another big spreadsheet, BANA NFHA LIT 0298915. This one has multiple tabs at the bottom. So I think you might need to download it to be able to view it

CERTIFICATE OF SHORTHAND REPORTER

NOTARY PUBLIC

I, Dianna C. Kilgalen, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 15th day of November, 2021.

My commission expires June 28th, 2025.

DIANNA C. KILGALEN NOTARY PUBLIC HARFORD COUNTY, MD

________________________________

NOTARY PUBLIC

IN AND FOR THE STATE OF MARYLAND

COUNTY OF HARFORD

# Exhibit 56

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

(Northern Division)

---------------------------x

NATIONAL FAIR HOUSING : Civil Action No.

ALLIANCE, et al., : CCB-18-01919

Plaintiffs, :

v. :

BANK OF AMERICA, N.A., :

et al., :

Defendants. :

---------------------------x

DEPOSITION OF DEAVAY TYLER

Conducted Virtually

Monday, March 14, 2022

9:34 a.m. EDT

Job No.: 438348

Pages: 1 - 337

Reported by: Monique Vouthouris, CCR, RPR, CRR

MS. BASCHE: Objection.

THE COURT STENOGRAPHER: I didn't hear the answer.

Q So we'll pull those pages so that you can review them on a break.

Let me ask you about the second part of this opinion that you have going back to 9D.

In 9D, again, you say, "Bank of America's and Safeguard's quality control to ensure proper maintenance of all REO properties was insufficient. This is particularly evident in areas where they apparently believe neighbors are less likely to complain."

What is that based on?

A Let me get to 9D. One second, sir. So initial report, paragraph 9, Section D. Is that correct?

Q Correct.

A Okay. I'm there now.

Q What's that second sentence based on? Second sentence says, "This is particularly evident in areas where they apparently believe neighbors are

less likely to complain." What's that based on?

A That particular statement is based on -- this is based on my experience, and I'll give you more. I'll give you an actual example, is -- part of my duties at A&D Property Services was to onboard new vendors. When I onboarded new vendors with no experience, I did not have the same type of challenges as vendors that came on board with property preservation and maintenance experience.

And so giving you a very, very specific examples, which I have numerous ones, is I would have vendors that would be given a territory, that I would give territories to -- and this is again from my experience -- that would submit photographic evidence and reports and just simply do different work. And so I would just ask them, well, why did you not address this, this or this. It can be the grass. It can be cutting the bushes or shrubs.

And the answer was: Well, this is on 39th and Wabash, and which you will probably being in Chicago, at one point in time that's an area -- or this is in Englewood, why would I do that. So me

having to recalibrate vendors that have had property preservation and maintenance experience to know that you handle each property irrespective of where it's sitting in the same was an experience that I had to do to retrain vendors who would be coming from different companies to do work with A&D Property Services.

So it's strictly based on my experience onboarding a vendor with experience to understand that all properties and all areas needed to be addressed equally.

Q Your statement says, "This is particularly evident in areas where they believe neighbors are less likely to complain." I assume that "they" means Bank of America and Safeguard. That's who you're referring to, right?

A And I'm going back to that statement to get it in context.

So they would specifically -- so there's two parts to this. They would specifically be addressing the -- the boots on the ground contractor that's doing the work. That's what comes from the

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, MONIQUE VOUTHOURIS, New Jersey License No. 30XI00083400, the officer before whom the foregoing remote deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony of DEAVAY TYLER; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of March 2022.

Monique Vouthouris

MONIQUE VOUTHOURIS NOTARY PUBLIC NEW JERSEY

Monique Vouthouris, CCR, RPR, CRR
Notary Public of the State of New Jersey
My commission expires: April 8, 2024

# Exhibit 58




PLAINTIFFS 025660




PLAINTIFFS 025661




PLAINTIFFS 025662




PLAINTIFFS 025663




PLAINTIFFS 025664




PLAINTIFFS 025665




PLAINTIFFS 025666

# Exhibit 62




PLAINTIFFS 0052

# Exhibit 79

WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

# Questions and Answers: ML 2010-18 Updated Property & Preservation (P&P) Requirements and Cost Procedures

FAQs updated as of February 7, 2013

*: The answers provided in these FAQs are directly related to the question asked. It may not be appropriate to apply certain answers to different questions. HUD cannot anticipate each potential scenario so there may be other interpretations or variations to each situation.*

## Updates from February 7, 2013 FAQs:

Correct the contact information on question 17.

## 60-Day Extension of ML 2008-31 Cost Exhibit:

1) Due to programming time constraints in transitioning P&P costs from ML 2008-31 to ML 2010-18, would HUD consider extending the implementation time?

**Answer**– HUD will allow for a 60 day extension for the continued use of ML 2008-31 cost schedules listed as Attachments 1 through 10 in the Mortgagee Letter. During this time, we expect the lender to migrate towards ML 2010-18 pricing and system coding.

- Work completed post 7/13/10 may be charged at the ML 2008-31 costs with appropriate documentation during the 60 day extension.

- As of 7/13/10, the property cap of $2,500 will go into effect for all loans, including those in the pipeline.

- The lender is allowed an aggregate cost per property of $2,500 whether the cost schedule of ML 2008-31 or ML 2010-18 is used; documentation to support the cost should be readily available at the request of the MCM.

- As of 7/13/10, “spent to date” is the aggregate of all work completed on the property, including all items considered “routine” per ML 2010-18 (inspections, pool securing, interior debris removal, etc.)

- During this 60 day extension timeframe, if aggregate cost is greater than $2,500 and subsequent work can be completed for the allowable cost of <u>either</u> ML 2008-31 or ML 2010-18, no overallowable is needed.

- If the mortgagee has previously received an overallowable approval for a reoccurring expense or one-time major repair/event, there is no need to obtain another approval.

  The lender will be required to indicate which cost schedule has been used on an overallowable request in the individual line item section "Mortgagee Remarks". If no overallowable is needed, the cost schedule used must be notated in Part B Claim submission**. If this clarification is not documented the line item cost will be denied.**

## <u>Grass Cuts:</u>

2) The 2012 grass cut season will begin soon. Which pricing schedule should be used?

   **Answer**– HUD has developed a grass cut cost schedule which will be used for the 2012 grass cut season, . The schedule is broken down by state and lot size.

   The pricing for shrub trimming and snow removal will continue to follow ML 10-18.

3) Exhibit A, Section F, of ML 2010-18 indicates in certain states "an initial grass cut may be completed when needed, during any month of the year." If the grass needs maintaining outside of the 4/1 to 10/31 timeframe, should it be submitted in P260 for approval?

   **Answer** – When it is determined a grass cut is needed outside of the grass mowing season timeframe the mortgagee should mow the grass in accordance with the grass cut schedule, . The mortgagee should remember that maintenance on the property is required to avoid code violations from local municipalities, including grass cuts.

4) In ML 08-31, there were 5 states for which year-round grass cuts were required; however, this isn't addressed in ML 10-18. How should these states be handled?

   **Answer**– HUD will continue to allow year round grass cuts in the 5 states listed in ML 08-31. Additionally, the grass cut pricing schedule, will be used until the beginning of the 2013 grass cut season (March 31, 2013).

   <u>Arizona/California/Nevada</u>
   Grass should be cut year-round. Properties with desert landscaping require only once a

month weed removal and are reimbursed as a re-cut.

Hawaii/Pacific Islands
Grass should be cut year-round.

Florida
Grass should be cut year-round.

## ML EFFECTIVE DATE:

5) The opening statement of the Mortgagee Letter states the guidance is for "foreclosed" properties. Can you please clarify the guidance is for both pre-foreclosure sale properties found vacant and abandoned as well as properties that have already been foreclosed?

**Answer** - Any property subject to an FHA-insured mortgage must be maintained in accordance with the regulations of 24 CFR 203.377, when it comes to preserving and protecting the property. The guidelines provided in ML 2010-18 outline some guidance to the mortgagee as to how this is done but in no way is it all inclusive. It is inherently the responsibility of the mortgagee to take prudent actions to document property condition when discovered vacant or abandoned, to secure and to prevent further damage. It is not HUD's intent to prescribe to the mortgagee how this is done.

6) How should the effective date of ML 2010-18 be applied to loans in the pipeline for conveyance?

**Answer** –

a. Loans ready to convey, prior to 7/13/10 – conveyance condition should comply with ML 2008-31
b. Loans ready to convey, post 7/13/10 – conveyance condition must comply with ML 2010-18

7) Please clarify HUD's definition of conveyance condition per ML 2010-

18. **Answer** –

a. Broom swept condition: Property that is free of dust, dirt, hazardous materials or conditions, personal belongings and interior and exterior debris. The cost to put the property in broom swept condition is included in the cost per cubic yard of the interior debris allowable. A separate fee may not be charged.

b. Interior repairs: Any necessary repairs should have been discovered and addressed before the final cleaning.

c. Interior/Exterior debris removal: It is the mortgagee's responsibility to obtain fiscally responsible pricing for both interior and exterior debris removal.

d. Roof Tarp:

  i. Prior to ML 2010-18 effective date, if an active leak is discovered within 30 days of conveyance, the mortgagee may convey the property tarped with prior notification to the MCM of the tarping.

  ii. After July 13, 2010, the lender may utilize a temporary tarp to mitigate the damage prior to repairing the roof. HUD will not accept a property tarped once ML 2010-18 becomes effective. If an extension of time is needed to complete the roof repair prior to conveyance it must be requested in a timely manner.

## ALLOWABLE COST LIMIT PER PROPERTY:

8) The ML states that the maximum property allowable has been increased to $2,500 and excludes the cost of one time major repair items – e.g. roof replacement and demolition. Do we no longer need to submit overallowable requests?

**Answer** – The $2,500 allowable P&P amount is for routine preservation and protection. Overallowable requests will be required when the aggregate costs of all preservation and protection (P&P) functions specified in 24 CFR 203.377 and in ML 2010-18 exceed $2,500 and the work cannot be completed for the line item allowable cost. If the aggregate cost for routine P&P work exceeds $2,500 and subsequent work can be completed for the line item allowable cost, the mortgagee is not required to submit an overallowable request.

9) What constitutes "routine" preservation and protection included in the $2,500 property allowable?

**Answer**– Routine preservation includes, but is not limited to, property inspections, securing, debris and hazard removal, boarding, pool securing, winterization and yard maintenance.

The $2,500 property cap is inclusive of all work completed on a property, with the exceptions of repairs completed with insurance proceeds or repairs that can be considered a "major repair".

10) Please define "major repair".

**Answer** – A "major repair" is a single extraordinary item or event that will cost more than $1,500 to repair. The cost of this item or event will not be included in the $2,500 per property allowable.

11) The ML states that if a property is conveyed damaged, or if a title defect is discovered the Department may re-convey; however, the letter does not outline the process. Can you please provide information on the guidelines and timeframes for the re-conveyance process?

**Answer** – When a title or property condition issue is discovered, the Mortgagee is alerted by the MCM issuance of the Preliminary Notice of Intent to Reconvey letter (PNOIR) via email through P260. The Mortgagee has 30 days to correct the issue before the reconveyance process continues.

Under 24 CFR 203.363 – Effect of Non-Compliance with Regulations:

*"In the alternative to holding processing in abeyance, the Secretary may reconvey title to the property to the mortgagee, in which event the application for insurance benefits shall be considered as cancelled and the mortgagee shall refund the insurance benefits to the Secretary as well as other funds required by 203.364 of this part."*

HUD and its contractors make every attempt to process a reconveyance within 30 days. However, certain circumstances arise that may prevent HUD, or its contractors, from meeting that deadline. Regardless, not meeting the 30 day timeframe in no way relinquishes HUD's right to reconvey.

While ML 2008-31 states that the M&M would provide a preliminary email of a possible reconveyance within 30 days of conveyance, there is no such language in ML 2010-18. ML 2010-18 superseded ML 2008-31 in its entirety.

12) Under Mortgagee Responsibility, Mortgagee Neglect, item (a) states "...adequately verify the occupancy status of a home". Please define "adequately".

**Answer**–The Mortgagee should provide necessary inspection and investigation documentation, including photos, in order to verify and report accurate occupancy status and attempt to identify the occupant of the property. See 4330.1 Rev 5, Section 9-9 for additional clarification on inspection requirements.

The Mortgagee is responsible to secure and maintain the property as required to protect the property from damage or deterioration until the property is conveyed.

13) Under Mortgagee Neglect, item (d), HUD has removed the securing timeframes and replaced the measurable timeframe with "promptly." Please define “promptly”.

    **Answer**– Promptly is defined as “as soon as reasonably practical”. The property should be secured no more than 5 calendar days following the determination that the property is vacant and/or abandoned post-foreclosure or 15 business days following the determination that the property is vacant and/or abandoned pre-foreclosure.

14) Under Mortgagee Neglect, item (e) it states the mortgagee must “Promptly notify the MCM of receipt of code violations, demolition notices and/or take appropriate action.” Please define the expected notification period required by HUD. Additionally, please confirm that the timely submission of bids for approval will be considered notification.

    **Answer** – Specific notification is required immediately upon receipt of notices by sending an e-mail to mcm-violations@mcbreo.com A copy of the code violation should be uploaded into P260 attached to the corresponding FHA case. The submission of an overallowable request does not constitute notification.

15) Exhibit A, 1, states “...the maximum property preservation allowance is the maximum reimbursement for all P&P on an individual property. Maximum amounts for individual line items are set forth in Exhibit B.” Does this mean we have to still submit an overallowable request if an individual line item exceeds the line item allowable in Exhibit B?

    **Answer** – No. Each property has an allowable of $2,500 for routine preservation work. If a routine item is greater than the individual line item in Exhibit B and the $2,500 property allowable has not been reached, the work may still be completed without MCM approval and claim submitted with the verifiable and auditable documentation substantiating the cost of work. The $2,500 property allowable excludes major repairs and it is calculated based on a chronological order of repairs/maintenance.

16) Language in the Mortgagee Letter references approving/denying/adjusting over-allowable requests utilizing an industry standard cost estimator. Does this mean the second bid requirement has been eliminated?

    **Answer**–Yes. ML 2010-18 does not require the submission of bids. It is the mortgagee’s responsibility to perform the work at the most reasonable and appropriate cost, unless additional information is specifically requested by the MCM.

Approved by Director, National Servicing Center, as vested pursuant to 71 FR, 60177 and as further delegated.

17) Has HUD determined which industry standard cost estimator tool will be utilized by the MCM? Is the cost estimator available to mortgagees and field service vendors?

    **Answer** - Vendors may continue to utilize any method of cost estimating that produces an accurate and independently verifiable cost proposal. This estimate will be reviewed and verified by the MCM utilizing a cost estimator that is commonly used by the preservation industry. The current Cost Estimator Contract has been awarded to Bluebook International and for more information regarding their services please Contact Arun Baheti at 949-470-9534. Bluebook's help line regarding assistance with cost estimates is 888-425-8326.

18) Please confirm that material receipts are required for dump fees and extermination receipts only.

    **Answer**– Receipts and/or other appropriate documentation are required to justify and verify any item where reimbursement is requested.

19) The letter advises that requests must be submitted at least 5 business days prior to the conveyance due date or they will be rejected. Will an overallowable request be automatically denied if not submitted prior to the 5 day deadline? Also, please confirm work completed can still be claimed.

    **Answer**–If the conveyance deadline has not passed, the lender should submit an extension of time request with justification to substantiate the timing of the overallowable request. An overallowable request is not automatically denied regardless of whether an extension of time to convey has been submitted and/or is pending review. Work completed may still be claimed.

20) What is the timeframe for the MCM to respond to overallowable

    requests? **Answer**–The MCM has 5 business days to respond.

21) If a timely response is not received, does the mortgagee receive an automatic extension?

    **Answer**– No, extensions will be determined on a case-by-case basis. Any delays caused by HUD or its agents will receive appropriate consideration.

22) In instances where a property sustains new damage (within the 5 day over-allowable review timeframe) and the max cap has been reached, should mortgagees file an extension and over-allowable request explaining the new damages?

**Answer**– If the mortgagee has determined it is prudent to do so.

23) If mold is present at FTV and if the root cause is addressed promptly by the mortgagee, please confirm no further action required to prevent growth prior to conveyance. How would HUD wish the existing mold be remediated? Should mitigation of the mold be bid or just documented as mortgagor neglect with no preservation action required?

**Answer** - The source of the mold is to be repaired or remediated as required to prevent further water infiltration or damage to the property.

Any repair or remediation required to prevent further damage that results in costs exceeding a one time major repair item of $1,500 or an aggregate amount of $2,500 shall be submitted as an overallowable.

24) The letter states, "As a matter of Administrative Practice, HUD generally will not deny conveyance of properties if the Government's estimate of the cost to repair the damage attributable to the mortgagee is equal to or less than $2,500. The claim is generally reduced by that amount." Is the $2,500 review going to be performed prior to or after the Part B-E claim is filed?

**Answer** - The review will be performed at the time of conveyance after filing the Part A claim.

25) Can the mortgagee reduce the claim by damage amount and convey?

**Answer**–The MCM, upon recommendation by the FSM, will make a determination and notify the Mortgagee accordingly upon request for a surchargable damage inspection.

26) The new letter indicates "If at any time local codes require more extensive protection than stated in this guidance, mortgagees shall contact the MCM." To whom should this information be provided and what specific documentation is required?

**Answer** – Documentation to support the more extensive work should be attached to the overallowable request.

27) Will the one-time $30 photo fee still be allowed? **Answer** –

HUD will continue to allow this photo fee to be claimed.

28) Is HUD eliminating the need to perform twice per week hot zone inspections?

**Answer** - Hot zones are established by local jurisdiction. Absent HUD guidelines, the mortgagee must follow local code. HUD will no longer provide prescriptive guidelines to mortgagees.

29) The letter states "Inspection reports and photographs shall be submitted in P260 in support of the 27011 parts B-D claim request." Document packages, including inspection reports and photographs, oftentimes exceed 100 pages. Please confirm HUD is requesting that the entire claim package be submitted to P260 at this time.

**Answer** - Documentation, including photos, to support routine preservation work will not be required during the Part B Claim submission. P&P work that includes previously reviewed and approved overallowables will require photos to document that the P&P work has been completed. As a reminder, mortgagees may upload photos at any time into P260 to document any P&P work to substantiate their claim.

HUD expects a quality control review and editing of large photo files and/or supporting documentation to ensure only the necessary and applicable information is uploaded into P260.

MCB may request supporting documentation to substantiate the claimed amount at anytime.

30) Are we required to go back and upload photos documenting completed previously approved P&P overallowables?

**Answer** – Photos documenting that P&P work was completed will be required on all overallowables submitted and approved on or after July 13, 2010.

31) What are the documentation requirements for the Part A Claim?

**Answer** – The Part A Claim submission has not changed.

32) HUD mailers were referenced in the 2008-31 regulations stating we should send out a mailer and wait 5 business days prior to inspecting. There is no mention of HUD mailers and the 5-day wait period, was HUD's intent that we still follow this directive?

**Answer–** Mailers are a good business practice but are not detailed in ML 10-18. A mortgagee may choose to use an occupancy mailer, door hanger or another form of contact; however, there is no requirement to wait a minimum of 5 days for a mortgagor to respond to the efforts. Further, HUD regulations require a mortgagee to inspect properties in a 25 – 35 day cycle unless contact has been made with the mortgagor and occupancy of the property has been verified. HUD reimburses up to 13 inspections per calendar year unless there is a need for additional inspections for which the lender must provide justification and supporting documentation.

33) Initial vacant property inspections are performed on the date the mortgagee takes physical possession of a vacant or abandoned property. The initial inspection is when the mortgagee ascertains the condition of the property and may be of critical importance in distinguishing between mortgagor neglect following conveyance. Please distinguish between vacant and abandoned properties.

**Answer** - Local jurisdictions define this requirement.

34) If a property is vacant and the loan is in bankruptcy, in active loss mitigation, etc., please confirm mortgagees will not be held liable for mortgagee neglect.

**Answer** - Mortgagees will be held responsible for any damage that occurs to a property during the time it is vacant or abandoned and the mortgagee failed to:

a. Establish contact with the mortgagor and adequately verify the occupancy status of a property;
b. Initiate foreclosure within the required timeframe;
c. Obtain timely and accurate property inspections;
d. Promptly secure and continue to protect all vacant properties; or
e. Promptly notify the MCM of receipt of code violations, demolition notices and/or take appropriate action.

35) The letter states, "Vacant property inspections are performed after the initial inspection and physical possession by the mortgagee have occurred." Please confirm that inspections on occupied properties and vacant/unsecured properties

can be claimed. Should these inspections be labeled as subsequent inspections rather than vacant property inspections? Please confirm that occupied inspections will be reimbursed.

**Answer** – Pursuant to 4330.1 Rev 5, Section 9-9, a (1.), during the course of any continuing delinquency reimbursement will be made for only one “initial inspection”.

When the conditions continue necessitating the occupancy inspections to continue; within the previous 30 days there have been no payments, no contact with the defaulting mortgagor and increased probability of potential abandonment, the mortgagee should consider having a visual inspection performed within thirty days from the date of the last visual inspection.

HUD will reimburse mortgagees for occupancy inspections which were performed in accordance with the requirements of the Administration of Insured Home Mortgages Handbook (4330.1) and are adequately documented including the valid follow-up attempt to confirm occupancy. The acceptance of a payment when a loan is in default does not constitute contact with the mortgagor.

36) Since ML 2010-18 has superseded ML 2008-31, the clear directive regarding occupancy inspections has been removed. Can you please clarify HUD's intent regarding the circumstances in which an occupancy inspection is required where there is no contact with the borrower but a payment on a delinquent loan is made? Is it HUD’s intent that the clear directive in ML 2008-31 still apply?

**Answer–**Yes, the example in ML 2008-31 regarding occupancy inspections has not changed and it still follows HUD Handbook 4330.1 Rev. 5, Section 9-9b(1)(2). The acceptance of a payment when a loan is in default does not constitute contact with the mortgagor.

37) There is no allowance for Voluntary Pre-Conveyance Inspections. In the case of extensive, non-surchargable damages should the servicer convey and document the Part A accordingly?

**Answer**– HUD will allow Mortgagees to claim the cost of one additional inspection at the rate of a Vacant Property Inspection, provided the Pre-Conveyance Inspection does not coincide with the regular inspection schedule.

38) Pre-eviction inspections are no longer defined and no longer reimbursable. Please confirm that eviction legal fees will not be denied reimbursement should the property be found vacant at the time of lockout.

**Answer**– If there is any doubt of a property’s occupancy status, the mortgagee may perform a pre-eviction inspection within 72 hours of a scheduled eviction. If this

inspection falls outside of the 25-35 day cycle, it may still be claimed and reimbursed as an occupancy inspection as HUD reimburses up to 13 inspections per calendar year unless there is a need for additional inspections for which the lender can provide justification and supporting documentation.

39) Previously, HUD required both interior and exterior inspections on properties once the initial securing had occurred. Is this still required?

**Answer**–Yes. In order to confirm property maintenance and security, the mortgagee should conduct interior and exterior inspection and surveillance of the property as necessary to prevent damage.

40) Exhibit A, Section B states, "All exterior doors shall be secured." Please confirm that only one lock should be changed for pre-sale properties.

**Answer** – Correct, it is appropriate that only one lock be changed on a pre-sale property; however, all other exterior doors should be re-keyed to correspond with the new lockset.

41) Is HUD eliminating the pre-approved boarding areas and preferring to always re-glaze except in the case of severe damage or high vandalism?

**Answer** – If local law or ordinance requires boarding, the property must be boarded.

42) Many servicers wish to have consistent key codes across their portfolio. Is this acceptable?

**Answer** – No. Follow the guidelines in ML 2010-18, Section B, Securing.

43) How should the servicer address antique locks? These previously were not removed or damaged; instead the door would be secured with a pad and hasp. Does HUD want servicers to continue this practice?

**Answer** – Yes, where the servicer is unable to re-key without removal or damage in special circumstances such as the presence of an antique lock, the mortgagee may utilize whatever method is available to secure the property and prevent damage.

44) If there are no locks present on windows in a property, how should the lender secure?

**Answer**–As directed in ML 2010-18, doors and windows must not be nailed or braced. Replace missing or inoperable locking mechanisms on windows or doors.

45) If a garage door is damaged and cannot be opened and closed, should the servicer repair or replace the door?

**Answer** – Garage doors should allow for opening and closing. It is the mortgagee's discretion as to how this should be accomplished.

46) The letter states that HUD does not tarp. However, in some instances it is needed to protect the property until the roof is repaired or replaced, especially when there may be insurance claim proceeds available. Will the cost of a tarp be reimbursed in this type of situation?

**Answer** – Yes, with the appropriate documentation to support the claim, this cost may be reimbursable. Any repair, temporary or permanent, required to prevent further damage that results in costs exceeding $2,500 shall be submitted as an overallowable.

47) The boarding requirement for pools has been eliminated. Please confirm that servicers may secure the pool in any fashion they see fit.

**Answer** – If local code is present, pools should be secured per those guidelines. If the area is absent of local guidelines, the pool should still be secured in a manner that will prevent access.

48) If a pool is found unsecure and could pose an immediate danger if not secured, will the cost to secure be reimbursed?

**Answer** - To mitigate potential risk, HUD considers pool securing an immediate issue to be addressed. The allowable cost for this maintenance is listed in Exhibit B of ML 10-18. If the work cannot be completed for the allowable or could be considered a one time major repair/event, the mortgagee should do the work and bid after the fact if necessary.

49) Please define both "operational" and "maintaining" of the pool. Is HUD expecting the utilities be maintained?

**Answer** – Utilities must remain on in accordance with local code or state law when required to maintain pool as described in ML 2010-18.

50) If the pool is found empty, does it need to be filled so that it becomes operational?

**Answer** – Pools are to be secured and maintained according to local code or state law. If local jurisdiction regulates the maintenance of pools, please follow local code.

51) If the pool filtration and other systems are broken, should the mortgagee submit a repair bid as a "major repair" to HUD for review?

**Answer** – If local jurisdiction/code regulates the maintenance of pools, please follow local code and repair as required.

52) New regulations state to keep pool filter system operating, if we are in the winterization time period, and we need to winterize the pool for the season, does HUD expect the servicer to turn the pool filtration system on once we are in the spring and summer months?

**Answer:** Pools must be maintained in operational condition according to local code and climatic conditions.

53) The specifications provided in the new letter indicate that openings should be secured with "plywood or equivalent." Is HUD recognizing particle board (OSB) as an acceptable alternative to plywood?

**Answer**– No, HUD does not consider this an equivalent alternative.

54) The directive in Exhibit A, Section E states "all openings shall be boarded" is in conflict of earlier passage under securing which indicates the mortgagee is responsible for replacing a broken window-pane (re-glazing), unless the opening is to be boarded. Please confirm intent and which action is desired.

**Answer** – Re-glazing is the preferred method of securing a broken window or glass opening, unless required to be boarded by local code or ordinance.

55) The letter states "small openings, such as pet openings in doors should be secured and not boarded." If there is not an existing lock present, how would HUD want this action to be performed?

**Answer**–The mortgagee should provide security, as required, to prevent unauthorized entry.

56) In Exhibit A, Section B, it states that if local codes differ from HUD requirements for boarding, the mortgagee should contact the MCM for direction. Is the MCM to be contacted prior to work being completed on a property or after the work is completed?

**Answer**: Contact with the MCM is not required unless the repair needed to prevent further damage results in costs for a one time major event of $1,500, or in aggregate exceeds $2,500. The mortgagee should provide documentation to support P&P work completed as per local code requirements.

57) Awaiting response from the MCM could delay the protection of the property leading to further vandalism or damage. Please advise how this potential delay should be handled.

**Answer** – The mortgagee should repair or secure as necessary to protect the property and prevent damage. The mortgagee should provide appropriate documentation to support the expenditure.

58) Please confirm the previously existing pre-approved boarding areas (i.e. certain zip codes within Chicago, IL) no longer exist.

**Answer** – The mortgagee is responsible for adhering to local code and ordinance requirements regarding boarding, other property maintenance and security regulations.

59) If local code does not dictate boarding requirements yet it is known the property is located in a high vandalism area, should the property be boarded? If so, what type of documentation should be provided to support the decision to board?

**Answer** – If the property is located in a high risk vandalism area and/or previously re-glazed windows have been broken, it would be in the best interest to board the property unless local ordinances do not allowing for boarding. Documentation to support this action could include crime statistics for the area or proof that windows had been previously re-glazed and subsequently broken.

60) Exhibit A, Section G states "properties are to be winterized between October 1 and March 31, unless, climatic conditions require earlier and extended winterization treatment periods." Please advise how climatic conditions will be defined.

**Answer**– Mortgagees must be prudent in the preservation and protection of the property. If climatic conditions require early or late winterization then the property should be winterized in accordance with ML 2010-18. Documentation to support this action could include weather reports or similar evidence to justify local climatic conditions.

61) Under the same section, sub-part Utilities, it states, "Utilities accounts...should be in the mortgagee's name until conveyance of the property to HUD...if there is any reason to believe that a mortgagor may abandon a property, the mortgagee shall contact the utility company...so that utilities can be transferred to the mortgagee's name and the heat remain on if the mortgagor vacates." Will the mortgagee be reimbursed for the cost of utilities if it was determined the mortgagor did not abandon the property?

**Answer** – The MCM will review the supporting documentation provided by the mortgagee to determine if the cost will be reimbursed.

62) In this sub-part, it does not outline which utilities are to remain on. If local ordinance does not mandate, should the servicer not maintain or connect utilities provided there is not a sump pump present?

**Answer**– If there is not a valid reason, including but not limited to, winterization, the presence of a sump pump, pool maintenance or local ordinances, the mortgagee is not required to connect the utilities.

63) In certain areas, utility companies do not allow the transfer of utilities into the mortgagee's name. If there is a valid reason to connect utilities how should the mortgagee address this issue?

**Answer** – The mortgagee should fully document the refusal of the utilities provider to transfer the utilities into the mortgagee's name. The requirement for P&P work to continue will not cease and the work must be performed to the best of the mortgagee's ability.

64) Upon conveyance of the property, what should the mortgagee do with the utility account**?**

**Answer** – If utilities cannot be transferred from the mortgagee to the FSM, the mortgagee should disconnect the utilities and notify the FSM.

65) If HUD approves an over-allowable for a demolition, does that automatically approve conveyance of a vacant lot or should permission still be sought as a "convey as is" package in P260?

**Answer** – At the time of submission request for demolition also note that the request is to convey the property "as is". If the MCM grants approval for demolition, it will also be noted that the conveyance of a vacant lot is approved as well.

66) The letter states approval must be obtained for demolition, but Exhibit B lists an allowable cost for demolition. If the property can be demolished for the provided allowable, does approval still need to be obtained?

**Answer** – Yes, the MCM should be notified prior to the demolition of the property.

67) In the event that a conveyance timeframe shifts due to a county recording date, please confirm that a request for extension of time can still be submitted for

consideration provided the servicer performed diligence in follow up with the local recording agency?

**Answer**–The conveyance timeframe does not shift since it does not begin until the latter of the date of the Foreclosure Deed being recorded or the date of possession. Extensions of time required to place the property in conveyance condition must be submitted within 30 days of this date.

<u>Example</u> – Foreclosure Deed recorded 5/1/10
Eviction completed and possession is obtained 6/1/10
Conveyance timeframe begins 6/1/10 and an extension must be requested prior to 7/1/10

HUD Handbook 4330.1 provides: Convey the Property to the Secretary within 30 calendar days after acquiring possession of and good marketable title to the property (24 CFR 203.359). For mortgages insured under a firm commitment issued on or after November 19, 1992, or under Direct Endorsement processing when the credit worksheet was signed by the mortgagee's approved underwriter on or after November 19, 1992, within 30 days of the latter of:

a. Filing for record the foreclosure deed; (Filing for record has been established as the date the deed was mailed or carried to the recording authority)
b. Recording date of a deed-in-lieu of foreclosure;
c. Acquiring possession of the property;
d. Expiration of the redemption period; or
e. Such further time as HUD may approve in writing.

68) The letter states, "If a mortgagee believes that a demand decision is not supported by regulation or circumstances, the mortgagee may request a review of the indebtedness determination...by submitting a request to the MCM through HUD's P260 portal within 20 days of receipt of the Secretary's notification." Will mortgagees be notified of the decision via email, P260, or by another method?

**Answer**–The mortgagee will be notified via P260 and email.

69) Will non-compliance letters no longer be issued?

**Answer**– Non-compliance letters will continue to be issued via P260 and email.

**<u>COST SCHEDULE:</u>**

70) Previously, traditional recurring inspections were reimbursed at $30/$20. Will HUD accept multiple $30 charges in the event a property goes from occupied to vacant more than once during the life of the loan?

**Answer** – Yes, with the appropriate documentation to support the charge this would be acceptable.

71) If more than one vacant property permit is required, please confirm the allowable is $250 per permit?

**Answer** – Yes, with the appropriate documentation to support the expense.

72) Will the mortgagee be required to re-secure at their cost if vandalism causes the need for a re-securing?

**Answer**– If the mortgagee initially secured the property appropriately and a re-secure is needed due to vandalism, the cost to re-secure will be reimbursable at the price of the initial secure. The mortgagee must provide documentation to support the claim for re-securing.

73) The Debris/Trash Removal line item reads "Maximum allowable for 1 unit $600 (Minimum load of 12 cu. yds of waste). Would HUD consider adjusting this allowable to a larger cubic yard amount due to the new requirement to remove interior debris?

**Answer** – The intent of the debris removal allowable is simply to advise that the cost should be no more than $50/cubic yard. If the mortgagee discovers a situation where excessive debris must be removed and it would constitute a major one-time event/repair an overallowable should be submitted for review. There is no maximum number of cubic yards per unit.

74) The letter does not indicate how to address personal property such as swing sets or dog houses in good condition. Should these remain at the property or be removed as exterior debris?

**Answer** – If personal property similar to that described above, is in good condition and may add to the value of the property, it may remain in place.

75) There is no longer an allowable addressing Large Appliance Removal (as related to decaying and rotting food) and Pest Infestation. Is the mortgagee to assume no action is required?

**Answer**–The mortgagee must be prudent and diligent in its actions and properties must be conveyed undamaged and free of any health and safety hazards. If appliances

found inside are inoperable, notation must be made on the initial inspection report and submitted to the MCM. Large appliances found outside should be discarded as debris.

76) Under Hazard Abatement, there is no allowable provided for paint or oil. These cannot be removed as debris in many locations. Should we submit an overallowable request for these items? Are these costs reimbursable and what documentation should be provided?

**Answer** - Local and state regulations frequently delineate what is hazardous and must be disposed of by special handling. Provide the special requirements per state or local code for special handling and the receipt(s).

## Miscellaneous Questions:

77) Please provide clarification that eviction man hours and/or sheriff directed services are not to be included in the max cap for a property.

**Answer**–The eviction process has not changed. Man hours are not included in the $2,500 property cap.

78) The reimbursement rate for evictions is not defined. Please confirm the allowable rate will remain at $20 per man hour?

**Answer**–Yes, that rate will remain $20/man hour.

79) How should lenders address the cost of the storage of personals? Are these fees reimbursable? Will HUD accept a storage fee receipt as a dump receipt?

**Answer**– HUD understands not all states have requirements to evict and store personal property. Since ML 2010-18 now requires properties to be in broom swept condition there may be certain situations in which the mortgagee deems it necessary to store personal property. HUD has established an allowable not to exceed $300 for storage and final disposition of the personal property. An overallowable request should not be submitted for any costs greater than $300 as this is the maximum HUD will reimburse. The initial cost of removing the personal property from the property is included in the customary $50/cubic yard allowance for debris removal.

The mortgagee must exercise good judgment when distinguishing between personal property and debris. HUD would not expect there to be a need to store personal property on every case. Additionally, the size of the storage unit should be appropriate to the amount of the personal property stored. If the Mortgagee has questions differentiating between personal property and debris, they should consult their legal

counsel to assess the risk or exposure in the removal of these items.

The costs related to the storage and final disposition of personal property are considered fees associated with the foreclosure action and will not be included in the $2,500 preservation and protection maximum property cap. This is an expense which will not be considered as money spent after the deed to HUD is filed. This fee should be claimed on Part D line 305 "Disbursements for HIP, ground rents and water rates, eviction costs and other disbursements".

The MCM audits all Part B-E claims and if the cost for personal property storage is not appropriately documented, through photographs and receipts, a demand will be issued to the mortgagee for reimbursement of the full amount claimed.

Example:

| | |
|---|---|
| ☐ 12 cyd of interior debris @ $50/cyd | $600 |
| ☐ 2 cyd of personal property @ $50/cyd | $100 |
| ☐ Storage of personal property | $ As appropriate - not to exceed $300 |

80) We frequently find piles of bricks, concrete, or cinderblocks at houses. Will HUD approve removal of non-hazardous debris that is not measured in cubic yards? Specifically, concrete weighs 2 tons per cubic yard (which is about $160 for disposal alone, not counting handling and transportation) - can heavy/bulky debris be bid separately from regular trash?

**Answer** - Exhibit B allows a fee per cubic yard of debris or trash. If the dump where the debris is being disposed of charges more by weight then this must be documented on the dump receipt and the receipt must indicate the name of the dump to verify the debris has been disposed of legally.

81) There are still concerns that clarification provided in the FAQs specifically relating to Preservation and Protection issues will be ignored or not recognized on a HUD post claim review. Some members have indicated that the FAQ's are being recognized on the HUD post claim reviews, while others are indicating they are not.

**Answer –** The NSC has confirmed with the Claims Audit Team that FAQs will be recognized as policy interpretation for ML 10-18.

82) Clarify for the servicer "Right of Entry" on vacant FHA insured properties addressing new local and state regulations and servicer compensation?

**Answer -** FHA-approved mortgagees are required to preserve and protect FHA-insured assets. This requirement shall be met in accordance with state and local laws. Mortgagees must comply with state and local law, pursuant to Mortgagee Letter 2012-12 (attached), and maintain supporting documentation of their attempts to gain access or possession. Documents required by or issued in accordance with state or local law relating to such attempts including, but not limited to, notices, pleadings, and court orders, will be the only documentation accepted by HUD when determining mortgagor or mortgagee neglect and whether the mortgagee has met its due diligence requirements in preserving and protecting FHA-insured assets. In addition, mortgagees may include the cost of taking legal action necessary to gain access to the property as a claim expense as long as they maintain the legal documents to support the amount being claimed.

**HECM Questions:**

1) Are Occupancy Inspections which are required after the HECM loan is called due and payable claimable?

   **Answer** – No. If a servicer is unable to secure the property after the loan has been called due and payable due to tenants or adverse occupants, the required monthly occupancy inspections through acquisition of title are considered a normal cost of business and not claimable.

2) Does broom-swept condition mean that the property is free from dust?

   **Answer** – Broom swept condition is free of dust, dirt, hazardous materials or conditions, personal belongings and interior and exterior debris. It is understandable that a vacant property may collect a usual amount of dust between inspections.

**ATTACHMENT 1:** 2012 Grass Cut Schedule

| | | | 5 | 5 | | 5 | 5 |
|---|---|---|---|---|---|---|---|
| Alabama | AL | $70 | $90 | $115 | $65 | $85 | $110 |
| Alaska | AK | $100 | $120 | $145 | $95 | $115 | $140 |
| Arizona | AZ | $75 | $95 | $120 | $70 | $90 | $115 |
| Arkansas | AR | $70 | $90 | $115 | $65 | $85 | $110 |
| California | CA | $100 | $120 | $145 | $95 | $115 | $140 |
| Colorado | CO | $85 | $105 | $130 | $80 | $100 | $125 |
| Connecticut | CT | $100 | $120 | $145 | $95 | $115 | $140 |
| Delaware | DE | $95 | $125 | $150 | $90 | $120 | $145 |
| District of Columbia | DC | $95 | $115 | $140 | $90 | $110 | $135 |
| Florida | FL | $85 | $105 | $130 | $80 | $100 | $125 |
| Georgia | GA | $85 | $105 | $130 | $80 | $100 | $125 |
| Guam | GU | $110 | $130 | $155 | $105 | $125 | $150 |
| Hawaii | HI | $110 | $130 | $155 | $105 | $125 | $150 |
| Idaho | ID | $100 | $120 | $145 | $95 | $115 | $140 |
| Illinois | IL | $85 | $105 | $130 | $80 | $100 | $125 |
| Indiana | IN | $85 | $105 | $130 | $80 | $100 | $125 |
| Iowa | IA | $85 | $105 | $130 | $80 | $100 | $125 |
| Kansas | KS | $85 | $105 | $130 | $80 | $100 | $125 |
| Kentucky | KY | $85 | $105 | $130 | $80 | $100 | $125 |
| Louisiana | LA | $85 | $105 | $130 | $80 | $100 | $125 |
| Maine | ME | $100 | $120 | $145 | $95 | $115 | $140 |
| Maryland | MD | $100 | $120 | $145 | $95 | $115 | $140 |
| Massachusetts | MA | $100 | $120 | $145 | $95 | $115 | $140 |
| Michigan | MI | $85 | $105 | $130 | $80 | $100 | $125 |
| Minnesota | MN | $85 | $105 | $130 | $80 | $100 | $125 |
| Mississippi | MS | $85 | $105 | $130 | $80 | $100 | $125 |
| Missouri | MO | $85 | $105 | $130 | $80 | $100 | $125 |
| Montana | MT | $85 | $105 | $130 | $80 | $100 | $125 |
| Nebraska | NE | $85 | $105 | $130 | $80 | $100 | $125 |
| Nevada | NV | $90 | $110 | $135 | $85 | $105 | $130 |
| New Hampshire | NH | $100 | $120 | $145 | $95 | $115 | $140 |
| New Jersey | NJ | $100 | $120 | $145 | $95 | $115 | $140 |

Approved by Director, National Servicing Center, as vested pursuant to 71 FR, 60177 and as further delegated.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| New Mexico | NM | $85 | $105 | $130 | $80 | $100 | $125 |
| New York | NY | $100 | $120 | $145 | $95 | $115 | $140 |
| North Carolina | NC | $85 | $105 | $130 | $80 | $100 | $125 |
| North Dakota | ND | $85 | $105 | $130 | $80 | $100 | $125 |
| Ohio | OH | $85 | $105 | $130 | $80 | $100 | $125 |
| Oklahoma | OK | $85 | $105 | $130 | $80 | $100 | $125 |
| Oregon | OR | $100 | $120 | $145 | $95 | $115 | $140 |
| Pennsylvania | PA | $95 | $115 | $140 | $90 | $110 | $135 |
| Puerto Rico | PR | $110 | $130 | $155 | $105 | $125 | $150 |
| Rhode Island | RI | $100 | $120 | $145 | $95 | $115 | $140 |
| South Carolina | SC | $85 | $105 | $130 | $80 | $100 | $125 |
| South Dakota | SD | $85 | $105 | $130 | $80 | $100 | $125 |
| Tennessee | TN | $85 | $105 | $130 | $80 | $100 | $125 |
| Texas | TX | $85 | $105 | $130 | $80 | $100 | $125 |
| Utah | UT | $85 | $105 | $130 | $80 | $100 | $125 |
| Vermont | VT | $100 | $120 | $145 | $95 | $115 | $140 |
| Virginia | VA | $95 | $115 | $140 | $90 | $110 | $135 |
| Virgin Islands | VI | $85 | $105 | $130 | $80 | $100 | $125 |
| Washington | WA | $100 | $120 | $145 | $95 | $115 | $140 |
| West Virginia | WV | $95 | $115 | $140 | $90 | $110 | $135 |
| Wisconsin | WI | $85 | $105 | $130 | $80 | $100 | $125 |
| Wyoming | WY | $85 | $105 | $130 | $80 | $100 | $125 |

Approved by Director, National Servicing Center, as vested pursuant to 71 FR, 60177 and as further delegated.

# Exhibit 91

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BANK OF AMERICA, N.A., *et al.*,<br><br>*Defendants*. | Case No.: 1:18-CV-1919 |

**BANK OF AMERICA, N.A.'S SUPPLEMENTAL**
**RESPONSE TO PLAINTIFFS' INTERROGATORY NO. 13**

Pursuant to Federal Rule of Civil Procedure 33, Defendant Bank of America, N.A. hereby supplements its previous response to Plaintiffs' Interrogatory No. 13. Bank of America incorporates by reference, as if fully set forth herein, all previously asserted objections (general and specific) and reservations to Interrogatory No. 13. Bank of America also continues to respond to Interrogatory No. 13 to the best of its present ability. Bank of America, however, has not completed its pretrial research, investigation, or analysis of all facts relating to this case. Accordingly, this supplemental response reflects the current state of Bank of America's knowledge respecting the matters about which inquiry is made and remain subject to further review, investigation, amendment, and supplementation. Bank of America has prepared its supplemental response based on its good faith interpretation and understanding of Interrogatory No. 13 and the supplementation Plaintiffs seek in light of Bank of America's supplemental response to Request for Admission No. 1, but reserves its right to correct any errors or omissions. Bank of America further reserves the right to modify, supplement, change, or amend its response after further

discovery and investigation, for reasons that may become apparent during the course of this action, or in light of the Court's current or future orders.

This supplemental response is made solely for the purpose of this action and is subject to the Stipulated Initial Case Management Order entered on November 6, 2019 (ECF No. 83, "Initial Case Management Order") and the Phase II Case Management Order entered on November 13, 2020 (ECF No. 117, "Phase II Case Management Order" and, together with the Initial Case Management Order, the "Case Management Orders"). Nothing herein shall be construed as an admission respecting the admissibility or the relevance of any facts, documents, or information, as an admission that documents or information exist, or as an admission as to the truth or accuracy of any characterization or assertion contained in any Interrogatory. This supplemental response incorporates all prior general and specific objections as if fully set therein, and remains subject to all objections as to competence, relevance, materiality, propriety, and admissibility, and any and all other objections on grounds that would require the exclusion of any statement herein if the Interrogatory were asked of, or statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial or other evidentiary proceedings.

**SUPPLEMENTAL RESPONSE**

**INTERROGATORY NO. 13:**

Identify any and all actions Bank of America considered or took in response to Plaintiffs' reports of discrimination resulting from Bank of America's property preservation and maintenance practices.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

Bank of America incorporates by reference, as is fully set forth herein, (a) all General Objections and Objections to Instructions and Definitions set forth in Bank of America's original Responses and Objections to Plaintiffs' Second Set of Interrogatories containing Interrogatory No.

13, and (b) all Specific Objections set forth in Bank of America's original response to Interrogatory No. 13. In addition, Bank of America incorporates by reference, as if fully set forth herein, all Specific Objections set forth in Bank of America's original and supplemental responses to Request for Admission No. 1. Bank of America further objects to this Interrogatory as improper, unduly burdensome and disproportional to the needs of discovery at this stage of the litigation to the extent (a) it seeks information already known to and equally accessible to Plaintiffs, and (b) it purports to require Bank of America to search and review voluminous decade-old records as a prerequisite to supplementing. Finally, Bank of America objects to this Interrogatory as improper and not relevant to the extent Plaintiffs seek to obtain information that is not admissible pursuant to Fed. R. Evid. 408.

Without prejudice to and expressly reserving (a) its objections to Interrogatory No. 13 and Request for Admission No. 1 and (b) its previously-asserted objections (each of which are express incorporated herein by reference as if fully set forth) to Plaintiff's duplicative and overlapping discovery concerning the same or similar subject matter as Interrogatory No. 13, and based upon its understanding of the supplementation Plaintiffs seek in light of Bank of America's supplemental response to Request for Admission No. 1, Bank of America states that it denied Request for Admission No. 1 because the assertion in the Request that Bank of America "took no [non-privileged] action in response to" Plaintiff's purported "investigation into or reports of discrimination resulting from Bank of America's property maintenance and marketing practices concerning REOs" is false. As Plaintiffs know, at various times in 2012 and 2013, representatives of Bank of America participated in various settlement meetings (in-person and telephonic) with representatives of NFHA relating to the purported "investigation" and "reports of discrimination." The dates of and participants in those settlement meetings are known and equally accessible to

Plaintiffs, and the burden of attempting to derive such information from now decade-old records is the same for Plaintiffs as for Bank of America.

Bank of America does not construe Interrogatory No. 13 to require the production of any additional information and makes no further response to Interrogatory No. 13 at this time. Bank of America reserves the right to supplement or amend this response to the extent necessary or appropriate at a later time.

## VERIFICATION

I, Amy Bernal, am authorized to make this verification on behalf of Bank of America, N.A. in the case of *National Fair Housing Alliance v. Bank of Am., N.A.*, No. 18-1919 (D. Md.). I have reviewed the document entitled "BANK OF AMERICA, N.A.'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' INTERROGATORY NO. 13 TO BANK OF AMERICA" and am familiar with its contents. I am informed and believe that the matters stated therein as to Bank of America, N.A. are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

BANK OF AMERICA, N.A.

Amy Bernal

Date: April 19, 2022
Title: Assistant Vice President
Printed Name: Amy Bernal

Served this 20th day of April, 2022

/s/ Ava E. Lias-Booker
Ava E. Lias-Booker (No. 05022)
McGuire Woods LLP
500 E. Pratt St., Ste. 1000
Baltimore, Md. 21202
Tel.: (410) 659-4430
Fax: (410) 659-4558
alias-booker@mcguirewoods.com

Thomas M. Hefferon (No. 15109)
Brooks R. Brown (*pro hac vice*)
Anthony M. Alexis (*pro hac vice*)
Keith Levenberg (No. 11957)
Goodwin Procter LLP
1900 N. Street, N.W.
Washington, D.C. 20036
Tel.: (202) 346-4248
Fax: (202) 346-4444
thefferon@goodwinlaw.com
bbrown@goodwinlaw.com
aalexis@goodwinlaw.com
klevenberg@goodwinlaw.com

*Counsel for Defendants Bank of America, N.A. and Bank of America Corp.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record, by agreement among the Parties, by email this 20th day of April, 2022.

*/s/ Keith Levenberg*
Keith Levenberg (No. 11957)

# Exhibit 93

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. CCB-18-1919 |
| BANK OF AMERICA, N.A., *et al.*, | * | |
| Defendants. | * | |

* * * * * * * * * * * * *

## DECLARATION OF LISA RICE

I, Lisa Rice, am over the age of 18 years and competent to testify as to the matters set forth in this Declaration. All statements herein are based on my personal knowledge.

1. I serve as President and Chief Executive Officer of the National Fair Housing Alliance ("NFHA"), one of the organizational plaintiffs in the above-referenced matter. I have been employed at the National Fair Housing Alliance since 2006.

### NFHA's Document Retention Policy

2. NFHA conducts fair housing investigations to ensure that individuals and entities are complying with the Fair Housing Act and, when appropriate, files lawsuits or administrative complaints to enforce the Act.

3. As a result of its investigations, NFHA has filed approximately 46 lawsuits and administrative complaints in the last ten years. Thirty-six of these cases resulted in favorable settlements for NFHA, several of which settled only after extensive litigation. In each of these cases, NFHA followed its investigation document retention protocol—the same protocol we followed in our investigation into the exterior preservation, maintenance, and marketing of real-estate owned properties ("REO investigation"), that is the subject of this

lawsuit. A true and accurate copy of NFHA's document retention policy for its investigations is attached hereto as Exhibit A. I understand this policy has been produced to Defendants as NFHA 024897-024905. This written policy has been in effect since 2006.

4. No court or administrative agency has ever expressed any concern with NFHA's investigation document retention policy.

5. NFHA followed its investigation document retention policy for all of its REO investigations—including those involving different banks and those that did not ultimately result in litigation.

6. Prior to the filing of the current lawsuit, neither Bank of America, N.A. nor Safeguard Properties Management, LLC ever asked NFHA to preserve the handwritten evaluation forms from our REO investigation. This remained the case even after NFHA filed a complaint with HUD against Bank of America in 2012.

7. The handwritten evaluation forms represent drafts of the information collected by investigators in this matter and the final iteration of the information investigators collected is preserved and contained in the REO database.

**July 5, 2022 Letter from HUD**

8. On July 5, 2022, I received a letter from Lynn M. Grasso, Deputy Assistant Secretary for Enforcement for the U.S. Department of Housing and Urban Development ("HUD"), regarding HUD's *U.S. Bank* determination. A true and accurate copy of this letter is attached hereto as Exhibit B.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 13_, 2022

[signature]
Lisa Rice

Filed Under Seal

Filed Under Seal

Filed Under Seal

# EXHIBIT B

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-2000

OFFICE OF FAIR HOUSING
AND EQUAL OPPORTUNITY

July 5, 2022

Lisa Rice
President and Chief Executive Officer
National Fair Housing Alliance
1331 Pennsylvania Avenue NW, Suite 650
Washington, DC 20004

Dear Ms. Rice,

Thank you for your May 3, 2022, inquiry concerning the Department's January 8, 2016, Determination of No Reasonable Cause in *National Fair Housing Alliance, et al v U.S. Bank N.A.,* 01-12-0283-8, and, specifically, whether this document may be relied upon as precedent concerning HUD's position on testing evidence.

A determination of no reasonable cause is based on evidence gathered during, and known at the conclusion of, the investigation it is intended to be a short and plain written statement of the uni ue evidence relevant to the sub ect complaint. A determination of no reasonable cause cannot be relied upon to articulate the Department's general views on particular issues. As such, determinations of no reasonable cause are not intended to serve as and should not be used as precedent.

Furthermore, the determination of no reasonable cause in the aforementioned matter was sub ect to a subse uent re uest for reconsideration challenging the factual and legal analysis supporting the determination. Complainant asserted that the claims and methodology it presented were not correctly evaluated. Complainant further stated that the determination contained errors in analyzing what parties can be liable under the Act and what type of evidence is necessary to establish a prima facie case that a respondent has engaged in discrimination. While the Department was actively evaluating these potential errors, the re uest for reconsideration was withdrawn. The Department, therefore, did not complete an assessment of the challenges raised in the re uest for reconsideration and took no further action in the matter.

In summary, the Department's determinations of no reasonable cause should not be considered precedential and generally cannot serve as a statement of Departmental policy.

Sincerely,

Lynn M. Grosso
Deputy Assistant Secretary for Enforcement

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BANK OF AMERICA, N.A., *et al.*,<br><br>*Defendants*. | Case No.: 1:18-CV-1919 |

**MEMORANDUM IN SUPPORT OF DEFENDANT BANK OF AMERICA, N.A.'S MOTION TO STRIKE THE PURPORTED EXPERT REPORTS OF JACOB RUGH, PAMELA KISCH, AND MICHAEL FETTERS**

# TABLE OF CONTENTS

Page

STANDARD OF LAW ........ 4

ARGUMENT ........ 5

I. Fetters' Opinions Should Be Excluded Because His Expertise Is Not Relevant Here. ........ 5

A. Plaintiffs' Claims Are Not Based on "Mixed Methods" Research. ........ 5

B. Fetters Improperly Opines Beyond His Irrelevant Expertise. ........ 6

II. Kisch's Claimed Expertise Is Also Irrelevant and Her Opinions Have No Scientific or Experiential Foundation. ........ 9

A. Kisch Has No Relevant Expertise and No Experience Fitting the Facts. ........ 9

B. Kisch's Opinions Are Unreliable and Unfounded. ........ 14

C. Kisch Improperly Offers Legal Conclusions as "Expert" Opinion. ........ 18

III. The Rugh Reports Should Be Excluded Because a Regression Analysis Based on Bad Data, Neglecting Critical Variables, Is Irrelevant and Unreliable. ........ 19

A. Despite Multiple Attempts to Fix His Model's Defects, Rugh Never Did So. ........ 19

B. Rugh's Analysis Is Also Unreliable Because It Depends on Bad Data. ........ 23

C. Rugh's Regression Analyses Are Unreliable on Their Own Terms. ........ 27

D. Rugh's Models Cannot Show a Robust Causal Link to BANA Policies. ........ 32

CONCLUSION ........ 34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agnew v. Cater*,
No. 18-50035, 2022 WL 313756 (N.D. Ill. Feb. 2, 2022) ....27

*Am. Strategic Ins. Corp. v. Scope Servs., Inc.*,
No. 15-2045, 2017 WL 4098722 (D. Md. Sept. 15, 2017) ....8, 12, 17

*Bazemore v. Friday*,
478 U.S. 385 (1986) ....30

*Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*,
No. 18-3384, 2021 WL 5359671 (D. Md. Nov. 17, 2021) ....19

*Bruno v. Bozzuto's, Inc.*,
311 F.R.D. 124 (M.D. Pa. 2015) ....1, 23, 26

*Cnty. of Cook v. Bank of Am. Corp.*,
No. 14-2280, 2022 WL 408299 (N.D. Ill. Feb. 10, 2022) ....18, 19, 28, 31

*Coffey v. Dowley Mfg.*,
187 F. Supp. 2d 958 (M.D. Tenn. 2002) ....26

*Conrad v. CSX Transp., Inc.*,
No. 14-0051, 2015 WL 3797873 (D. Md. June 17, 2015) ....12

*Cooper v. Smith & Nephew, Inc.*,
259 F.3d 194 (4th Cir. 2001) ....4, 5, 31

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ....1, 5, 12

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ....27

*Eastland v. TVA*,
704 F.2d 613 (11th Cir. 1983) ....31

*EEOC v. Freeman*,
961 F. Supp. 2d 783 (D. Md. 2013) ....11

*EEOC v. Kaplan Higher Educ. Corp.*,
748 F.3d 749 (6th Cir. 2014) ....11

*Foster v. Legal Sea Foods, Inc.*,
No. 03-2512, 2008 WL 2945561 (D. Md. July 25, 2008) ............................................. *passim*

*Kumho Tire Co. Ltd. v. Carmichael*,
526 U.S. 137 (1999)........................................................................................................4

*Laumann v. NHL*,
117 F. Supp. 3d 299 (S.D.N.Y. 2015).............................................................................14

*Legendary Art, LLC v. Godard*,
2012 WL 3550040 (E.D. Pa. 2012) ...............................................................................26

*Maddox v. Claytor*,
764 F.2d 1539 (11th Cir. 1985) .....................................................................................23

*Maryland Shall Issue, Inc. v. Hogan*,
No. 16-3311, 2021 WL 3172273 (D. Md. July 27, 2021) .............................................8, 15

*McKiver v. Murphy-Brown, LLC*,
980 F.3d 937 (4th Cir. 2020) ........................................................................................18

*Metro. St. Louis Equal Hous. Opportunity Council v. Gordon A. Gundaker Real Estate Co.*,
130 F. Supp. 2d 1074 (E.D. Mo. 2001)...........................................................15, 16, 26

*Modern Remodeling, Inc. v. Tripod Holdings, LLC*,
2021 WL 5234698 (D. Md. Nov. 9, 2021) .............................................................7, 11, 15

*Moore v. Napolitano*,
926 F. Supp. 2d 8 (D.D.C. 2013)...................................................................................29

*Nease v. Ford Motor Co.*,
848 F.3d 219 (4th Cir. 2017) ..........................................................................................5

*Newman v. Motorola, Inc.*,
218 F. Supp. 2d 769 (D. Md. 2002).....................................................................4, 27, 34

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994).............................................................................................34

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997).............................................................................................11

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) ............................................................................................5

*Sheehan v. Daily Racing Form, Inc.*,
104 F.3d 940 (7th Cir. 1997) ........................................................................................28

*Shreve v. Sears, Roebuck & Co.*,
166 F. Supp. 2d 378 (D. Md. 2001) ........................................................................12

*Small v. WellDyne, Inc.*,
927 F.3d 169 (4th Cir. 2019) ..................................................................................6

*Smith v. Virginia Commonwealth Univ.*,
84 F.3d 672 (4th Cir. 1996) ...................................................................................31

*State v. Swinton*,
847 A.2d 921 (Conn. 2004) ....................................................................................26

*Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Proj., Inc.*,
576 U.S. 519 (2015)..................................................................................................27

*In re Titanium Dioxide Antitrust Litig.*,
No. 10-0318, 2013 WL 1855980 (D. Md. May 1, 2013).........................................18

*United States v. Bynum*,
604 F.3d 161 (4th Cir. 2010) ..............................................................................12, 13

*United States v. Thomas*,
No. 03-0150, 2006 WL 140558 (D. Md. Jan. 13, 2006).........................................14

**Rules**

FED. R. EVID. 702 .................................................................................................4, 12

**Other Authorities**

RICHARD A. BERK, STATISTICAL LEARNING FROM A REGRESSION PERSPECTIVE (3d
ed. 2020) ....................................................................................................23, 31, 32

FELICE D. BILLUPS, QUALITATIVE DATA COLLECTION TOOLS: DESIGN,
DEVELOPMENT, AND APPLICATIONS (2021) ..............................................................13

FLOYD J. FOWLER, JR., SURVEY RESEARCH METHODS (5th ed. 2014)..........................13

R. Garcia, *"Garbage In, Gospel Out": Criminal Discovery, Computer Reliability, and the Constitution*, 38 UCLA L. REV. 1043 (1991) ............................................26

MONIQUE HENNINK *et al.*, QUALITATIVE RESEARCH METHODS (2d ed. 2020) ...............13

Keith Ihlanfeldt & Tom Mayock, *The Variance in Foreclosure Spillovers Across Neighborhood Types*, 44 PUB. FIN. REV. 80 (2014).........................................7, 18, 34

ALAN JULIAN IZENMAN, MODERN MULTIVARIATE STATISTICAL TECHNIQUES:
REGRESSION, CLASSIFICATION, AND MANIFOLD LEARNING (2008) ...............................30, 31

MATTHEW B. MILES et al., QUALITATIVE DATA ANALYSIS: A METHODS SOURCEBOOK (4th ed. 2020) ....................8, 13

MICHAEL QUINN PATTON, QUALITATIVE RESEARCH & EVALUATION METHODS (4th ed. 2015) ....................13, 15

As demonstrated in Defendants' summary-judgment motions (ECF Nos. 166, 167), among the fatal problems for Plaintiffs' case is that their method of investigation was not a legally or scientifically valid method of collecting data on how Defendants maintained REO properties.[1] As a result, the analysis they had their purported statistics expert (Jacob Rugh) perform on the data they generated is just as scientifically invalid and unreliable. It is what multiple courts have described as "the 'garbage in, garbage out' problem."[2] Recognizing this, Plaintiffs employ two more purported experts (Michael Fetters and Pamela Kisch) to attempt to prop up their defective methodology. Without the opinions of these two purported experts, Plaintiffs have no case, because they have no evidence supporting their claims of disparate outcomes *other* than the statistics their defective methods produced. But none of Plaintiffs' purported experts satisfy the gatekeeping standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), intended to ensure that expert testimony rests on reliable and generally accepted science.

Fetters is a family-medicine doctor claiming to have pioneered a field called "mixed methods research." According to Fetters, "mixed methods research" combines both empirical data and "sociology, anthropology, education, and nursing" methods. Ex. 2 at 5. He claims that Plaintiffs' pre-suit investigation qualifies as "mixed methods" research because it included "quantitative" data collected by Plaintiffs during their property inspections plus "qualitative" interviews of residents of other neighborhood properties. *Id.* at 10. But the latter is a red herring. Plaintiffs' claims rest solely on the results of their field inspections (albeit as later altered by NFHA's senior executives), not on any information collected in a few dozen interviews from

---

[1] As used in this Motion, the defined terms and short forms have the same meaning ascribed to them in BANA's summary-judgment motion. Exhibit citations refer to the exhibits to the Declaration of Jacqueline Odum, filed concurrently with this Motion.

[2] *E.g.*, *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 143–44 (M.D. Pa. 2015); *Coffey v. Dowley Mfg.*, 187 F. Supp. 2d 958, 974 (M.D. Tenn. 2002).

among more than 1,600 properties originally investigated. No qualitative research was "mixed" with Plaintiffs' quantitative property ratings to turn their data into the product of "mixed methods." So Fetters' purported expertise in "mixed methods"—the basis for his reports—is no more relevant than his expertise in family medicine.

Next, Kisch is the executive director of a fair housing center in Michigan with the same mission as Plaintiffs. Ex. 3 at 1. Plaintiffs proffer Kisch to opine that "Plaintiffs' investigation [methodology] is consistent with traditional enforcement testing and furthers the goals of the FHA." *Id*. at 3. This is an impermissible legal opinion and, even if it were not, Kisch is not qualified to offer it. The purported basis for Kisch's opinion is that she claims to "have served as a tester and [] participated in at least 100 rental, sales, mortgage, and insurance fair housing tests." *Id.* at 1. For example, she says she once proved a housing provider discriminated against families with children by having testers apply for an apartment and being told it was "an adult apartment" and "you can't have kids." *Id*. at 8–9. This sort of testing experience does not qualify Kisch to opine on Plaintiffs' methods because, as HUD spelled out in the *U.S. Bank* matter, those methods bear no resemblance to traditional fair-housing testing. *See NFHA v. U.S. Bank N.A.*, No. 01-12-0283-8, Determination of No Reasonable Cause, at 3 (HUD Jan. 8, 2016) (Ex. 1). Astonishingly, despite proffering her broad opinion that there is "nothing" about Plaintiffs' methodology that would not be accepted by HUD, [redacted]. Kisch's failure to consider this [redacted] renders her report an easy case for exclusion under *Daubert*.

Lastly, Rugh is a Brigham Young University sociology professor. He opines that Plaintiffs' property-inspection methods revealed a disparity in average property conditions as between the REOs Plaintiffs inspected in majority-white and majority-minority Census tracts, and that his

statistical "regression analysis" failed to identify non-racial factors fully explaining this purported disparity. The threshold problem with these reports is that Rugh does not himself have any opinion on whether the inspection data were validly collected, so he has no idea whether his regression analysis was run on good data or on bad data. In the latter case, of course, the conclusions of his regression analysis would be just as invalid as the data set itself. A regression analysis is only as good as the data fed into it. It is also only as good as the potential explanations for the purported disparity its designer *chooses* to test. In Rugh's case, his analysis is not reliable or scientifically valid because it was preordained to fail at finding non-racial explanations for the alleged disparity. That is because his regression analysis didn't test *any* of the non-racial explanations Defendants furnished—*e.g.*, differences in the conditions properties were in when BANA acquired them, or any of the myriad property-specific factors knowable only from reviewing Defendants' property maintenance records (which Rugh didn't review), such as the presence of holdover occupants precluding maintenance work, or properties vandalized mere days before Plaintiffs' inspections.

Rugh's failure to consider these (and other) non-discriminatory explanations for the purported statistical disparity makes his analysis a façade—it may look like a regression analysis, but it doesn't do the job a regression analysis is supposed to do. It does not establish that discrimination was the cause of Plaintiffs' results, and does not rule out alternative causes—failures which this Court has cited in the past in excluding purported expert opinion on causation. *See Foster v. Legal Sea Foods, Inc.*, No. 03-2512, 2008 WL 2945561, at *9 (D. Md. July 25, 2008) (Blake, J.). Discovery has shown that Rugh's regression was created in the first place in the most bare-bones fashion, just to give Plaintiffs' claims an air of plausibility to survive a motion to dismiss. It has since been revised multiple times in implicit concessions that the criticisms Defendants made of it were well-founded. But it still does not clear the *Daubert* bar of showing that its conclusions are reliable, testable, and consistent with generally accepted scientific practice.

Despite substantial discovery concerning Bank of America's REO maintenance practices and policies, Plaintiffs have no direct evidence of discrimination. As a result, Plaintiffs' claims of discrimination hinge on the say-so of purported experts using analytical methods vulnerable to endless subjective manipulations capable of giving a veneer of scientific support to *any* desired result. It is a classic case of the problem recognized by this Court, and the Supreme Court, that "expert witnesses have the potential to be both powerful and quite misleading." *Newman v. Motorola, Inc.*, 218 F. Supp. 2d 769, 772 (D. Md. 2002) (Blake, J.) (quoting *Daubert*, 509 U.S. at 595), *aff'd*, 78 F. App'x 292 (4th Cir. 2003)). This Court should perform its gatekeeping function and exclude the irrelevant and unreliable opinions of Fetters, Kisch, and Rugh.[3]

## STANDARD OF LAW

*Daubert*'s "gatekeeping" function exists to ensure expert testimony is both relevant and reliable. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). This function extends not only to scientific testimony but to all manner of "technical" and "specialized" knowledge. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). *Daubert* enforces Federal Rule of Evidence 702, which permits expert testimony only if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The pertinent (but non-exhaustive) factors to guide courts include "(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there

[3] The improper opinions of Plaintiffs' fourth purported expert (Tyler Deavay) and one of NFHA's senior executives (Lindsay Augustine) are addressed in Safeguard's Motion to Strike Purported Expert Opinions and Other Evidence, also filed today. BANA will not repeat those arguments here, but joins in Safeguard's arguments and incorporates them by reference.

are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Cooper*, 259 F.3d at 199 (citing *Daubert*, 590 U.S. at 592–94). Separately, purported expert testimony must "fit" the case in the sense that it is "tied to the facts of the case," because "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591. Fitness requires "a valid scientific connection" between the expert's opinion and a "pertinent inquiry." *Id*.

The burden of establishing the admissibility of a purported expert opinion rests on the party proffering it. *Cooper*, 259 F.3d at 199. Application of these well-established standards here demonstrates that the reports of Fetters, Kisch, and Rugh should be excluded in their entirety.

## ARGUMENT

### I. Fetters' Opinions Should Be Excluded Because His Expertise Is Not Relevant Here.

Fetters' opinions fall short of the *Daubert* standard in multiple respects. First and most fundamentally, neither his experience as a family medicine doctor nor his claimed expertise in "mixed methods" research is relevant in a case about property maintenance. Further, Fetters offers numerous opinions beyond his claimed expertise and without sufficient factual basis.

#### A. Plaintiffs' Claims Are Not Based on "Mixed Methods" Research.

It is black-letter law that an expert opinion must have "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citing *Daubert*, 509 U.S. at 588). "Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). That connection and relevance do not exist here.

Fetters claims expertise in "mixed methods" research, which he defines as mixing "qualitative and quantitative" research. Ex 2 at 5. He labels Plaintiffs' investigation such an effort because it combined "data collection" from their property inspections with "qualitative" research

like "interviews with neighbors in communities where REOs were assessed." *Id*. at 10. But merely having conducted these interviews does not make them any part of the basis for Plaintiffs' claims. This Court already ruled that Plaintiffs' claims are not based on anything other than the alleged statistical disparity, which was based on their property inspections, not neighbor interviews. ECF No. 66 at 15. Fetters likewise admits that neither the "interviews" nor anything else is proffered as evidence of the alleged statistical disparity. *See* Ex. 7 at 129:5–12 ("Q. And how did the Plaintiffs use these neighbor surveys in their conclusions regarding disparate treatment and discrimination? A. . . . I don't believe that this [*sic*] data has been used extensively, or at least not to my knowledge."), 148:8–14 ("Q. Did the Plaintiffs use these neighborhood interviews in their analysis of disparate treatment and discrimination? A. I have not seen evidence of how this was used in the documentation that I've seen in terms of the case, that I recall at this time."). A purported mixed-methods expert has no relevant "connection" to claims not founded on mixed methods.

**B. Fetters Improperly Opines Beyond His Irrelevant Expertise.**

A separate problem with Fetters' reports is that he offers numerous opinions *outside* his purported mixed-methods expertise, for which he has no relevant qualifications. It is well-settled that an expert's opinions must be grounded in his or her area of expertise, supported by something more than speculation or the untested "say so" of a party engaging the expert. *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019). Fetters' opinions fail this standard:

- He opines that Plaintiffs' single-point-in-time inspection strategy was "appropriate in assessing the level of maintenance applied to properties" (Ex. 2 at 27), even though he has no expertise in property maintenance and HUD, the agency with expertise in property maintenance that enforces the FHA, said otherwise. *See U.S. Bank*, *supra*, at 3 (maintenance testing "must . . . be two-dimensional (occur over time)").

- He opines that Plaintiffs' inspection criteria were correctly chosen (Ex. 2 at 14–15), despite admitting that he "would not know" "what property preservation and maintenance standards" apply (Ex. 7 at 162:5–7, 163:15–17), and despite the fact that *both* HUD and another one of Plaintiffs' own experts (Tyler) found their inspection criteria overbroad. *See U.S. Bank*, *supra*, at 5; Ex. 16 at App'x 3. He does not base this

opinion on his expertise, but on Plaintiffs' own statements about their efforts to get "input" on their maintenance checklist. Ex. 2 at 14. But he did not even know what kind of "input" Plaintiffs got; he just took what they told him at face value. Ex. 7 at 73:3–74:17, 76:21–77:4.

- He opines that the various ways Plaintiffs skewed their sample population to compare properties and geographies that were not similarly situated (*see* Ex. 2 at 24–26) were appropriate because studying comparable properties was impossible. But again he is not relying on his own expertise in rendering this opinion, but on "NFHA employees" who had "master's degree[s] in urban and regional planning" and "geography and urban studies." Ex. 2 at 13. Such opinions that "largely recycle" a party's own testimony are "unhelpful." *Modern Remodeling, Inc. v. Tripod Holdings, LLC*, 2021 WL 5234698, at *4 (D. Md. Nov. 9, 2021) (Blake, J.).

- He opines that he is "confident this investigation could be written up for publication in an academic journal, pass through the peer review process, and be published as a respectable, compelling, and influential study." Ex. 2 at 23. But the *Daubert* standard does not ask merely for a paid expert's "confidence" that something "could" survive peer review; it asks "whether it *has been* subjected to peer review and publication." *Daubert*, 590 U.S. at 592 (emphasis added). Otherwise, Fetters' "confidence" is sheer speculation. As it happens, Plaintiffs' study *was* a subject of commentary in a peer-reviewed journal—whose authors tested Plaintiffs' conclusions and found them erroneous. *See* Keith Ihlanfeldt & Tom Mayock, *The Variance in Foreclosure Spillovers Across Neighborhood Types*, 44 PUB. FIN. REV. 80, 81–85, 94–100 (2014) (reaching "results . . . inconsistent with the idea that REO spillover effects are worse in communities of color because REOs are maintained less well within those communities").

Plaintiffs also rely on Fetters to defend their evidence spoliation. *See* ECF No. 155-1, *passim* (detailing Plaintiffs' practice of destroying their property inspection reports, and altering the results in their property inspection database). He summarily opines that it was a "strength of the investigation" that Plaintiffs' staff were permitted to change the results of their property inspections at will, which he refers to as "data cleaning." Ex. 2 at 18.

This entirely misses the point. He doesn't even acknowledge the key fact that Plaintiffs' "data cleaning" not *only* entailed changing the results, but spoliating their records of the original results, which cannot be defended under any standard of scientific practice. The generally accepted standard is that "the underlying data is sacrosanct." Ex. 12 ¶¶ 47–50. One can scarcely locate a scholarly text on research methods that does not impress on the importance of retaining raw data.

*E.g.*, MATTHEW B. MILES et al., QUALITATIVE DATA ANALYSIS: A METHODS SOURCEBOOK 39 (4th ed. 2020) ("Regardless of what you call them, the main issues are ensuring . . . retention of data," and mentioning "[r]aw material: field notes" as the primary item that must be "managed in a project and retained afterwards").

Without the underlying data, Fetters has no basis whatsoever to offer his opinions that changes were only made based on "unequivocal evidence" that a change was warranted. Ex. 2 at 30 & n.96. He did no analysis of how Plaintiffs' alleged "cleaning" of the data affected the results, and in fact had *no idea* that Plaintiffs routinely changed their results at the data entry stage. Ex. 7 at 127:17–128:5, 158:6–20. It follows that Fetters' opinion that all of these changes were warranted neither "can be [n]or has been tested," and so is inadmissible. *Daubert*, 590 U.S. at 592. Beyond this, neither Fetters' professional experience in family medicine nor his claimed expertise in "mixed methods" research experience qualifies him to provide expert testimony on evidence spoliation. That is an issue for this Court to resolve by reference to the law.

Plaintiffs' strategy in proffering Fetters is fairly transparent. With respect to virtually every flaw BANA's experts identified in Plaintiffs' investigative methods, Fetters opines that the method in question may look bad, but it is actually good. The apparent goal is to call this case a battle of the experts only a jury can resolve. But that cannot work here for a very fundamental reason: BANA's experts based their critiques of Plaintiffs' methods on actual tests of their data (albeit tainted by Plaintiffs' post-inspection alterations of the original inspection reports). *See, e.g.*, Ex. 10 ¶ 11; Ex. 11 ¶ 20; Ex. 12 ¶ 23. Fetters' defense of those methods, on the other hand, just recycles Plaintiffs' own insistence that they did everything perfectly *without* any effort to test or substantiate Plaintiffs' assertions and assumptions. This is a textbook case of "opinion evidence . . . connected to existing data only by the *ipse dixit* of the expert." *Maryland Shall Issue, Inc. v. Hogan*, No. 16-3311, 2021 WL 3172273, at *4 (D. Md. July 27, 2021); *see also*, *e.g.*, *Am.*

*Strategic Ins. Corp. v. Scope Servs., Inc.*, No. 15-2045, 2017 WL 4098722, at *6 (D. Md. Sept. 15, 2017) (excluding expert whose testimony "amounts to little more than his personal views").

## II. Kisch's Claimed Expertise Is Also Irrelevant and Her Opinions Have No Scientific or Experiential Foundation.

Recognizing that Fetters' opinions are irrelevant because their investigation did not rely on any "mixed methods," Plaintiffs proffer Kisch to opine that their methodology is sound as matter of traditional fair housing testing. This effort also fails because Kisch is not qualified to offer her opinions, her opinions are not tied to the facts of this case and otherwise ignore critical evidence undermining them, and her opinions are improper legal conclusions.

### A. Kisch Has No Relevant Expertise and No Experience Fitting the Facts.

Kisch is the Executive Director of the Fair Housing Center of Southeast & Mid Michigan, an organization with the same mission as NFHA and the other organizational Plaintiffs here. She claims that this experience qualifies her as an expert in the "design and execution of fair housing tests." Ex. 3 at 1–2; Ex. 8 at 37:19–22. Specifically, she says her experiences comes from her work "in successfully resolving 95 fair housing lawsuits with total settlements of over $2.2 million," or an average of $23,158 per case. Ex. 3 at 1. As examples of the type of fair-housing tests and lawsuits she's worked on, Kisch offers the following anecdotes:

- Kisch sent testers to apply for an apartment and were told "it is an adult apartment" and that "you can't have kids." Ex. 3 at 8–9. "Based on this evidence," Kisch concluded that the building was discriminating against families with kids. *Id.*

- Kisch sent testers to apply for a two-bedroom apartment. "[T]he Black tester was told that no two-bedroom units were available," but "[t]he White tester was told that two two-bedroom units were empty." *Id.* at 9. Kisch "evaluated the evidence from the test and determined" there was racial discrimination. *Id.* at 10.

- A tenant complained to Kisch's organization that his apartment was not "handicapped accessible." *Id.* For example, accessibility regulations require "doorways at least 36" wide," but Kisch retained her organization's "staff," a "cooperating attorney, and his paralegal," and they "all helped to measure the doorway widths" and determined the doorways were not 36" wide. *Id.*

Admitting that none of this testing is anything like Plaintiffs' investigation methodology here, Kisch "acknowledge[s]" in her report "that [Plaintiffs'] investigation varies from most of the tests conducted by my organization." Ex. 3 at 12. That is precisely why she is not qualified to opine on Plaintiffs' methods. [redacted] Ex. 8 at 20:17–21:3, 21:4–8, 35:7–11, 34:18–35:1. [redacted] *Id*. at 37:2–6. [redacted] *Id*. at 21:4–8, 34:18–35:11. [redacted] *Id*. at 141:13–142:4. Thus she has no basis, experience, or expertise to opine that [redacted] Ex. 8 at 136:9–13.

And her opinion that "Plaintiffs' investigation is consistent with traditional fair housing testing" (Ex. 3 at 11), even if true, actually illustrates the *un*reliability of Plaintiffs' methods, because such "traditional" testing is exactly what HUD found inapplicable to Plaintiffs' claims:

> A claim that a landlord refuses to rent, or steers, can be proven based on a single instance because the discriminatory act occurs during that specific interaction. In the allegations here—that the Bank discriminated by failing to maintain properties—the disparate treatment does not take place at a single point in time, but over the course of time (the discrimination is 'two-dimensional' rather than one-dimensional). Any testing sufficient to prove disparate treatment due to a lack of maintenance must likewise be two-dimensional (occur over time). . . .

*U.S. Bank*, *supra*, at 3. HUD expressly cautioned against "equating the testing of a single visit to an REO property with the testing of a single visit to a landlord." *Id*. But that's exactly the equation Kisch purports to draw on a basis of testing experience HUD found totally irrelevant in context of FHA discrimination claims predicated upon Plaintiffs' investigative methods.

Kisch's own testimony confirms her lack of relevant experience. For example, she claims it doesn't matter whether or not the sampling of REO properties Plaintiffs chose to inspect is a representative or statistically valid sample. Ex. 3 at 3–4, 14–15. She opines: "If a company is accused of race discrimination and testing at 25% of their properties supports that claim, the fact that 75% of their properties were not tested has no bearing on the fact that the company is in violation of the Fair Housing Act." *Id.* at 15. This opinion embodies the critical error HUD cautioned against in *U.S. Bank*—conflating the sort of discrimination alleged in this case with "single instance[s]" of discrimination "occur[ring] during [a] specific interaction." *U.S. Bank*, *supra*, at 3. In a disparate-impact case founded on statistical evidence, no observation standing alone constitutes the "instance" of discrimination. The claim is based on the alleged disparity that emerges (or fails to emerge) after comparing outcomes across similarly situated populations. In those circumstances, it matters very much whether the sample population alleged to support the claim is, among other things, large enough and representative. *See*, *e.g.*, *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 750, 754 (6th Cir. 2014) (striking expert because "an unrepresentative sample by definition . . . is not a reliable means to demonstrate disparate impact").[4]

Kisch also admits bringing no relevant expertise to the table with respect to assessing REO maintenance. [redacted] Ex. 8 at 94:5–95:2. But [redacted] is not a valid basis to admit an opinion under Rule 702. "[A]llowing experts to opine on 'the commonplace' 'might supplant a jury's independent exercise of common sense.'" *Modern Remodeling*, 2021 WL

[4] *Accord*, *e.g.*, *EEOC v. Freeman*, 961 F. Supp. 2d 783, 799 (D. Md. 2013) (striking analysis in disparate-impact hiring case based on population not "representative of the relevant applicant pool"), *aff'd*, 778 F.3d 463 (4th Cir. 2015); *Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997) (striking analysis based on "unrepresentative sample").

5234698, at *4. "Common sense" could just as easily support the opposite conclusion, that inspectors doing the job Plaintiffs asked their inspectors to do required more objective guidance on the applicable requirements than a gut feeling of whether a house is "being taken good care of." *See Am. Strategic*, 2017 WL 4098722, at *4, *10 (excluding expert whose "common sense" opinion has no "discernible basis in 'government or industrywide standard' or regular practices in the industry"); *Conrad v. CSX Transp., Inc.*, No. 14-0051, 2015 WL 3797873 at *4–5 (D. Md. June 17, 2015) (excluding expert whose "common sense" opinion is not the product of reliable principles and methods).

In *Daubert* terms, Kisch's professed experience and expertise has no "fit" to the facts of this case. 509 U.S. at 591. Kisch may have experience in designing and conducting tests to identify discrimination in apartment leasing or mortgage applications. *E.g.*, Ex. 3 at 8–9. But, as she concedes, that type of testing—where similarly-situated applicants are presented to the party being tested to assess whether discrimination occurs in that interaction—is not at issue in this case. And because it is not, Kisch's purported expertise neither fits nor is relevant to this case. *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) ("The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify [her] to testify as an expert in all related areas."); *see also*, *e.g.*, FED. R. EVID. 702 advisory comm. n. ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."); *accord United States v. Bynum*, 604 F.3d 161, 167 (4th Cir. 2010) (quoting same). The methods at issue in this case are data-collection practices to generate statistics for a disparate-impact discrimination claim about REO property maintenance. None of Kisch's experience is in gathering data for statistical analysis (nor, for that matter, in property maintenance).

This is also not a case where mere "experiential expert testimony" that "does not rely on anything like a scientific method" is appropriate. *Bynum*, 604 F.3d at 167. Contrary to Kisch's assumptions, data collection and data analysis *are sciences*.[5] As a leading text in the field explains:

> The quality of qualitative data depends to a great extent on the methodological training, skill, sensitivity, and integrity of the researcher. Systematic and rigorous observation involves far more than just being present and looking around. . . . Generating meaningful and useful qualitative findings through observation, interviewing, and content analysis requires discipline, knowledge, training, practice, creativity, and hard work.

MICHAEL QUINN PATTON, QUALITATIVE RESEARCH & EVALUATION METHODS 15 (4th ed. 2015). When data are collected without the requisite knowledge, training, and expertise, the danger arises of "researchers adapt[ing] existing tools from other projects that may not adequately suit the research approach they are employing"—as Kisch defends here. FELICE D. BILLUPS, QUALITATIVE DATA COLLECTION TOOLS: DESIGN, DEVELOPMENT, AND APPLICATIONS xix (2021). But Plaintiffs consulted no experts in this field *before* devising their data-collection method. So Kisch cannot somehow bless it after-the-fact based on her experience with inapposite testing methodology. Nor can she excuse its failure to pass scientific muster by taking an unscientific stance *against* "[r]equiring FHA testing to comport with social science methodological principles." Ex. 3 at 4.

Kisch's response to the showing of "Defendants' experts Dr. McCrary and Dr. Skanderson" of how Plaintiffs *could* have performed their investigation with appropriate scientific rigor is that doing so would have been "impracticable from a resource and expertise standpoint—frustrating the mission of fair housing organizations and the FHA." Ex. 3 at 4. This is not a legally valid excuse for flouting the scientific method:

---

[5] *See generally*, *e.g.*, MILES *et al.*, *supra*, at 3 (text on "[t]he need to construct credible and trustworthy meaning from qualitative data through analytic methods"); MONIQUE HENNINK *et al.*, QUALITATIVE RESEARCH METHODS 5 (2d ed. 2020) (text addressing "tasks in qualitative data collection, including designing the research instrument, recruiting participants and collecting data"); FLOYD J. FOWLER, JR., SURVEY RESEARCH METHODS 1 (5th ed. 2014) (text on using surveys as "data collection and measurement processes . . . to produce statistics").

> [T]he law is clear: expert opinions are inadmissible if they are not "based on sufficient facts or data," or on a reliable application of scientific methods to those facts or data. This is true no matter how burdensome or difficult collecting relevant data or devising methods to apply to that data may be.

*Laumann v. NHL*, 117 F. Supp. 3d 299, 315 (S.D.N.Y. 2015).[6] And Kisch's view that it would "frustrat[e] the mission of fair housing organizations and the FHA" to require them to base their claims on reliably collected data is not well taken. The "mission of fair housing organizations and the FHA" is served by meritorious claims, not by meritless ones. There is no organizational mission, and certainly no public policy, served by letting discrimination claims proceed on unreliable data.

### B. Kisch's Opinions Are Unreliable and Unfounded.

Kisch also fails to furnish opinions with a reliable foundation—or in some cases, with any foundation at all. Some of her opinions are just Plaintiffs' own assertions, laundered through a purported expert. For example, she claims Plaintiffs' skewed sample population was appropriate because "NFHA carefully chose neighborhoods to compare." Ex. 3 at 3. The only basis for this opinion was that [redacted]

[6] *Accord, e.g.*, *United States v. Thomas*, No. 03-0150, 2006 WL 140558, at *17 (D. Md. Jan. 13, 2006) ("While the Court recognizes . . . that collecting empirical data is difficult in this context, this difficulty cannot, by itself, render a [] methodology reliable or exempt it from any sort of testing or validation.").

Ex. 8 at 95:9–14. So it's another "unhelpful" opinion that just "recycle[s]" a party's own conclusory assertions through a purported expert. *Modern Remodeling*, 2021 WL 5234698, at *4.

The rest of Kisch's efforts to defend aspects of Plaintiffs' methods are equally unreliable. She opines that Plaintiffs' methods were sound because their inspectors "were required to provide thorough documentation of their findings." Ex. 3 at 11. But they weren't: Plaintiffs *spoliated* most of the documentation of their inspectors' findings. *See* ECF No. 153-1. Then Kisch opines that Plaintiffs' inspectors did their jobs "objectively" based on "standardized" criteria. Ex. 3 at 3. They did not: the criteria were subjective and applied inconsistently across inspectors and across properties. *See* ECF No. 167-1 at 6–7, 34–35. The inspectors were not objective but Plaintiffs' own employees, vulnerable to confirmation bias because they were told what they were supposed to find before they went to a single property, in breach of generally accepted research protocols. Ex. 13 ¶ 78; *see also* PATTON, *supra*, at 353 ("A site visitor should not have a preformed position on the intervention or the intervention model. Openness to what the data reveal is essential. . . ."). Kisch does not address these dubious practices. And she does not base the opinions she does offer on sufficient facts. She opined that Plaintiffs' inspectors "documented evidence objectively" (Ex. 3 at 3) without [redacted]. Ex. 8 at 88:17–91:9, 249:5–16. Instead, she relied [redacted]. *See id.*

Her opinion that Plaintiffs' data-collection methods were sound is thus a textbook opinion "connected to existing data only by the *ipse dixit* of the expert." *Hogan*, 2021 WL 3172273, at *4. The same sort of opinion was excluded in remarkably similar circumstances in the case of *Metro. St. Louis Equal Hous. Opportunity Council v. Gordon A. Gundaker Real Estate Co.*, 130 F. Supp. 2d 1074 (E.D. Mo. 2001), where the plaintiffs actually relied on a NFHA executive as a purported expert in the same role Kisch is playing here.

In *St. Louis*, the city engaged the St. Louis Equal Housing Opportunity Council ("EHOC") to investigate whether local realtors were engaging in racial steering. 130 F. Supp. 2d at 1078. EHOC created a "test form" in which testers "pretending to be potential home buyers" were "asked [] a number of questions relating to their contact with the agent such as name and description of agent, what the agent said about availability of the types of homes requested, whether the tester(s) were shown any of the homes and general information about the homes shown, financial information sought by the agent, what particular information about the tester(s) background was sought by the agent, etc." *Id*. "After filling out a tester form, each tester was to be 'debriefed' by the Test Coordinator who would then complete a debriefing form." *Id*. That is, of course, a different kind of fair-housing test from the one at issue here, although ironically enough it is exactly the sort of test Plaintiffs urge the Court to find analogous on the basis of Kisch's report.

Among the purported experts EHOC retained to opine that its methods were "on solid foundation for 'enforcement testing'" were Shanna Smith, NFHA's Executive Director, and Clifford Schrupp, Executive Director of the Fair Housing Center of Detroit. *Id*. at 1086.[7] But, after holding a *Daubert* hearing, the Court found "ambiguity in the test instructions" and "inconsistencies in the execution of the tests." *Id*. at 1083. For example, "[s]everal of the testers failed to follow the fabricated script," "[s]ome failed to complete the test form or left parts blank," "[t]he testers differed as to their response to follow-up calls by the agents," and "[t]he debriefing of testers varied greatly." *Id*. Thus, the Court found "the testing protocol . . . seriously flawed and lack[ing] any reasonable indicia of reliability." *Id*. at 1082. The Court excluded Smith's opinion about how the testing results should be analyzed because "she could offer no standard by which to

---

[7] EHOC also retained an "urban geography" Ph.D. with statistics training to opine that EHOC's testing showed that the "defendant[s] had engaged in racial steering." *Id*. at 1087. That expert's role is analogous to the role Plaintiffs enlisted Rugh to perform here, so this aspect of *St. Louis* is addressed *infra* Part. __.__.

adjudge the validity and reliability of the EHOC tests." *Id.* at 1087. The Court excluded Schrupp's opinion on the appropriate "standards . . . for an 'enforcement test'" because "his 'legal' standards for the testing done in this case" were unsupported by any known authority and never subject to the sort of peer review, error testing, or general acceptance in the relevant social science community that the *Daubert* test contemplates. *Id.*

The same fatal flaws are present here. As the summary judgment record confirms, Plaintiffs' testing criteria were defined subjectively and applied subjectively and inconsistently—and only applied uniformly in those areas where they *shouldn't* have been, such as Plaintiffs' application of uniform maintenance requirements to different municipalities with *different* maintenance requirements that changed over time. *See* ECF No. 167-1 at 21–22, 32–34.

Kisch's *ipse dixit* that none of this matters because Plaintiffs ticked off some generalized boxes like making their inspectors attend training and fill out forms is not sufficient to support her conclusions that the resulting data are reliable. Conclusory opinions and legal conclusions reached without regard for contradictory record evidence do not satisfy the basic *Daubert* criteria of general acceptance or being subjected to testing or peer review. We *know* Kisch's opinions enjoy no general acceptance because no less an authority than HUD rejected them. And Kisch could not [redacted]:

[redacted]

Ex. 8 at 101:10–14. *Daubert* requires the exclusion of expert opinions with no "discernible basis in 'government or industrywide standard' or regular practices in the industry." *Am. Strategic*, 2017

WL 4098722, at *4.[8] The testing and peer-review elements are manifestly lacking as well. Not only did Plaintiffs' methods fail the replication testing they were given in discovery (ECF No. 167-1 at 21-22), but, as noted, Plaintiffs' investigation has also been the subject of academic literature finding its conclusions ill-supported. *See* Ihlanfeldt & Mayock, *supra*, at 94–100. In short, the unscientific grounds Kisch relies on to bless Plaintiffs' investigative methods in this case are not "generally accepted" by anyone other than herself and are based on nothing more than her own say-so. They are therefore inadmissible under Rule 702.

### C. Kisch Improperly Offers Legal Conclusions as "Expert" Opinion.

Exacerbating the deficiencies in Kisch's opinions is that many of her *ipse dixit* statements are actually legal conclusions that are improper for experts to proffer:

- She opines on what is "required to prove discrimination under the FHA." Ex. 3 at 3.
- She opines on "the purpose of the FHA," and how to serve it. *Id*. at 4.
- She opines on what determines whether a defendant "is in violation of the Fair Housing Act," based on "the standards required by HUD and DOJ." *Id*. at 11, 15.
- She opines on how to satisfy the legal requirement that comparators be "similarly situated"—then claims [redacted] *Id*. at 14; Ex. 8 at 80:1–83:10, 156:6–157:4.
- She says the [redacted] Ex. 8 at 98:8–16.

Such legal conclusions "fall[] squarely into the category of inadmissible testimony" because it amounts to "tell[ing] the jury"—and the Court—"the result to reach." *In re Titanium Dioxide*

---

[8] *See also, e.g.*, *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 1008 (4th Cir. 2020) (expert's method "does not have any credence in the broader scientific community" where he "admitted that he was unaware of anyone [else] who used" it); *see also Cnty. of Cook v. Bank of Am. Corp.*, No. 14-2280, 2022 WL 408299, at *13 (N.D. Ill. Feb. 10, 2022) (striking expert whose "methodology has never been used, much less approved, by anyone else in the field of fair lending" or "anyone other than [the purported expert] himself").

*Antitrust Litig.*, No. 10-0318, 2013 WL 1855980, at *5 (D. Md. May 1, 2013); *see also*, *e.g.*, *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, No. 18-3384, 2021 WL 5359671, at *8 (D. Md. Nov. 17, 2021) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."). It is the province of this Court to decide on the "standard" for finding a "violation" of the FHA. It is not a subject for opinion testimony—"expert" or otherwise. *See Sinclair,* 2021 WL 5359671, at *9 (expert cannot "simply parrot [plaintiffs'] legal arguments and lend them the imprimatur of expert testimony").

## III. The Rugh Reports Should Be Excluded Because a Regression Analysis Based on Bad Data, Neglecting Critical Variables, Is Irrelevant and Unreliable.

Plaintiffs retained Rugh as a purported expert in this case primarily to conduct a "regression analysis" of the altered ratings Plaintiffs ultimately gave to the condition of the subject REO properties in their property inspection database. In a case like this where the plaintiff carries the burden of proving that the complained-of effects "were directly caused by defendants' alleged discrimination," a regression analysis is supposed to "isolate[e] the effects of defendants' conduct from the influence of [] other factors." *Cook Cnty.*, *supra* n.8, 2022 WL 408299, at *2. Rugh's regression analyses fails to do this in multiple respects, offending both of the core *Daubert* considerations—relevance and reliability. It should be excluded.

### A. Despite Multiple Attempts to Fix His Model's Defects, Rugh Never Did So.

At the inception of this lawsuit, Plaintiffs told this Court the "other factors" Rugh controlled for across the subject REO properties were "prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until the Organizational Plaintiffs' site visit, and property values." Compl. ¶ 87. That turned out not to be true. Plaintiffs overstated both the scope of the analysis (in terms of the number of properties) and the nature of the variables considered.

Rugh's analysis "was based on a sample of only 981 properties in 26 metro areas, not the 1,677 properties in 37 metro areas" referenced in the Complaint. Ex. 10 ¶ 13. And the variables Rugh controlled for were far more limited than the variables listed in the Complaint:

- Rugh did not control for "property values" or "prior sales dates and prices." Compl. ¶ 87. The only data he used pertinent to property value was the tax-assessed value of each parcel as *unimproved land*—which Rugh admits is not based on actual market values, and, more fundamentally, does not account for the value of the *structure*. Ex. 9 at 81:6–82:3; Ex. 4 Table 3. This is an important omission because if two properties came into BANA's possession that were otherwise comparable except for one having its value depressed from being in disrepair, Rugh's model would fail to account for that, and incorrectly attribute the difference to differential treatment by BANA rather than to the different conditions reflected in the property values.[9]

- Rugh did not control for "local crime statistics." The only variable in his analysis related to crime was a binary value based on whether the property was in an area with a [redacted] burglary rate. Ex. 4 Table 3. He did not have data on other property crimes (*e.g.*, vandalism), so he decided to treat burglary as a [redacted] for these crimes under the assumption that they have some (though not perfect) correlation with each other. Ex. 4 at 24. Compounding this issue, much of Rugh's burglary statistics came from "city-level data," not at the level of individual Census tracts. Ex. 12 ¶ 21. As a result, Rugh regularly attributed the *same* burglary rate to every property in the same city limits. *See id*. Obviously, this cannot do the job of testing relationships between crime rates and property conditions at the Census tract level.

- Rugh's analysis *did* consider "property age" (Compl. ¶ 87), but only in a crude manner designed to blunt the effects of property age rather than clarify it. Rather than simply considering the age of the structure, Rugh put them in broad ranges based on whether they were "Built before 1940," "Built 1940-1969," or "Built 1970 or later." Ex. 4 Table 3. But property conditions differ significantly *within* these ranges—homes built in the 1970s are as much as 6 times more likely to have some of the defects measured by Plaintiffs as homes built in the 2000s. Ex. 4 App'x 3. Rugh's analysis, by design, obscured these differences rather than accounting (properly) for them.

---

[9] The only other data related to property sales included in Rugh's model were (i) a variable he labeled "Change in Zip Code Home Prices," which was intended to account for whether properties were in areas where "home prices declined more" during the post-2007 recession (Ex. 4 App'x 3 at 18), and (ii) variables indicating whether the foreclosed borrower had acquired the property in a "flipped sale" and whether BANA acquired the property in a deed-in-lieu-of-foreclosure. Ex. 4 Table 5. Rugh found the effect of these variables "insignificant" (*id*), which is unsurprising, as none of them accounted in any way for the actual property values at any point in time.

Bank of America's expert economist David M. Skanderson replicated Rugh's analysis based on Rugh's data to assess whether it supported the Complaint's allegations of an average disparity of 2.7 defects that was "not explained by non-racial factors." Compl. ¶ 87; Ex. 10 ¶ 120. Even with the defective and incomplete variables Rugh used, those non-racial variables explained at least part of the alleged disparity, with an alleged disparity of 2.0 left unexplained by the variables in the model. Ex. 10 ¶ 120. When Skanderson added just two more variables to the mix—"share of households with income below the poverty level" and "property vacancy rates"—this purportedly unexplained disparity was reduced from 2.0 to 1.19, a small difference with no demonstrated economic or practical significance. *Id.* ¶¶ 120, 128.

In response to these and other criticisms by Defendants' experts, Rugh substantially revised his original regression analysis in his expert report. *See* Ex. 5. The revised version no longer divided construction dates into eras and instead factored in the year of each construction—unsurprisingly, the effect of this was to reduce the alleged unexplained disparity. *Id.* Table 16. Rugh also accepted Skanderson's criticism that poverty rates were vital to account for, but upon finding this to have a significant effect in diminishing the unexplained disparity, fiddled with the input so the effect would not be as large. Specifically, instead of factoring in the poverty rate of the tract in which the REO property was located, Rugh considered only the poverty rate among homeowners under the assumption that renters could not have anything to do with the observed conditions. *Id.* This assumption proved unfounded, since Rugh had no idea how many of the subject properties were owner-occupied before becoming REO properties following foreclosure, and there were documented cases of renter indifference (or malfeasance) contributing to the damaged state of certain REO properties. *See* ECF No. 167-1 at 13.

Despite its revision, Rugh's revised analysis still failed to embrace the entire universe of properties at issue. There are 1,405 properties out of the original 1,677 at issue, after accounting

for properties Plaintiffs agreed they had included erroneously because BANA didn't actually own them at the time of Plaintiffs' inspections. *See id*. at 4. Rugh's first revised regression analysis only covered 940 properties out of those 1,405 (932 after subtracting 8 properties that weren't vacant at the time of Plaintiffs' inspection). Among these 932 properties, Rugh found 35% of the alleged disparity explained by the non-racial factors in his (revised) model, leaving the alleged unexplained gap at 1.97 defects. Ex. 5 Table 16.

Subsequent to his report, Plaintiffs' counsel [redacted] Rugh to re-do his analysis on the full population of 1,405 properties. Ex. 6 at 2. This lowered the alleged disparity unexplained by the variables in the model from 1.97 to 1.91. *Id*. at 14. Then Rugh re-did the analysis on a smaller population he called the [redacted]—635 properties out of the 1,405 after excluding properties where Plaintiffs manipulated their ratings after the original data entry, though he only factored 430 of the 635 in his analysis because he [redacted] on the rest. *Id*. at 3. (There is also still no way of knowing how many properties had their ratings manipulated *during* the original data entry.) This analysis of the [redacted] population lowered the unexplained disparity even *more* dramatically. Within this population, [redacted] in Rugh's model." *Id*. In other words, nearly half the disparity was accounted for by non-racial factors, bringing the alleged unexplained disparity by Plaintiffs' own measures down even further from 1.91 to 1.65. (The large difference between the [redacted] and the "edited" ones also illustrates how one-sided Plaintiffs' "edits" were.)

All told, Rugh has at least four different regression analyses on the record in this case, with inconsistent results. Every time he has revised and refined his analysis, the portion of the disparity for which he fails to find a non-racial explanation has gone down. This, coupled with Rugh's repeated need to revise and update his analysis in response to some of Defendants' criticisms and inability (or, perhaps, unwillingness) to address other criticisms, reveals that Rugh's analysis has

always been and remains inherently unreliable. *See*, *e.g.*, RICHARD A. BERK, STATISTICAL LEARNING FROM A REGRESSION PERSPECTIVE 43 (3d ed. 2020) ("[I]t is common to fit a regression model, look at the results and in response, revise the regression model. The aim is to build the best model possible. Yet, a winner is chosen without formally acknowledging all of the competitors that were discarded or all of the competitors that *could* have been discarded with new realizations of the dataset. It also is possible that with new realizations of the dataset, a different winner would be crowned. This too is ignored.").

**B. Rugh's Analysis Is Also Unreliable Because It Depends on Bad Data.**

As discussed in BANA's summary-judgment motion, a regression analysis is only as relevant and reliable as the data fed into it. *See* ECF No. 167-1 at 36–37. A regression analysis "measures the probability that the calculated disparity could occur randomly—but the analysis in no way validates the calculation of the disparity itself. If the tested disparity is based on erroneous assumptions or suffers from flaws in the underlying data, then [the regression] analysis is foredoomed to yield an equally faulty result." *Maddox v. Claytor*, 764 F.2d 1539, 1552 (11th Cir. 1985). That is the case here. Rugh's regression analysis is unreliable out of the gate due to Plaintiffs' unscientific methods for collecting (and then altering) the data fed into it.

This is the classic "'garbage in, garbage out' problem." *Bruno*, 311 F.R.D. at 143. Even if an expert's analysis is otherwise reliable, basing it on dubious and altered underlying data "warps the true purpose of such models." *Id*. This is true as a matter of law and as a matter of science.

> [T]here is no substitute for good data. . . . It is very important to invest time and resources in data collection. One cannot count on statistical learning successfully coming to the rescue. Indeed, some forms of statistical learning can be quite fussy and easily pulled off course by noisy data, let alone data that have substantial and systematic measurement error.

BERK, *supra*, at 422.

There are multiple factors here that cast doubt on the integrity of the data before Rugh even picked up his pen to start his work. First among them is the fact that, as HUD described at length in its *U.S. Bank* ruling and as Plaintiffs' own property-maintenance expert admits, the criteria Plaintiffs used for deciding what constitutes a "defect" were inconsistent with BANA's actual obligations. *See* ECF No. 167-1 at 6–7, 9, 15–16, 30–32. Equally fundamental is Plaintiffs' spoliation problem: even if the criteria they applied were legitimate, *nobody knows* how their field inspectors scored the majority of the properties at issue because Plaintiffs admitted to altering the results after-the-fact and then destroying the original reports in paper shredders, to leave no trail behind of what the alterations were. *See* ECF No. 153-1.

Exacerbating these problems was the subjectivity of Plaintiffs' inspection criteria and the vague guidance they gave on how to apply them, resulting in identical conditions being rated differently at different properties based on subjective whim (at best) or confirmation bias (at worst). *See* ECF No. 167-1 at 16–22. This resulted in Plaintiffs' results being irreplicable. Neither their own inspectors nor their own property-maintenance expert could agree on the scoring of the properties put in front of them for comparison. *See id*. at 21.

Even the *numerical* aspect of this exercise, while dressed in the language of mathematics, is arbitrary and subjective—every reference to the purported "disparity" of 1.65 defects rests on Plaintiffs' rating every possible defect with a binary value of 0 or 1 regardless of significance or severity, so that a postcard in a mailbox, chipped paint on a windowsill, or a gutter downspout that needs to be shifted a few inches back into place literally counts the same as a collapsed building:

**TWO HOUSES, BOTH ALIKE IN CURB APPEAL?**



**The above house crushed by a massive oak tree in a majority-white suburb of Chicago earned 5 curb-appeal deficiencies from Plaintiffs' inspectors. The damage from the tree was worth 1 deficiency, for "damaged roof." Ex. 18 at 26272 ([redacted]).**




**Plaintiffs gave 8 curb-appeal deficiencies to the house above in a majority-minority Baltimore suburb. The yard alone counted for *three*: overgrown grass, overgrown shrubs, invasive plants. Ex. 18 at 67 ([redacted]).**



**The debris above earned 1.0 curb-appeal deficits, for "trash." Ex. 18 at 20341 ([redacted]).**



**This house *also* earned 1.0 curb-appeal deficits for "trash." The "trash" is apparently the bottle of sidewalk salt or a cleaning supply on the porch corner. Ex. 18 at 29092 ([redacted]).**

This is doubly problematic because Plaintiffs' theory of liability does not turn on the conditions of properties in the abstract, but on the notion that subpar "curb appeal" somehow "diminish[es] home values for surrounding homeowners" and "deter[s]" prospective buyers from purchasing properties in the neighborhood. Compl. ¶¶ 71, 144, 295. Thus, a pertinent set of maintenance criteria, to support these claims, would need to limit itself to the type of issues that *actually* depress home

values or deter prospective buyers. Plaintiffs have no evidence that such easily redressable cosmetic issues as chipped paint on a door frame or overdue lawnmowing have these effects at all, much less having them to the same degree as severe structural damage. To the contrary, there is record evidence of buyers undeterred by the damages Plaintiffs complain about. *See* ECF No. 167-1 at 12 (regarding 1610 U St, S.E., Washington, D.C.).

The problem for Rugh is that, since he professes no expertise in property maintenance, he has no opinion on whether Plaintiffs applied the right criteria in rating properties or performed their inspections with any level of professional competence. *See id.* at 37 (citing Ex. 23 at 22:6–29:6)). And there is no usefulness to his analysis of Plaintiffs' data if the data set itself was not reliably collected. The law does not require an expert to be a jack-of-all-trades, but it does require more diligence than a blind reliance in the integrity of information furnished by self-interested litigants. Rugh is in the same position as the "urban geologist" in *St. Louis*, whose report was excluded because it was "based upon unreliable data furnished by" the organizational plaintiff. 130 F. Supp. 2d at 1087–88.[10] "Given the importance of the accuracy of the underlying data, a fact [the expert] admitted, it would have been prudent for him to examine the test report forms and the debriefing forms to assure himself of the accuracy of the underlying data," *St. Louis* held. *Id.*[11]

---

[10] *See*, *e.g.*, *Bruno*, 311 F.R.D. at 137 ("blind adherence to data absent any sort of independent investigation stops short of the type of reliability contemplated by *Daubert*") (citing *Legendary Art, LLC v. Godard*, 2012 WL 3550040, at *5 (E.D. Pa. 2012)) (excluding expert that "relied exclusively on the self-serving data provided by [the plaintiff]" while "profess[ing] no experience in the plaintiff's industry")).

[11] *See also*, *e.g.*, *Coffey*, 187 F. Supp. 2d at 974 ("if [an expert] assumed certain parameters for his [] analysis, and those parameters were later proven to be incorrect, then the conclusion reached by the computer model would also be incorrect"); *State v. Swinton*, 847 A.2d 921, 942–43 (Conn. 2004) ("In addition to the reliability of the evidence itself, what must be established is the reliability of the procedures involved. . . . We note that 'reliability problems may arise through or in: (1) the underlying information itself; (2) entering the information into the computer. . . .'") (quoting R. Garcia, *"Garbage In, Gospel Out": Criminal Discovery, Computer Reliability, and the Constitution*, 38 UCLA L. REV. 1043, 1073 (1991)).

Not only did Rugh not do this, he lacked the expertise to do it. So, his analysis necessarily just assumes the reliability of the underlying data. Compounding this issue, Rugh made no effort in his analysis to account for the testimony of the only one of Plaintiffs' experts with any experience in property maintenance, Deavay Tyler. Tyler disagreed with numerous of the investigation criteria Plaintiffs applied, as well as with the way in which Plaintiffs applied them. *See* ECF No. 167-1 at 16, 19, 20, 30, 33. So Rugh's analysis is built on a foundation of concededly erroneous data that Plaintiffs' own expert concedes derive from misapplied investigation criteria. It is therefore of no use to the Court or to any potential factfinder. *See*, *e.g.*, *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613–15 (7th Cir. 2002) (striking purported expert who "himself lacks the necessary expertise to determine whether [modeling] techniques" he relied on "were appropriately chosen and applied").[12]

**C. Rugh's Regression Analyses Are Unreliable on Their Own Terms.**

Even setting aside the faulty data underlying Rugh's analysis, the results are still unreliable. The purpose of Rugh's regression analysis is to carry Plaintiffs' burden to show "robust causality" between the purported disparity and the "defendant's policy or policies." *Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Proj., Inc.*, 576 U.S. 519, 541–43 (2015). Thus, to evaluate the reliability of Rugh's analysis and its "fit" to this case (*Newman*, 218 F. Supp. 2d at 772), the Court needs to pose two main questions: 1) How reliably and robustly does Rugh attribute causality to BANA's policies? and 2) How reliably does Rugh *eliminate* alternative causal explanations?

The answer to the first question is an easy one: **Not at all.** Rugh's regression analysis neither tests nor concludes anything about Defendants' "policies." Instead, it tries to carry

---

[12] *See also*, *e.g.*, *Agnew v. Cater*, No. 18-50035, 2022 WL 313756, at *9 (N.D. Ill. Feb. 2, 2022) ("because many of [the expert's] opinions are based upon [another]'s opinions, he cannot testify as to his opinions that relied upon [those] opinions").

Plaintiffs' substantial causation burden only by testing a handful of alternative explanations for the alleged disparity, and then concluding that any portion of the disparity *not* attributable to these explanations *must* be [redacted] Ex. 4 at 3. This falls short in multiple respects, as detailed in BANA's summary-judgment motion. ECF No. 167-1 at 41–44. First, it doesn't *really* mean [redacted]—it just means it was unexplained by the limited explanations *Rugh chose to test*. Second, Rugh is very careful *not* to claim any BANA policy as the explanatory factor, only "race" in general. But that could correlate with all sorts of pre-existing racial disparities having nothing to do with any BANA policy, such as the documented disparities in housing stock long pre-dating any of the properties becoming REOs. *See id.*; Ex. 13 ¶ 39 & App'x 3. As the court reasoned in *Cook County*, another FHA disparate impact case to fail on summary judgment due to the unreliability of the experts' statistical and regression models, the assumption "all of these life experiences will happen to all families regardless of their race and ethnicity, equally, . . . is 'true only if no other factor relevant to those life experiences is correlated with race'"—and yet, "such correlations *do* exist." 2022 WL 408299, at *12 (quoting *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (citation and brackets omitted).

The answer to the *second* question is that Rugh's analysis no more reliable when it comes to eliminating alternative explanations. With an alleged disparity reduced to 1.65 out of a possible 37 defects that has gone down every time Rugh has revised his analysis, Rugh's analysis does not come close to eliminating every possible cause besides race discrimination. The only explanations a regression analysis can eliminate are those it tests. But Rugh neglected to test numerous explanations for which there is actual concrete evidence of their connection to the purportedly observed property conditions, such as:

- **The condition the properties were in when BANA acquired them.** *See* ECF No. 167-1 at 38–41. This is a glaring omission because Rugh admitted that this is exactly the sort of thing an analysis like his *should* account for. *See* Ex. 9 at 45:15–20 ("It

would be important to capture the initial condition of the property . . . to understand what are all the determinants of the observed disparities at any point in time. . . ."), 48:7–20 (similar). So, for example, his analysis (correctly) considers property age an "important" explanatory factor because houses acquire "wear and tear" as they get older. ECF No. 167-1 at 38 (quoting Ex. 9 at 40:10–41:8). But property age is not, of course, the *only* factor that speaks to the wear-and-tear a house will have experienced before it became an REO, and Rugh admitted that if he'd been given data on other factors—or direct evidence of the condition the properties were in at an earlier point of time—he would have accounted for those, too. *Id.* at 38–39 (quoting Ex. 9 at 207:11–213:21, 236:17–21).

- **Property values.** Plaintiffs *said* that Rugh's regression analysis controlled for property values. Compl. ¶ 87. But it did not. The only variable he used related to property values was *land* value based on tax assessments, which (i) is just based on the unimproved lot, not the actual house, and (ii) is *not* based on actual market value. Ex. 9 at 43:6–12, 81:6–82:3. Rugh explained that the reason he used this variable instead of one accounting for actual property values was because *he didn't want the value affected by the actual condition of the home*. *Id.* at 82:4–84:2. Yet the condition of the home at a prior point in time is *exactly* what Rugh needed to control for to draw valid conclusions about whether Plaintiffs were observing pre-existing deficiencies or maintenance deficiencies.

  Notwithstanding this deliberate omission, when asked whether he would have analyzed "historic property value information, say the value of each property as of the date the prior homeowner became delinquent," if available to him, Rugh conceded he would. *Id.* at 84:3–11. The reason he didn't, he said, was because he didn't have those data. *Id.* at 84:12–16. But in fact such data *were* available in BANA's records of appraisals and broker-price opinions on the subject properties; Plaintiffs just failed to make Rugh aware of them. *Id.* at 90:7–93:5; *see Moore v. Napolitano*, 926 F. Supp. 2d 8, 24 n.11 (D.D.C. 2013) ("An expert who fails to review relevant data, and can offer no good reason for it or does not understand the omitted relevant data, has not reliably applied a scientific methodology.").

- **Vandalism.** Rugh *wanted* to control for vandalism, but only did so in a roundabout way: by collecting (faulty) burglary statistics, then concluding that vandalism rates are likely similar. That extrapolation merely incorporates the defects in Rugh's burglary data, which he only had for barely half the properties at issue (Ex. 5 Table 4), often undifferentiated by Census tract and therefore useless for testing its correlation with disparities on the Census-tract level. Without question, Rugh failed to account for *actual instances* of vandalism responsible for *actual property damage*, like the D.C. property vandalized four days before Plaintiffs' visit. *See* ECF No. 167-1 at 12.

- **Actual maintenance requirements.** Different municipalities have different laws on how REO properties must be maintained. There are also different requirements imposed by investors based on whether the properties secured loans owned or insured by Fannie Mae, Freddie Mac, the FHA, the VA, and so on. Thus, something like a boarded window might be legally required in one place and legally prohibited in

another. Nothing in Rugh's regression model accounts for these differences, notwithstanding that Plaintiffs treat them as maintenance defects in all cases without regard to the applicable laws or investor requirements.

- **Ability to repair.** An implicit assumption of Rugh's analysis is that BANA *could have* attended to all the alleged defects Plaintiffs complain about by the time of Plaintiffs' inspections. But that is not the case. Some properties had holdover occupants that needed to be evicted before any work could be done. ECF No. 167-1 at 12.[13] More than three-quarters of the subject properties came from FHA-insured loans subject to FHA-imposed limitations on the amount and cost of permissible maintenance work. Ex. 14 ¶ 61. Other mortgage investors like Fannie Mae and Freddie Mac impose their own limitations. Plaintiffs thus ended up blaming BANA for numerous defects BANA had no ability to fix at the single point in time of Plaintiffs' visits. ECF No. 167-1 at 12, 32. Plaintiffs also gave BANA myriad deficiencies for not "marketing" properties with for-sale signs when it owned them, without accounting for the fact that BANA was not charged with marketing FHA REOs and the FHA markets them upon reconveyance. Ex. 14 ¶ 15. At no point has Rugh ever done an analysis limited to those alleged defects BANA actually had the ability to address.

- **Sixteen of the metropolitan areas at issue.** In an effort to reduce the influence of location-specific factors on Plaintiffs' results (*e.g.*, properties in Michigan more likely to experience autumn leaves than properies in Florida due to the weather, not due to Defendants' maintenance practices), Rugh used a variable in his regression model called [redacted] Ex. 4 Table 16, Ex. 9 at 224:4–9. Rugh found that accounting for this "does help explain a good portion of the variance and bring down racial disparities." *Id.* at 222:1–3. But it requires a sufficiently large sample size within each metropolitan area. Rugh set that bar at 30 (Ex. 4 Table 16), and thus could not account for these location-specific factors in sixteen metropolitan areas where Plaintiffs inspected fewer than 30 properties.

Neglecting such important factors in a regression model is contrary to generally accepted scientific practice. *See*, *e.g.*, ALAN JULIAN IZENMAN, MODERN MULTIVARIATE STATISTICAL TECHNIQUES: REGRESSION, CLASSIFICATION, AND MANIFOLD LEARNING 143 (2008) ("[I]f too few variables are included, . . . the regression function will have increased bias, it will give a poor explanation of the data, and *underfitting* will occur."). It also renders the model inadmissible under *Daubert*, since "the Supreme Court . . . in *Bazemore v. Friday*, 478 U.S. 385 (1986) . . . left no question whatsoever

[13] Another of Plaintiffs' purported experts, Fetters, concedes this is a vital factor to account for. *See* Ex. 2 at 28 (opining on the importance of excluding occupied properties because BANA "would not have as much control over an occupied property").

that a regression analysis that does not control for at least major variables may be altogether inadmissible." *Smith v. Virginia Commonwealth Univ.*, 84 F.3d 672, 681 (4th Cir. 1996) (en banc) (Luttig., J., concurring); *see also*, *e.g.*, *Eastland v. TVA*, 704 F.2d 613, 621 (11th Cir. 1983) ("The probative value of a multiple regression analysis depends in part upon [] the inclusion of all the major variables likely to have a large effect on the dependent variables. . . ."); *Cook Cnty.*, 2022 WL 408299, at *11 ("salient flaw[]" in expert model was failure "to control for numerous other variables").

Rugh's choice of variables (and exclusion of others) also fails the Daubert criterion of "whether [his] technique . . . has been tested." *Cooper*, 259 F.3d at 199. When BANA's expert tested his model, adding just two more variables—poverty and vacancy rates—reduced the unexplained purported disparity by 38%. Ex. 10 ¶ 129, Table 12. Rugh does not furnish scientific justifications for his decisions not to include certain variables, but the choice of variables is part of the science of regression modeling and must also be done according to generally accepted standards. "[O]ne interpretation is that a variable is important if dropping it seriously affects prediction accuracy." IZENMAN, *supra*, at 143 (citation omitted). Another strategy for testing if a model is "good enough" is "the comparative performance of alternative model specifications." BERK, *supra*, at 12. Rugh did not subject his models to such tests in deciding on his variables.

To be sure, this was partially because he didn't *have* data on important variables like property values or property conditions before (or after) Plaintiffs' inspections. But he admitted that if such data had been available to him, he would have analyzed them. *See* Ex. 9 at 84:3–16, 87:21–88:18, 208:14–214:9, 230:17–232:21. Regardless whether that reflects a failure in Plaintiffs' data-collection or a limitation on the available data, it cannot justify a substandard regression model. The solution was for Plaintiffs to go beyond their "single point in time" snapshots and collect better data. *See* BERK, *supra*, at 195 ("There is one and only one ironclad solution to missing data

regardless of the form of data analysis: don't have any. The message is that it pays to invest heavily in the data collection so that missing data does not materialize or is very rare."). Or, if the data necessary for a good regression model couldn't be captured, then a regression model simply is not the appropriate tool of analysis. *See* Ex. 17 ¶¶ 31–39 (reviewing "examples of property-specific circumstances and conditions that illustrate why a statistical regression analysis of point-in-time inspection findings based on readily available data cannot capture all non-discriminatory explanations for the state of an REO property at a given point in time"). As stated in the Berk text:

> But advancing a scientific or policy discourse does not imply that the model used is right, or even close. . . . [W]hy should this matter? . . . It matters because ***certain features of the analysis used to bolster substantive claims may be fundamentally wrong or misleading***. For example, if a model is not first-order correct, the probabilities associated with statistical texts are almost certainly incorrect. . . . [T]he relevant estimate from the data will on the average be offset by its bias.

Berk, *supra*, at 13 (emphasis added).

### D. Rugh's Models Cannot Show a Robust Causal Link to BANA Policies.

This Court has had occasion to rule on the admissibility of expert testimony plagued by analogous problems. The case was *Foster v. Legal Sea Foods, Inc.*, 2008 WL 2945561 (D. Md. July 25, 2008) (Blake, J.). It was not a statistical discrimination case, but rather arose from what might or might not have been a negligently prepared platter of *moules marinière*. Nonetheless, the *Daubert* analysis the Court performed is strikingly apropos. The plaintiffs in that case proffered two purported medical experts to opine that the plaintiffs had caught hepatitis from the defendants' practice of harvesting mussels from polluted waters. "To be reliable," this Court ruled of such a diagnosis, it "must first 'rule in' a plaintiff's proposed cause and then 'rule out' alternative causes." *Id.* at *10. In other words, the experts needed (i) to cite "strong evidence" that the defendants' product, "from the universe of possible causes," was a "likely" cause of the illnesses, and (ii) to

"eliminate[], or at least minimize[], other potential causes." *Id.* at *11–12. This Court ruled that the plaintiffs' experts did not reliably do either.

The Court first found that the experts "fail[ed] to reliably rule in mussels as a cause" because the only record evidence was that food-borne hepatitis was rare and cases caused by shellfish had "declined to near zero." *Id.* at *12. By the same token here, Plaintiffs have no independent evidence that property conditions tend to deteriorate during the REO period; academic research shows the opposite—that "financially distressed homeowners neglect maintenance, and property conditions deteriorate, long before foreclosure sales and lender ownership"; that these negative effects "grow[] in magnitude during the delinquency period and reach[] a maximum before the REO period"; and that "there is a stabilization and improvement in property conditions following the foreclosure sale, or when the lender takes ownership of the foreclosed property." Ex. 15 ¶¶ 15–16. And since Plaintiffs' single-point-in-time inspections gave them no data on how property conditions were improving or deteriorating under BANA ownership, they have likewise failed to "rule [it] in" as a factor in the conditions they claim to have observed.

Next in *Foster*, this Court found the plaintiffs' experts hadn't reliably "rule[d] out alternative causes" of the plaintiffs' illness. *Id.* at *13. Chief among these was "other contaminated foods they consumed during the incubation period or contact with other infected persons." *Id.* "This failure is especially egregious," the Court found, "in light of the [] evidence that [] infected food handlers are the most common source of the virus." *Id.* Neither expert "inquire[d] into the food [plaintiffs] may have may have eaten at Burger King" or a Delaware café on the same trip they patronized the defendant's restaurant, among "the universe of possible causes." *Id.* at *11. Thus, the Court ruled that the "expert testimony . . . that Legal's mussels were more likely than not the cause of the [plaintiffs'] illness must be excluded as unreliable and potentially misleading to the jury." *Id.* at *13. Again, the same sort of problems infects Rugh's analysis here. He inquired

into *some* alternative causes, but far from the entire "universe of possible causes" (*id.* at *11), while omitting the *likeliest* causes. His analysis is simply incapable of ruling out the condition of properties when BANA acquired them as an explanatory factor for the condition Plaintiffs claim the properties were in when Plaintiffs found them. It is also incapable of ruling out non-racial factors that corelate with race but have nothing to do with Defendants' maintenance practices. *See* Ihlanfeldt & Mayock, *supra*, at 85 ("The differences in REO maintenance levels across communities found by the NFHA may be due to differences in the race of these neighborhoods, as alleged by the NFHA, but they may also reflect income differences, because neighborhood race and neighborhood income are highly correlated and the NFHA did not control for income differences."). Plaintiffs' effort to paint Rugh's regression analysis to *look* like it controls for such factors (but not doing so) is actually even worse than doing nothing at all. It is the kind of submisison that does more to "mislead" than illuminate. *Newman*, *supra*.

## CONCLUSION

*Daubert* requires expert conclusions to be "supported by good grounds for each step in the analysis, which means that *any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994). The reports and opinions of Plaintiffs' purported experts lack reliable support at multiple steps in the analysis, any one of which thus furnishes ample justification for striking them in full.

WHEREFORE, BANA respectfully moves that the Court strike the irrelevant and unreliable testimony and reports of Plaintiffs' experts Jacob Rugh, Pamela Kisch, and Michael Fetters.

Respectfully submitted this 12th day of September, 2022,

*/s/ Ava E. Lias-Booker*
Ava E. Lias-Booker (No. 05022)
Melissa Martinez (No. 28975)
McGuire Woods LLP
500 E. Pratt St., Ste. 1000
Baltimore, Md. 21202
Tel.: (410) 659-4430
Fax: (410) 659-4558
alias-booker@mcguirewoods.com
mmartinez@mcguirewoods.com

*/s/ Thomas M. Hefferon*
Thomas M. Hefferon (No. 15109)
Brooks R. Brown (*pro hac vice*)
Anthony M. Alexis (*pro hac vice*)
Keith Levenberg (No. 11957)
Goodwin Procter LLP
901 New York Ave., N.W.
Washington, D.C. 20001
Tel.: (202) 346-4248
Fax: (202) 346-4444
thefferon@goodwinlaw.com
bbrown@goodwinlaw.com
aalexis@goodwinlaw.com
klevenberg@goodwinlaw.com

*Counsel for Defendant Bank of America, N.A.*

# Exhibit 18




PLAINTIFFS 000067



PLAINTIFFS 020341



PLAINTIFFS 026272



PLAINTIFFS 029092

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A., *et al.*,<br><br>Defendants. | Civil Action No. CCB-18-1919 |

**PLAINTIFFS' OPPOSITION TO DEFENDANT BANK OF AMERICA, N.A.'S MOTION TO STRIKE [ ] EXPERT REPORTS OF JACOB RUGH, PAMELA KISCH, AND MICHAEL FETTERS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 2

LEGAL STANDARD ........ 5

ARGUMENT ........ 7

I. Dr. Fetters' testimony is grounded in the facts of the case and his relevant experience. ........ 7

A. Dr. Fetters' areas of expertise are relevant and valuable to a fact finder.... 8

B. Neither *Daubert* nor FRE 702 requires Dr. Fetters to have substantive experience in property preservation and maintenance, REOs, or fair housing. ........ 11

C. Dr. Fetters' opinions are based on his expertise and independent review of the factual record. ........ 13

II. Pamela Kisch's opinions, based on her deep experience in the fair housing testing field and HUD and DOJ testing standards, provide important context for Plaintiffs' enforcement investigation, not legal conclusions. ........ 17

A. Ms. Kisch's extensive experience in fair housing testing design is relevant to the issues and facts in this case. ........ 18

B. Ms. Kisch's opinions are reliable and based on her review of the record, experience in the field, and fair housing testing standards used by HUD and the DOJ. ........ 20

C. Ms. Kisch's opinions reflect her insight and perspective as a fair housing testing expert, not legal conclusions. ........ 24

III. Dr. Rugh's analyses are relevant and reliable in demonstrating that the racial disparity in maintenance and marketing Plaintiffs observed remains statistically and practically significant even after controlling for a multitude of non-racial factors. ........ 25

A. Dr. Rugh carefully applied widely accepted methodology—capable of being tested—to evaluate, through a series of separate analyses, a plethora of potential non-racial explanatory factors for the observed racial disparity in REO maintenance and marketing. ........ 26

1. Dr. Rugh's analyses considered 40 potential alternative explanatory factors for which he had data and demonstrated that no combination of these factors eliminated the statistically and practically significant racial disparity. ........ 27

2. Dr. Rugh performed multiple regression analyses to test Defendants' various theories about the cause of the racial disparity in REO maintenance and marketing. ........ 30

3. Dr. Rugh properly used Plaintiffs' investigation data in his analyses. ..... 32

B. Dr. Rugh's analysis demonstrates that race—rather than the 40 other factors he considered—drives the maintenance and marketing disparities Plaintiffs observed and thus establishes robust causality. ..... 33

CONCLUSION ..... 35

## TABLE OF AUTHORITIES

### Cases

*Ambrosini v. Labarraque*,
101 F.3d 129 (D.C. Cir. 1996) .......... 27

*Balbed v. Eden Park Guest House, LLC*,
No. PJM-16-0193, 2019 WL 3717582 (D. Md. Aug. 7, 2019) .......... 6, 18

*Bazemore v. Friday*,
478 U.S. 385 (1986) .......... 26, 30

*Belk, Inc. v. Meyer Corp., U.S.*,
679 F.3d 146 (4th Cir. 2012) .......... *passim*

*Bresler v. Wilmington Tr. Co.*,
855 F.3d 178 (4th Cir. 2017) .......... 30

*Brundle on behalf of Constellis Emp. Stock Ownership Plan v. Wilmington Tr. N.A.*,
No. 115CV1494LMBIDD, 2017 WL 6403105 (E.D. Va. May 16, 2017) .......... 32

*Burns v. Anderson*,
123 F. App'x 543 (4th Cir. 2004) .......... 21

*Cavallo v. Star Enter.*,
100 F.3d 1150 (4th Cir. 1996) .......... 6

*Coal. for Equity & Excellence in Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*,
295 F. Supp. 3d 540 (D. Md. 2017) .......... 8, 10, 23

*Columbia Gas Transmission, LLC v. 76 Acres, More or Less, in Baltimore & Harford Cntys.*,
701 F. App'x 221 (4th Cir. 2017) .......... 14, 15, 26

*Conwood Co. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) .......... 27, 34

*Daubert v. Merrell Dow Pharmaceuticals Inc.*,
509 U.S. 579 (1993) .......... *passim*

*E. Tenn. Nat. Gas Co. v. 7.74 Acres in Wythe Cnty.*,
228 F. App'x. 323 (4th Cir. 2007) .......... 15

*Foster v. Legal Sea Foods, Inc.*,
No. CCB-03-2512, 2008 WL 2945561 (D. Md. July 25, 2008) .......... 33, 34

*Goebel v. Denver & Rio Grande Western R.R. Co.*,
346 F.3d 987 (10th Cir. 2003) .......... 27

*Heckman v. Ryder Truck Rental, Inc.*,
No. CCB-12-664, 2014 WL 3405003 (D. Md. July 9, 2014) .......... 34

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
892 F.3d 624 (4th Cir. 2018) .......... 7

*Jahn v. Equine Servs., PSC*,
233 F.3d 382 (6th Cir. 2000) ........................................ 27

*Kopf v. Skyrm*,
993 F.2d 374 (4th Cir. 1993) ........................................ 5, 18

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ........................................ 5, 15, 31

*Manpower, Inc. v. Ins. Co. of Pa.*,
732 F.3d 796 (7th Cir. 2013) ........................................ 32

*Metropolitan St. Louis Equal Housing Opportunity Council v. Gordon A. Gundaker Real Estate Co.*,
130 F. Supp. 2d 1074 (E.D. Mo. 2001) ........................................ 20, 21, 32

*Palmer v. Shultz*,
815 F.2d 84 (D.C. Cir. 1987) ........................................ 30

*Pugh v. Louisville Ladder, Inc.*,
361 F. App'x 448 (4th Cir. 2010) ........................................ 7

*RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*,
609 F. App'x 731 (4th Cir. 2015) ........................................ 12, 19

*Sarkees v. E. I. Dupont De Nemours & Co.*,
15 F.4th 584 (2d Cir. 2021) ........................................ 34

*Shreve v. Sears, Roebuck & Co.*,
166 F. Supp. 2d 378 (D. Md. 2001) ........................................ 6

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
467 F.3d 107 (2d Cir. 2006) ........................................ 6, 15

*TFWS, Inc. v. Schaefer*,
325 F.3d 234 (4th Cir. 2003) ........................................ *passim*

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
878 F.2d 791 (4th Cir. 1989) ........................................ 19

*United States v. Simmons*,
470 F.3d 1115 (5th Cir. 2006) ........................................ 23

*United States v. Stanley*,
533 F. App'x 325 (4th Cir. 2013) ........................................ 7

*United States v. Wilson*,
484 F.3d 267 (4th Cir. 2007) ........................................ 5, 23

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999) ........................................ *passim*

**Rules**

Federal Rule of Evidence 401 ........................................ 5

Federal Rule of Evidence 702 ........................................ *passim*

Federal Rule of Evidence 703 ........ 13, 19

**Regulations**

*Equal Access to Housing in HUD Programs—Regardless of Sexual Orientation or Gender Identity*, 76 Fed. Reg. 4194, https://www.govinfo.gov/content/pkg/FR-2011-01-24/pdf/2011-1346.pdf ........ 22

**Other Authorities**

Keith Ihlanfeldt & Tom Mayock, *The Variance in Foreclosure Spillovers Across Neighborhood Types*, 44 Pub. Fin. Rev. 80, 81–85, 94–100 (2014) ........ 16

Kenneth Temkin, *et al.*, U.S. Dep't of Housing & Urb. Dev., Study of the Fair Housing Initiatives Program 48 (2011) ........ 22

*Long Island Divided*, Newsday (Nov. 17, 2019), https://projects.newsday.com/longisland/real-estate-agents-investigation/ ........ 19

*NFHA v. U.S. Bank N.A.*, No. 01-12-0283-8 (HUD Jan. 8, 2016) ........ 17, 18

*Sexual Orientation and Housing Discrimination in Michigan*, Michigan's Fair Housing Centers (Jan. 2007), https://www.fhcmichigan.org/images/Arcus_web1.pdf ........ 19, 22

## INTRODUCTION

Recognizing that Plaintiffs' experts' opinions undeniably create disputes of material fact, Defendant Bank of America, N.A. ("BANA") moves to these experts' opinions in conjunction with filing its summary judgment reply. BANA uses this oddly timed motion as a vehicle for gaining additional pages, beyond its summary judgment briefs, to dispute Plaintiffs' experts' conclusions. But disagreement with a well-grounded conclusion is not a valid basis to strike expert opinion under Federal Rule of Evidence 702 or *Daubert*. BANA cannot refute that Dr. Michael Fetters is an expert in mixed methods research and that Pamela Kisch, M.S. has deep expertise in traditional fair housing testing. Yet it argues their opinions should be stricken because the Court should believe BANA, over these experts, that Plaintiffs' investigation does not fall within their areas of expertise. BANA asserts that it knows better than Dr. Fetters, a preeminent mixed methods researcher, whether an investigation qualifies as mixed methods research. It similarly claims to know better than Ms. Kisch, the Executive Director of a respected fair housing organization and a fair housing testing veteran, whether Plaintiffs' investigation falls within the scope of the fair housing testing her organization traditionally conducts. BANA may disagree with these experts' opinions, but it cannot legitimately claim that they fall outside of their relevant fields of expertise. BANA's additional critiques of these experts' opinions are simply disagreements with their conclusions, which are based on the experts' years of expertise within their respective fields and their thorough review of relevant portions of the record.

BANA seeks to strike Dr. Jacob Rugh's opinions by misrepresenting the non-racial factors he considered, demanding that he should have included unavailable data in his analyses, and recycling circular arguments that Plaintiffs' investigation data cannot be used as evidence of discrimination in this case. Because BANA identifies no material flaws in the mechanics or

method of analysis Dr. Rugh performed and because he controlled for every testable variable Defendants and their experts have posited as potential alternative explanations for racial disparities in maintenance and marketing, Dr. Rugh's opinions are admissible.[1]

## STATEMENT OF FACTS

Although Plaintiffs need not rely on expert testimony to validate their fair housing investigation methodology, *see* Pls.' Opp'n to Defs.' Mots. for Summ. J. ("Pls.' Opp'n") at 20–21, ECF No. 182, Plaintiffs offered expert testimony from Dr. Michael Fetters and Pamela Kisch to further explain why, whether viewed through the lens of scientific research standards or traditional fair housing testing practices, their investigation methodology is sound. Dr. Fetters is the Director of the Mixed Methods Program at the University of Michigan, which he co-founded in 2015. He is a highly regarded "research methodologist with extensive experience in qualitative, mixed methods, health services and social sciences research." Fetters Rep. at 1, ECF No. 183-2 (Ex. 2-A). Since 2009, Dr. Fetters has served as an editor of the Journal of Mixed Methods Research ("JMMR"), the premier journal in the field of mixed methods research methodology and became the Co-Editor in Chief in 2015. *Id.* Dr. Fetters hosts international workshops on mixed methods research ("MMR") methodology, provides consultations to researchers seeking to use the latest advances in research design for their projects, and has published two books on MMR with two additional books under contract. *Id*. He also has hands-on experience conducting mixed methods research studies. He has led and participated in numerous qualitative, quantitative, and mixed methods studies and has published over 200 peer-

[1] While BANA adopts and incorporates by reference Safeguard's Motion to Strike Certain Expert Opinions, ECF No. 205, Plaintiffs address those arguments in a separate opposition memorandum also filed today. Plaintiffs adopt and incorporate by reference herein the arguments set forth in their contemporaneously filed opposition to Safeguard's motion to strike.

reviewed papers and over 50 book chapters, articles, and commentaries. *Id.* at 2. In this case, Dr. Fetters offers expert opinions both in mixed methods research methodology and in social science research methodology design, sampling, implementation, and interpretation more broadly. *Id.* at 3. After an extensive review of Plaintiffs' investigation methodology, Dr. Fetters concluded that Plaintiffs "conducted a well-designed investigation that would qualify as a rigorous and compelling mixed methods study with the goal of elucidating evidence of whether there were disparities between the maintenance and marketing of REO properties" between racial groups within the 37 metropolitan areas. *Id.* at 4.

Ms. Kisch is the Executive Director of the Fair Housing Center of Southeast & Mid Michigan ("FHC"), which she helped found over 30 years ago. Kisch Rep. at 1, ECF No. 183-6 (Ex. 6-A). She has assisted in resolving 95 fair housing lawsuits, 58% of which relied on testing evidence. *Id.* Because FHC receives funding from the U.S. Department of Housing and Urban Development ("HUD") Fair Housing Initiatives Program ("FHIP"), HUD has approved its testing methodology. *Id.* The U.S. Department of Justice ("DOJ") has also relied on Ms. Kisch's testing in its cases. *Id.* She has served as a tester in at least 100 rental, sales, mortgage, and insurance fair housing tests—in a variety of formats. *Id.* She is responsible for the recruitment, training, and supervising of testers in fair housing investigations. *Id.* Ms. Kisch offers expert opinion on the "use of testers and the role of fair housing organizations in uncovering illegal discrimination" and "[t]he design and execution of fair housing tests." *Id.* at 2. Based on her training, education, and experience, Ms. Kisch concluded that Plaintiffs' investigation is consistent with traditional enforcement testing, that "social science methodological principles are not required to prove discrimination under the FHA," and that "[r]equiring FHA testing to

comport with social science methodological principles, in the manner suggested by Defendants' experts, would frustrate the purpose of the FHA and harm fair housing efforts." *Id.* at 3.

To assist the jury with interpreting the results of Plaintiffs' investigation and to determine whether non-racial factors could reduce or eliminate the racial disparity in maintenance and marketing they observed, Plaintiffs offered the expert opinion of Dr. Jacob Rugh—a sociologist, statistician, and tenured professor at Brigham Young University. Rugh Rep. at 1, ECF No. 183-7 (Ex. 7-A). Dr. Rugh received his Ph.D. from Princeton University in interdisciplinary Urban Policy with an emphasis in the sociology, economics, and public policy dimensions of the 2008 housing foreclosure crisis. *Id.* Before receiving his Ph.D., Dr. Rugh obtained a dual M.P.A. (Public Affairs) and U.R.P. (Urban and Regional Planning) master's degree and a B.S. in Economics. *Id.* He has served as a consulting statistical expert in ten fair housing cases, and he was the lead author of an article on race discrimination in mortgage lending in Baltimore that won the John Hope Franklin Prize for Best Article on Race, Racism, and the Law from the Law and Society Association in 2016. *Id.* His peer-reviewed research has been cited over 2,000 times, and he has "extensive experience in matching primary and secondary data sources to U.S. Census data, Home Mortgage Disclosure Act mortgage data, local county assessor and recorder public data, and other records," as well as with "using geospatial methods, georeferenced data, and geographic information software and systems of maps." *Id*. Based on his experience and extensive review and statistical modeling of Plaintiffs' investigation data, he concluded that the racial disparity in maintenance and marketing deficiencies between properties in majority white and non-white communities "is highly statistically significant, practically significant, and is not fully explained by an analysis of other potential alternative explanations." *Id.* at 2.

## LEGAL STANDARD

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), expert testimony is admissible if: (1) "the reasoning or methodology underlying the expert's proffered opinion is *reliable*—that is, whether it is supported by adequate validation to render it trustworthy"; and (2) "the opinion is *relevant* to the facts at issue." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260–61 (4th Cir. 1999) (emphasis added) (citing *Daubert*, 509 U.S. at 590–92). Although *Daubert*'s principles apply to both scientific and non-scientific expert testimony, courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The reliability inquiry requires courts to examine "the reasoning or methodology underlying the expert's proffered opinion." *Westberry*, 178 F.3d at 260 (citing *Daubert*, 509 U.S. at 590 & n.9). "[T]here exist meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). Indeed, the text of Rule 702 contemplates that an expert may be qualified on the basis of experience alone. *Id.*

Expert testimony is "relevant" where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert*, 509 U.S. at 587 (quoting Fed. R. Evid. 401). Because the question for the court is simply whether the expert's "knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, the expert need only have "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012), *as*

*amended*, (May 9, 2012); *see also Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) ("Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror.").

"[T]he fit between an expert's specialized knowledge and experience and the issues before the court need not be exact," and when it is not, this "lack of perfect fit will go to the weight not the admissibility of expert testimony." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392–93 (D. Md. 2001). Similarly, if an expert's testimony has deficiencies, those gaps go to the weight of the evidence, not admissibility. *Balbed v. Eden Park Guest House, LLC*, No. PJM-16-0193, 2019 WL 3717582, at *3 (D. Md. Aug. 7, 2019); *see also SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132–33 (2d Cir. 2006). Therefore, "the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Westberry*, 178 F.3d at 261. "In applying *Daubert*, a court evaluates the methodology or reasoning that the proffered scientific or technical expert uses to reach his conclusion; the court does not evaluate the conclusion itself." *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003); *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). Courts need only determine whether the testimony is reliable and relevant. *Westberry*, 178 F.3d at 260–61 (citing *Daubert*, 509 U.S. at 590–92).

*Daubert* made clear that Rule 702 was intended to liberalize the introduction of expert evidence, with exclusion of testimony being "the least favored means of rendering questionable scientific evidence ineffective." *Cavallo v. Star Enter.*, 100 F.3d 1150, 1158–59 (4th Cir. 1996). "The trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule."

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018) (alteration omitted) (quoting *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013)).

The party offering expert testimony "does not have the burden to 'prove' anything." *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 452–53 (4th Cir. 2010) (quoting *Maryland Casualty*, 137 F.3d at 784). Instead, the party is only required to establish by a preponderance of the evidence that the expert testimony is admissible. *Daubert*, 509 U.S. at 592 n.10.

## ARGUMENT

### I. Dr. Fetters' testimony is grounded in the facts of the case and his relevant experience.

BANA does not dispute that Dr. Fetters is an expert in both mixed methods research methodology and, more broadly, in social science research methodology design, sampling, implementation, and interpretation. Instead, BANA simply ignores this latter, broader area of expertise and second guesses—without evidentiary support—Dr. Fetters' ability to recognize when an investigation falls within his field of mixed methods research. BANA further cloaks its disagreement with Dr. Fetters' conclusions in misguided accusations of his opinions being *ipse dixit* or supported only by speculation. At their core, however, BANA's arguments confuse expertise in the underlying subject matter of an investigation (on which Dr. Fetters does not opine) with expertise in the methodological design of the investigation (on which he does). Furthermore, Dr. Fetters thoroughly explains how he reached his conclusions and why Plaintiffs' investigation design reflects best practices in social science research—a transparent analysis that BANA is free to challenge before a jury.

**A. Dr. Fetters' areas of expertise are relevant and valuable to a fact finder.**

BANA's critique that Dr. Fetters' areas of expertise are not relevant to the issues in this case fails for two distinct reasons. First, BANA ignores that Dr. Fetters is not only an expert in mixed methods research, but an expert in "social science research methodology design, sampling, implementation, and interpretation" more broadly. Fetters Rep. at 3. BANA does not challenge this clearly relevant area of expertise (other than a few offhand criticisms of him being both a family medicine doctor and researcher)—it simply pretends that Dr. Fetters is only qualified to discuss MMR.

Second, BANA's argument boils down to its disagreement with Dr. Fetters' conclusion that Plaintiffs' investigation qualifies as MMR. BANA argues that Dr. Fetters, an undisputed expert in MMR, incorrectly characterizes Plaintiffs' investigation as MMR. This is not a proper basis for a *Daubert* challenge, in which the court evaluates expert testimony "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

To the extent BANA attempts to call into question the field of MMR, this Court has already noted that MMR is a popular approach "generally employed in the social sciences," *Coal. for Equity & Excellence in Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*, 295 F. Supp. 3d 540, 553–54 (D. Md. 2017). As Dr. Fetters explained, MMR "represents an approach to investigation featuring the integration of qualitative and quantitative approaches in a sustained program of inquiry with due consideration of the philosophical, methodological, and applications in practice." Fetters Rep. at 5.[2]

[2] BANA misquotes Dr. Fetters' report in explaining MMR. Mem. in Supp. BANA's Mot. to Strike ("BANA Mem.") at 1, ECF No. 206-1 (claiming that Dr. Fetters writes that MMR "combines both empirical data and 'sociology, anthropology, education, and nursing' methods"). The full context

BANA mainly disputes Dr. Fetters' conclusion that Plaintiffs' investigation involved qualitative methods. Putting aside that this represents only a disagreement with his opinion—not the methods he used in reaching the opinion—Dr. Fetters' conclusion was supported by the record and scholarly research. First, qualitative data takes many forms—and Defendants isolate only one of them. *See* BANA Mem. at 5–6 (incorrectly stating that the only qualitative data Plaintiffs collected were interviews). "Qualitative research represents a rigorous approach to investigation that typically involves the collection of textual interview data, observational data, and archival data." Fetters Rep. at 5 (citing Fetters, M.D., (2020) The Mixed Methods Research Workbook-Activities for Designing, Implementing, and Publishing Project, Sage pp. 3–4). Plaintiffs utilized different forms of qualitative research in the design and execution of their investigation.

For instance, Dr. Fetters concluded that Plaintiffs' sampling approach could be "characterized as an integrated strategy because both qualitative (*e.g.*, information rich cases) and quantitative criteria (foreclosure rates, home ownership rates, etc.) were relevant and required to sample at the various levels." *Id.* at 11. Plaintiffs' data collection also involved a qualitative component: the investigation was "designed to compare maintenance and marketing of REO properties through categorical rankings and *qualitative* comments based on field observations using a predefined list of criteria for discerning differences . . . . The NFHA investigators used a *mixed data collection field observation form* as the primary source of information featured in this investigation." *Id.* at 10 (emphasis added). "Given the lack of a preexisting instrument designed specifically for making in-person assessments of deficiencies in

of this quoted language is: "Qualitative research has strong roots in sociology, anthropology, education, and nursing sciences, to name a few." Fetters Rep. at 5. Nowhere does Dr. Fetters say that MMR must include methods from these disciplines.

maintenance and marketing of REOs, the NFHA investigators developed, piloted, and refined a 37-item instrument to standardize collection of both categorical data for quantitative assessments and *qualitative information to corroborate findings*." *Id.* at 22 (emphasis added). Indeed, BANA concedes that Plaintiffs' data collection and analysis relied in part on qualitative methods. BANA Mem. at 13 (citing Michael Quinn Patton, Qualitative Research & Evaluation Methods 15 (4th ed. 2015) to argue that Plaintiffs collected qualitative data that was scientific in nature).

Second, MMR does not require that both quantitative and qualitative data be analyzed in equal measure at every stage following the data collection:

> Researchers who conduct mixed methods research may choose to emphasize one component of the research more strongly than the other. Hence, there are qualitatively driven mixed methods studies and quantitatively driven mixed methods studies that also contrast with equivalently driven mixed methods studies. Moreover, in very large-scale projects, researchers may focus initially on one component of the mixed methods project, namely, the qualitative assessment or the quantitative assessment. Subsequent analyses may fit more closely with one tradition or the other, *e.g.*, qualitative, or quantitative. Reports may be disseminated later in some combination of as empirical mixed methods reports, empirical quantitative only reports, and empirical qualitative reports, as well occasional methodological reports when novel methodology is utilized.

Fetters Rep. at 8. As part of Plaintiffs' investigation, they sent a "mixed data collection survey" to neighbors of investigated REOs, which contained both structured and "unstructured (qualitative) items," *id.* at 19, and also conducted qualitative individual interviews with certain neighbors. *Id.* at 22. Simply because Plaintiffs have not focused on neighbor interviews and surveys thus far does not mean that they were not a valid and valuable component of their investigation. "[I]nterview data were used to illustrate the breadth and depth of the real experiences of the homeowners living adjacent to REO properties." *Id*. Indeed, NFHA identified the individual Plaintiffs in this case from their survey responses. *See* Ex. 1, NFHA 014319–310; Ex. 2, NFHA 014362–63.

Like many MMR investigations, Plaintiffs "'drew from multiple sources' and would 'look at the data, go back and look at the patterns, look at sources, look at historical factors, . . . and so accepted, embraced the fact that those different dimensions are interactive.'" *Coal. for Equity & Excellence in Maryland Higher Educ.*, 295 F. Supp. 3d at 553. Thus, Plaintiffs' emphasis on the more quantitative data from the investigation at this stage in the litigation does not render Dr. Fetters' opinion that the investigation fits within the MMR framework (or within his larger scope of expertise in designing and carrying out social science research more generally) incorrect. Even if it did, on a *Daubert* challenge, the court does not assess whether an expert's opinion is correct. *TFWS*, 325 F.3d at 240.

**B. Neither *Daubert* nor FRE 702 requires Dr. Fetters to have substantive experience in property preservation and maintenance, REOs, or fair housing.**

Dr. Fetters is an expert on "[s]ocial science research methodology design, sampling, implementation, and interpretation," and "[m]ixed methods research methodology." Fetters Rep. at 3. This is more than a sufficient basis to offer an opinion into the methodology of various aspects of Plaintiffs' investigation—including how Plaintiffs selected their evaluation criteria and went about evaluating them. Contrary to BANA's contentions otherwise and insistence that only an expert in property preservation industry standards could evaluate how Plaintiffs selected their evaluation criteria and studied them, specialized knowledge in property maintenance and preservation is not required in order to offer opinions about research methodology. Certainly, "an expert must have specialized knowledge to assist jurors in deciding particular issues in the case," but BANA "reads this [qualification] requirement far too narrowly." *Belk*, 679 F.3d at 162. The court should "consider the proposed expert's full range of experience and training," *id.*, and Dr. Fetters' experience in designing mixed methods studies, submitting those studies for peer review, and evaluating studies to determine if they are qualified to publish in the premier MMR journal

properly qualifies him to opine on whether Plaintiffs' investigation was designed and executed in a way that would be accepted in the social science or MMR community. Research design in the property preservation and maintenance field is not so unique that it requires knowledge more specialized than Dr. Fetters'.

In *Belk*, for instance, the Fourth Circuit affirmed the district court's finding that an expert's experience in "marketing, consumer behavior, and evaluative studies" was sufficient for him to opine on the "design and conduct of consumer survey research, particularly in trade dress or trademark surveys." *Id*. at 161–62. The court found "that consumer survey research in trade dress litigation" was not "*sui generis* such that an expert's lack of experience in designing these specific surveys necessarily disqualifies him from giving an expert opinion." *Id.* Rather, "Belk's concerns were instead appropriately addressed during cross-examination." *Id.* Similarly, in *RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, the Fourth Circuit found that an economist's opinion on the extent of appellee's losses did not call for expertise in maritime contracts specifically. 609 F. App'x 731, 738 (4th Cir. 2015).

As in *Belk* and *RG Steel*, BANA "provide[s] no support for its argument" that the design of investigations in property maintenance "is *sui generis* such that an expert's lack of expertise in . . . these specific [areas] necessarily disqualifies him from giving an expert opinion." *Belk*, 679 F.3d at 162; *see also RG Steel*, 609 App'x at 739 (stating that this point was further supported by the fact that "[b]ackground issues that required special knowledge of steel mills and maritime commerce were addressed by other witnesses at trial").

Dr. Fetters' background is in research methodology across various fields—he is not limited by discipline or the subject matter of the studies. *See* Ex. 3, Fetters Dep. 159:18–161:4 ("I deal with studies of all sorts, some that are strictly written by economists, some that are

written by anthropologists and . . . virtually everything in between. And so you have to develop a certain flexibility in terms of understanding what constitutes data and what are considered threats to the accuracy of information."). Indeed, a recent issue of Dr. Fetters' journal included articles on a diversity of topics, ranging from the use of geospatial mapping in the global south, research in the education context, a study of cultural factors and logistical challenges in conducting MMR in Africa and the Caribbean, and cancer survivorship care. 16 J. of Mixed Methods Res., no. 2, Apr. 2022, https://journals.sagepub.com/toc/mmra/16/2.

Notably, BANA's experts opine on Plaintiffs' investigation methodology without having any background in property preservation or in designing an investigation similar to Plaintiffs' specifically. *See* Ex. 4, McCrary Dep. 21:6–22:19 ("I'm not holding myself out as an industry expert. . . . I'm an expert in economics and statistics."); *id.* at 23:4–13 (stating that he never designed a study involving the condition of residential housing); Ex. 5, Skanderson Dep. 71:18–19 ("I'm not an expert on property preservation."), 29:4–18 (testifying that he has never been involved in the peer-review process for social science research and has no experience designing or conducting fair housing testing). By BANA's own standards, therefore, lack of expertise in the property preservation industry does not disqualify an expert from opining on Plaintiffs' investigation methodology. The merits of Plaintiffs' investigation criteria and how Plaintiffs chose to evaluate them is an area in which the parties and their experts simply disagree, which is not grounds to disqualify an expert.

### C. Dr. Fetters' opinions are based on his expertise and independent review of the factual record.

BANA decries several of Dr. Fetters' opinions as *ipse dixit* because they support Plaintiffs' arguments (which BANA disagrees with) and are based, in part, on discussions with one of the individuals who helped design and implement the investigation. But whether or not

BANA approves, Dr. Fetters' opinions are based on his considerable expertise in the field of research methodology and on facts—not on "speculation," as BANA claims. Under *Daubert*, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (citing Fed. R. Evid. 702, 703). In forming his opinions, Dr. Fetters reviewed and considered a number of documents from the investigation (training materials, a sample evaluation form, example photographs, among others), the deposition testimony of, and his additional follow-up interviews with, National Fair Housing Alliance ("NFHA") Senior Associate Director of Enforcement Lindsay Augustine, and Defendant's expert reports. Fetters Rep. at 2.

BANA appears to take issue with Dr. Fetters' reliance on Ms. Augustine for certain facts about how the investigation sample was selected, but it is unclear how learning about the basis for methodological decisions from someone who helped make those decisions would render Dr. Fetters' opinions unreliable or irrelevant. If BANA disagrees with any of the factual bases for Dr. Fetters' opinions, it can cross-examine him on those issues. Learning from Ms. Augustine is not a methodological flaw that disqualifies him as an expert. Indeed, Defendants' experts also cite Ms. Augustine's Rule 30(b)(6) testimony on behalf of NFHA in forming the bases of their opinions as to how the investigation was designed and conducted. *See, e.g.*, Skanderson Rep. at 7 n.9, 11, 25 n.36–37, 26 n.38, ECF No. 206-12; McCrary Rep. at 4 n.1, 6 n.9–10, 7 n.11–12, 14, ECF No. 206-15.

Furthermore, as Dr. Fetters has made clear, his task was not to independently assess the comparability of the selected properties, but instead "to consider the methodological procedures that were utilized" in selecting the sample. Ex. 3, Fetters Dep. 152:17–153:2; 172:2–12 (challenging the idea that he was required to analyze whether every selected property was

comparable). The Fourth Circuit has repeatedly held that courts are not required to determine whether the comparators on which an expert relied "were 'certainly correct' measurements." *Columbia Gas Transmission, LLC v. 76 Acres, More or Less, in Baltimore & Harford Cntys.*, 701 F. App'x 221, 229 (4th Cir. 2017) (quoting *E. Tenn. Nat. Gas Co. v. 7.74 Acres in Wythe Cnty.*, 228 F. App'x. 323, 329 (4th Cir. 2007)); *see also E. Tenn. Nat. Gas Co. v. 7.74 Acres in Wythe Cnty.*, 228 F. App'x. 323, 328–29 (4th Cir. 2007) (explaining that because the court was not the trier of fact, it "would be on a very slippery slope to start saying what is a proper comparable and what is not a proper comparable"). Instead, such an argument goes to the weight of the evidence, especially when the opposing party has an opportunity to cross-examine the expert on the topic and present its own expert to contradict such testimony. *Columbia Gas Transmission, LLC*, 701 F. App'x at 230.

BANA also incorrectly claims that Dr. Fetters' conclusion that Plaintiffs' investigation could be included for publication in a peer-reviewed journal is based on speculation. Dr. Fetters, the Editor-In-Chief of a widely-read and competitive journal on social science methodology, Fetters Rep. at 2–3, has explained that in offering this opinion, he is relying upon the generally-accepted principles that researchers use in the peer-review process to confirm whether a study passes muster to be published. Ex. 3, Fetters Dep. 159:19–160:9 (listing criteria for evaluating publication in a peer-reviewed journal).

Further, BANA misconstrues the *Daubert* factor directing courts to consider whether the subject of the expert testimony "has been subjected to peer review and publication." *Daubert*, 509 U.S. at 592–94. It is the expert's relied-upon technique that is subject to peer-review and general acceptance, not the facts at issue in the case. *Id.*

In any event, the use of this factor is discretionary, and its applicability depends on each case's particular circumstances. *Kumho Tire*, 526 U.S. at 150–51. It is within reason that the specific investigation an expert analyzes "has never been the subject of peer review." *Id.* at 151 (highlighting that "the particular application at issue may never previously have interested any scientist"); *see also SR Int'l Bus. Ins.*, 467 F.3d at 132–33 (exemplifying that in unprecedented or novel situations, certain methods or practices may not have had the opportunity to be applied previously).

BANA's attempt to discredit Dr. Fetters by citing a bank-sponsored paper published in a financial review that, in part, is critical of the conclusions Plaintiffs draw from their investigation, is unavailing. *See* BANA Mem. at 7 (citing Keith Ihlanfeldt & Tom Mayock, *The Variance in Foreclosure Spillovers Across Neighborhood Types*, 44 Pub. Fin. Rev. 80, 81–85, 94–100 (2014) ("[Author] Ihlanfeldt thanks the Federal Home Loan Bank of Atlanta for its financial support.")). First, BANA's attempt to use an article as a rebuttal expert should be rejected (particularly where none of its experts cited this 2014 article). Second, this bank-sponsored article's conclusions about Plaintiffs' investigation do not undermine the relevancy and reliability of Dr. Fetters' methodology—at most, the article represents a differing view. But under Rule 702 and *Daubert*, the Court is not tasked with evaluating an expert's conclusions—it is only tasked with determining whether his testimony is reliable and relevant. *TFWS*, 325 F.3d at 240; *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

Finally, BANA's disagreement with Dr. Fetters' opinions regarding Plaintiffs' data quality control process does not render the opinions beyond Dr. Fetters' areas of expertise. BANA had—and utilized—the opportunity to test Dr. Fetters' understanding of data cleaning,

and Dr. Fetters passed BANA's test. Ex. 3, Fetters Dep. 105:3–13 (defining criteria in the data cleaning "rubric"). To the extent BANA wants Dr. Fetters to opine on the legal question of whether Plaintiffs' quality control process constituted the legal concept of "spoliation," that would clearly go beyond the scope of his expertise. BANA's argument simply reflects its disagreement with Dr. Fetters' conclusion that Plaintiffs' quality control process was a strength of the investigation, not a detriment. Fetters Rep. at 18. This is an improper basis for a *Daubert* challenge.

## II. Pamela Kisch's opinions, based on her deep experience in the fair housing testing field and HUD and DOJ testing standards, provide important context for Plaintiffs' enforcement investigation, not legal conclusions.

Ms. Kisch's opinions regarding the field of fair housing testing and how Plaintiffs' investigation fits into that field are rooted in her highly relevant experience as a veteran designer and executor of fair housing tests. BANA's arguments to the contrary stem purely from its disagreement with her conclusions, which is not a valid basis for a *Daubert* challenge. In addition to being relevant, Ms. Kisch's opinions are reliable, based on her years of experience and on standards for fair housing enforcement used by HUD and the DOJ. Further, BANA's heavy reliance on HUD's non-precedential *U.S. Bank* determination as a pseudo rebuttal expert is improper. BANA Mem. at 10–11 (citing *NFHA v. U.S. Bank N.A.*, No. 01-12-0283-8 Determination of No Reasonable Cause, at 3 (HUD Jan. 8, 2016)). Ms. Kisch's disagreement with that determination does not render her opinions invalid, irrelevant, or unreliable. In deeming its disagreements with Ms. Kisch's opinions appropriate for a *Daubert* challenge, BANA appears "to be overly pessimistic about the capabilities of the jury and of the adversary system generally." *Daubert*, 509 U.S. at 596. BANA further misses the mark in labeling Ms. Kisch's opinions legal conclusions, when Ms. Kisch has never opined on the ultimate legal question of whether Plaintiffs have proven their claim, let alone analyzed the investigation results.

**A. Ms. Kisch's extensive experience in fair housing testing design is relevant to the issues and facts in this case.**

As with Dr. Fetters, BANA argues that it understands the field of fair housing testing better than veteran fair housing expert Pamela Kisch. Without disputing Ms. Kisch's decades of experience designing and executing fair housing tests, BANA contends that she is simply wrong when she opines that Plaintiffs' investigation is consistent with traditional fair housing testing. But BANA's disagreement with Ms. Kisch's conclusion does not render her expertise irrelevant.

"Where the expert's qualifications are challenged, the test for exclusion is a strict one," in which the court must determine that the expert is not qualified on the relevant issue in any way through "knowledge, skill, experience, training, or education." *Kopf*, 993 F.2d at 377. That this investigation varies from more traditional fair housing tests in certain ways does not place it beyond Ms. Kisch's ability to evaluate it against those more traditional tests. BANA may dispute Ms. Kisch's conclusions before a jury, but its disagreement is not grounds for exclusion. *See Balbed*, 2019 WL 3717582, at *4 (citing *TFWS*, 325 F.3d at 240) ("It is the province a jury, not this Court, to determine whether the asserted deficiencies undermine [the expert's] opinion.").

Similarly, Ms. Kisch did not need to review a single, non-precedential HUD determination to opine—based on her years of training and experience—that Plaintiffs' investigation would satisfy standards outlined by the section of HUD that funds fair housing enforcement efforts (and holds those funding recipients to specific testing standards). *See* Ex. 6, Kisch Dep. 147:5–11 (clarifying that the enforcement division of HUD, with which she does not always agree, is separate from the funding division, which sets "the parameters" for FHIP recipients' testing methodology). Ms. Kisch—as a fair housing expert—is entitled to disagree with the *U.S. Bank* determination or any other HUD decision. *See* Ex. 6, Kisch Dep. 146:3–7 (stating that she disagrees with HUD's determination of no reasonable cause in the U.S. Bank

case). As Ms. Kisch explained, it is not uncommon for HUD to issue a no-cause determination in a case that ultimately goes on to be successful in litigation. *Id*. at 151:7–12. The *U.S. Bank* determination is not determinative, *see* Pls.' Opp'n at 16–18, and does not render Ms. Kisch's opinions irrelevant.

BANA also incorrectly contends that Ms. Kisch must have specialized knowledge in statistics or REO maintenance to qualify as an expert in "[t]he use of testers and the role of fair housing organizations in uncovering illegal discrimination" and "[t]he design and execution of fair housing tests." Kisch Rep. at 2. As explained above, *see supra* Section I.B., "[o]ne knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion," *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989), "or even have prior experience with the particular subject the testimony concerns," *RG Steel*, 609 F. App'x at 739 (citing *Lorillard*, 878 F.2d at 799; Fed. R. Evid. 703). This is especially true when the additional topics at issue are addressed by other witnesses. *Belk*, 679 F.3d at 162; *see generally* Tyler Rep. (opining about REO and property maintenance), ECF No. 183-3 (Ex. 3-A); Rugh Rep. (conducting statistical analyses of investigation findings), ECF No. 183-7 (Ex. 7-A). Ms. Kisch does not offer opinions on statistical questions such as whether the sample size is appropriate for statistical analysis or what kinds of statistical conclusions can be drawn; her opinion relates to the design and execution of Plaintiffs' enforcement investigation—a topic she is exceedingly familiar with given her depth of experience in

designing and implementing fair housing enforcement tests, including those involving larger scale enforcement efforts.[3]

Finally, BANA contorts Ms. Kisch's statement that the investigators in this case did not need to be property preservation experts to evaluate the appearance of REOs because being able to tell if a house is taken care of is "common sense," with the mistaken notion that she called her own expert opinions in this case "common sense." BANA Mem. at 11–12. She did not. Ms. Kisch's opinions are based on decades of experience in the fair housing testing field—not mere "common sense." Her specialized knowledge in the areas of fair housing testing, design, and enforcement "will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, which renders her testimony relevant, *see Belk*, 679 F.3d at 162.

**B. Ms. Kisch's opinions are reliable and based on her review of the record, experience in the field, and fair housing testing standards used by HUD and the DOJ.**

In reaching her opinions, Ms. Kisch properly relied on her review of the record, her deep experience in the fair housing testing field, and on standards for fair housing testing used by both HUD and DOJ. There is nothing *ipse dixit*, "recycled," or unreliable about Ms. Kisch's opinions.

To advance this spurious argument, BANA relies primarily on a 21-year-old, out-of-circuit case, *Metropolitan St. Louis Equal Housing Opportunity Council v. Gordon A. Gundaker Real Estate Co.*, 130 F. Supp. 2d 1074 (E.D. Mo. 2001), asserting that Ms. Kisch is unqualified to offer her conclusions and that her testimony is unsupported by anything other than Plaintiffs' positions. As an initial matter, *Gundaker* is an outlier on this issue. At the time of the decision,

---

[3] *See Sexual Orientation and Housing Discrimination in Michigan*, Michigan's Fair Housing Centers (Jan. 2007), https://www.fhcmichigan.org/images/Arcus_web1.pdf; *Long Island Divided*, Newsday (Nov. 17, 2019), https://projects.newsday.com/longisland/real-estate-agents-investigation/.

the court acknowledged that no court had ever required fair housing testing investigation results to be presented through experts or be subject to a *Daubert* analysis. 130 F.2d at 1081 n.12. Twenty-one years later, *Gundaker* has only been cited in two decisions, neither involving fair housing or within the Fourth Circuit.[4]

*Gundaker* is also distinguishable in several meaningful ways. The court's critique of Shanna Smith's testimony centered on her opinion that an expert had used the wrong standard "to analyze the data gathered by" plaintiffs; she did not opine on the testing design and execution. *Id.* at 1085. Ms. Kisch, however, is not offering an opinion on how the investigation results should be analyzed. The *Gundaker* court also found Ms. Smith's testimony unsupported because she "did not review a single test report form, tester deposition, agent deposition, or test debriefing report," *Gundaker*, 130 F.2d at 1086. Here, by contrast, Ms. Kisch reviewed precisely these types of materials, and more: NFHA training materials used to train the testers in this investigation, the evaluation form used by the testers, examples of a completed evaluation form and photographic evidence of a visited property,[5] and deposition transcripts of NFHA's Rule 30(b)(6) designee and of a tester in the investigation. Kisch Rep. at 2. Whether Ms. Kisch should have reviewed more evidence goes to "the proper weight to afford [her] testimony, not its admissibility." *Burns v. Anderson*, 123 F. App'x 543, 549 (4th Cir. 2004) (rejecting claim that an expert's testimony was unreliable because he "failed to review certain documents which would" have influenced his opinion).

---

[4] In *Gundaker*, although the court found two of the experts to be unqualified, it made clear that it was not making a "wholesale dismissal" of expert testimony about testing investigation results. 130 F. Supp. 2d at 1093.

[5] BANA's assertion that Ms. Kisch never reviewed a completed evaluation form is simply wrong. Kisch Rep. at 2 (stating that she reviewed "the completed evaluation form and photographic evidence of a visited property").

Further distinguishing *Gundaker*, the standards Ms. Kisch relied upon to arrive at her conclusions were clearly identified in her report and stated in her deposition. In *Gundaker*, the court took issue with fair housing professional Clifford Schrupp's failure to articulate or cite to any set of standards that governed fair housing testing in his analysis of plaintiff's testing design.[6] 130 F.2d at 1084. In contrast, Ms. Kisch relied on HUD's FHIP-participant testing requirements, in addition to her experience conducting tests for HUD and the DOJ, to define what standards comprise a valid fair housing test. Kisch Rep. at 1; Ex. 6, Kisch Dep. 137:6–139:1. Ms. Kisch also identified several governing criteria relied upon by fair housing experts to evaluate a fair housing test, including whether the investigation "was completed by properly trained testers," *id*. at 86:3–6, whether "testers use a standardized list of defined criteria," *id.* at 86:7–9, and whether the testing organizations "carefully choose [comparators] that would best isolate the single factor they were testing," *id*. at 86:10–13; *see also id.* at 30:5–12 ("the question is, how do you isolate the thing you're looking at to see if there is significant evidence of discrimination?"). These standards are generally accepted amongst FHIP recipients nationwide. Kisch Rep. at 19 & n.50 (citing Kenneth Temkin, *et al.*, U.S. Dep't of Housing & Urb. Dev., Study of the Fair Housing Initiatives Program 48 (2011) ("Temkin") (noting that HUD must

---

[6] The *Gundaker* court was also critical of Mr. Schrupp's lack of publication in the field at the time he was offered as an expert, 130 F.2d at 1086, but Ms. Kisch's work on fair housing testing has been published, *see* Kisch Rep. Ex. 1 (resume)—with HUD quoting one of her pieces in its housing discrimination regulations. *See Equal Access to Housing in HUD Programs—Regardless of Sexual Orientation or Gender Identity*, 76 Fed. Reg. 4194 (codified at 24 C.F.R. pts. 5, 200, 203, 236, 570, 574, 982), https://www.govinfo.gov/content/pkg/FR-2011-01-24/pdf/2011-1346.pdf (quoting "*Sexual Orientation and Housing Discrimination in Michigan*," Michigan's Fair Housing Centers, (Jan. 2007), https://www.fhcmichigan.org/images/Arcus_web1.pdf). Furthermore, unlike Mr. Schrupp, Ms. Kisch, has a master's degree in social work and a bachelor's degree in social science, Kisch Rep. at 1. She has also appeared in televised, print, and radio newscasts as an expert on fair housing testing, has presented on numerous panels and summits on the topic, and has won awards for her leadership in the field. *Id.* at Ex. 1 (resume).

approve all testing methodologies of FHIP grantees)); *see also* Temkin at 46 (outlining the investigation procedures utilized by FHIP recipients in a HUD-commissioned study).

While BANA cherry picks a portion of Ms. Kisch's deposition to make it appear that she could not identify an industry-accepted standard upon which she relied, Ms. Kisch made clear in other portions of her deposition—as she did in her report—that she relied on the fair housing testing standards used by HUD and DOJ, as well as the standards used in the fair housing field, to inform her assessment. Kisch Rep. at 11 ("[T]he investigation in this case aligns with the expectations and standards of traditional fair housing testing, including the standards required by HUD and DOJ."); Ex. 6, Kisch Dep. 136:9–13 ("[T]here is nothing about this testing that would not be accepted by . . . HUD standards, or by the standards of the Department of Justice."). Even if Ms. Kisch were to rely solely on her own center's standards to inform her opinion, as BANA implies, those standards have been approved—and employed—by HUD. Kisch Rep. at 19 (citing Temkin at 48; *see also* Ex. 6, Kisch Dep. 137:6–16.

Furthermore, professional experience has long been recognized as a reliable basis for expert opinion. *See Wilson*, 484 F.3d at 274 ("Rule 702 expressly contemplates that an expert may be qualified on the basis of experience" (citing Fed. R. Evid. 702 advisory committee's note)). "[T]o the extent that [Ms. Kisch] base[d] [her] opinions on [her] experience, rather than a particular social science methodology, the applicable standard is the one that governs testimony by experiential experts." *Coal. for Equity & Excellence in Maryland Higher Educ.*, 295 F. Supp. 3d at 554–55; *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) ("In such instances, other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations.").

BANA's remaining criticisms regarding the reliability of Ms. Kisch's opinions stem from misunderstanding the scope of her opinions or simply disagreeing with them. BANA makes much of Ms. Kisch stating she took NFHA's word on how it went about selecting its sample. BANA Mem. at 14. But Ms. Kisch is not performing a deep dive into the location and history of each property selected or even whether the sample selected matched NFHA's selection criteria—she is only opining on whether, based on her experience and knowledge of fair housing testing, the criteria Plaintiffs selected in their investigation design fell within the best practices for fair housing testing. *See* Kisch Rep. at 3. To render this opinion, Ms. Kisch learned about the property-selection process and criteria Plaintiffs used through NFHA's Rule 30(b)(6) deposition testimony and analyzed it based on fair housing testing standards. Ex. 6, Kisch Dep. 82:5–10.

BANA's other accusations of "unreliable and unfounded" opinions reflect only its disagreements with Ms. Kisch's conclusions. *See, e.g.*, BANA Mem. at 15 (disputing conclusions that investigators thoroughly documented their findings (through both extensive photographs and the evaluation forms), evaluated properties objectively, and used standardized criteria). But the question before the Court at this juncture is not whether Ms. Kisch's conclusions are "irrefutable," *E. Tennessee Nat. Gas Co.*, 228 F. App'x at 327 (quoting *Westberry*, 178 F.3d at 261); it is simply whether they are relevant and reliable, and they are.

### C. Ms. Kisch's opinions reflect her insight and perspective as a fair housing testing expert, not legal conclusions.

Ms. Kisch offers opinions in this case employing her expertise in "[t]he use of testers and the role of fair housing organizations in uncovering illegal discrimination" and "[t]he design and execution of fair housing tests." Kisch Rep. at 2. In her decades of experience designing and executing fair housing tests to support enforcement of the Fair Housing Act ("FHA"), Ms. Kisch has developed an understanding of the type of testing required to enforce the FHA. Her opinions

set forth how fair housing testing has been used to enforce the FHA, how Plaintiffs' investigation is consistent with traditional fair housing testing, and why the overly rigorous standards Defendants' experts seek to impose on Plaintiffs' investigation are both unnecessary and would in fact be harmful to achieving the FHA's goals, especially given how fair housing enforcement has historically been performed in this country. *Id.* at 2–4. None of these opinions constitute ultimate legal conclusions.

The issue in this phase of the case is the soundness of Plaintiffs' methodology for investigating a fair housing complaint. Ms. Kisch is not opining on whether Plaintiffs have proven discrimination, nor is she providing any analysis of the results of their investigation. In concluding that Plaintiffs' investigation methodology comports with traditional fair housing testing and standards, she is providing valuable context for this enforcement investigation, informed by years of experience in the field. Her opinions on how Plaintiffs' investigation methodology comports with traditional fair housing testing are no more legal in nature than Defendants' experts' and Dr. Fetters' opinions on how the investigation methodology fits within the context of social science research. None are being offered to tell the fact finder whether Defendants violated the FHA.

## III. Dr. Rugh's analyses are relevant and reliable in demonstrating that the racial disparity in maintenance and marketing Plaintiffs observed remains statistically and practically significant even after controlling for a multitude of non-racial factors.

To test whether the racial disparity Plaintiffs observed in maintenance and marketing deficiencies could be attributed to non-racial factors, Dr. Jacob Rugh performed a series of analyses considering 40 non-racial potential explanatory factors—including those posited by Defendants' experts, such as property age, poverty level, crime rates, home value, distance from city center (urban versus suburban), time of year of Plaintiffs' inspection, lot size, length of time

BANA had held the REO at the time of Plaintiffs' inspection, whether and for how long the previous owner remained in the property after the foreclosure sale, and time elapsed between the previous owner's delinquency on mortgage payments and the foreclosure sale, in addition to controlling for differences between metropolitan areas. Rugh Rep. at 9, 16–38, ECF No. 183-7 (Ex.7-A); Suppl. Rugh Rep. at 4–7, ECF No. 183-7 (Ex. 7-B). BANA does not (and cannot) argue that Dr. Rugh's commonly used analytical methods "have not been tested, have not withstood peer review and publication, have excessive rates of error, have no standards for their application, or have not been accepted in their field." *TFWS*, 325 F.3d at 240; *see Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (discussing the use of regression analyses in litigation); Ex. 5, Skanderson Dep. 90:18–91:16 (testifying that Dr. Rugh's calculations contained no material errors). Instead, BANA mainly recycles arguments from its summary judgment briefing, "attacking the weight of [Dr. Rugh's] testimony rather than mounting a 'true' *Daubert* challenge." *Columbia Gas Transmission, LLC*, 701 F. App'x at 230. Because BANA's critiques fail on their merits and because they do not challenge the relevancy or reliability of Dr. Rugh's analyses, Dr. Rugh's exceedingly thorough and well-explained analyses are admissible.

**A. Dr. Rugh carefully applied widely accepted methodology—capable of being tested—to evaluate, through a series of separate analyses, a plethora of potential non-racial explanatory factors for the observed racial disparity in REO maintenance and marketing.**

Dr. Rugh performed multiple regression analyses to eliminate myriad potential non-racial explanations for the racial disparity Plaintiffs observed in Defendants' maintenance and marketing of REO properties. Although, to be relevant and reliable, Dr. Rugh's analyses need not have included every factor BANA posits, he in fact tested every non-racial factor suggested by Defendants' expert witnesses for which he had sufficient data. His additional and updated analyses—incorporating new or changed data, as well as new theories posited by Defendants—

are a strength of his approach. Finally, Dr. Rugh's careful review of the investigation data used in his analyses renders his opinions reliable.

**1. Dr. Rugh's analyses considered 40 potential alternative explanatory factors for which he had data and demonstrated that no combination of these factors eliminated the statistically and practically significant racial disparity.**

Unable to refute Dr. Rugh's consistent finding—over the course of several separate analyses considering 40 different non-racial potential explanatory factors—that no combination of these factors eliminated or even reduced below the point of statistical significance the observed racial disparity in maintenance and marketing deficiencies, BANA grasps at straws in arguing that Dr. Rugh's analyses are inadmissible. BANA misrepresents the factors Dr. Rugh considered, faults him for failing to include data unavailable to him in his analyses, and speculates that possibly including a 41st non-racial factor would have changed the outcome of his analyses. But courts in the Fourth Circuit and beyond have repeatedly held that statistical experts need not "'rule out' all potential causes" for their testimony to be reliable and admissible. *Westberry*, 178 F.3d at 265–66 ("The alternative causes suggested by a defendant 'affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony.'"); *see also Goebel v. Denver & Rio Grande Western R.R. Co.*, 346 F.3d 987, 998–99 (10th Cir. 2003) (indicating that an expert's failure to rule out all possible alternative causal sources does not render the expert's testimony inadmissible); *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996) ("The fact that several possible causes might remain 'uneliminated' . . . only goes to the accuracy of the conclusion, not to the soundness of the methodology."). This is particularly true where an expert "ruled out all plausible alternatives for which he had data" and "accounted for all variables raised by [the opposing party's] own expert," as Dr. Rugh did in this case. *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002) ("[I]n order to be

*admissible* on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." (quoting *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000)).

Exhibit 3 to Dr. Rugh's report provides extraordinary detail on every factor and property list Dr. Rugh evaluated and explains why he chose to include or exclude each factor from his final regression analyses. *See* Rugh Rep. Ex. 3. BANA's arguments alternate between disregarding these explanations and misrepresenting them:

- **Poverty rate:** BANA incorrectly criticizes Dr. Rugh for considering "only the poverty rate among homeowners," rather than "the poverty rate of the tract in which the REO property was located." BANA Mem. at 21. Although Dr. Rugh explained in detail why "the overall poverty rate of the census tract is a poor proxy for poverty rates among homeowners in the area," he nonetheless controlled for poverty rate of the tract, in response to Defendants' experts, and found that "it does not explain the observed maintenance disparities as strongly as race." Rugh Rep. at 27–34.

- **Limited properties:** BANA suggests that Dr. Rugh left out large numbers of properties from his analyses. BANA Mem. 21–22. Yet Dr. Rugh has made clear that "for each analysis [he] performed, [he] used as many properties as possible, which was dependent on the data available to [him]." Suppl. Rugh Rep. at 19. Thus, because he had data for all 1,405 properties on the year built, time of year evaluated, and changes in zip code home prices, he was able to control for these variables against the full set of 1,405 properties. *See* Pls.' Opp'n at 15. He ran several other factors against groups of 1,264 to 1,000 properties. *Id.* Thus, BANA is incorrect in asserting that Dr. Rugh only included 940 properties in his regression analysis.

- **Property value:** BANA incorrectly asserts that Dr. Rugh considered only land value instead of property value. Dr. Rugh collected data on the structural value of the property. Rugh Rep. Ex. 3 at 1. Although he explains why land value is a more accurate factor because it is "less likely to be influenced by events such as foreclosure and maintenance," Ex. 7, Rugh Dep. 43:8–12, he still analyzed property sale price, Rugh Rep. at 38, Table 15 (including "REO Property Sale Price at Foreclosure by Lender per Sq. Ft.," "REO Property Re-Sale Price, Sold by Lender per Sq. Ft.," and "Property Sales Price to Foreclosed Owner per Sq. Ft."). He found there was no statistically significant difference in the sale price of properties to foreclosed homebuyers between white and non-white tracts or in the sale price to BANA as an REO between white and non-white tracts. Rugh Rep. at 41.

- **Vandalism rates:** Dr. Rugh thoroughly explains his approach to testing vandalism rates in Exhibit 3 to his report. *See* Rugh Rep. Ex. 3 at 19–22. He explains that "vandalism is not one of the crimes required to be reported to the FBI by all jurisdictions, so it is not universally publicly available." *Id.* at 21. Therefore, he instead

ran tests to determine—and included graphs to show—that "burglary rates and vandalism rates are strongly related, tracking each other closely across these seven cities with available data." *Id.* This meant that "burglary rates are a suitable substitute or proxy for local property crime most related to REO property maintenance." *Id.*

- **Maintenance requirements:** BANA's criticism that Dr. Rugh did not account for differences in municipal law or investor requirements ignores Dr. Rugh's clear consideration of these factors. He used the U.S. Census Bureau metropolitan statistical area ("MSA") code[7] to control for "differences across MSAs, such as variation in state and local laws." Suppl. Rugh Rep. at 18. He also analyzed whether the maintenance and marketing disparities were attributable to differences between FHA/VA-owned loans versus other types of mortgages, but found no statistically significant difference between "FHA/VA loan usage among foreclosed REO properties in white versus non-white tracts."[8] Suppl. Rugh Rep. at 20–21.

- **Condition at time of BANA acquisition:** BANA ignores that Dr. Rugh used all data available to him to determine whether the racial disparity Plaintiffs observed resulted from preexisting property conditions. Preliminarily, BANA and its expert have admitted that Defendants provided insufficient data on preexisting property condition (including appraisal data) to include in a regression analysis (and this data is not publicly available). BANA Mem. at 31; Ex. 5, Skanderson Dep. 147:16–153:5, 223:5–21. Thus, Dr. Rugh evaluated this factor through different analyses: considering whether deficiencies decreased the longer BANA held a property (they did not) and analyzing only the overgrown grass/accumulated leaves and trash deficiencies, since these deficiencies are unrelated to initial property condition, to see if the racial disparity was reduced or eliminated (it was not). *See* Pls.' Opp'n at 66–67.

- **Ability to repair:** BANA also incorrectly claims that Dr. Rugh failed to control for Defendants' ability to perform repairs. Dr. Rugh considered the effect of holdover occupants and found they were not driving the disparity. Rugh Rep. at 17–19. And, as far as any investor limitations on repair are concerned, Dr. Rugh found no statistically significant difference between FHA/VA loan usage based on tract racial composition. Suppl. Rugh Rep. at 20–21.

---

[7] BANA complains that Dr. Rugh only used the MSA code in metro areas in which at least 30 properties were evaluated, but it does not actually disagree with his decision to do so (and agrees that using this variable "requires a sufficiently large sample size within each metropolitan area"). BANA Mem. at 30.

[8] Dr. Rugh also ran his regression analysis without the boarded doors and windows deficiencies for all properties where local law could be read to require boarding for vacant homes and all warning/no trespass sign deficiencies removed and found that the racial disparity remained nearly unchanged. *See* Pls.' Opp'n at 67. Furthermore, BANA expert David Skanderson agreed that Plaintiffs' inclusion of a deficiency for something required by law or investor would affect the scoring of properties in both majority-white and non-white neighborhoods. Ex. 5, Skanderson Dep. 165:2–14.

- **Property age**: BANA ignores that Dr. Rugh controlled for property age not just by era, but by individual year built. *See* Rugh Rep. Ex. 3 at 4; *id.* at 40 (Table 16, Row 3). Neither factor—era or year built—reduced the racial disparity below the point of statistical significance. *Id.* at 40.

Despite these supposed "shortcomings," even BANA's statistical expert agreed that it would be "reasonable to conclude that the remaining difference between deficiencies in majority-minority and majority-white communities, after controlling for the various factors in regression analysis, are based on the race of the neighborhood." Ex.5, Skanderson Dep. 146:3–16.

At bottom, BANA's erroneous contentions amount to "disagreement with the values [Dr. Rugh] chose to assign to certain variables." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195–96 (4th Cir. 2017). Although BANA "may have preferred that [Dr. Rugh] use [different variables] in his formula, along with other values more favorable to [BANA]," these challenges at most "affect the weight and credibility" of [Dr. Rugh]'s assessment, not its admissibility." *Id.*

**2. Dr. Rugh performed multiple regression analyses to test Defendants' various theories about the cause of the racial disparity in REO maintenance and marketing.**

Dr. Rugh's willingness to run multiple regression analyses to test Defendants' theories about non-racial causes of the disparity in REO maintenance is a strength of his approach—not a shortcoming. As BANA points out, "it is common to fit a regression model, look at the results and in response, revise the regression model" since "[t]he aim is to build the best model possible." *See* BANA Mem. at 23 (citing Richard A. Berk, Statistical Learning From a Regression Perspective 43 (3d ed. 2020)). Dr. Rugh tested different theories to ensure his statistical model was as complete as the universe of relevant data would allow. His various analyses were not "revisions" attempting to fix issues with his previous regression analyses—there was nothing about his methodology that needed correcting. The supplementary analyses Dr. Rugh offered included additional and different variables in response to Defendants' experts'

critiques. *See, e.g.*, Suppl. Rugh Rep. at 17 ("Although poverty is not an adequate indicator and was only used in response to Dr. Skanderson's original critiques, I still found that poverty is not a significant driver of deficiencies . . . or a significant explanation for deficiencies or disparities . . . ."). This goes above and beyond what *Daubert* requires of an expert. *Palmer v. Shultz*, 815 F.2d 84, 101 (D.C. Cir. 1987) ("*Bazemore* instructs lower courts to be cautious about dismissing plaintiffs' statistical studies as not probative simply because defendant offers some nondiscriminatory explanation for the disparities shown."). "[W]hen otherwise relevant evidence is challenged on methodological grounds, the burden should normally be on the challenger (a) to present credible evidence that the statistical proof is defective and (b) to present a plausible explanation of how the asserted flaw is likely to bias the results against his or her position." *Id.* at 101 n.13 (quoting D. Baldus & J. Cole, Statistical Proof of Discrimination at vii (1986 Suppl.)). BANA does neither.

BANA's statistical expert, David Skanderson, testified that he did not identify any material issues or errors in Dr. Rugh's computations or data. Ex. 5, Skanderson Dep. 91:6–15. Dr. Rugh's work has thus been tested by his peers, and his technique "enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho Tire*, 526 U.S. at 149–50.

Finally, BANA devotes several pages to dissecting the regression analysis from Plaintiffs' Complaint, which Dr. Rugh performed as a consulting expert and without the benefit of any of Defendants' data. The opinions Dr. Rugh will testify to in this case, and the analyses from which those opinions derive, however, are those disclosed in his expert reports, which are based on data following years of discovery and include the current list of properties at issue. *See* Rugh Rep. & Suppl. Rugh Rep. His reports also incorporate all non-racial explanatory theories posited by Defendants' experts for which data is available. *Id.* Dr. Rugh's refinements of his

analysis based on new data and an updated property list only strengthen the reliability of his methodology, not undercut it as BANA would have the Court believe.

**3. Dr. Rugh properly used Plaintiffs' investigation data in his analyses.**

BANA's argument that Dr. Rugh's opinions are inadmissible because of Plaintiffs' data collection method is nothing more than a thinly veiled attempt to secure additional pages to litigate issues discussed *ad nauseum* in Defendants' summary judgment and spoliation motions. Dr. Rugh offers statistical and econometric analysis of the results of Plaintiffs' investigation, not evaluation of the way the investigation was conducted or the criteria assessed. BANA's argument incorrectly assumes that Plaintiffs' investigation methodology is too flawed to use as evidence as a matter of law. But Plaintiffs have not been precluded from relying on their investigation data as evidence; Dr. Rugh, therefore, may properly use that data in his analyses.

Furthermore, reliability "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). A court risks "usurp[ing] the role of the jury" by "unduly scrutiniz[ing] the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Id*; *see also Brundle on behalf of Constellis Emp. Stock Ownership Plan v. Wilmington Tr. N.A.*, No. 115CV1494LMBIDD, 2017 WL 6403105, at *5 (E.D. Va. May 16, 2017) (noting that "methodology can be discussed independently of numerical inputs").

The exclusion of the statistical expert in *Gundaker* is readily distinguishable. First, while that statistical expert "did not review any of the original underlying data," *Gundaker*, 130 F. Supp. 2d at 1087, Dr. Rugh "examined [Plaintiffs' data] very carefully and closely," and verified things such as whether the properties were coded to the right census tract. Ex. 7, Rugh Dep. 20:20–23:7. Dr. Rugh also examined Plaintiffs' data to see whether any deficiency subcategories

were "driving the results disproportionately such that if you remove one subcategory or another" it affects "the pattern or the disparity in any meaningful way." *Id.* 21:15–22:5; *see also id.* 22:19–23:1 (stating that he "examined the data very carefully to try to detect any systematic patterns that would indicate . . . problems [with the Plaintiffs' inspection methods]").

Second, the *Gundaker* expert admitted to using "an incorrect test because he was not familiar with statistical testing in the area of fair housing." *Gundaker*, 130 F. Supp. 2d at 1088. He conceded that he applied his first statistical test incorrectly, and "he was reluctant to alter his expert opinion in light of this error." *Id.* at 1087. Dr. Rugh's analysis suffers from no such issue. Finally, that expert admitted that another test he used "could not be used to determine the existence of racial steering," which was the central issue in the case. *Id.* at 1087–88. His testimony, therefore, could not assist a trier of fact in deciding any significant issue. *Id.* at 1088. In this case, by contrast, BANA does not dispute that Dr. Rugh's analyses are directly relevant.

**B. Dr. Rugh's analysis demonstrates that race—rather than the 40 other factors he considered—drives the maintenance and marketing disparities Plaintiffs observed and thus establishes robust causality.**

Dr. Rugh's thorough analysis establishes that no non-racial factor or combination of factors eliminates or reduces the observed racial disparity in maintenance and marketing of Defendants' REOs below the point of statistical and practical significance. Rugh Rep. at 2–4. These findings isolate race as the factor driving the maintenance and marketing deficiencies Plaintiffs observed and thus establish robust causation. Plaintiffs do not rely on Dr. Rugh to causally connect the deficiencies they observed with Defendants' maintenance and marketing practices: they have offered abundant evidence of this from Defendants' policies and property-level documents and through the expert reports of Deavay Tyler. Pls.' Opp'n at 69–70. Dr. Rugh's findings that factors like poverty levels, crime, holdover occupants, and homeowners

failing to maintain the property before foreclosure are not driving the racial disparity underscore the unlikeliness that something other than Defendants' own practices are responsible.

BANA's emphasis on *Foster v. Legal Sea Foods, Inc.*, in which the plaintiffs' medical experts opined on *what caused* plaintiffs to contract hepatitis, is misplaced. No. CCB-03-2512, 2008 WL 2945561, *8 (D. Md. July 25, 2008). Here, Dr. Rugh is not opining on which of Defendants' practices *caused* the racial disparity—he is analyzing whether the racial disparity persists when a number of non-racial alternative explanations are considered in a regression analysis. When an expert sets out "to accomplish [a] limited goal," and his methodology is rationally designed for that purpose, arguments that the expert did not exceed that goal do not support exclusion. *Heckman v. Ryder Truck Rental, Inc.*, No. CCB-12-664, 2014 WL 3405003, at *3 (D. Md. July 9, 2014). Nevertheless, Dr. Rugh went above and beyond in ruling out non-racial factors that simply happen to correlate with race as potential causes of the racial disparity Plaintiffs observed by considering 40 different potential alternatives to race—including all theories posited by Defendants' experts for which there was available data.

Unlike the expert witness in *Foster*, who failed to investigate, consider, or "inquire into" other potential causes, Dr. Rugh was forced to omit certain factors BANA argues he should have run in his regression analysis because he lacked sufficient data (that Defendants failed to produce).[9] 2008 WL 2945561 at *10–11. Courts have repeatedly recognized that "precise quantification is often not available and not required." *Sarkees v. E. I. Dupont De Nemours & Co.*, 15 F.4th 584, 593 (2d Cir. 2021) (listing courts, including the Fourth Circuit, that have found that experts are not required to test unavailable data); *see also Westberry* 178 F.3d at 264 (noting that while "precise information concerning" harm from toxic exposure is "beneficial,

---

[9] *See* Pls.' Opp'n at 15 n.23.

such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans" and thus need not "provide the basis for an expert's opinion on causation"). Because Dr. Rugh "ruled out all plausible alternatives *for which he had data*" and "accounted for all variables raised by [Defendants'] own expert[s]" his opinions are admissible. *Conwood Co.*, 290 F.3d at 793 (emphasis added).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny BANA's Motion to Strike [ ] Expert Reports of Jacob Rugh, Pamela Kisch, and Michael Fetters.

Dated: October 14, 2022

Respectfully submitted,

*/s/ Jessica P. Weber*

Jessica P. Weber (Fed. Bar No. 17893)
Andrew D. Freeman (Fed. Bar No. 03867)
Monica R. Basche (Fed. Bar No. 20476)
Lauren A. DiMartino (Fed. Bar No. 22046)
Brown, Goldstein & Levy, LLP
120 East Baltimore Street, Suite 2500
Baltimore, MD 21202
Phone: 410-962-1030
Fax: 410-385-0869
jweber@browngold.com
adf@browngold.com
mbasche@browngold.com
ldimartino@browngold.com

Morgan Williams (*pro hac vice*)
National Fair Housing Alliance
1101 Vermont Avenue, NW, Suite 710
Washington, DC 20005
Phone: 202-898-1661
mwilliams@nationalfairhousing.org

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BANK OF AMERICA, N.A., *et al.*,<br><br>*Defendants*. | Case No.: 1:18-CV-1919 |

**DEFENDANT BANK OF AMERICA, N.A.'S REPLY IN SUPPORT OF ITS MOTION TO STRIKE THE PURPORTED EXPERT REPORTS OF JACOB RUGH, PAMELA KISCH, AND MICHAEL FETTERS**

# TABLE OF CONTENTS

Page

ARGUMENT ........ 2

I. Fetters' Claimed Expertise in "Mixed Methods" Has No Application to Claims Not Based on Any "Mixed Methods." ........ 2

II. Kisch's Claimed Expertise in "Traditional Fair Housing Testing" Has No Application to Plaintiffs' Novel, *Non*-Traditional Investigation. ........ 6

III. Rugh's "Regression Analysis" Fundamentally Fails to Account for Essential Information, and Does Not Actually Analyze the Data Plaintiffs Claim it Does. ........ 8

A. Plaintiffs Make Misleading Claims About the Data Rugh Considered. ........ 9

1. Plaintiffs inflate their own expert's count of the factors tested. ........ 10

2. Plaintiffs misrepresent the factors Rugh *did* test. ........ 11

3. Rugh failed to account for the condition properties were in when acquired. ........ 13

4. Rugh's conclusions do not apply to the population at issue. ........ 15

B. Rugh's Failure to Account for Important Explanatory Factors Makes His Regression Analysis Irrelevant and Unreliable. ........ 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Belk, Inc. v. Meyer Corp.*,
679 F.3d 146 (4th Cir. 2012) ....................3, 4

*Carpenter v. Boeing Co.*,
456 F.3d 1183 (10th Cir. 2006) ....................18, 19

*Caruso v. Bon Secours Charity Heath Sys., Inc.*,
2016 WL 8711396 (S.D.N.Y. Aug. 5, 2016),
*aff'd*, 703 F. App'x 31 (2d Cir. 2017)....................5

*Citizens Fin. Grp. v. Citizens Nat'l Bank of Evans City*,
383 F.3d 110 (3d Cir. 2004)....................9, 10, 17

*Cloud v. Pfizer Inc.*,
198 F. Supp. 2d 1118 (D. Ariz. 2001) ....................5

*Cnty. of Cook v. Bank of Am. Corp.*,
2022 WL 408299 (N.D. Ill. Feb. 10, 2022) ....................20

*Cooper v. Smith & Nephew, Inc.*,
259 F.3d 194 (4th Cir. 2001) ....................13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).................... *passim*

*EEOC v. Kaplan Higher Educ. Corp.*,
748 F.3d 749 (6th Cir. 2014) ....................6

*Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*,
2022 WL 433006 (E.D. Va. Feb. 11, 2022)....................2, 3, 4

*Faulkner v. Arista Records LLC*,
46 F. Supp. 3d 365 (S.D.N.Y. 2014)....................18

*Foster v. Legal Sea Foods, Inc.*,
2008 WL 2945561 (D. Md. July 25, 2008)....................17

*Matthews v. Hewlett-Packard Co.*,
2017 WL 6804075 (S.D.N.Y. Dec. 22, 2017) ....................5

*Modern Remodeling, Inc. v. Tripod Holdings, LLC*,
2021 WL 5234698 (D. Md. Nov. 9, 2021) (Blake, J.)....................4, 5

*Nat'l Ass'n of the Deaf v. Dist. Hosp. Partners, LP*,
2016 WL 447444 (D.D.C. Feb. 4, 2016) ....8

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Wells Fargo Bank, N.A.*,
2005 WL 6459866 (C.D. Cal. Mar. 17, 2005) ....2

*Newman v. Motorola, Inc.*,
218 F. Supp. 2d 769 (D. Md. 2002) (Blake, J.) ....1

*NFHA v. U.S. Bank N.A.*,
No. 01-12-0283-8 (HUD) ....6, 14

*RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*,
609 F. App'x 731 (4th Cir. 2015) ....4, 12

*Sabal Trail Transmission, LLC v. 13.386 Acres of Land in Lake Cnty., Fla.*,
2018 WL 8583439 (M.D. Fla. Aug. 13, 2018) ....10, 12

*Sackman v. Balfour Beatty Communities, LLC*,
2014 WL 4415938 (S.D. Ga. Sept. 8, 2014) ....8

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021) ....1

*Shreve v. Sears, Roebuck & Co.*,
166 F. Supp. 2d 378 (D. Md. 2001) ....2, 3

*Smith v. Virginia Commonwealth Univ.*,
84 F.3d 672 (4th Cir. 1996) (en banc) (Luttig, J., concurring) ....20

*In re Sonic Corp. Customer Data Sec. Breach Litig.*,
2021 WL 5916743 (N.D. Ohio Dec. 15, 2021) ....19

*TLC Commc'ns. Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*,
2017 WL 11598725 (C.D. Cal. Feb. 2, 2017) ....20

*United States v. Berkeley Heartlab, Inc.*,
2017 WL 2773794 (D.S.C. June 26, 2017) ....5

*Universal Coin & Bullion, Ltd. v. Fed. Ex. Corp.*,
2015 WL 12001264 (W.D. Tenn. June 30, 2015) ....10

**Rules**

FED. R. EVID. 702 ....2, 9, 15, 21

**Books & Articles**

David C. Baldus & James W. L. Cole,
*Statistical Proof of Discrimination* (1980) ....................19

Richard A. Berk,
*Regression Analysis: A Constructive Critique* (2004) ....................6

Peter Chinloy *et al.*,
*Foreclosure, REO, and Market Sales in Residential Real Estate*, 54 J. REAL ESTATE FIN. ECON. 188 (2017) ....................13

Darren K. Kayunga *et al.*,
*Borrower Risk and Housing Price Appreciation*, 58 J. REAL ESTATE. FIN. ECON. 544 (2018)....................13

As demonstrated in Defendants' pending summary-judgment motions (ECF Nos. 166–67), Plaintiffs' efforts to evade summary judgment rely heavily—indeed, almost exclusively—on their four purported experts. Two of them, family-medicine doctor Michael Fetters and fair-housing activist Pamela Kisch, are proffered for their opinions that Plaintiffs' investigative methodology was a reliable and accurate way of assessing how Defendants maintained REO properties (it was not). A third, sociology professor Jacob Rugh, has no opinion on Plaintiffs' investigative methodology, but is proffered to perform statistical analyses of the data purportedly collected as part of that investigation (albeit data tainted by Plaintiffs' after-the-fact alterations).[1] Each of these purported experts fails the standards for admission established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Plaintiffs' opposition ("Opp.," ECF No. 218) to BANA's motion ("Mot.," ECF No. 206-1) fails to show otherwise.

*Daubert* charges this Court with a gatekeeping function to ensure that expert testimony is reliable and fitted to the case. Plaintiffs make no serious effort to defend the substance of their submissions as either reliable or fitted to this case, and instead insist that these are questions for a jury. But the *Daubert* criteria are not jury questions. "While district courts have broad discretion in analyzing reliability, such discretion does not include the decision to abandon the gatekeeping function." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) (quotation marks omitted). It is precisely due to the power of expert testimony to "mislead" that the gatekeeping function exists. *Newman v. Motorola, Inc.*, 218 F. Supp. 2d 769, 772 (D. Md. 2002) (Blake, J.). This Court should perform that function here and foreclose Plaintiffs' effort to proffer testimony so irrelevant and unreliable that its power to mislead far exceeds its power to inform.

---

[1] The last, maintenance contractor Deavay Tyler, was ostensibly proffered to ratify the validity of Plaintiffs' inspection criteria, but he ended up approving of only some of them. Safeguard addresses Tyler and various inadmissible opinions proffered by Plaintiffs' lay witnesses in a separate motion (ECF No. 203), which BANA has joined. Citations herein to Exhibit 1–18 refer to the Exhibits to BANA's opening brief; Exhibits 19–21 are filed with this reply.

## ARGUMENT

### I. Fetters' Claimed Expertise in "Mixed Methods" Has No Application to Claims Not Based on Any "Mixed Methods."

The case for excluding Fetters is straightforward. Fetters describes himself as an expert in "mixed methods" research. But as the record confirms, Plaintiffs' claims here are not based on any "mixed methods" research. *See* Mot. at 5–6. So Fetters' asserted expertise has no relevance or "fit" to "the facts of the case." *Daubert*, 509 U.S. at 591.

Plaintiffs' counter-arguments are self-contradictory. They argue simultaneously that (i) neither BANA nor the Court are allowed to "second guess" Fetters' contention that Plaintiffs' methods "fall[] within his field of mixed methods research," and *also* that (ii) he should be allowed to opine *outside* the field of mixed methods research because he claims expertise in "social science research . . . more broadly." Opp. at 7. In so doing, Plaintiffs effectively concede that this case has nothing to do with "mixed methods."

It is not "second guess[ing]" a purported expert to assess whether his claimed expertise fits the facts of the case; to the contrary, it is an essential part of the *Daubert* analysis. The fitness criterion would serve no purpose if, as Plaintiffs argue, the Court were obliged to accept every expert's contentions that their opinions are applicable to the case at hand. *See* FED. R. EVID. 702, advisory comm. n. to 2000 amend. ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"). It is precisely because courts are *not* obliged to do so that expert opinions are routinely excluded because their expertise does not fit the case. *See*, *e.g.*, *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 2022 WL 433006, at *8–10 (E.D. Va. Feb. 11, 2022) (expert "not qualified" to opine on the issues at bar "[d]espite his impressive pedigree"); *accord*, *e.g.*, *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378 (D. Md. 2001); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Wells Fargo Bank, N.A.*, 2005 WL 6459866, at *4

(C.D. Cal. Mar. 17, 2005) (similar). Fetters' claimed expertise likewise fails to fit this case.

According to his report and testimony, Fetters considers Plaintiffs' investigation a "mixed methods" project because it combined quantitative data from property inspections with "qualitative" research like "interviews with neighbors." Ex. 2 at 4, 10. But he conceded at deposition that the neighbor interviews did not comprise any part of Plaintiffs' actual claims arising from their investigation. Ex. 7 at 148:8–14. Instead, Plaintiffs' claims are based purely on an alleged disparity in their *quantitative* data. *See* Mot. at 5–6.

Recognizing this, Plaintiffs argue that Fetters' opinions nonetheless should be admitted even if his "mixed methods" experience doesn't fit, because he claims to be "not only an expert in mixed methods research, but an expert in 'social science research methodology design, sampling, implementation, and interpretation' more broadly." Opp. at 8. Plaintiffs then accuse BANA of "ignor[ing]" this. *Id.* That accusation is untrue. BANA's motion ignored nothing and included an entire section addressing the opinions Fetters proffered on matters "broad[er]" than his "mixed methods" expertise. *See* Mot. at 6–9.

As BANA showed there, the fatal problem for Plaintiffs (and Fetters) is that these opinions cannot be rescued from the gatekeeping threshold by labeling them as general "social science" opinions. Rather, they are opinions on *specific* subjects on which Fetters, even by his own account, professes no expertise whatsoever, such as how to observe "the level of maintenance applied to properties." *See id.* at 6–7. Fetters' asserted expertise in "social science . . . more broadly" does not qualify him to opine on property-maintenance criteria for the same reason the "general" expertise in cases like *Elegant Massage*, *Shreve*, and *National Union* was not a qualification to offer the *specific* testimony called for in those cases.

Plaintiffs argue, in purported reliance on *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146 (4th Cir. 2012), and *RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, 609 F.

App'x 731 (4th Cir. 2015), that "property maintenance" is not a specialized field such that a general social scientist (or family-medicine doctor) should be precluded from offering an opinion on it. *See* Opp. at 11–12. But the specific opinions Fetters offered on property maintenance do indeed implicate the specialized aspects of that field. *See* Mot. at 6–7. Otherwise, Plaintiffs would not have proffered Tyler as a separate purported expert on property maintenance. And while there are *aspects* of Plaintiffs' investigation that implicate general methodological principles (such as its susceptibility to various biases), Fetters' opinions are not of that sort. Thus, this is not a situation like *Belk* where expertise in consumer research generally was held a sufficient qualification for consumer research on trade dress (679 F.3d at 161–62) or like *RG Steel* where expertise in damages calculations generally was held a sufficient qualification for calculating damages from a maritime contract (609 F. App'x at 738–39). *See also Elegant Massage*, 2022 WL 433006, at *9 (distinguishing *RG Steel* at length).

Fetters' opinions on Plaintiffs' property-maintenance investigation must also be excluded because they are not drawn from his own claimed expertise (even if it were applicable), but simply repeat assertions by Plaintiffs' executives. *See* Mot. at 6–7 (citing *Modern Remodeling, Inc. v. Tripod Holdings, LLC*, 2021 WL 5234698, at *4 (D. Md. Nov. 9, 2021) (Blake, J.) (opinions that "recycle" assertions of litigants are "unhelpful")). Plaintiffs' effort to excuse this failing as mere "reliance" on their executives "for certain facts" (Opp. at 14) cannot withstand scrutiny. The statements Fetters recycled from Plaintiffs are not limited to factual matters, but opinions and legal claims. *E.g.*, Ex. 2 at 10 ("Per information shared by Lindsay Augustine," "NFHA's preliminary work looking at REOs owned by multiple lenders in the late 2000s and early 2010s demonstrated patterns of discrimination along racial and ethnic lines."), 11 (relying on Plaintiffs' statements about factors that "necessitated" their skewed population sample), 13 (relying on the "training" of NFHA executives in opining that Plaintiffs' "[c]oncentric circles"

methodology was "necessary to find comparable" properties and that properties "further away" were only "chosen as a last resort"). Such an opinion that merely repackages Plaintiffs' opinions under an expert's signature is of no use to the Court should be excluded. *See Modern Remodeling*, *supra*. Further, had Fetters undertaken the requisite inquiry into any of these matters on his own rather than simply accepting what Plaintiffs told him, he would have discovered countervailing facts to consider. *See*, *e.g.*, Ex. 10 at ¶¶ 62, 96–98 & App'x 5 (discussing comparators Plaintiffs excluded within their [redacted]); ECF No. 209 at 11–12.

Fetters also echoes Plaintiffs' assertions that their practice of "cleaning" data by altering their inspection results after the fact was a "strength" of their investigation. Ex. 2 at 10. But Plaintiffs apparently neglected to tell Fetters that their "data cleaning" practice not only involved altering the results, but spoliating the original results and thereby leaving no evidence behind of what they were. *See* Mot. at 7–8. Plaintiffs make no response to the authorities cited in BANA's motion explaining why such lapses in data retention are contrary to generally accepted scientific practice. *See id*. Nor do they dispute that a purported expert's "failure . . . to review highly material information . . . before presuming to offer a general opinion" is an independent ground for exclusion. *United States v. Berkeley Heartlab, Inc.*, 2017 WL 2773794, at *4 (D.S.C. June 26, 2017).[2] Fetters' "general" opinions are therefore no more reliable or admissible than opinions grounded in his inapplicable "mixed methods" expertise.

---

[2] *See also*, *e.g.*, *Caruso v. Bon Secours Charity Heath Sys., Inc.*, 2016 WL 8711396, at *6 (S.D.N.Y. Aug. 5, 2016), *aff'd*, 703 F. App'x 31 (2d Cir. 2017) (excluding expert who failed to review "key pieces of evidence"); *Matthews v. Hewlett-Packard Co.*, 2017 WL 6804075, at *4 (S.D.N.Y. Dec. 22, 2017) (excluding expert who "did not review [] Plaintiff's medical records" and offered opinions "based on little more than Plaintiff's *own* opinion on this issue"); *Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1136 (D. Ariz. 2001) (excluding expert who failed to review "relevant information before forming [his] opinion").

## II. Kisch's Claimed Expertise in "Traditional Fair Housing Testing" Has No Application to Plaintiffs' Novel, *Non*-Traditional Investigation.

The case for Kisch's exclusion is even more straightforward. She claims to be an expert in "traditional fair housing testing" and, on that basis, opines that Plaintiffs' investigation was a sound fair-housing test. Opp. at 18. Her claimed expertise in "traditional fair housing testing" derives from her organization having contracted with HUD to perform such "traditional" tests. *See* Ex. 3 at 1. Embarrassingly for Kisch, however, she did not know (and Plaintiffs apparently never told her) that HUD closely reviewed Plaintiffs' investigative methodology and found it was (i) not methodologically sound and (ii) not a traditional fair housing test. See *NFHA v. U.S. Bank N.A.*, No. 01-12-0283-8, Det. of No Reasonable Cause (HUD Jan. 8, 2016) (Ex. 1).

That alone should end the inquiry into Kisch's fit and relevance to this case. The statistical disparate-impact claims at issue here give rise to matters well outside Kisch's "traditional" testing experience as a matter of both law and generally accepted science. For example, the law says "an unrepresentative sample by definition . . . is not a reliable means to demonstrate disparate impact." *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 750, 754 (6th Cir. 2014); *see* Mot. at 11. The scientific literature abounds with discussions of the importance of representative samplings. *E.g.*, Richard A. Berk, *Regression Analysis: A Constructive Critique* 40–45 (2004) (warning about "misleading" results from "selected" samples). Plaintiffs nevertheless ask this Court to credit Kisch's "expert" opinion that the unrepresentativeness of Plaintiffs' sample does not matter. *See* Mot. at 11.

Plaintiffs' main counter-argument is the same meritless one they made as to Fetters, *viz.*, that the Court must take at face value Kisch's own self-interested statement that this case implicates her expertise. Opp. at 18. But again, the law requires that this Court determine for itself whether her expertise is "tied to the facts of the case." *Daubert*, 509 U.S. at 591. Plaintiffs

are therefore wrong that "disagreement" about the fitness of Kisch's experience to the facts of this case "is the province a [*sic*] jury." Opp. at 18. Plaintiffs are equally wrong that Kisch's ignorance of the HUD ruling rejecting Plaintiffs' methodology is no reason to exclude her opinion that there is "nothing" about Plaintiffs' methodology "that would not be accepted by . . . HUD." *See id*. at 18, 23 & Mot. at 2. As noted *supra* Part I, failure to consider relevant facts is a textbook ground for exclusion, and there is no fact more material to an opinion that HUD would accept Plaintiffs' methodology than an actual ruling from HUD rejecting it. Plaintiffs cannot avoid this by protesting that Kisch "is entitled to disagree" with HUD. Opp. at 18. The issue is not Kisch's disagreement with the ruling, but her ignorance of it and failure to consider it.

Plaintiffs also recycle their defense of Fetters in insisting Kisch needs no "specialized knowledge in statistics or REO maintenance" to opine on how to collect reliable statistics on REO maintenance. *Id*. at 19. This again misses the mark. This is a disparate impact case based on statistics. Kisch has no experience collecting statistics to support disparate impact claims and does not even understand how disparate impact differs from disparate treatment, betraying an understanding of the field no better than a layperson's. *See* Ex. 19 at 123:16–133:19.

Plaintiffs do Kisch no favors defending her opinions on the ground that "experiential" testimony, "as opposed to scientific," is good enough here (Opp. at 5, 23)—a continuation of their insistence that "statistical evidence" need not be "held to scientific research standards." ECF No. 182 at 19, 21. Her opinions are not experiential testimony since, as set forth above, her experience is not relevant. *See* Mot. at 9–14; Ex. 8 at 20:17–21:8 (admitting she had only [redacted]), 35:7–11 (admitting to [redacted]); Ex 3 at 12 (admitting "this investigation varies from most of the tests conducted by my organization.").

Lastly, Plaintiffs do no better defending the improper legal conclusions offered by Kisch

on the asserted ground that she "is not opining on whether Plaintiffs have proven discrimination." Opp. at 25. In reality, Kisch's *entire report* is about what is "required to prove discrimination under the FHA," and how Plaintiffs' investigation supposedly satisfied those requirements. Ex. 3 at 3; *see* Mot. at 18–19. Plaintiffs implicitly recognize this through their repeated insistence that Kisch's opinions are grounded in "standards used by HUD and the DOJ." Opp. at 20 & *passim*. But evidentiary standards are legal standards, and "it is not for an expert to 'communicate a legal standard—explicit or implicit." *Sackman v. Balfour Beatty Communities, LLC*, 2014 WL 4415938, at *26 (S.D. Ga. Sept. 8, 2014).[3]

### III. Rugh's "Regression Analysis" Fundamentally Fails to Account for Essential Information, and Does Not Actually Analyze the Data Plaintiffs Claim it Does.

Rugh performed the "regression analysis" at the core of Plaintiffs' claims. That analysis is the sole basis for Plaintiffs' contention that the disparity they claim to have observed was attributable to race, rather than economic and other non-racial factors. At the outset, Rugh's analysis can be excluded as irrelevant because there is no point to an analysis into the cause of a disparity if the disparity itself was not the product of a methodologically valid, scientific investigation. Plaintiffs do not address—and thus concede—this threshold point that if their data-collection or sampling methods were unreliable, then nothing Rugh did to parse the unreliable data can have any relevance, under the basic maxim of "garbage in, garbage out." *See* Mot. at 23–27; *accord*, *e.g.*, Berk, *supra*, at 73 ("measurement error" makes "the results of a regression analysis . . . very misleading"); *Citizens Fin. Grp. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 120–21 (3d Cir. 2004) (affirming exclusion of expert testimony based on "skewed" survey population because "if the universe is skewed, then the conclusion will similarly be skewed")

---

[3] *See also*, *e.g.*, *Nat'l Ass'n of the Deaf v. Dist. Hosp. Partners, LP*, 2016 WL 447444, at *5 (D.D.C. Feb. 4, 2016) (excluding expert opinion in discrimination case where "the thrust of [the] testimony . . . provides testimony as to whether the legal standard has been satisfied").

(brackets omitted). Both on this threshold ground, and on the ground that Rugh's regression analysis does not actually do the work needed to provide reliable support for Plaintiffs' claims that non-discriminatory explanations have been ruled out, his opinions should be excluded as irrelevant and unreliable.

**A. Plaintiffs Make Misleading Claims About the Data Rugh Considered.**

Plaintiffs begin their opposition not by addressing any of the grounds for exclusion set forth in BANA's motion, but rather by attacking straw men that "BANA does not . . . argue." Opp. at 26. Their lead argument is that regression analyses, as a general matter, are "commonly used" and "widely accepted" in litigation. *Id*. Neither of these propositions is at issue here, and neither one establishes, as they must to meet the *Daubert* standard, that the *particular* regression analysis Rugh performed "is based on sufficient facts or data" or "reliably applied . . . to the facts of the case." FED. R. EVID. 702. In an obvious attempt to distract the Court from this, Plaintiffs devote most of their opposition to misrepresenting what Rugh actually did. The apparent goal of this effort is (i) to leave the Court with the misimpression that Rugh's regression analysis accounted for numerous factors and whole populations for which it did not actually account, and (ii) to try to frame any effort to point out these failings as a "weight" challenge rather than a *Daubert* challenge. The Court should not be misled. Rugh's failures to account for important explanatory factors are not the sort of "mere technical flaws" that "go[] to the weight," but "fatal flaws" that call upon the Court to "fulfill[] its duty as a gatekeeper" and exclude his analysis as neither relevant nor reliable. *Citizens*, 383 F.3d at 121.[4]

---

[4] *Accord*, *e.g.*, *Universal Coin & Bullion, Ltd. v. Fed. Ex. Corp.*, 2015 WL 12001264, at *14 (W.D. Tenn. June 30, 2015) ("The infirmities in the regression analysis are so fundamental that they do not merely go to the probativeness of [the] testimony but go to its admissibility as well."); *Sabal Trail Transmission, LLC v. 13.386 Acres of Land in Lake Cnty., Fla.*, 2018 WL 8583439, at *7–8, 11 (M.D. Fla. Aug. 13, 2018) (excluding testimony on "methodologically flawed survey" because its "patently flawed methodology," including "susceptib[ility] to bias,"

1. ***Plaintiffs inflate their own expert's count of the factors tested.*** Throughout their opposition brief, Plaintiffs contend there were "40 non-racial potential explanatory factors" that Rugh purportedly "consider[ed]" and ruled out as explanations for the purported disparity. Opp. at 25, 27, 34. Plaintiffs cite these "40" factors in a way designed to give the Court the misimpression that they were the factors *actually tested* in Rugh's regression analysis. They were not. Rugh's first regression analysis tested only twelve variables, which he described as follows:

[redacted]

Ex. 4 at 10 (Table 4). His revised regression analysis changed the first variable from [redacted] to [redacted] and added three variables purportedly to address the criticisms of BANA's experts:

[redacted]

*Id*. at 40 (Table 16). That amounts to 15 variables—not 40. By Rugh's *own* count, his [redacted]—not 40. *Id*. at 16. This count is itself overstated as discussed further below, but Plaintiffs' count is *so* inflated it literally doubles the tally furnished by Rugh himself.

Plaintiffs' inflated count of "40" variables is based on counting up every data point Rugh discussed anywhere in his report for any purpose, including data points that he expressly *declined* to consider in his regression analysis, and insinuating they were part of the regression analysis. *Compare id*. Tables 3 & 15 *with* Tables 4 & 16. But it is the regression analysis, not any other ruminations Rugh may have done, that does the work of attempting to test "alternative explanatory [non-racial] factors" for the purported disparity. Opp. at 27.

---

"selection method," and "failure to adequately obtain a representative sample population," "strik[es] at the very heart of the survey's validity" and "do[es] not merely affect the weight").

Plaintiffs' inflated count of "40" (and Rugh's own count of "20") variables is also based on double-counting some of the same things twice. For example, the "Era Property Was Built" variable in Rugh's first regression model was artificially derived by taking the year the property was built and then placing it into three buckets of [redacted] [redacted] and [redacted] Ex. 4 at 9 (Table 3). Plaintiffs' and Rugh's each count this as *four* separate variables, even though all Rugh did was take a single variable (the year) and dull its salience by dividing it into three arbitrary [redacted] Realizing there was no justification for this, Rugh replaced the [redacted] with the year in his revised model—which, unsurprisingly, explained more of the purported disparity. *Id.* at 40 (Table 16). But the three abandoned, unused variables remain part of Plaintiffs' count of 40 variables purportedly [redacted] and Rugh's count of the 20 variables his analysis [redacted] Ex. 4 at 9 (Table 3), 16.

**2. *Plaintiffs misrepresent the factors Rugh <u>did</u> test.*** Compounding the unfitness and unreliability of Rugh's analysis for *Daubert* purposes, the 15 variables he actually incorporated into his revised regression model do not actually account for many things Plaintiffs *claim* Rugh accounted for. *See* Mot. at 27–32. As one significant example, Plaintiffs assert that Rugh accounted for "home value." Opp. at 25. He did not. As noted above, the only variable in the regression model related to property value was a [redacted] metric based on the tax-assessed value of the *land*, exclusive of the [redacted] of the *home* actually *on* the land. Ex. 5 at 10 (Table 4) & App'x 3 at 1; Mot. at 29.

Plaintiffs' response to this omission is to say it is "incorrect[]" to "assert[] that Dr. Rugh considered only land value instead of property value," because he also "collected data on the structural value." Opp. at 28. Perhaps he did "collect" such data, but he did not actually *use* it in his analysis, as Plaintiffs admit. *Id.* They say he limited his regression analysis to "land value" (*omitting* "structural value") because he deemed the land value "less likely to be influenced by

events such as foreclosure and maintenance." *Id*. But the whole *point* of accounting for property values is to test the influence of foreclosure and maintenance—specifically, whether allegedly observed "defects" (including the structural defects Plaintiffs purported to have investigated) reflect the way Defendants maintained the property, or the way the prior homeowner maintained it *before* foreclosure. Plaintiffs thus concede that their regression model avoids controlling for this important variable *by design*, rendering Rugh's analysis unreliable and irrelevant.

Plaintiffs next assert that despite omitting data on "structural value," Rugh "still analyzed property sale price" through data on "REO Property Sale Price at Foreclosure by Lender per Sq. Ft.," "REO Property Re-Sale Price, Sold by Lender per Sq. Ft.," and "Property Sales Price to Foreclosed Owner per Sq. Ft." Opp. at 28. In reality, however, *none* of these data points were included in the regression analysis. Thus, Rugh has no analysis whatsoever of how much of the alleged disparity might be explained by differences in these numbers. Regardless, none of them actually furnish information on property values at any point in time relevant here. The price the original homeowners paid for a property years before a delinquency and foreclosure (often years before) does not speak to the condition in which they left the property at the time of foreclosure after the entire period of time they occupied it. The "sale price at foreclosure" does not reflect property value for a host of reasons, and thus enjoys no "general acceptance within [the] relevant scientific community" as a basis for drawing even remotely reliable conclusions about property values.[5] *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

It also is not true, as Plaintiffs contend, that Rugh "in fact tested every non-racial factor suggested by Defendants' expert witnesses for which he had sufficient data." Opp. at 26. As

[5] *See*, *e.g.*, Darren K. Kayunga *et al.*, *Borrower Risk and Housing Price Appreciation*, 58 J. REAL ESTATE. FIN. ECON. 544, 549 (2018) (discussing how REOs are customarily obtained with a "bid equal to the amount owed plus various other costs" that does not reflect the property's "market price"); Peter Chinloy *et al.*, *Foreclosure, REO, and Market Sales in Residential Real Estate*, 54 J. REAL ESTATE FIN. ECON. 188, 193 (2017) (similar).

shown above, although Rugh claimed to have data on structural values, he admitted he never tested for them in any of his regression models. Further, Skanderson identified stark differences in economic and neighborhood characteristics between the majority-white and majority-minority tracts in Plaintiffs' skewed population along such variables as [redacted] and [redacted] Ex. 10 ¶ 74 (Table 6), ¶¶ 79–80, ¶ 92. In most cases, Rugh did not even attempt to account for these factors. Only the vacancy rate made it into his model as Skanderson "suggested."

As to income, for example, Skanderson demonstrated that [redacted] and that [redacted] *Id.* at ¶¶ 62, 76. Rugh concedes that income levels could be a significant explanatory factor for the condition properties were found in for the obvious reason that income directly relates to "the resources that the [prior] homeowner has to . . . devote to maintenance." Ex. 20 at 210:17–214:9. But there is no variable in his regression model accounting for income levels, again compounding its unreliability.

**3.** ***Rugh failed to account for the condition properties were in when acquired.*** From the beginning of this case, BANA has emphasized the initial condition of the properties at the point of acquisition as an essential variable that must be controlled for to draw *any* reliable conclusions about the cause of property conditions at a later point in time. HUD, too, expressly ruled this an essential variable to control for. *U.S. Bank*, *supra*, at 24 ("comparative analysis" requires "similar property condition at the point of acquisition"). To that end, in addition to the above economic factors, Skanderson accounted for [redacted] as

proxies fo[redacted]—specifically, appraisals furnishing both [redacted] and [redacted] values for the subject properties. Ex. 10 ¶¶ 93–94. These data were produced to Plaintiffs, but Rugh did not consider them. *See* Mot. at 29.

Plaintiffs defend this failure first by asserting that "BANA and its expert have admitted that Defendants provided insufficient data on preexisting property condition (including appraisal data) to include in a regression analysis." Opp. at 29. This is both misleading and irrelevant. First, Plaintiffs' phrasing insinuates that relevant information existed that Defendants withheld from Plaintiffs. That is not the case. BANA produced all the requested appraisal data it had, but not all properties had such data to produce. Second, although it is true that Skanderson determined that the appraisal data did not exist "for a sufficient number of properties in the sample at issue in this case . . . to use in a regression model" (Ex. 21 at 223:8–16), that did not prevent him from performing other analyses of those data and reaching salient conclusions based on those analyses. Ex. 10 ¶¶ 92–98. Plaintiffs are in no position to claim that Rugh was unequipped to consider them in the same fashion, particularly given their assertions that he "considered" numerous variables he did not include in his regression model. *See supra* Part III.A.1. This failure to consider these additional "facts or data" makes his opinions unreliable. FED. R. EVID. 702(b).

Plaintiffs' fallback argument is to contend that Rugh indeed accounted for property "[c]ondition at time of BANA acquisition . . . through different analyses: considering whether deficiencies decreased the longer BANA held a property." Opp. at 29. This contention is both misleading and misplaced. For one thing, Plaintiffs' assumption that the observed deficiencies *should* decrease as properties are held for longer periods of time is unfounded and mistaken given that Plaintiffs gave properties "deficiencies" for conditions they concede Defendants were under no obligation to fix. *See* ECF No. 167 at 9, 16, 31–33. For example, if BANA obtained a

property with dead grass or missing shutters, those conditions would persist over time since, as Plaintiffs' maintenance expert agrees, it's neither Defendants' obligation nor practice to make those purely aesthetic property improvements. Ex. 16 at 11 n.2 & App'x 3 at 3, 8. But whether either deficiency was there or not at the single point in time Plaintiffs visited the property says nothing about whether it was also there or not at an earlier point in time, as would be necessary for this factor to reveal anything about conditions "at time of BANA acquisition." Opp. at 29.

Just as fundamentally, Rugh *could not* have "consider[ed] whether deficiencies decreased the longer BANA held a property" because Plaintiffs did not actually collect any data on "whether deficiencies decreased the longer BANA held a property." *Id*. By their own account, they inspected each property only once and allege "deficiencies" only as to that single moment in time. The reference to "whether deficiencies decreased the longer BANA held a property" is not based on whether or how much deficiencies decreased at any property. Rather, Rugh [redacted] then compared Plaintiffs' deficiency counts across the *different* properties in those different groups. Ex. 11 ¶ 18. But Plaintiffs have no data on how many "deficiencies" each group started out with, as would be necessary to draw any reliable conclusions from comparing the "deficiencies" Plaintiffs allege as to a later point in time. Regardless, the data actually show the alleged disparity in deficiencies *decreasing* as the time in REO increased—undermining, rather than supporting, Plaintiffs' groundless theory that discriminatory maintenance practices explain the disparity. *See id.* at ¶ 23.

**4. *Rugh's conclusions do not apply to the population at issue.*** Years ago, Rugh filed a sworn declaration with this Court saying that "**any analysis** of the evidence in this case from Plaintiffs' investigation of Bank of America's REO properties **should be conducted on all properties investigated** to properly demonstrate the causal connection." ECF No. 107-3 ¶ 9

(emphases added). Rugh's regression analysis does not satisfy his *own* standard for reliably demonstrating the requisite causal connection. There are 1,405 properties at issue and his regression models were variously limited to populations of 1,194, 940, 932, 807, 635, and 430. *See* Mot. at 22. Plaintiffs take issue with this showing and insist he had *some* data points "for all 1,405 properties" and it was only certain other variables where he limited his analysis to a smaller population. Opp. at 28. That is true, but it still shows the analysis saying far less than Plaintiffs promised. Of the 15 variables that made their way into Rugh's regression model, only four were tested across all 1,405 properties. Ex. 4 at 10 (Table 4). The only variable accounting for crime, for example, was tested across only 807 properties. *Id*. Plaintiffs cannot proffer Rugh's regression analysis to rule out "local crime" as an explanatory factor (Compl. ¶ 87) when the analysis indisputably failed to account for it for 43% of the population.

### B. Rugh's Failure to Account for Important Explanatory Factors Makes His Regression Analysis Irrelevant and Unreliable.

The admissibility of a purported expert opinion depends both on the reliability of the analysis *and* whether that analysis is applicable to the inquiry it is proffered to advance. *See Daubert*, 509 U.S. at 592–93 (requiring "a preliminary assessment of whether the reasoning or methodology . . . properly can be applied to the facts in issue"). Plaintiffs try to distract the Court's attention from this inquiry by defending Rugh's analysis from the perspective of whether it contained mechanical errors in its math or calculations, rather than from the broader perspective of whether its methods are scientifically grounded and whether its conclusions can be applied to the facts of the case. Opp. at 26. But the nature of the challenge here is to its fundamental principles and fitness, not to "mere technical flaws." *Citizens*, *supra*.

Here, Plaintiffs proffer Rugh's regression analysis to support their claim that the alleged statistical disparity cannot be "explained by non-racial factors." Compl. ¶ 87. The most obvious

non-racial factor explaining the condition of the properties Plaintiffs purportedly observed is the condition the properties were in when BANA acquired them. Thus, any analysis proffered to support a claim that discriminatory maintenance practices, rather than pre-existing conditions, explains a disparity in property conditions must accomplish at least two things to be "properly . . . applied to the facts at issue": it must "rule in" discriminatory maintenance as a cause, and "rule out" pre-existing conditions and other explanations as a cause. *Foster v. Legal Sea Foods, Inc.*, 2008 WL 2945561, at *10 (D. Md. July 25, 2008). Rugh's analysis does neither.

Recognizing this, Plaintiffs try to distinguish *Foster* on the asserted ground that the expert there "opined on *what caused*" the plaintiffs' injury, while here "Rugh is not opining on which of Defendants' practices *caused* the racial disparity." Opp. at 34. This does not serve to distinguish *Foster*'s framework for assessing whether an expert opinion can advance a causation analysis. And it actually *under*states the matters on which Rugh is not opining. It is true that Rugh offers no opinion on "which" practice could have caused the supposed disparity, but, beyond that, Rugh *also* offers no opinion on *whether* any Defendant caused the supposed disparity. The extent of the opinion Rugh offers is that the 15 factors he tested in the regression model explain only about half of the alleged disparity. Ex. 6 at 4 (Table S1). Whether any *other* non-racial factors explain the rest, Rugh does not, and, *cannot* say. This dual failure to "rule in" discrimination and "rule out" important non-racial factors makes this case analogous to *Foster*.

Plaintiffs protest that the reason Rugh's analysis is incapable of ruling out alternative, non-racial causes is because there was no "available data" on them. Opp. at 34. Then Plaintiffs take it a step further and complain that the *reason* "he lacked sufficient data" is because "Defendants failed to produce" them. *Id.* This claim is not well-taken because the truth is diametrically opposite. At substantial burden and expense, BANA produced *reams* of property records on the condition properties were in throughout the relevant period. *See Faulkner v. Arista*

*Records LLC*, 46 F. Supp. 3d 365, 380 (S.D.N.Y. 2014) (collecting cases finding "that an expert report lacked reliability where the expert did not review data he believed to be unavailable, when the data was, in fact, produced"). Plaintiffs' contention that this information was "unavailable" doesn't actually mean it was unavailable; it just means Plaintiffs and their experts were uninterested in doing the work of reviewing those records and reducing them to some form of spreadsheet data that could be formulaically analyzed in their regression model. But just because this would have entailed manual work—"determin[ing] . . . issues" from "narrative comments," "interpret[ing]" "pictures"—does not mean the information is *unavailable*. Ex. 21 at 231:5–232:20. This language from an appeals court rejecting a disparate impact claim for inadequate statistical evidence is squarely on point:

> Plaintiffs have not established that the data necessary to establish the impact . . . were unavailable. Plaintiffs acknowledge that variables . . . are relevant . . . but claim that they cannot be held responsible for including them in their statistical analysis because "Boeing did not maintain electronic data on any of the omitted variables." But data may be available in nonelectronic form. Electronic data are undeniably more convenient, especially for use in statistical studies, but **inconvenience does not excuse failure to collect the data**.

*Carpenter v. Boeing Co.*, 456 F.3d 1183, 1199 (10th Cir. 2006) (emphasis added).

It is *especially* inappropriate for Plaintiffs to blame *Defendants* for any lack of data on the conditions properties were in before Plaintiffs' single-point-in-time inspections, because any such blame falls squarely on Plaintiffs. As has already been addressed at length, nothing prevented them from visiting properties more than once to paint a fuller, three-dimensional picture. *See* Ex. 13 ¶¶ 57–61. It was their own choice not to generate the data they now complain is "unavailable." Having made that choice, they are in no position to blame the lack of comparison data on Defendants, or to complain that the regression analysis they rely on to carry the entirety of their "robust causation" burden should be excused for its failure to test an important explanatory factor on account of their *own* efforts to leave that factor unexplored.

Notably, BANA's expert *did* do the work of studying the "nonelectronic records" (*Carpenter*, *supra*), and found myriad [redacted] unaccounted for in Rugh's regression model. Ex. 17 ¶¶ 34–39. That is not surprising and fully consistent with the inherent limitations of regression analyses. As a leading treatise cautions, "the results of a regression have a less solid empirical foundation than the results of a matching procedure," because the former is based on "estimation procedures" and assumptions, and the latter compares how actual populations "were actually treated." David C. Baldus & James W. L. Cole, *Statistical Proof of Discrimination* § 8.022[2] at 248 (1980).

At bottom, complaining that vital data is "unavailable" does not excuse the omissions in Plaintiffs' regression model. It merely confirms that these omissions are fatal. *See*, *e.g.*, *In re Sonic Corp. Customer Data Sec. Breach Litig.*, 2021 WL 5916743, at *9 (N.D. Ohio Dec. 15, 2021) (excluding expert for failure to "overcome the underlying problem of insufficient and biased data"; "[c]ourts properly exclude testimony . . . even where the flaws stem in part from the expert's efforts to do the best job he could with the limited data his client would provide").

Recognizing this, Plaintiffs try to portray the explanatory factors Rugh neglected to consider as small and insignificant. They say this is a situation where Rugh merely "fail[ed] to rule out all possible alternative causal sources" and claim it doesn't matter "that several possible causes might remain 'uneliminated.'" Opp. at 27. But the issue here is not a mere failure to rule out "all" alternative causes, but rather a failure to rule out some of the most likely. In those circumstances, "the Supreme Court . . . left no question whatsoever that a regression analysis that does not control for at least major variables may be altogether inadmissible." *Smith v. Virginia Commonwealth Univ.*, 84 F.3d 672, 681 (4th Cir. 1996) (en banc) (Luttig, J., concurring). Plaintiffs do not respond to the case law cited in BANA's opening brief holding that a regression analysis failing to include "major variables" is inadmissible. *See* Mot. at 31; *cf. TLC Commc'ns.*

*Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, 2017 WL 11598725, at *6 (C.D. Cal. Feb. 2, 2017) ("the flaws here are not ones of degree going only to weight, but rather undermine the fundamental reliability of the analysis," where expert failed to "control for differences" that serve as explanatory factors). And the omission of "major variables" is indeed the issue here—not merely a failure to exhaust every conceivable alternative, as Plaintiffs insinuate.

This matters, because a conclusion based on a regression analysis that "race" is a factor in an asserted disparity does not establish that *racial discrimination* is an explanation. There might be some "other factor . . . correlated with race," but itself non-discriminatory, which furnishes the explanation and which must be accounted for if the regression model is to do its job. *Cnty. of Cook v. Bank of Am. Corp.*, 2022 WL 408299, at *12 (N.D. Ill. Feb. 10, 2022) (quoted in Mot. at 28); *accord*, *e.g.*, Baldus & Cole, *supra*, § 8.021 at 243 (advising "caution" against drawing causal inferences from a regression model showing hiring patterns explained by sex because "[t]here would always be the chance that a legitimate qualification variable not included in the model, but highly correlated withs sex (such as experience), was in fact the causal factor"). BANA has already identified legitimate variables not included in Rugh's model which are correlated with race and capable of explaining the purported disparity. *See*, *e.g.*, Ex. 13 ¶¶ 38–41 & Ex. 1–3 (HUD data on pre-existing property conditions). Rugh's failure to account for these renders his analysis fundamentally unreliable and incapable of helping the Court "determine a fact in issue." FED. R. EVID. 702. It should be excluded.

Respectfully submitted this 10th day of November, 2022,

/s/ Ava E. Lias-Booker
Ava E. Lias-Booker (No. 05022)
Melissa Martinez (No. 28975)
MCGUIRE WOODS LLP
500 E. Pratt St., Ste. 1000
Baltimore, Md. 21202
Tel.: (410) 659-4430

/s/ Thomas M. Hefferon
Thomas M. Hefferon (No. 15109)
Brooks R. Brown (*pro hac vice*)
Anthony M. Alexis (*pro hac vice*)
Keith Levenberg (No. 11957)
GOODWIN PROCTER LLP
1900 N St. N.W.

Fax: (410) 659-4558
alias-booker@mcguirewoods.com
mmartinez@mcguirewoods.com

Washington, D.C. 20036
Tel.: (202) 346-4248
Fax: (202) 346-4444
thefferon@goodwinlaw.com
bbrown@goodwinlaw.com
aalexis@goodwinlaw.com
klevenberg@goodwinlaw.com

*Counsel for Defendant Bank of America, N.A.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 10, 2022, a copy of the foregoing Defendant Bank of America N.A.'s Reply in Support of its Motion to Strike the Purported Expert Reports of Jacob Rugh, Pamela Kisch, and Michael Fetters, Declaration of Keith Levenberg, and Exhibits were filed and served via CM/ECF, on all counsel of record.

*/s/ Melissa O. Martinez*
Melissa O. Martinez

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al.,<br><br>v.<br><br>BANK OF AMERICA, N.A., et al. | Civil Action No. SAG-18-1919 |

**MEMORANDUM**

In this lawsuit, a coalition of nonprofit fair housing advocacy organizations and individual homeowners allege that in the years following the 2008 financial crisis, Bank of America, N.A. and Safeguard Properties Management LLC discriminated on the basis of race in their maintenance and marketing of real estate owned properties. Numerous motions are currently pending. This Court resolves one here: the defendants' Motion for Dismissal or Other Appropriate Relief Due to the Organizational Plaintiffs' Spoliation of Material Evidence. *See* ECF 153, ("Mot."). The motion is fully briefed, and no oral argument is necessary. *See* Local Rule 105.6. For the following reasons, this Court will grant the motion in part and permit the parties to introduce evidence and argument related to the spoliated material at trial.

**BACKGROUND**

The opinion on the motion to dismiss outlined the comprehensive factual background to this litigation, so only a brief recap, followed by the detail needed to resolve the sanctions motion, is necessary here. *See* Mem., ECF 66. After the 2008 sub-prime mortgage collapse, Bank of America took ownership of a vast number of properties that it had foreclosed upon but not sold. Properties of this nature are known as "real estate owned properties" or "REOs." The bank contracted with Safeguard to manage many of its newly acquired REOs.

In the years following the mortgage crisis, the National Fair Housing Alliance ("NFHA") received complaints that Bank of America had failed to maintain and market its REOs in communities of color with the same rigor it devoted to white communities. Decl. of Lindsay Augustine ¶ 2, ECF 179-1. In response, plaintiff NFHA, together with a group of partner organizations who are also plaintiffs here, designed and conducted a nationwide investigation to test whether racial demographics in fact impacted the defendants' maintenance and marketing of particular REOs. *Id.* After a seven-year investigation, the plaintiffs concluded that there is a "substantial and statistically significant" disparity "between the routine exterior maintenance and marketing of Bank of America-owned homes in communities of color and the routine exterior maintenance and marketing of Bank of America-owned homes in predominantly white neighborhoods" that cannot be "explained by non-racial factors."[1] *See* Compl. ¶¶ 65, 80, 87, ECF 1.

This motion concerns the preservation of evidence related to the plaintiffs' investigation of Bank of America REOs. The plaintiffs' claims are predicated upon the objective, measurable disparities they allege exist between REOs in white and non-white communities. Those disparities are calculated using the aggregated results of the plaintiffs' in-person investigations of Bank of America properties in 37 cities across the country. Decl. of Lindsay Augustine ¶ 17. To conduct those on-site investigations, the plaintiffs dispatched teams of investigators to evaluate thousands of properties in carefully selected metropolitan areas. *Id.* ¶¶ 7-17. The plaintiffs trained investigators to score properties based on dozens of criteria they developed as a proxy for the quality of a property's "maintenance, marketing, and [] overall curb appeal." Decl. of Shanna L.

[1] This Court's references to "the plaintiffs" in this opinion refer to the organizational plaintiffs only. There is no allegation that the individual plaintiffs, though co-equal plaintiffs in this lawsuit, had any involvement in the issue litigated here.

Smith ¶ 5, ECF 178-2. Each criterion represented a possible "deficiency" in the maintenance or marketing of a property. Decl. of Lindsay Augustine ¶ 14. The more deficiencies, the worse the defendants' treatment of the property. And on the plaintiffs' logic, the greater the disparity between the average number of deficiencies in minority communities and otherwise comparable white communities, the greater the disparity in the defendants' treatment of properties based on race. Ultimately, the plaintiffs believe their evidence reveals a significant disparity in observed deficiencies between properties in white and minority communities, and as a result that the defendants treated properties in white communities more favorably than properties in communities of color.

In this way, the plaintiffs' bottom-line conclusions are the product of aggregating and analyzing thousands of individual evaluations conducted by scores of investigators over years of work. The accuracy and continuity of these investigations is, therefore, critical to the integrity of the plaintiffs' claims. Recognizing this, the plaintiffs put each investigator through "a rigorous two-day training program" where they educated trainees on identifying, evaluating, photographing, and recording deficiencies in REO properties. *Id.* Once trained, investigators were sent to the field in pairs to evaluate their assigned properties. *Id.* ¶ 17. At each location, the investigators took general photographs of the property, as well as specific photographs of each deficiency. *Id.* ¶¶ 17-18. They also recorded each deficiency in a standardized REO Evaluation Form provided by the plaintiffs. *Id.* ¶ 17.

After completing property evaluations, investigators delivered the results to their local office, where they or another trained staff member input the data collected in the REO Evaluation Form, all the photographs taken of the property, and any relevant additional notes into a central database. *Id.* ¶¶ 19-20. Once the data was uploaded, the plaintiffs retained or disposed of the paper

copies of the REO Evaluation Forms in accordance with the document retention policy of the relevant organization in possession of the form. *Id.* ¶ 24. As a final step, three NFHA executives—Shanna Smith, Shanti Abedin, and Lindsay Augustine—reviewed the entries and edited them "for standardization." *Id.* ¶ 25. Ms. Augustine attested in her declaration that these edits were mostly cosmetic—for example, adjusting the orientation of a photograph or fixing spelling—but at times included "reclassifying a deficiency" (which would not change a property's total deficiency score) or removing a deficiency not supported by photographic evidence (which would).

This motion arises from the defendants' concern with the plaintiffs' destruction of or failure to retain REO Evaluation Forms and their related practices for entering and standardizing REO evaluation data. The defendants contend that, in purporting to comply with their document retention protocols, the plaintiffs instead violated their duty to preserve relevant evidence related to reasonably foreseeable litigation by disposing of 284 out of the 307 REO Evaluation forms related to the properties at issue in this initial stage of the litigation (92% of the Phase II forms), and at least 750 of the total REO Evaluation Forms created in the broader investigation. Mot. at 6.

The defendants fear that absent the original surveys, the plaintiffs could have, and may have, selectively or inadvertently translated data from the REO Evaluation Forms into the central database in a manner favorable to their claims, and that the defendants will now be unable to identify such inaccuracies because most original copies of the evaluation forms no longer exist. They filed this motion to remedy that perceived harm.

## ANALYSIS

The defendants seek sanctions for the plaintiffs' alleged evidence spoliation under the court's inherent authority to remedy discovery-related misconduct. Imposing sanctions for evidence spoliation is appropriate where (1) the party in control of the evidence had an obligation

to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 104 (E.D. Va. 2018); *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013). Where these elements are satisfied, the "court has broad discretion in choosing an appropriate sanction," which "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999)). The defendants claim a sanction is warranted because NFHA and its partners intentionally disposed of the REO Evaluation Forms that supplied the data underlying the plaintiffs' database—and, by extension, this entire lawsuit—and that as a result, they are so irreparably prejudiced that the suit must be dismissed. This Court agrees that the plaintiffs have spoliated evidence but concludes a more moderate sanction is sufficient to remedy the harm.

**A. Timeliness**

As a threshold matter, this Court considers the timeliness of the defendants' motion. There is no formal statute of limitations governing spoliation motions, but they should "be filed as soon as reasonably possible after discovery of the facts that underlie the motion." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 508 (D. Md. 2009). Together with this underlying principle, courts in the Fourth Circuit consider five factors to assess the timeliness of a spoliation motion: (1) the time between the filing of the motion and the close of discovery; (2) the time between the filing of the motion and the filing of summary judgment motions; (3) the time between the filing of the motion and trial; (4) whether the court imposed a deadline for filing spoliation motions; and (5) the moving party's justification for not filing sooner. *See id.* at 506-08. Finally, courts also

consider the prejudice of any delay to the non-moving party. *See Membreno v. Atlanta Rest. Partners, LLC*, 338 F.R.D. 66, 76 (D. Md. 2021).

The court first considers how promptly the defendants moved for sanctions. The defendants here appear to have been on notice since at least June 2020 that the plaintiffs' productions lacked original copies of the REO Evaluation Forms. *See* Opp. to Mot. for Sanctions at Ex. 5 ¶ 3, ECF 178-6 ("Opp."). Nevertheless, the defendants waited sixteen months, until October 21, 2021, to raise the issue, even though they considered the documents' absence to reflect a "[s]erious deficienc[y]" in the plaintiffs' production. *Id.* at Ex. 5-B. The plaintiffs confirmed within days that they had produced all the requested forms in their possession, yet the defendants waited another six months to file this motion. *See id.* at Ex. 5-C. This amounts to nearly two years between the first concrete indication that the plaintiffs lacked complete records of the evaluation forms and the defendants' corresponding request for sanctions. All the while, the parties continued to engage in discovery despite the potential of this motion to alter the scope of discovery or obviate the need for it altogether.

The defendants explain the timing of their motion as predicated on a baseline assumption that the "Plaintiffs—experienced participants in federal court litigation—[would not have] intentionally destroyed the bulk of the property inspection reports." Reply in Support of Mot. for Sanctions at 5, ECF 195 ("Reply"). They attribute the delay between the plaintiffs' June 2020 production and their October 2021 letter in large part to this underlying assumption. *See id.* Once the plaintiffs confirmed the scope of the available surveys, the defendants indicate, they "reviewed the available evidence about the nature, scope, and prejudice of Plaintiffs' spoliation, met and conferred with Plaintiffs about their refusal to provide complete spoliation discovery as required by the Federal and Local Rules, and prepared and filed their Motion." *Id.*

The court is sympathetic to the defendants' position but is unconvinced it justifies a delay of this extent. The defendants' assumption that the plaintiffs preserved the evidence was, up to a point, reasonable. Likewise, the defendants' efforts to verify the existence and scope of the spoliation, after receiving the plaintiffs' October 2021 letter, were prudent. This is also a complex matter with many moving pieces that has imposed high demands on counsel for both parties. Still, the defendants' sixteen-month delay in seeking the missing documents is difficult to reconcile with their own characterization of the plaintiffs' production as self-evidently containing "[s]erious deficiencies," Opp. at Ex. 5-B, regarding documents upon which they believe "[t]his entire case is predicated," Mot. at 16. The subsequent six-month lapse between the receipt of the October 2021 letter, and the filing of this motion on the date on which summary judgment motions were previously due, is similarly troubling. *See* Stipulated Order Extending Deadlines, ECF 144. Considering all this, this Court finds that the defendants' explanation cannot fully justify the length of the delay and thus weighs moderately against the motion's timeliness.

The remaining *Goodman* factors either weigh further against the defendants or do not restore the balance. To start, the "least disruptive time to" file a spoliation motion "is *during* the discovery phase, not after it has closed," *Goodman*, 632 F. Supp. 2d at 508, and the defendants here waited until two months after Phase II discovery closed to file this motion, *see* Stipulated Order Extending Deadlines, ECF 139. Moreover, although the defendants ultimately filed this motion before their motions for summary judgment, that is only because the court granted the defendants' emergency motion to extend the summary judgment deadline, permitting the defendants to file this motion on the date their dispositive motion was previously due. *See* Emergency Mot. to Vacate Deadlines, ECF 146; Order, ECF 158. These factors counsel against permitting the motion. Against all this, the only *Goodman* factors favoring the defendants are that

they did not file this motion "on the eve of trial" and did not violate any court-imposed deadline for filing spoliation motions. *Goodman*, 632 F. Supp. 2d at 507-08. In other words, their timing could have been worse.

Although the length of the defendants' delay and the related *Goodman* factors suggest the motion is untimely, the court is conscious that even where a movant "has not provided a good reason for [their] delay," where the non-moving party's "misconduct is serious and [the non-movant is] not significantly prejudiced because of the delayed filing," the court should proceed to the merits of the sanctions motion. *Membreno*, 338 F.R.D. at 76. As the analysis below makes clear, the defendants allege a serious violation of the plaintiffs' duty to preserve. At the same time, the burden of additional discovery introduced by this motion is likely to be relatively minimal in the context of this case, the parties' summary judgment motions remain pending, and the motion will not independently delay a trial date. *See id.* at 75-76. Thus, the seriousness of the spoliation outweighs any undue prejudice of the motion, and the court will resolve it on the merits.

**B. Duty to Preserve**

Whether the plaintiffs had a duty to preserve relevant evidence during their investigations is undisputed. It is well-established that the "duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591. "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)). The defendants pin the plaintiffs' duty to preserve at no later than "the inception of their investigation" in May 2011. Mot.

at 13. And although the plaintiffs contest the relevance of the evidence at issue, they do not dispute that initiating their investigation triggered their duty to preserve relevant evidence. *See* Opp. at 11-16. So, for purposes of this motion, this Court finds the plaintiffs were under a duty to preserve relevant evidence when they disposed of the REO Evaluation Forms.

**C. Culpability**

The dispute about the plaintiffs' state of mind is minimal. For spoliation to occur, the spoliator "must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction"—mere "negligent loss or destruction of evidence" is not enough. *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013) (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir.1995)); *see First Mariner Bank v. Resol. L. Grp., P.C.*, No. CIV. MJG-12-1133, 2014 WL 1652550, at *9 (D. Md. Apr. 22, 2014).[2] Intentionally spoliating evidence is sanctionable even where the evidence is destroyed in good faith. *See id.* (citing *Vodusek*, 71 F.3d at 155); *see Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008). "'Destruction is willful when it is deliberate or intentional,' whereas bad faith destruction occurs when a party engages in destruction 'for the *purpose of depriving the adversary of evidence.*'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 497 (E.D. Va. 2011) (quoting *Powell v. Town of Sharpsburg*, 591 F.Supp.2d 814, 820 (E.D.N.C. 2008)). "Assessing the quantum of fault becomes appropriate when determining the appropriate sanction, not in deciding whether spoliation has taken place." *Id.* (collecting cases).[3]

---

[2] Unpublished opinions are cited for the persuasiveness of their reasoning only, not for precedential value.

[3] The state of mind required to warrant sanctions for evidence spoliation is the subject of some dispute in the Fourth Circuit. *Compare First Mariner Bank*, 2014 WL 1652550, at *9 (quoting *Turner*, 736 F.3d at 282) ("The Fourth Circuit recently clarified" that spoliation "does not result merely from the negligent loss or destruction of evidence.") *with Eller v. Prince George's Cnty.*

The plaintiffs here intentionally destroyed the field evaluation forms. NFHA itself explains that it implemented a policy of "discard[ing] the paper versions of the evaluation forms . . . immediately after uploading the data or as soon as practicable," and invited its partners to do the same. Decl. of Lindsay Augustine ¶ 24. Such "intentional, purposeful, [and] deliberate" conduct satisfies the spoliation standard. *First Mariner Bank*, 2014 WL 1652550, at *9. And the plaintiffs should "have known that the evidence was relevant to some issue in the anticipated case," *Turner*, 736 F.3d at 282, because the forms were the only contemporaneous records of investigators' property assessments. It may well have been reasonable, and even prudent, for NFHA's quality control team to modify entries when constructing its database, but the defendants were still entitled to access the original forms to test NFHA's methodology.

The plaintiffs' conduct, albeit intentional, does not amount to bad faith. A party has acted in bad faith only where it spoliates evidence "for the purpose of depriving the adversary of evidence." *E.I. du Pont de Nemours & Co.*, 803 F. Supp. 2d at 497 (emphasis omitted) (quoting *Powell*, 591 F.Supp.2d at 820). There is no evidence of illicit motive here. To the contrary, NFHA's Senior Associate Director of Enforcement, Lindsay Augustine, represented in her declaration that NFHA disposed of the original copies of the evaluation forms to comply with its document retention policy, and instructed its partner organizations to follow their own document

---

*Pub. Sch.*, No. TDC-18-3649, 2020 WL 7336730, at *8 (D. Md. Dec. 14, 2020) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 529 (D. Md. 2010)) ("In the Fourth Circuit, for a court to impose some form of sanctions for spoliation, any fault—be it bad faith, willfulness, gross negligence, or ordinary negligence—is a sufficiently culpable mindset."). This Court need not resolve the debate here, however, because as explained below the plaintiffs' actions were intentional and thus culpable under any standard.

retention policies. Decl. of Lindsay Augustine ¶ 24. Ms. Augustine explained that NFHA considered the forms "preliminary drafts that contained rough notes" which "became duplicative" once "the relevant information on the forms . . . was saved to" NFHA's database. *Id.* NFHA President and Chief Executive Officer Shanna Smith corroborates this account, explaining in her declaration that NFHA's destruction of the forms is in line with the document retention protocol it has employed for over 30 years, one that, in its experience, has been consistently accepted for investigation and litigation purposes. *See* Decl. of Shanna L. Smith ¶ 10. NFHA's prior experience cannot contract the scope of its duty to preserve here, but it does suggest NFHA acted in good faith. Aside from the fact of the document destruction itself—which NFHA has explained adequately and under oath—the defendants have presented no direct or circumstantial evidence of improper motive.[4] So although NFHA's culpability is sanctionable, the degree of its culpability, and the corresponding need for a severe sanction, is moderated by its good faith.

---

[4] The parties dispute whether NFHA did, in fact, comply with its document retention policy. The defendants, obviously, contend that a deviation could be construed as a sign of impropriety or bad faith. The plaintiffs offer evidence that NFHA did comply, *see* Decl. of Lindsay Augustine; Decl. of Shanna L. Smith, whereas the defendants interpret the policy's text to suggest it did not, *see* Reply at 7 (quoting Document Protocols for NFHA Investigations, ECF 179-2, ("NFHA Retention Policy")). The court finds the text of the policy too ambiguous to compel the defendants' reading, and thus insufficient to rebut the evidence offered by the plaintiffs. *See* NFHA Retention Policy at 024903 (making it unclear whether NFHA's retention policy during "Investigations That Uncover Evidence of Non-Compliance" modifies the scope or the duration of NFHA's standard policy). In addition, NFHA's approach in this investigation provides circumstantial evidence of good faith. NFHA delegated decision making over whether to retain each particular tranche of surveys to the individual partner organization responsible for those surveys, resulting in the preservation of some originals and the disposal of others. The more logical approach, were NFHA engaged in deliberately concealing unfavorable survey results, would have been to apply NFHA's purportedly advantageous policy universally across the investigation. Furthermore, the investigators themselves were often responsible for their own data entry. Decl. of Lindsay Augustine ¶ 19. The defendants do not explain why, were the plaintiffs truly engaged in deliberately misrepresenting evidence, an investigator would accurately record deficiencies on the REO Evaluation Form in the field but then manipulate the results at the database entry stage, rather than rigging the data at the outset during the investigation.

**D. Relevance**

The central dispute in this sanctions motion is the relevance of the survey forms and the corresponding prejudice their absence inflicts. "In the context of spoliation, lost or destroyed evidence is relevant if 'a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.'" *Eller v. Prince George's Cnty. Pub. Sch.*, No. TDC-18-3649, 2020 WL 7336730, at *9 (D. Md. Dec. 14, 2020) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 531 (D. Md. 2010)). If the spoliated evidence is relevant, sanctions are proper where "the absence of the evidence [is] prejudicial to the party alleging spoliation." *Id.* (quoting *Victor Stanley*, 269 F.R.D. at 531). As with culpability, the extent of the sanctions must be commensurate with the degree of the prejudice. *E.I. du Pont de Nemours & Co.*, 803 F. Supp. 2d at 499-500.

The defendants view the destroyed evidence as relevant and prejudicial because, at minimum, it "would have been relevant to Defendants' defenses regarding the accuracy and reliability of the database, the subjective nature of Plaintiffs' 37 criteria, Plaintiffs' inconsistent application of each criteria across the subject properties, and the inherent bias of Plaintiffs' employees changing the inspection results." Mot. at 18. At worst, the defendants fear that the plaintiffs could have used their database entry process to launder the investigation results in a manner that disproportionately reduced deficiencies on properties in white communities, thus improving the plaintiffs' litigation prospects. Reply at 18-19. The absence of the documents, the defendants say, deprives them of the opportunity to expose pro-plaintiff manipulation in the database, if this worst-case scenario occurred.

The plaintiffs, on the other hand, characterize the physical evaluation forms as flatly irrelevant because they merely represent preliminary notes about a property that were then fully

transposed into the database, either through written comments or through photographs, and thus the forms themselves contain no information not also captured in the database the plaintiffs produced. Opp. at 21, 23. Even if the notes were relevant, they continue, their absence is not prejudicial because the available sample indicates that the quality control process actually reduced the discrepancies between white and minority properties, "slightly weakening Plaintiffs' claims." *Id.* at 24.

To resolve the parties' competing characterizations of the missing evidence, this Court determines whether the moving party, here the defendants, has met its burden of "establish[ing] a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to [its] cause," while also bearing in mind that, in a spoliation case, the information available to the movant will naturally be incomplete. *Pandora Jewelry, LLC v. Chamilia, LLC*, No. 06-cv-3041-CCB, 2008 WL 4533902, at *9 (D. Md. Sept. 30, 2008). With respect to their worst-case scenario, the defendants have not met their burden. The defendants simply have no evidence that any changes made between the original forms and the initial database entry favor the plaintiffs' case.[5]

The plaintiffs, on the other hand, do provide evidence, and that evidence reduces the cause for concern. Ms. Augustine attests that most quality control "edits did not change the total number of deficiencies for a property," and therefore cannot have prejudiced the defendants. Decl. of Lindsay Augustine ¶ 25. Similarly, the plaintiffs' review of the 67 available survey forms shows that of the 224 handwritten notes on those forms, the relevant notes were fully captured in the final database, with only 3 exceptions. *Id.* ¶¶ 21-22. Moreover, although the 67 surveys are not a perfect

[5] The defendants offer evidence through their expert, Dr. Justin McCrary, about how the plaintiffs' dataset has evolved since the filing of the complaint. Mot. at 11 & n.30. That is not evidence, however, of differences between the plaintiffs' dataset and the REO Evaluation Forms themselves.

sample of the unavailable forms, the plaintiffs' empirical analysis of these forms suggests that, if anything, the alterations made between the original surveys and the final database favor the defendants. Decl. of Samantha Duckworth ¶ 17, ECF 178-18. The defendants' concerns, however natural, do not rebut this evidence, and are thus insufficient to demonstrate a "reasonable possibility" that the defendants manufactured survey results to improve their dataset. *Pandora Jewelry, LLC*, 2008 WL 4533902, at *9. The court will not impose the severe degree of sanctions such a conclusion would warrant.

The court agrees with the defendants, however, that the plaintiffs' spoliation inflicts a more modest degree of prejudice. As the motions for summary judgment indicate, the reliability and subjectivity of the plaintiffs' data collection methodology is a serious source of dispute in this case. And the improper spoliation of the REO Evaluation Forms hampers the defendants' ability to dispute the plaintiffs' evidence on both scores. As the plaintiffs themselves concede, even without any indicia of improper motive, the translation of relevant observations from the survey forms to the database was imperfect. Decl. of Lindsay Augustine ¶¶ 21-22. That human error alone, multiplied across hundreds of properties, could have provided the defendants with valuable evidence with which to impeach the accuracy of the database. At the same time, the missing forms hinder the defendants' ability to elicit disagreement between the NFHA moderators' characterizations of certain deficiencies and the field investigators' characterizations of the same deficiencies, divergences which the defendants could have used to support their position that the plaintiffs' evaluation metrics were overly subjective. For both these reasons, the court concludes the spoliation of the original survey forms has prejudiced the defendants and that a corresponding remedy is appropriate.

**E. Remedy**

The parties' views of the appropriate remedy for the plaintiffs' spoliation differ vastly. "When assessing what sanction to impose, courts consider the degree of culpability and the extent of the prejudice[.]" *E.I. du Pont de Nemours & Co.*, 803 F. Supp. 2d at 499–500. A spoliation sanction "should (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Victor Stanley, Inc.*, 269 F.R.D. at 534 (internal quotation marks omitted). In service of these principles, the sanctions available for spoliation include "assessing attorney's fees and costs, giving the jury an adverse inference instruction, precluding evidence, or imposing the harsh, case-dispositive sanctions of dismissal or judgment by default." *Id.* at 533. Courts should select "the least harsh sanction that can provide an adequate remedy." *Eller*, 2020 WL 7336730, at *10. Here, the defendants seek dismissal—"the ultimate sanction for spoliation," *Silvestri*, 271 F.3d at 593—or, alternatively, to preclude the plaintiffs from introducing evidence related to any of the properties for which original survey forms do not exist. Although the plaintiffs believe no sanction is necessary, they contend that the court should at most permit the parties to call witnesses related to the spoliated documents or instruct the jury that the plaintiffs discarded the forms without a corresponding adverse inference instruction.

As discussed, the plaintiffs' conduct here was intentional, but was not carried out in bad faith. Similarly, there is no evidence that the absence of the original forms severely prejudiced the defendants, or indeed that the forms contained much evidence at all not captured in the database the plaintiffs produced. Although the court cannot deny the specter of bias that inevitably flows from a plaintiff discarding its own relevant evidence, it cannot impose sanctions based on

speculation, particularly where, as here, the available evidence indicates the extent of the prejudice is limited. Still, the court has concluded that the missing evidence does prejudice the defendants' ability to impeach the accuracy of the database and the objectivity of the plaintiffs' evaluation criteria. The defendants are entitled to a remedy for this prejudice.

A modest sanction can provide that remedy. The court is confident that the defendants can cure much of the harm themselves: they can attack the database's accuracy by reference to the more than 30,000 photographs the plaintiffs produced, and they can test the objectivity of the plaintiffs' metrics through independent witness examination. In the end, the problem is that they will be doing so with incomplete information. To fill this "hole in the evidence," the court will permit "all parties to present argument and evidence at trial regarding" the spoliated surveys. *Butler v. Kroger Ltd. P'ship I*, No. 2:19-cv-673, 2020 WL 7483447, at *9 (E.D. Va. Nov. 30, 2020), *report and recommendation adopted,* No. 2:19-cv-673, 2020 WL 7482186 (E.D. Va. Dec. 18, 2020). No harsher sanction is necessary or warranted.

**CONCLUSION**

For the reasons explained above, the defendants' motion for sanctions is granted in part, and the court will permit the parties to introduce evidence and argument related to the spoliated material at trial.

A separate order follows.

1/23/2023
Date

/s/
Stephanie A. Gallagher
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al.,<br><br>v.<br><br>BANK OF AMERICA, N.A., et al. | Civil Action No. SAG-18-1919 |

**MEMORANDUM OPINION**

A collection of fair housing advocacy groups and individual plaintiffs filed this lawsuit against Bank of America, N.A. and Safeguard Properties Management, LLC for their allegedly discriminatory maintenance and marketing of real estate owned properties in the wake of the 2008 financial crisis. The plaintiffs' case is predicated on a proprietary investigation of properties owned by Bank of America and serviced by Safeguard in 37 cities between 2011 and 2018. The plaintiffs' study purports to demonstrate a statistically significant racial disparity in the defendants' management of real estate owned properties, which, in the plaintiffs' view, evinces disparate impact and disparate treatment in violation of the Fair Housing Act. Given the centrality of their study to the claims in this case, the plaintiffs supply at least four expert witnesses to opine on the validity of the investigation and to interpret its results. The defendants move to exclude the opinions of each of those four experts, as well as the opinion of National Fair Housing Alliance Senior Associate Director of Enforcement Lindsay Augustine. Safeguard's Mot. to Strike, ECF 205; BANA's Mot. to Strike, ECF 206. The motions are fully briefed, and no oral argument is

necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons explained below, the motions to exclude experts will be granted in part and denied in part.[1]

## I. BACKGROUND

The factual background to this case has been detailed in two prior opinions, so only a short summary is necessary here. *See* Mem., ECF 66; Mem., ECF 226. Following the 2008 mortgage crisis, Bank of America assumed ownership of foreclosed properties across the country, many of which it engaged Safeguard to service on its behalf. Properties under this ownership structure are referred to as "real estate owned properties" or "REOs."

The plaintiffs, a group of fair housing organizations assembled by the National Fair Housing Alliance, or "NFHA," claim that as early as 2009, they started fielding complaints that the defendants were failing to hold REOs in minority communities to the same standard as those in white communities. Decl. of Lindsay Augustine ¶ 2, ECF 184-1 ("Augustine Decl."). "As a result of those concerns, NFHA developed a large-scale investigation to determine whether the racial makeup of a neighborhood had an impact on the quality of [the defendants'] maintenance and marketing of REO properties." *Id.* The investigation found, in the plaintiffs' view, a "substantial and statistically significant" disparity "between the routine exterior maintenance and marketing of Bank of America-owned homes in communities of color and the routine exterior maintenance and marketing of Bank of America-owned homes in predominantly white

---

[1] The parties' summary judgment motions remain pending and will be addressed separately. In conjunction with this motion, the defendants filed an unopposed motion to seal certain items, ECF 224, which will be granted. Additionally, Safeguard incorrectly filed its memorandum in support of its motion to exclude expert opinions under a separate docket entry, ECF 203, instead of simply attaching it as an exhibit to its motion, ECF 205. The memorandum has been considered in this Court's adjudication of the motion.

neighborhoods" that cannot be "explained by non-racial factors." *See* Compl. ¶¶ 65, 80, 87, ECF 1.

To reach this conclusion, NFHA measured the number of observed "deficiencies" in REOs in white and non-white communities, ultimately finding "an average of 3.06 more deficiencies among properties in non-white tracts than in white tracts." Rugh Report at 2, ECF 208-2. A "deficiency," for purposes of this case, is the presence of one of 37 criteria developed by the plaintiffs as a proxy for the quality of "routine exterior maintenance, marketing, and [] overall curb appeal of" a particular property. Decl. of Shanna L. Smith, ECF 184-3 ("Smith Decl."). For example, a property might accrue deficiencies for exhibiting features like overgrown grass, damaged steps, missing "For Sale" signs, or other similar problems. *Id.* at Ex. A. The more deficiencies visible on a property, the worse its score. And, on the plaintiffs' theory, the greater the disparity between average deficiencies of REOs in white and non-white neighborhoods, the stronger the evidence of disparate impact and disparate treatment.

As this overview suggests, the plaintiffs' top-line conclusions are the product of a bottoms-up approach. First, the plaintiffs identified 37 metropolitan areas with high foreclosure rates across the United States in which to conduct their study. Augustine Decl. ¶¶ 3-12. Next, they developed the 37 criteria against which to score each property. Smith Decl. ¶¶ 3-5. They then dispatched teams of trained investigators to the field to evaluate the deficiencies on pre-identified REOs. Augustine Decl. ¶¶ 14-17. Investigators visited each property in pairs, tallied each observed deficiency on an evaluation form, and photographed each deficiency to document their conclusions. *Id.* ¶ 17. After completing an assignment, investigators returned to a local field office to upload the evaluation results and supporting photographic evidence to a centralized database.

*Id.* ¶ 19. NFHA executives reviewed these uploads for quality control purposes, and in some cases edited the results for accuracy and standardization. *Id.* ¶ 25. Once the results for each of the 1,405 properties currently at issue were uploaded, the plaintiffs analyzed them to compare the effectiveness of the defendants' property maintenance and marketing between white and minority neighborhoods. *Id.* ¶¶ 26-30.

The plaintiffs have retained at least four experts to offer opinions in support of the investigation at the heart of their case. Dr. Michael D. Fetters, M.D., M.P.H., M.A., opined "on the mixed methods methodology used by the plaintiffs to conduct their investigation." Fetters Report at 4, ECF 206-2. Fair Housing Center of Southeast & Mid Michigan Executive Director Pamela A. Kisch offered opinions on the "use of testers and the role of fair housing organizations in uncovering illegal discrimination" and the "design and execution of fair housing tests." Kisch Report at 2, ECF 206-3. Brigham Young University Professor Dr. Jacob S. Rugh, Ph.D., provided a regression analysis for the purpose of attributing the plaintiffs' observed disparities to potential causal factors, concluding that the racial disparity in deficiencies "is highly statistically significant, practically significant, and is not fully explained by" any variable other than race. Rugh Report at 2-3, ECF 208-2. Finally, former A&D Property Services, Inc., Executive Vice President and Chief Financial Officer Deavay Tyler provided a report applying his expertise in the "preservation and maintenance of REOs and post-foreclosure HUD properties, including industry standards, policies, and procedures," to the defendants' management of the REOs at issue in this case. Tyler Report at 2-3, ECF 183-3 Ex. A.

In addition to proffering these formal expert reports, the plaintiffs also introduced the declaration of NFHA Senior Associate Director of Enforcement Lindsay Augustine. Augustine

Decl. ¶ 1. In her declaration, Ms. Augustine explained under oath the plaintiffs' investigation methodology and provided an analysis of the study's results in Microsoft Excel. *See generally* Augustine Decl.

The defendants now seek to exclude the opinions of each of the plaintiffs' proffered experts. They also ask this Court to exclude Ms. Augustine's data analysis as improper testimony for a lay witness.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. A qualified expert may give testimony if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The trial court's core duty under Rule 702 is to ensure that proposed expert testimony is both "reliable" and "relevant." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In *Daubert*, the Supreme Court provided five non-exhaustive factors to guide courts in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique or theory has gained "general acceptance." 509 U.S. at 592-94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x

448, 452 (4th Cir. 2010).[2] Ultimately, however, the inquiry is "a flexible one," with the relevant factors varying with the needs of each case. *Daubert*, 509 U.S. at 594.

For an expert's proffered testimony to be sufficiently reliable, it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (first quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); then quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)). The analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and not supported by the record," is inadmissible. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

For an expert opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591). Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Anderson v. Home Depot U.S.A., Inc.*, No. 14-cv-2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Anderson*, 2017 WL 2189508, at *3 (quoting *Main St. Am. Grp. v.*

---

[2] Unpublished opinions are cited for the persuasiveness of their reasoning only, not for precedential value.

*Sears, Roebuck, & Co.*, No. 08-cv-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n.10.

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). It falls to the court to balance these interests and decide whether the disputed expert testimony "has greater potential to mislead than to enlighten." *Id.*

## III. DISCUSSION

The defendants move to exclude the testimony of Dr. Fetters, Ms. Kisch, Dr. Rugh, Mr. Tyler, and Ms. Augustine. This Court addresses the admissibility of each witness's testimony in turn.

### A. Dr. Fetters

Dr. Michael D. Fetters, M.D., M.P.H., M.A., is the Director of the Mixed Methods Program at the University of Michigan, where he is also a professor of family medicine. Fetters Report at 1. He has served as the Co-Editor in Chief of the *Journal of Mixed Methods Research* since 2015. *Id.* His academic work focuses on social science research methodology, and he has "published over 200 peer reviewed papers and over 50 book chapters, articles, and commentaries," as well as two books, with "two additional books [] under contract." *Id.* at 1-2. The plaintiffs retained Dr. Fetters to apply his expertise in social science research methodology design, sampling,

implementation, and interpretation, as well as mixed methods research methodology, to the context of this case. *Id.* at 2-3.

Dr. Fetters offered three principal opinions: (1) "NFHA conducted a well-designed investigation that would qualify as a rigorous and compelling mixed methods study"; (2) the defendants' experts' critiques of the study mistakenly assumed that the results were intended to be extrapolated to the defendants' entire nationwide stock of REOs; and (3) the "defendants' experts" critiques of the investigation's "methodological design flaws" were "unwarranted." *Id.* at 4-5.

The defendants move to exclude Dr. Fetters's testimony in full because they believe his expertise in mixed methods research methodology—"an approach to investigation featuring the 'integration of qualitative and quantitative approaches,'" *id.* at 5—is irrelevant to this lawsuit which, in their view, relies only upon quantitative, and not qualitative, data, Mem. in Support of BANA Mot. to Strike at 5-6, ECF 208-1 ("BANA Mem."). The plaintiffs, however, offered Dr. Fetters first and foremost as an expert on "[s]ocial science research methodology." Fetters Report at 3. That is precisely the expertise Dr. Fetters's report contributes. And based on his position at the University of Michigan, his extensive scholarship across sociological disciplines, and his position leading an influential social sciences journal, he is well-positioned to provide it. Dr. Fetters's ultimate specialization within the sub-discipline of mixed methods research does not preclude him from opining on general social science methods in which he also has expertise and which are prerequisites to his area of specialization.

Even if Rule 702 confined Dr. Fetters to opining on mixed methods research methodology, the second field of expertise in which he was offered, this Court would still admit his testimony in this case. The mixed methods approach "is 'one generally employed in the social sciences.'" *Coal.*

*for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 295 F. Supp. 3d 540, 553 (D. Md. 2017) (citing *United States v. Hammoud*, 381 F.3d 316, 337 (4th Cir. 2004) (en banc)). As Dr. Fetters has explained in both his report and in his scholarship, "mixed methods research may choose to emphasize one component of the research more strongly than the other." Fetters Report at 8. Some studies are "qualitatively driven"; others are "quantitatively driven." *Id.* (citing Michael D. Fetters, *The Mixed Methods Research Workbook: Activities for Designing, Implementing, and Publishing Projects* 212 (2020)). Alternatively, a "large-scale project[] may focus initially on one component," and later on another, so that ultimately results "may be disseminated" as "empirical mixed methods reports, empirical quantitative only reports, [or] empirical qualitative reports." *Id.*; *cf. Coal. for Equity & Excellence*, 295 F. Supp. 3d at 553-54. Likewise, a mixed methods approach may involve initial data collection via qualitative methods, for example, interviews, followed by a subsequent quantitative assessment of the broader research questions identified in the initial phase. National Institutes of Health, *Best Practices for Mixed Methods Research in the Health Sciences* 5 (2011), https://obssr.od.nih.gov/sites/obssr/files/Best_Practices_for_Mixed_Methods_Research.pdf.[3]

The defendants here do not seem to dispute that the plaintiffs initially deployed a mixed methods investigation that collected both qualitative and quantitative data, but instead argue that because the qualitative data does not ultimately form "the basis for Plaintiffs' claims," the quantitative portion of the investigation can no longer be classified under the mixed methods

[3] The National Institutes of Health selected Dr. Fetters as a member of its "Working Group of 18 individuals" convened to identify best practices "on how to rigorously develop and evaluate mixed methods research applications." *Id.* at 1, 36.

rubric. *See* BANA Mem. at 6. That ex-post reclassification is illogical. For one, Dr. Fetters is opining on the study design as a whole—not interpreting the quantitative results in isolation. For another, the quantitative elements of a mixed methods study remain derivative of a mixed methods study even when presented independently. Finally, the plaintiffs' ultimate emphasis on quantitative data is perfectly consistent with the "iterative" process that defines mixed methods research. *See Coal. for Equity & Excellence*, 295 F. Supp. 3d at 553-54; Fetters Report at 8. Dr. Fetters is thus qualified to provide his opinions in this case both as a product of his general social sciences expertise and his specific concentration in mixed methods research.

As an alternative to excluding Dr. Fetters's testimony in full, the defendants ask the court to exclude certain specific instances of commentary that, even granting his suitability to testify on social science research methodology generally and mixed methods study design specifically, they believe still exceed the scope of his expertise. *See* BANA Mem. at 6-7. Here, however, the defendants quarrel with the conclusions Dr. Fetters reached applying his expertise to the facts at hand. This goes "to [the] weight" of Dr. Fetters' testimony, not its "admissibility," which the defendants may attack through "[v]igorous cross-examination" at trial—not exclusion altogether. *Coal. for Equity & Excellence*, 295 F. Supp. 3d at 555.

For all these reasons, the defendants' motions to exclude the expert testimony of Dr. Fetters will be denied.

**B. Ms. Kisch**

Pamela A. Kisch is "the Executive Director of the Fair Housing Center of Southeast & Mid Michigan ('FHC'), which [she] helped to found." Kisch Report at 1. She has held the position of Executive Director "for nearly 30 years." *Id.* During her tenure she has "assisted in successfully

resolving 95 fair housing lawsuits," most of which "relied on testing evidence." *Id.* In that role, she vetted whether particular "testing evidence[] was sufficient to proceed to litigation," and she has had her methodologies approved by both the U.S. Department of Housing and Urban Development ("HUD") and the U.S. Department of Justice ("DOJ"). *Id.* HUD also contracts with her organization to conduct fair housing tests. *Id.* Ms. Kisch was retained as an expert on the "use of testers and the role of fair housing organizations in uncovering illegal discrimination" and the "design and execution of fair housing tests." *Id.* at 2.

Ms. Kisch offered four central opinions in this case: (1) "Testing for enforcement purposes comports with the meaning and intent of the FHA;" (2) "Plaintiffs' investigation is consistent with traditional enforcement testing and furthers the goals of the FHA;" (3) "social science methodological principles are not required to prove discrimination under the FHA;" and (4) "[r]equiring FHA testing to comport with social science methodological principles, in the manner suggested by Defendants' experts, would frustrate the purpose of the FHA and harm fair housing efforts." *Id.* at 3-4.

As for Ms. Kisch's first opinion, the defendants characterize her testimony that enforcement testing fulfills the purposes of the FHA as an improper legal conclusion. "Expert testimony that merely states a legal conclusion is" inadmissible because it is unlikely to aid the jury in resolving factual disputes. *United States v. Barile*, 286 F.3d 749, 760 & n.7 (4th Cir. 2002). The Fourth Circuit has made clear "that it does not help the jury for an expert to give testimony that "states a legal standard or draws a legal conclusion by applying law to the facts." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011). Some problematic testimony,

however, "can be more carefully phrased to elicit similar information yet avoid a response that constitutes a mere legal conclusion." *Barile*, 286 F.3d at 760.

Ms. Kisch's opinion on the goals of the FHA contains improper legal conclusions, but only in part. The bulk of Ms. Kisch's opinion on the role of testing under the FHA provides historical background on the evolution of FHA claims, explains the variety of ways in which testing is conducted in FHA lawsuits, and contextualizes the role of fair housing organizations in adducing evidence of housing discrimination. *See* Kisch Report at 2-11. This is proper, relevant expert testimony and Ms. Kisch is well-qualified to provide it. The opinion does, however, stray to the province of legal conclusions in some discrete instances. Specifically, Ms. Kisch opines on "the meaning," "intent," and "goals of the FHA," and states further that "HUD, the Department of Justice, and the courts do not require research-based testing to demonstrate violations of the FHA." *Id.* at 2. These are legal conclusions that Ms. Kisch may not offer.

Moving to her second opinion, the defendants contend that Ms. Kisch is unqualified to testify about the relationship between the plaintiffs' investigation and traditional FHA testing because, in their view, this case depends upon sophisticated statistical analysis too atypical of traditional FHA testing to fall within the scope of Ms. Kisch's expertise. In advancing this argument, the defendants overread Ms. Kisch's testimony as opining on the validity of the plaintiffs' *results*, rather than accepting that she merely discusses a subset of their *methods*, which she then compares—and contrasts—with traditional approaches to FHA testing. In particular, Ms. Kisch compares the plaintiffs' methods of conducting training, documenting survey results, and utilizing checklists to similar methods deployed in other fair housing testing. *Id.* at 11-13. These limited and specific opinions require no special expertise in statistics and are squarely within Ms.

Kisch's domain. Ms. Kisch also candidly explains that, because of the plaintiffs' objectives, their "investigation varies from most" FHA tests. *Id.* at 12. That candor is a feature of her testimony—not a bug—and the opinions she offers are limited to the components of the investigation that do mirror the traditional fair housing tests in which she has extensive expertise. The motions to strike this portion of Ms. Kisch's testimony will be denied.

The defendants attack Ms. Kisch's third opinion—that "social science methodological principles are not required to prove discrimination under the FHA"—as another improper legal conclusion. Kisch Report at 3-4. To reiterate, expert "testimony that [] states a legal conclusion is" inadmissible, but often "can be more carefully phrased to . . . avoid a response that constitutes a mere legal conclusion." *Barile*, 286 F.3d at 760. That is the case here. To the extent Ms. Kisch purports to opine, prospectively, on what is "required" to prevail in an FHA claim, her testimony is inadmissible. Kisch Report at 3, 13-19. Most of her testimony, however, discusses testing that, in her experience, has been successful in the past, and compares it to the plaintiffs' investigation. *Id.* at 13-19. Ms. Kisch will be permitted to offer such testimony about the testing conducted in other cases, but must stop short of characterizing it as sufficient to satisfy the FHA or prove discrimination, lest she "invade[] the province of the jury" by telling it "how the verdict should read." *Offill*, 666 F.3d at 175 (quoting Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2003)).

Finally, the defendants object to Ms. Kisch's testimony that subjecting FHA testing to scientific standards "would frustrate the purpose of the FHA" as again offering an improper legal conclusion. Kisch Report at 4. Here too, Ms. Kisch's top-line conclusion is phrased as an improper legal conclusion, but most of her testimony remains admissible. Ms. Kisch's opinion on this point is, in fact, devoted to explaining how "[f]air housing enforcement efforts would be thwarted if

their testing were required to comport with the rigor of scientific methods." *Id.* at 19; *see id.* at 19-21. This conclusion, and the testimony about the practical constraints of FHA testing that supports it, is admissible. *See id.* at 19-21. Ms. Kisch need only refrain from tying it to the purpose of the FHA or other legal opinions.

In sum, the motions to strike Ms. Kisch's legal conclusions will be granted, but the motions will be denied in all other respects.

**C. Dr. Rugh**

Dr. Jacob S. Rugh, Ph.D., is "an Associate Professor of Sociology at Brigham Young University," where he has taught "for nearly ten years." Rugh Report at 1. He teaches both undergraduate and graduate students "in urban sociology, race and ethnicity, and related subjects." *Id.* Dr. Rugh holds a "Ph.D. from Princeton University in interdisciplinary Urban Policy in Public Affairs with an emphasis in the sociology, economics, and public policy dimensions of the 2008 housing foreclosure crisis." *Id.* He is experienced "in using geospatial methods, georeferenced data, and geographic information software and systems of maps, and [has] published work on these subjects." *Id.* More broadly, his academic research has been cited over 2,000 times, including by state and federal courts. *Id.* Some of that work earned him "the John Hope Franklin prize for Best Article on Race, Racism, and the Law from the Law and Society Association in 2016." *Id.* The plaintiffs retained Dr. Rugh to analyze racial disparities in housing and provide statistical and econometric analysis. *Id.* at 1-2.

Dr. Rugh provides the key opinion on the results of the plaintiffs' investigation that forms the basis for their disparate impact and disparate treatment claims. Dr. Rugh's report explains that among "the properties investigated by NFHA, there was an average of 3.06 more deficiencies

among properties in non-white tracts than in white tracts." *Id.* at 2. He also found that in "nonwhite tracts, REO properties [were] 3.3 times as likely to exhibit a high number" of "deficiencies than properties in white tracts," and that "properties in white tracts were 2.9 times as likely to exhibit a low number" of "deficiencies as in non-white tracts." *Id.* He concluded that this racial discrepancy was "highly statistically significant, practically significant, and" could be explained only by race. Indeed, in controlling for as many as "40 other variables," he found "no variable or set of variables that eliminates or comes close to accounting for the racial disparity." *Id.*; *see id.* at 3-4.

Dr. Rugh used the plaintiffs' deficiency data, collected through their in-person evaluations, to conduct his analysis. He measured statistical significance using a p-value of 0.001 (in other words, the odds the disparity is due to chance is less than one in one thousand) and assessed practical significance using Cohen's *d*, which he calculated as .86 (that is, the disparity amounted to almost a full standard deviation—a large effect). *Id.* at 6-7. Dr. Rugh then employed a regression analysis to measure the strength of race as "an explanatory factor" in the outcome of the plaintiffs' investigation. *Id.* at 7.[4] After conducting his analysis, Dr. Rugh concluded that "no other variable or set of variables"—besides race—"can account for most of the racial difference in deficiencies between white and non-white tracts." Rugh Report at 10; *see id.* at 7-17. Race, he found, explained 78% of the disparity in deficiencies—a statistically and practically significant difference. *See id.* at 10. Dr. Rugh later complemented his initial report with a revised report and a supplemental

---

[4] A regression analysis is "a statistical tool used to understand the relationship between two or more variables" that "is often employed in the analysis of data about competing explanations for the relationships among a number of explanatory variables." *In re Titanium Dioxide Antitrust Litig.*, No. 10-cv-0318, 2013 WL 1855980, at *14 n. 14 (D. Md. May 1, 2013) (citing Daniel L. Rubinfeld, *Reference Guide on Multiple Regression, inReference Manual on Scientific Evidence* 305 (Fed. Judicial Ctr., 3d ed. 2011)).

report in which his ultimate conclusions that race is a statistically and practically significant factor in the disparity between deficiencies in white and non-white tracts remained the same. *See* Rugh Revised Report, ECF 208-3; Rugh Supplemental Report, ECF 208-4.

The defendants object to Dr. Rugh's opinion on several fronts, mostly emphasizing arguments also contained in their pending motions for summary judgment. Specifically, the defendants say (1) the data Dr. Rugh relied upon is too flawed to rule in race as the cause of any observed racial disparity; (2) the variables Dr. Rugh controlled for are too incomplete to rule out non-racial factors as causing any observed racial disparity; and (3) even assuming the validity of Dr. Rugh's analysis, he failed to connect any observed racial disparity to the defendants' specific policies. BANA Mem. at 19-34. Safeguard adds that even if Dr. Rugh's opinion is admissible against Bank of America, it is inadmissible against Safeguard because it fails to isolate the properties Bank of America hired Safeguard to service from the ones it did not. Mem. in Support of Safeguard Mot. to Strike at 17-20, ECF 203 ("Safeguard Mem.").

As the defendants' motions for summary judgment make clear, the objections they raise to Dr. Rugh's testimony here are more appropriately reserved for summary judgment or, potentially, trial. The thrust of the defendants' criticism is that the plaintiffs' dataset was too flawed, and the breadth of variables Dr. Rugh considered too narrow, to adequately support his opinion. But under "*Daubert*, a court evaluates the methodology or reasoning that the proffered scientific or technical expert uses"—it "does not evaluate the conclusion itself." *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003) (citing *Freeman v. Case Corp.,* 118 F.3d 1011, 1016 n.6 (4th Cir. 1997)). And the defendants do not dispute the technical validity of regression analysis generally or Dr. Rugh's application of the technique specifically. Instead, they simply argue that his

"calculations," however accurate, "do not support his conclusion." *See id.* That "is a challenge to the proper weight to be given to" Dr. Rugh's testimony, "not to its admissibility." *Id.*[5]

The defendants' argument that Dr. Rugh failed to connect the observed racial disparity to the defendants' policies is also more appropriate for summary judgment. After all, Dr. Rugh did not purport to opine on the defendants' specific policies, and the plaintiffs "do not rely on Dr. Rugh to causally connect the deficiencies they observed with Defendants' maintenance and marketing practices." Opp. to BANA Mot. at 33, ECF 218. An expert opinion, of course, "need not prove the [proponents'] entire case" to be admissible. *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980, at *14. Dr. Rugh's restraint from opining on particular policies is therefore no basis for excluding his testimony.

Finally, Safeguard's assertion that Dr. Rugh's testimony cannot be admitted against it also fails under *Daubert* because it does not address the validity of Dr. Rugh's methodology. That is particularly true in this phase of the litigation, which is specifically "directed at the methodology and validity of the theories on which the plaintiffs' experts' conclusions are based." Mem. & Order, ECF 115; *see* Phase II Case Management Order, ECF 117. Safeguard's argument is also predicated

---

[5] The defendants make forceful objections to the plaintiffs' investigation methodology, but this is certainly not a case in which an expert relied "entirely on unverified data, upon which no reasonable expert would rely" such that exclusion is warranted. *See Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137 (M.D. Pa. 2015) (capitalization altered). Similarly, "'while the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said' that the analysis must be deemed inadmissible." *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980, at *15 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., joined by all other members of the court, concurring)) (brackets omitted). Instead, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore*, 478 U.S. at 400.

on its contention that it is responsible only for 794 of the properties in the plaintiffs' database, which remains a disputed fact—the plaintiffs still "hold Safeguard responsible" for 1,333 properties. Opp. to Safeguard Mot. at 22, ECF 220; *see* Safeguard Mem. at 19.

For each of these reasons, the defendants' motions to strike the testimony of Dr. Rugh will be denied.

**D. Mr. Tyler**

Deavay Tyler has a decade of experience in the property preservation and maintenance industry, serving as the Executive Vice President and Chief Financial Officer for A&D Property Services, Inc., for over nine years. Tyler Report at 1. A&D Property Services "is a property preservation and maintenance company servicing over 8,000 properties in the Greater Chicagoland Area" that "worked as a prime contractor for government-sponsored enterprises (GSEs), banks, and municipalities that were responsible for preserving and maintaining properties after borrowers had defaulted on their loans and after foreclosure, when they became real estate owned (REO) properties or properties awaiting conveyance back to the U.S. Department of Housing and Urban Development (HUD)." *Id.* A&D Property Services worked with Bank of America for around four months in 2011, but ultimately stopped doing business with them. Mr. Tyler was retained "to offer expert opinions on the preservation and maintenance of REOs and post-foreclosure HUD properties, including industry standards, policies, and procedures." *Id.* at 2. He produced two reports, an initial report and a supplemental report.

Mr. Tyler offered six central opinions in his initial expert report. To summarize, he opined that: (1) the plaintiffs' REO evaluation criteria corresponded to industry standards; (2) the plaintiffs properly documented marketing and maintenance deficiencies; (3) the defendants should

have resolved many of the deficiencies the plaintiffs recorded; (4) the defendants' quality control was inadequate, especially in neighborhoods the defendants believed would generate fewer complaints; (5) total maintenance expenditures on a property do not necessarily correlate with the quality of maintenance to that property; and (6) the plaintiffs' point-in-time investigation methodology cannot explain the observed racial disparity in property deficiencies. *Id.* at 2-4. The defendants object to Tyler offering the final three opinions in his initial report. Safeguard Mem. at 7-13.

Mr. Tyler offered six more categories of opinions in his supplemental expert report. Tyler Suppl. Report at 1-2, ECF 183-3 Ex. B. Specifically, he testified that: (1) many of the plaintiffs' REO evaluation criteria were independent of a property's condition at the time the defendants assumed responsibility of the property; (2) the plaintiffs' REO evaluation criteria are independent of the "features of the neighborhood"; (3) vandalism and weather do not explain most of the deficiencies the plaintiffs observed; (4) the "national model of property preservation and maintenance followed by Bank of America" is inferior to the "local model"; (5) Mr. Bryar "lack[s] experience in the property preservation and maintenance industry"; and (6) banks and servicers may have more maintenance and marketing responsibilities than typical property preservation and maintenance vendors. *Id.* at 1-2. The defendants move to strike all but the second and fifth of these opinions. Safeguard Mem. at 13-17. The court now addresses in turn each of the seven opinions the defendants seek to exclude.

First, the defendants move to strike Mr. Tyler's opinion that their quality control was insufficient, particularly in areas where they seem to believe neighbors may be less likely to

complain. *Id.* at 7. Specifically, they seek to strike the opinion Mr. Tyler offers in paragraph 42(b) and the second sentence of paragraph 9(d). *Id.* at 7-8.

In paragraph 42(b), Mr. Tyler opines that vendor self-assessments are an unreliable quality control mechanism and that he reviewed photographs of the defendants' properties that evinced problems a "robust quality control process should have caught." Tyler Report at 18. Mr. Tyler's opinion that self-assessments are an inadequate quality control method is properly based on his industry experience, as is his opinion that a more effective quality control process would have caught the deficiencies he observed. The defendants are free to challenge these conclusions, but their disagreement with them is no basis for exclusion. The motions to strike paragraph 42(b) will be denied.

The second sentence of paragraph 9(d) states that the defendants' quality control issues are "particularly evident in areas where they apparently believe neighbors are less likely to complain." *Id.* at 3. In his deposition, Mr. Tyler explained that this opinion was informed by his experience working with vendors who have prior "property and preservation maintenance experience" generally, not on any materials related to the defendants specifically. Tyler Dep. at 123:10-17, ECF 220-1. Without any defendant-specific evidence to form the basis for this opinion, the court cannot conclude it "is based on sufficient facts or data." Fed. R. Evid. 702(b). The motions to strike the second sentence of paragraph 9(d) will be granted.

Second, the defendants move to strike Mr. Tyler's opinion in paragraph 9(e) that maintenance expenditures do not correspond to maintenance quality, along with related opinions in Section E about the defendants' quality assurance measures. Safeguard Mem. at 9-13. Mr. Tyler's opinion as to maintenance expenditures, like his opinion on the influence of neighborhood

characteristics on quality control, is based only on his industry experience and not on defendant-specific information. *See* Opp. to Safeguard Mot. at 13. That is too generalized a basis for ascribing malfeasance to the specific defendants here. *See* Fed. R. Evid. 702(b); *cf.* Fed. R. Evid. 404. Similarly, in Section E Mr. Tyler testifies that comparatively low financial compensation incentivizes vendors "to cut corners." Tyler Rep. 16-17. Mr. Tyler, however, was "not aware of what Bank of America paid its" servicers, or "what Safeguard pays its subcontractors." *Id.* at 16. Without knowledge of the defendants' actual financial incentives, Mr. Tyler cannot opine on how those financial arrangements may have influenced their behavior. *See* Fed. R. Evid. 702(b). Finally, Mr. Tyler's opinions in paragraph 43 that the defendants' employees engaged in "creative photography" to omit maintenance issues from their reports, and his "three theories . . . as to why," are equally speculative. The court will therefore grant the motions to strike paragraphs 9(e), 38-40, and 43.

Third, the defendants move to strike Mr. Tyler's opinion on the propriety of the defendants' point-in-time investigations as lacking a sufficient basis. Safeguard Mem. at 10. Here again, Mr. Tyler's opinion is based only upon "his years of industry experience." Opp. to Safeguard Mot. at 14. That general industry knowledge, however, does not equip him with specialized experience for opining on which variables actually influenced disparities between the specific housing tracts at issue in this case. Fed. R. Evid. 702(a)-(b). The motions to strike the testimony in paragraph 9(f) and Section G will be granted.

Fourth, and now turning to Mr. Tyler's supplemental report, the defendants move to strike the opinion that "many" of the plaintiffs' REO evaluation criteria are unrelated to property condition at the point of acquisition or should have been addressed within 30 days. Safeguard

Mem. at 13-14. Mr. Tyler's use of the word "many" to characterize his findings—the defendants' principal objection to that portion of his opinion—is a conclusion the defendants are free to challenge on cross-examination, not a ground for exclusion. And his opinion on industry standards for addressing certain criteria is amply supported by his experience and expertise. The defendants' motions to strike this portion of Mr. Tyler's testimony will be denied.

Fifth, the defendants object to Mr. Tyler's opinion that vandalism and weather do not adequately explain the observed racial disparities in deficiencies. This portion of Mr. Tyler's opinion is based on "common sense." Tyler Suppl. Report at 5. But "expert testimony does not help where the jury has no need for an opinion because the jury can easily reach reliable conclusions based on common sense, common experience, the jury's own perceptions, or simple logic." 29 Victor J. Gold, *Federal Practice and Procedure (Wright & Miller)* § 6265.2 & n.14 (2d ed. Apr. 2022); *accord United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995). The plaintiffs fail to explain why expert testimony is needed to supply these commonsense arguments to the jury, so the defendants' motions to strike paragraphs 3 and 10 of Mr. Tyler's report will be granted.

Sixth, the defendants seek exclusion of Mr. Tyler's opinion that the national model of property preservation and maintenance is inferior to the local model. Safeguard Mem. at 14-17. As a threshold matter, this opinion in Mr. Tyler's supplemental report responds to opinions the defendants introduced through Mr. Bryar and is thus proper material for a supplemental report. *See* Tyler Suppl. Rep. at Ex. 1. The testimony is also relevant because it relates to a policy the plaintiffs raise as a possible cause of the alleged racial disparities at issue in this case. As for the merits, Mr. Tyler's testimony is properly based upon his experience and expertise in the property preservation and maintenance industry and his application of that knowledge to evidence he was

provided. The defendants' objections are to Mr. Tyler's conclusions alone and thus provide no basis for excluding his opinion. The motions to strike paragraphs 11-19 of Mr. Tyler's report will be denied.

Finally, the defendants move to exclude Mr. Tyler's testimony that his prior opinion on industry standards is limited to standards in the property preservation and maintenance industry and does not extend to the distinct standards of the property servicing industry. Safeguard Mem. at 17. Mr. Tyler is perfectly well-qualified to explain the differences between the two industries and to articulate the specific application of opinions that he himself has furnished. The motions to exclude Section D of Mr. Tyler's supplemental report will be denied.

All told, this Court will grant the defendants' motions to strike the second sentence of paragraph 9(d); paragraphs 9(e), 9(f), 38-40, and 43; and Section G of Mr. Tyler's initial report, and paragraphs 3 and 10 of his supplemental report. The motions to strike Mr. Tyler's opinions in all other respects will be denied.

**E. Ms. Augustine**

Lindsay K. Augustine is NFHA's Senior Associate Director of Enforcement. Augustine Decl. ¶ 1. She was central to designing and implementing the plaintiffs' investigation in this case. *See generally* Augustine Decl. The plaintiffs did not offer Ms. Augustine as an expert witness, but instead introduced her as a lay witness who, through her declaration, testified about the development and execution of the plaintiffs' investigation. *See id.*

Nevertheless, the defendants move to strike a portion of Ms. Augustine's declaration as improper expert testimony. Safeguard Mem. at 20-23. They argue that, notwithstanding her presentation as a lay witness, she purports to introduce evidence only admissible through an expert.

As such, the defendants say, the plaintiffs' introduction of her testimony after the expert witness deadline is untimely, her failure to provide an expert report is improper, and for both these reasons, the defendants are prejudiced. Moreover, the defendants contend, her testimony is flawed and unreliable.

The defendants specifically object to paragraph 30 and Exhibit G of Ms. Augustine's declaration. *Id.* at 20. In paragraph 30, Ms. Augustine explains that she used Microsoft Excel to isolate the 778 REOs for which Safeguard admits responsibility and analyzed the racial disparities in observed deficiencies among those properties. Augustine Decl. ¶¶ 28, 30. She then narrowed the results to show the disparity when controlling for "the individual deficiencies that Safeguard's expert, Marcel Bryar, agrees are within industry standards." *Id.* ¶ 30. She provided these results in Exhibit G. *Id.* The defendants characterize this as expert—rather than lay—witness testimony because Ms. Augustine "conducted a separate analysis based on data collected during this litigation and relied upon Safeguard's expert, Marcel Bryar, in assessing certain criteria to use in her analysis." Safeguard Mem. at 21.

Lay witness testimony is governed by Federal Rule of Evidence 701. Rule 701 permits lay witness testimony if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Although the distinction between lay and expert testimony "can be a fine one, the key to Rule 701 lay opinion testimony is that it must arise from the personal knowledge or firsthand perception of the witness." *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017), *as amended* (Mar. 7, 2017) (internal quotation marks and citation omitted).

Ms. Augustine's declaration fits comfortably within Rule 701's parameters. First, Ms. Augustine's testimony is based upon her own data analysis of figures with which she had "first-hand experience on the job." *Id.* Second, distilling the plaintiffs' data into summary form, as Exhibit G does, is the only logical means of communicating the factual results of the plaintiffs' investigation to a jury. Third, simple data manipulation in Microsoft Excel, like that required to produce Exhibit G, does not require the kind of expert training Rules 701 and 702 contemplate. Finally, Ms. Augustine may have sliced the data in response to anticipated objections she expected the defendants would rely on expert testimony to raise, but her analysis continued to rest solely upon primary source data gathered in the course of her employment and thus well-within the realm of lay witness testimony. The defendants are free to test Ms. Augustine's lay conclusions throughout this litigation, but their motions to strike her declaration will be denied.

## IV. CONCLUSION

For the reasons explained above, this Court will deny the motions to strike the testimony of Dr. Fetters, Dr. Rugh, and Ms. Augustine. It will grant the motions to strike the legal conclusions contained in Ms. Kisch's opinion, specifically her testimony on the meaning, intent, goals, and requirements of the FHA, but will deny the motions to strike her opinion in all other respects. Finally, this Court will grant the defendants' motions to strike the second sentence of paragraph 9(d); paragraphs 9(e), 9(f), 38-40, and 43; and Section G of Mr. Tyler's initial report, and their motions to strike paragraphs 3 and 10 of his supplemental report, but deny their motions to strike Mr. Tyler's opinion in all other respects. A separate order follows.

2/8/2023
Date

/s/
Stephanie A. Gallagher
United States District Judge